UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **JARI MCPHERSON, JERALD SAMS,** | § | |
| **and DANIEL MARTINEZ,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Case No. 1:20-cv-01223-DAE** |
| | § | |
| **TEXAS DEPARTMENT OF** | § | |
| **PUBLIC SAFETY, and Director Steven** | § | |
| **C. McCraw, in his official capacity,** | § | |
| *Defendants*. | § | |

**PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

Defendants' Motion for Summary Judgment ("MSJ") [#57] against Plaintiffs McPherson, Sams, and Martinez should be denied because the evidence raises genuine issues of material fact for the trier of fact to decide.

## I.  LEGAL STANDARD

"The Fifth Circuit has made it clear that summary judgment is strongly disfavored in Title VII actions."[1] The Supreme Court has "emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts,' which 'are jury functions, not those of a judge.'"[2]

## II.  FACTS OF THE CASE

### A.  McPherson Facts.

This suit arises out of a pattern of harassment, motivated by race, occurring in the CT (Capitol) region of Defendant DPS. McPherson joined DPS in 2002; promoted to special agent in December,

---

[1] *Perales v. Am. Ret. Corp*., No. SA-04-CA-0928 NN, 2005 U.S. Dist. LEXIS 22630, at *38 (W.D. Tex. 2005) (citing *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 190-91 (5th Cir. 2001).

[2] *Fierros,* 274 F.3d at 190-191, (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, (2000))

2016 and was assigned to the Recovery Services Division (RSD) In May, 2018, he was transferred to CID Temple where he remained until October, 2019. During this assignment, McPherson experienced discriminatory treatment by his supervisors, Lt. Oscar Holguin and Capt. Steven Schwartz, creating a hostile work environment in the denial of training opportunities, the denial of work assignments and disparately intense scrutiny of his time sheets, his investigative reports and the issuance of a C1 regarding his use of his service vehicle. DPS supervisors tried to block his transfer to the CID office in Austin where he experienced discrimination in his assignment to 7C1, a segregated unit, in the denial of a requested transfer to unit 7C2 and in the disparate and harassing application of the 50-mile radius rule for the use of his service vehicle.

Shortly after his arrival in Temple, Lt. Holguin told him that, in CID Temple, the DPS policy on vehicle usage was not strictly followed: he was told that he could use his service vehicle for personal use: "it's not unusual for [you] to go to your child's school in case of an emergency in certain situations, it happens." Ex9(p. 53.) He was also told that it was not necessary to account for personal errands on his weekly report, saying "it all comes out in the wash." Ex10(pp.5-6,10) Holguin himself would leave the office every day at approximately 8:00 am, to take his daughter to school and did not hide what he was doing. This was reflective of a relaxed environment for time accountability. Ex10(p. 9)

McPherson was the only African-American in the Temple CID unit. Schwartz directed Holguin to closely monitor McPherson's activities, creating a hostile work environment. He told me that, he [Schwartz] did direct me to monitor him. Ex9(pp.39, 48, 67) Holguin even requested another agent, Chad Buenger, to perform surveillance on McPherson, but Buenger refused. Ex10(p.8) Schwartz also discussed placing a tracking device on McPherson's vehicle to monitor his travels. Holguin stated: "I told Captain Schwartz that it was against policy to do that, that I didn't agree

and I am not going to do that to one of my agents." Ex9(pp. 77-78) Schwartz had never discussed the use of a tracking device on any of the vehicles operated by white agents. Ex9(p.78)

The weeklies document the duty hours of work by special agents and works on the honor system: the agent inputs the time he arrives at work and when he goes home. In spite of the relaxed system of accountability, Holguin was told to monitor McPherson's weeklies, and to collect McPherson's gas receipts (to compare the time he purchased gas to the times he claimed to be at work) Ex9(pp 39, 42) This level of monitoring was limited to McPherson and did not apply to any of the white agents. Ex9(pp. 40-41)

This monitoring came to a head on October 2, 2018 when McPherson left work to pick up his daughter and take her to a doctor's appointment. He drove his service vehicle to Killeen, picked up his daughter, took her to a doctor's appointment and returned her to school. He then returned to work. [#57-1, Appx. Ex. 2 pp 115-118]. After Holguin learned of his absence, he examined his weekly which did not reference the time spent on this personal errand. Ex9(pp. 67-68)

Because this practice was consistent with what Holguin had told McPherson about a relaxed environment for their accountability, Holguin verbally counseled McPherson about the personal trip and the need for accurate time reporting. Ex9(p. 59) Holguin knew that other agents, white and Hispanic, had engaged in the same conduct, using their service vehicle for personal trips, and they had not been disciplined. Ex9(pp 56-57) He believed that verbal counselling was sufficient to end the matter. Ex9(p. 59)

Captain Schwartz told Holguin to upgrade the sanction to a written counselling, an HR-31 (a warning) Holguin did not agree with this upgrade, but Schwartz was adamant about increasing the discipline. Ex9(p. 64-65)

When McPherson appealed the HR-31, Schwartz retaliated, and enlarged the investigation into the use of his service vehicle to transport his daughter. Schwartz instructed Holguin to obtain

footage from the school surveillance video to confirm his arrival and departure times and to determine if a service vehicle had been used. Ex9(pp. 42-43) Holguin objected, stating that "I'm not going to be checking somebody. I gave everyone the benefit of the doubt" Ex9(p. 43) According to Holguin, "I totally disagreed with what Schwartz was doing." Ex9(p. 79) Holguin further acknowledged that he had never been asked to collect video surveillance on white special agents. Ex9(p. 44)

Schwartz obtained this videotape; he met with McPherson; McPherson was confused about the date and denied using his service vehicle to pick up his daughter. (In a later interview, McPherson stated that he may have been confused about the date, and thinking of another appointment when he used his private vehicle. Ex10(pp 10-13)

Schwartz issued a C1 complaint. This is a significant sanction because it goes into McPherson's permanent DPS personnel record and must be reported whenever an agent applies for a promotion. The Complaint contained four allegations: 1) failure to properly reflect duty hours, 2) failure to report for duty as assigned, 3) using his state vehicle for an improper purpose, and 4) being untruthful when interviewed by Schwartz about the use of his state vehicle. Ex10(pp 1-3) The C1 was reviewed by the Office of the Inspector General which did not sustain the first two allegations but did sustain the last two allegations and McPherson was given four days off without pay. Ex10(p. 15)

McPherson's evidence also identifies other acts of harassment at CID Temple. Schwartz insisted that Holguin's evaluations of McPherson be downgraded even though Holguin did not agree with these changes. Ex9(pp. 74-75) McPherson's investigatory reports were reviewed by Schwartz and returned for re-writing more frequently than the reports written by white special agents. Ex9(pp. 70-71) Once, McPherson mimicked the report writing style of a white agent: the white agent's report was accepted, but McPherson's report was rejected. Ex9(pp. 72-73)

McPherson was also denied training and job assignments. He was not allowed to attend raid entry classes. [57-1, Appx21(p. 77)] He applied for an open position of sex offender compliance officer; even though Holguin highly recommended him for that position, his application was denied by Schwartz. Ex9(p.90) On another occasion, I was instructed by Captain Schwartz not to [allow McPherson] to partake in investigation surveillancing; the ostensible reason was that he needed to complete his reports, but Schwartz had never precluded any white agents from participating in active investigations because of the need to complete reports Ex9(pp. 83-87) In an effort to leave this hostile work environment, McPherson transferred to the CID Austin office in October, 2019. According to Holguin, he felt that he was being singled out and he was in a work environment that was inadequate for him. Ex9(pp 92-93) Holguin agreed with this assessment, stating:

> Q:     What about towards McPherson, [did you believe] that he was being discriminated against because of his race?
>
> A:     At the time, that's my opinion. And, yes, he was. And I didn't agree with what was happening and I should have done something about it.
>
> Q:     I understand. Because you believed that Mr. McPherson was being treated less favorably than his white similarly-situated co-workers.
>
> A:     At that time Ex9(p.89)

After transferring to Austin, McPherson filed an EEOC complaint against Captain Schwartz with the DPS; when this was denied in March, 2020, McPherson filed a federal EEOC complaint. Ex11

Before filing the Charge, McPherson discussed it with Captain Koenig; as agent of notice, Koenig was required to inform OIG and the EEO officers of the charge, but he took no steps to report as an agent of notice as was his duty. Ex12(pp. 43, 50.)  But Koenig also discussed the charge with Captain Schwartz. Ex12(p. 41.)

5

After McPherson transferred to the CID unit in Austin, the pattern of discrimination continued. There are three CID units in the Capitol region: 7C1, investigations, 7C2, countersurveillance, and 7C3 threat to life. Plaintiff Danny Martinez (Lt.) was his immediate supervisor in 7C1, and all three units were under the command of Captain Mark Koenig. Initially, Captain Koenig tried to block McPherson's transfer. Ex12(pp. 85-86.)   McPherson specifically asked Koenig for assignment on 7C2, an assignment that fit his skill set (two years investigative experience in RSD and two years investigative experience in CID Temple) and his desired career path; nevertheless, his request was denied and he was assigned to 7C1.

At this time, Unit 7C1, unlike the other capitol CID units, consisted of only minority agents. Indeed, Lt. Martinez, who was in charge of 7C1 testified:

> My squad was a segregated squad. I had all the black agents in my squad. We had more work hours. We were denied training opportunities. We were denied promotion opportunities . . . We were mocked about by the [name of] 7C1 squad, meaning that you needs to have a C1 [Complaint in your file] in order to be placed in 7C1. [57-1, Appx139(71)]

Martinez later filed an EEOC Charge of Discrimination (dated April 1, 2022) asserting that 7C1 consists of minorities. Ex13

The ostensible reason for denying McPherson's request was that he lacked capital investigative experience. Two months later, when a position opened up on 7C2, McPherson's request to transfer was denied, and Nathan Head (white), with no experience in investigations was given the position. One of the reviewing officers, Major Gabriel Ortiz, acknowledged that McPherson had superior credentials to Head. Ex14(p. 45) After McPherson was transferred to 7C2 in July 2020, other white troopers, with no investigative experience, were directly assigned to 7C2. [57-1, Appx22-23(pp. 80-82)]

Another form of retaliatory behavior was the enforcement of the 50-mile restriction on the use of his assigned vehicle. When he transferred to Austin his residence was Killeen, just a couple of

miles over the 50-mile limit from his Austin duty station. Initially, Captain Koenig told him not to worry about it [57-1, Appx7(pp 20-21)] Later, Lt. Martinez authorized him to park the vehicle at the firing range in Florence, within the 50-mile radius. [57-1, Appx7(p 19)] This authority was later rescinded, and he was required to use his personal vehicle. This retaliation took place after he engaged in protected activity by filing his Charge of Discrimination since other white individuals are not required to follow the 50-mile policy. [57-1, Appx11(p37)]

Other white employees were allowed to drive beyond the 50-mile limit [57-1, Appx22(p78)] The Department also allowed white officers to skirt the policy by claiming mobile travel trailers as their permanent residence. Ex15(pp.15,24,34)

**B. Sams Facts.**

Plaintiff Sams (Sams) has served as a commissioned officer with Defendant DPS for more than 26 years. During said period of public service, Sams has always achieved a "meets expectations" or above rating on each of his annual performance evaluations, and has also received special recognition for his work on numerous occasions, Ex22(**168:22-25, 169:1-5**) On or about October 2017, while assigned and working in the DPS Mounted Patrol Unit Sams was falsely accused of making questionable leadership decisions by alegedly over working the White officers within the Mounted Patrol unit, Ex4(**76:21-25, 77:1-11**) Sams at that time was a corporal and had no supervisory authority over any Troopers at all. Following that allegation, Sams was demoted by Highway Patrol Chief Ron Joy, a White male**, [#57-1,Appx102]**. During the period 2017 to 2020, Sams consistently sought written/evidentiary justification for being subjected to said demotion and was never provided any explanation or justification since Sams started asking to the present date, Ex4(**79:5-25 - 80:1-18**) Chief Joy has a history of using the "N" word (Nigger) in his pre-DPS life but can't remember how old he was when he last used it, Ex23(**182-183**) Louis Sanchez, former Deputy Inspector General **DPS** testified at his deposition on 2/1/23 that his office received a lot of

allegations from other people that they felt Chief of the DPS Highway Patrol Ron Joy treated minorities, specifically Black males differently. Sanchz also testified that he thought it was fair to say that the DPS is not making public announcements of opposition against discriminatory practices and that tends to nurture and tolerate that kind of conduct, Ex24(**62:15-25, 63:1-25, 64:1-21, 38:7-14**) During his deposition Major Chris jones testified that he feels "Institutional Racism" exist in the **DPS** and that there are now "zero" African Americans in the DPS Mounted Unit, Ex25(**238:22-23, 239:1-17, 244:21-25, 245:1-25**)

During the period 2014-2017, due to Sams's experience he ran point on developing the Standard Operational Procedures Manual for the DPS Mounted Unit, and was part of the ongoing process of editing the original draft,  Ex22(**30:6-10, 27:3-25 - 28:1-15, 30:2-10**) The DPS adopted and implemented said Manual, Ex22(**27:8-19**) On or about September 2018, Joe Ortiz, Regional Commander (White male) of the **DPS** accused Sams of attempting to turn the DPS Mounted Unit into a "Buffalo Soldiers Unit", Ex4(**50:5-25 – 51:1-22**) Sams denied such an allegation. Ortiz has produced no evidence to support his allegation against Sams that Sams was attempting to turn the **DPS** Mounted Unit into a "Buffalo Soldiers Unit." During the period of 2017-2020 Sams found the series of unlawful discriminatory actions by **DPS**, beginning in 2017 (with his demotion), to include but not limited to the unsupported allegation by his supervisors of attempting to turn the **DPS** Mounted Unit into a "Buffalo Soldiers Unit", failure to promote Sams to Sergeant twice, harassed by supervisor for not shaking the hand of a White co-worker in a "traditional way", false accusations by supervisors and White co-workers of abusing horses, being stripped of duties as an instructor in the Mounted Unit, being subjected to two investigations for the same false accusations by White co-workers, each investigation concluded that the accusations were not sustained but Sams was demoted from his position as Corporal based on said false accusations notwithstanding.

A White female Trooper sent a racially offensive and insulting image to Sams and Trooper Starks. Ex26

Said above enumerated conduct was racially offensive, harassing, and created a racially hostile work environment. Ex4(**82:24-25, 83:1-25 – 84:1-25**) On or about November 2017, Joe Ortiz, Commander of DPS region 7, told Sams, *"can't you see what the perception is with all of these African Americans that are on the Mounted Unit".* Ex4(**51:4-22**) Major Chris Jones, during his deposition testified that he felt Sams's communication to him that the DPS environment was racially hostile was a fair description of the DPS environment.

On or about July 2018, Jeremiah Richards, Captain over the DPS Mounted Unit took a picture of Sams while Sams was trimming a horse's hooves. Captain Richards texted that photo to his friend. Captain Richards then read out his friend's response, stating while laughing, "I have never seen a black man doing that before." Sams was offended by Captain Richards's statement and behavior as racially derogatory, belittling, hostile, and offensive. On or about October 2018, Sams filed a complaint against Captain Richards with the DPS OIG for racial discrimination. Ex27. On or about January 15, 2020, approximately fifteen (15) months after Sams filed his complaint of discrimination, the DPS OIG provided a written response pertaining to said complaint *sustaining Sams's complaint of racial discrimination against Captain Richards*. Ex28 On or about July 2018, Captain Richards announced that the DPS will soon post for filling a permanent Sergeant supervisory position for the DPS's Mounted Unit. Said position was posted in September 2018, Ex29 Sams applied for that Sergeant position and was not selected. A lesser experienced White male with less seniority and less qualifications was selected for that Sergeant position Ex22(**78:10-25, 79-89:1-4**) Richards, during his deposition, could not cite any documentation which he relied upon in support of his selections of Davenport over Sams other than what Davenport presented in his HR-113 form. Richards admitted that Davenport was never a member of the Mounted Unit, as

was Sams prior to his selection Ex22(**78:21-25, 79:1-12**) Sams led the Mounted Unit of those who were most highly skilled Ex22(**25:7-10**) No one top to bottom had superior skills to Sams' regarding training or instruction of the horses or Mounted Troops, Ex36(**20:15-25, 21:1-13**) Sams was denied said position because of his race, African American and out of retaliation for opposing Captain Richards racially disparaging comments and actions against Sams while he was cleaning a horse's hooves. Captain Richards at all times material hereto was supervisor over the DPS's Mounted Unit. On or about October 2018, Sams filed another complaint against Captain Richards for race discrimination with the DPS OIG for improperly interfering with Sams's application for promotion to the posted Sergeant position over the DPS's Mounted Unit, as referenced above, Ex29 On or about March 17, 2020, the OIG issued its finding and decision not sustaining Sams's complaints of race discrimination and retaliation against Captain Richards stating in part *"The information obtained failed to reveal misconduct by Captain Richards. However, the investigation identified the potential for improvement that will be addressed through training."* Ex31

Captain Richards intentionally interfered with and obstructed Sams from being selected for said promotion into the position of Sergeant for the DPS's Mounted Unit Ex32(recording: **time marks 3:30-4:24, 6:30-11:08, 10:27-16:20, 27:00-29:48, 29:50-31:14, 33:00-34:24**) Major Katie Conley stated in her OIG interview the following regarding Captain Richards' inappropriate and wrongful behavior causing Sams not to be selected for that Sergeant's Position over the Mounted Unit: 1. *Use of unacceptable scoring methods which has no place in law enforcement scoring* Ex32(recording: **time mark 6:30-10:50**). 2. *Sams' disciplinary history should not have been discussed with the other board members by Captain Richards as same was not provided by HR* Ex32(recording: **time mark 36:27-37:35**). 3. *Captain Richards giving marginal ratings to Sams resulted in improper influence over the other two board members causing an unfair evaluation of Sams application for promotion* Ex32(recording: **time mark 6:30-11:08**). See also

Ex33(recording: **time mark 17:14-18:00)**. The TXDPS promotion boards are 100% subjective Ex32(recording: **time marks 3:30-4:24)**. Richards gave Sams a marginal rating improperly influencing the other two (2) board members resulting in low promotion marks and the non-selection of Sams for said promotion. Major Katie Conley stated during her interview that Richards discussed Sams disciplinary record and that same was not proper and wrong.  Captain Richards intentionally engaged in said unlawful discriminatory conduct because of Sams's race, African American and/or in retaliation for Sams's engaging in protected activity (complaining against Captain Richards racially discriminatory conduct). On or about July 2019, said Sergeant position for DPS Mounted Unit was posted again. This time DPS prohibited applications for promotion into said position and instead allowed only transfers without any legitimate work-related reason for that restriction. That second Sergeant position was also filled by a person outside of Sams's protected class. The selected person was less experienced and less qualified than Sams as that selected person had no experience with horses or the Mounted Unit**.** This unlawful discriminatory employment practice disparately and intentionally denied/prevented Sams from any possibility of being promoted into said position for reasons of Sams's race and/or retaliation for Sams's protected activities.

Major Jones testified at his deposition that it is possible, likely and probable that the transfer method used to select Wong instead of Sams to fill the Mounted Unit's sergeant's position to prevent Sams from being selected for the sergeants' position, Ex25(**204:25 - 209:1-5)** During the period of the second posting of the Sergeant position, Sams requested through Captain Rodriguez, supervisor over the DPS Mounted Unit, that Sams be allowed to apply for said position. DPS denied Sams's request without any legitimate work-related reason being provided. Sams was again denied promotion into the Sergeant position within DPS's Mounted Unit for reasons of his race and/or in retaliation for engaging in protected activity.

### C.  **Martinez Facts.**

**1.**     **Martinez's Employment Prior to Capitol CID – 2007 – September 2019**

A native Texan, Martinez honorably served in the U.S. Marines (5 years active duty and 3 years in the reserves)[3] followed by a career in law enforcement with DPS starting in 2007 that continues to this day. Ex2(p.10) Martinez sustained multiple injuries during his time in the Marines, both physical and psychological, that continue to impact Martinez to the present day. Ex2(p.12) Martinez notified DPS of his medical conditions and disabilities on multiple occasions. Ex2(p.12)

Martinez promoted to Lieutenant in 2015. Ex2(pp.28-29) Martinez supervised 6-8 agents and worked successfully with other law enforcement agencies in El Paso, including the Texas Anti-Gang ("TAG") Center; that Martinez helped start and develop. Ex2(p.30)

Martinez had no problems other personnel except with Captain Heather Krueger, who Martinez observed had a problem with Hispanic males in positions of authority (Ex2(p.100)) given Martinez's observation that Capt. Krueger engaged in favoritism toward white males over Hispanics and also referring to several Hispanic males, including Martinez, using the derogatory term, "machistas," among other racially disparate actions.[4] Ex2(pp.99-100) Martinez did his best to avoid Capt. Krueger's racist attitude from affecting his work ((Ex5(¶17)), however, Capt. Krueger made that impossible by falsely accusing Martinez with misconduct that has been misused and misrepresented by Capt. Krueger and others within DPS as a pretext to harass, discriminate, and retaliate against Martinez. Ex5(¶¶1-11,15-21)

---

[3] Ex2(p.10)
[4] Martinez complained to Maj. Byrd and Capt. Sanchez in 2017 and 2018 that Capt. Krueger was racially discriminatory against Martinez by making false allegations against Martinez, for example, that Martinez was taking racially disparate actions against employees that were not Hispanic or did not speak Spanish, that Martinez was lying, and that Martinez was mistreating his employees- all of which were not based in fact. Ex5(¶17)

In short, Martinez and two other DPS employees, while off duty, agreed to assist another off-duty DPS employee with a civil matter involving retrieving personnel property associated with court-ordered restrictions related to a divorce. Ex5(¶1) During the process, Martinez did not engage in any illegal or criminal behavior, was not arrested or threatened with arrest, and only acted with legal consent. Ex5(¶¶8-9) There was a disagreement between Martinez and one El Paso County Sheriff's Office ("EPCSO") Deputy, but it was verbal and when the Deputy directed Martinez to leave, Martinez complied without incident or delay. Ex2(p.60), Ex5(¶9) Martinez completely disclosed his actions to both his supervisor, Capt. Sanchez, before Capt. Krueger arrived (Ex2(p.62), Ex5(¶2), and then to Capt. Krueger in a single conversation with Martinez and the other off-duty DPS personnel there. Ex5(¶1) That evening, Capt. Krueger made no accusation of lying or any other accusation of misconduct. Ex5(¶3) It was not until several months later that Martinez learned that Capt. Krueger accused Martinez of lying to her. Ex5(¶4) Capt. Krueger continues to this day to misrepresent that Martinez lied to her about what Martinez and the others did to the vehicle. [#57-1,Appx160(¶2)], Ex6(p.45), Ex7(pp.53-54)

The false and misrepresented allegations by Capt. Krueger have been used to support the issuance of a permanent disciplinary action on Martinez's DPS employment record, referred to as a C1 (Ex8(p.10)); deny Martinez a hardship transfer ADA accommodation request on 12/18/20 (Ex2(p.100,111-114)); and deny Martinez two promotions to Captain (one in September 2020 and the other in November 2021). Ex6(pp.63-64), Ex7(pp.54,82,85-87,109) Martinez initiated an appeal to the C1, but feeling the futility of fighting the system, Martinez decided instead to transfer to the Capitol to start fresh without Capt. Krueger's negative influence over his career, or so he wrongly hoped. Ex5(¶35) It is important to point out that Martinez's C1 does not include a

sustained finding that he lied to anyone (Ex8(p.10)), much less Capt. Krueger, despite Capt. Krueger's repeated and continued assertions defaming Martinez as a liar.[5]

## 2.    <u>Martinez's Time At Capitol CID – October 2019-November 2022</u>

Upon arrival, Martinez began to experience multiple negative indicators that the Capitol was not going to be as positive an experience as he had hoped. These observations when viewed separately as they were divulged over time to Martinez, did not have a substantial impact on Martinez, however, when viewed as a whole over time, became unbearable and impossible to ignore prompting Martinez to report and attempt to rectify. Ex5(¶36)

The following is a list of Martinez's observations and negative experiences, all of which were racist, retaliatory, sexual, or harassing:

- On his way into work for the first day, 10/15/19, Lt. Chris Hanson (white), informed Martinez that he would be supervising a black employee, Plaintiff Jari McPherson, that recently transferred to the Capitol from Temple, Texas and that Martinez should be careful because McPherson "plays the race card" since McPherson had filed a race discrimination complaint against Captain Schwartz, Ex2(p.150)
- Upon arriving at work that first day, Martinez's new supervisor, Capt. Mark Koenig, changed Martinez's assignment that had been discussed on the phone prior to Martinez's arrival in Austin from the newly created 7C3 Life Threat Prevention squad to the 7C1 Criminal Investigations squad, Ex2(pp.65-67)
- During the first day, Martinez observed that every black employee under Capt. Koenig was assigned on his 7C1 squad, or put another way, the other two squads had no black employees, Ex2(pp.71,77,90)
- Shortly before arriving in Austin, Martinez was aware that Koenig had shifted employees around between the three squads, however, it wasn't until Martinez arrived in Austin that he realized that the switches that Koenig had made resulted in every black employee ending up only on 7C1, Ex5(¶37)
- The only other employee on Martinez's 7C1 squad was an Italian immigrant with English as his second language, Ex2(p.77), Ex12(p.107)
- Capt. Koenig had denied Plaintiff McPherson's (who, being black, had been assigned to 7C1) multiple requests both before and after arriving in early October, 2019 to be placed on 7C2. Ex12(p.113) Capt. Koenig based his denial on there being no vacancy on 7C2. Ex12(p.64,78) However, that was not true as reflected on Capt. Koenig's org chart effective at the time McPherson arrived and Martinez's first day, Ex12(p.106), Ex18

---

[5] [#57-1,Appx160(¶2)], Ex6(p.45), Ex7(pp.53-54)

- After Capt. Koenig had allowed McPherson to drive his state vehicle from home for several weeks even though Koenig knew that McPherson lived only a couple of miles beyond the 50-mile policy limit, Capt. Koenig directed Martinez to tell McPherson that he was no longer allowed to drive his state vehicle unless he moved his residence to within the 50-mile limit, Ex5(¶30)

- Capt. Koenig also denied McPherson a spot on 7C2, under Lt. Hanson, alleging that McPherson needed training performing criminal investigations of the types of crimes that happen at the Capitol (Ex12(pp.60,63)), even though McPherson was not a new special agent and had DPS training as a criminal investigator, yet 2-3 months later (in Dec 2019) Capt. Koenig assigned a newly promoted white special agent, Nathan Head, to 7C2 that had no DPS criminal investigation experience at the Capitol and did not have the recent counter-surveillance experience hat McPherson had, Ex12(pp.63,69)

- Martinez observed in late 2019 and into 2020, when two new special agents came to Capitol CID under Capt. Koenig (Patrick Alonzo-black and Nathan Head-white), Capt. Koenig assigned the white agent to 7C2 and the black agent to 7C1, continuing and increasing the fact that only 7C1 had black special agents. Ex12(p.111) There was no legitimate reason for these continued racially segregated assignments,

- Martinez's 7C1 squad had a majority of its special agents with C1 disciplinary actions which remain permanently in their personnel files, while the other two squads did not, Ex2(p.71), Ex12(p.112)

- Martinez's 7C1 squad were harassed by being disparaged audibly as the C1 squad by the others on 7C2 and 7C3 under Capt. Koenig throughout 2019-2021 and Koenig knoew about this but did nothing to stop it, Ex2(p.71), Ex12(pp.110-111)

- Martinez's 7C1 squad were given disparately heavy work assignments compared to 7C2 and 7C3 by Capt. Koenig and Lt. Hanson throughout 2019-2021,

- Martinez's 7C1 squad were given disparately fewer days off and less holidays off, denied training, denied promotional opportunities than 7C2 and 7C3 by Capt. Koenig and Lt. Hanson, or put another way were required to work more days in a row without a break throughout 2019-2021, Ex2(p.71)

- Martinez's black employees Patrick Alonzo (black), Dori Livingston (black), Chase Oduwole (black), and McPherson (black) complained to Martinez of race discrimination against Capt. Koenig and Lt. Hanson in 2020 prior to Martinez's complaints in June 2020, Ex2(pp.86,89,125)

- McPherson did fantastic counter-surveillance work during the George Floyd protests in the first half of 2020 (no one had measurably better production and tangible results than McPherson even though McPherson was not on the counter-surveillance squad, 7C2), Ex12(p.94) but was not acknowledged or honored (Ex15(p.260)), while the non-black employees on Hanson's 7C2 squad were later acknowledged and honored for less impactful undercover work compared to McPherson,[6] Ex12(pp.92,93), Ex15(p.258)

- Lt. Hanson repeatedly sent racially offensive and harassing texts and pictures on a DPS work sponsored communication platform and Capt. Koenig, who received these offensive texts failed and refused to address and stop them throughout 2019-2021, Ex2(pp.125-127), Ex5(¶22), Ex15(p.117)

---

[6] McPherson finally received some recognition of his good work, but it was not until after Martinez reported complaints or race discrimination and after McPherson was finally transferred to 7C2. Ex3(pp.145-146)

- Martinez complained verbally to Capt. Koenig on June 8, 2020 about the racial discrimination he was observing from Capt. Koenig and Lt. Hanson in an attempt to address the problem, but Capt. Koenig was not receptive to the complaint, Ex2(p.86), Ex19(p.2)

- Martinez then complained to DPS EEO representative, Nathaniel Haddox, in writing on June 10, 2020 and then verbally on June 11, 2020, where Martinez told Haddox about his own racially disparate experience as well as those of his squad. Ex2(pp.84-86), Ex19 DPS did not investigate, interview Martinez, or otherwise let Martinez know what it was doing or not doing with his complaint until two years later, after Martinez had filed suit against DPS. Ex2(pp.101-103)

- McPherson complained about consistently being denied a spot on 7C2 for pretextual reasons while non-black employees were assigned to 7C2 from October 2019 to July 2020, Ex2(pp.148-149), Ex3(p.46), Ex12(pp.69-70)

- On 12/18/20, DPS denied Martinez a hardship transfer back to El Paso in writing without explanation. Ex20(p.4) Martinez had made the request explaining in writing that he was experiencing complications with his disabilities (physical and psychological) impacting his ability to both work and care for his family in Austin. Ex20(pp.2-3) DPS did not provide him with an interactive process. DPS verbally told Martinez that it would not transfer him to El Paso as a Lt. because of the EPCSO controversy, but that DPS would agree to transfer him back to El Paso if he took a voluntary demotion. Ex2(pp.118-119), Ex5(¶¶10-11)

- In January 2021, Martinez's admin assistant, Brenda Helton, filed complaints of harassment and discrimination against Lt. Hanson, Lt. Saldivar, Marisela Reynaga, and Victor Bibliosambolin (who was the Italian member of 7C1) for their mistreatment of her and their degrading comments about Martinez and the black members of Martinez's 7C1 squad. Ex21

- Martinez and Justin Murphy (black) saved a man's life by talking him out of jumping off of a tall building to his death in Dec. 2020 and instead of receiving an award for this valiant service, Hanson and Koenig took no action on the nomination for the award, Ex35, Ex12(pp.179-183), Ex15(pp.262-264)

- Lts. Hanson and Saldivar told Martinez on 8/3/21 that they could not trust Martinez because of Martinez's complaints of discrimination to EEO/OIG and that they were upset with Martinez because they believed that Martinez had coached his admin, Helton, to file her complaints against Hanson and Saldivar. During this meeting both Hanson and Saldivar were verbally loud and abusive to Martinez. Ex5(¶12)

- On 8/11/21, Major Ortiz called a meeting with Martinez's new Captain, Ralph Ohland, to discuss the intended resignation of Martinez's admin, Helton, who had been run off by the other Lts. and others after Helton had filed complaints against them and DPS's OIG was not taking her complaints seriously. OIG later did not sustain Helton's complaints. Martinez explained to Major Ortiz (who had been Capt. Koenig's supervisor since before Martinez arrived at the Capitol), that Helton, Martinez, and Martinez's squad members were continuing to experience the on-going hostile work environment in the Capitol region and that Hanson and Saldivar had just informed Martinez that he could not be trusted because Martinez filed EEO/OIG complaints. Maj. Ortiz agreed with Martinez that hostile work environment issues needed to be addressed, but Maj. Ortiz remained silent on Martinez report about Hanson and Saldivar not trusting Martinez. Instead, Maj. Ortiz told Martinez that in the future, he preferred to be informed about any complaints of

discrimination prior to those complaints being reported to EEO or OIG. Maj. Ortiz then went on to justify OIG's handling of Helton's complaints without explaining that anything would be done to rectify the harassment and racial disparities. Ex5(¶13)

- On 10/21/21, Capt. Ohland called a meeting with his three Lts., Martinez, Hanson, and Saldivar, to "hash out" the issues between them. Hanson and Saldivar repeated their lack of trust of Martinez because of his complaints to EEO and also conveying more false allegations against Martinez. Martinez reminded them all that it was Saldivar and Hanson that had been harassing employees and not reporting violations according to their duties as "agents of notice" and that Martinez and his squad were continuing to be subjected to retaliatory actions and a hostile work environment. Ex5(¶14)

- During November 2021, Martinez tried to promote to Captain again, but was denied. Capt. Krueger should have recused herself (Ex5(¶38)) given her history of consistently taking adverse actions against Martinez and being a respondent on multiple discrimination and retaliation complaints by Martinez from 2017 through 2020. During the board, none of the panelists brought up Martinez's C1, which struck Martinez as odd, since it was a part of his application and was the only negative aspect of his employment performance or conduct. Ex5(¶15)

None of Martinez concerns were addressed. Ex5(¶16) Instead, if anything, only time passed bringing some distance between prior forms of harassment, but there was never any evidence or sense that any of the harassment, discrimination, and retaliation had been confronted, addressed, or eliminated; thus leaving a concern for Martinez that it could and would return at any time. Ex5(¶16)

### 3.    Martinez's Return to El Paso – November 2022

In September 2022, the first Lt. position finally came open that Martinez qualified for since his hardship request was denied in December 2020 and his 2-year commitment expired in October 2021. Ex2(pp.34-35) Because Martinez was the only person that put in for that El Paso Lt.'s position, DPS could not deny Martinez the transfer. Ex5(¶39)

Upon Martinez's return to El Paso, although Martinez was thankful not to have to interact with Krueger, it was unsettling that DPS had reorganized the office, with Krueger's participation, just before Martinez arrived ensuring that Krueger would not be required to work with or come in contact with Martinez. Ex5(¶40), Ex6(p.72)

17

Since Martinez has been in El Paso, he has performed award winning work and has had no conflicts or confrontation with the EPCSO or any other agency (Ex2(pp.143-144)); contrary to DPS's pretextual assertions that Martinez's return to El Paso would engender.

## III.   LEGAL ARGUMENTS

### A.   Martinez's Legal Arguments

**Martinez Denial of Promotion – Nov. 2021 – Disability Discrimination or Retaliation**

Martinez was denied a spot on the Captain's promotion eligibility list in November 2021 that applies to every Captain position that becomes available across Texas and the eligibility lasts no longer than 12 months or until every person on the list has been promoted into an existing Captain vacancy. At that point, a new Captain's promotion eligibility list is created. DPS has a process by which four persons of Captain rank or higher are randomly selected to sit on a promotions board with the sitting Chief of CID, in this case Floyd Goodwin, and the five persons, referred to as the promotion board, assess the qualified applicants by interviewing them and then going through a ranking process prior to applying the cut-off number of how many will be on the eligibility list. The number of successful candidates to place on the eligibility list each time is not set but can vary between a range set by the CID Chief (for example "at least 5 and no more than 10"). Ex7(p.45) This allows for some unspecified alteration at the discretion of the board chair depending upon who is being ranked rather than an unbiased assessment of candidates.

The promotion board ranks the interviewed applicants from 1 to 5 following each interview without discussing the applicant or the applicant's answers. Ex7(pp.29,30,60) Chief Goodwin, the Chief and board chair over the November 2021 Captain board, admitted that the ranking process for each board member is **subjective**. Ex7(p.61)

A candidate that gets five 1's would be a top candidate and five 5's would be in the lowest group. Ex7(p.47) DPS says that the interviews are recorded, but the Plaintiffs have not received

those recordings. The board members are allowed to take notes, there are policies requiring the Chair to collect and retain notes, but Goodwin not only says that he did not collect the notes on either of Martinez's Captain's boards (Sept 2020 and Nov 2021), but also that he has never received notes during any of the promotional boards that he has been on. Ex7(pp.30-34) In disturbing contrast, Capt. Krueger testified that she does take notes, but that she shreds her notes. Ex6(pp.67-68) No board member is known to have ever retained those notes. Ex7(p.34) Chair decides 2-3 core questions asked of every candidate. Ex7(pp.22-24) Then each board member creates 2 questions each, so 10-11 questios total. Ex7(p.24)

Since there are no notes kept on the responses and there is no discussion between the board members on the responses, the process is **subjective**, **opaque**, and **not susceptible to review or analysis** to compare how one applicant was rated in the same response to the same question or how one board member rated different candidates for the same answer. Therefore, DPS is not able to identify that actual reason(s) that existed at the time the decisions were made as to why one candidate was more qualified than another other than the application of an arbitrarily/subjectively assigned 1-5 ranking resulting from each board member's personal preferences and therefore biases as well.

In the case of the Captain board from November 2021, Martinez deposed two of the five members of that board, Chief Goodwin and Capt. Krueger.

Goodwin's memory of the Martinez interview: Martinez did not make the cut (Ex7(p.79)), Martinez answered questions about the C1 from the incident that occurred on 9/30/18, but Goodwin doesn't remember the 2021 answer (Ex7(p.80-84)), Krueger says that Martinez lied to her about what he did on 9/30/18 (Ex7(pp.53-54)), Martinez did not establish that he had learned from his mistakes from the incident that occurred on 9/30/18 (38 months before) sufficient for Goodwin to consider Martinez ready to promote (Ex7(pp.57,86)), that his response to the C1

19

question was what kept Martinez from promoting. Ex7(p.54),[7] doesn't remember Martinez's response was to the question about the C1 incident,[8] what Martinez's ranking score was (Ex7(p.50)), and consequently, how far up or down the list Martinez was (Ex79(p.50)), and, lastly, Goodwin could not remember any detail about Martinez's responses. Ex7(p.87)

Krueger remembers somewhat differently: that Krueger provided her knowledge of the 9/30/18 incident while Martinez was not present (Ex6(pp.66-67)) thus eliminating Martinez's ability to both know what Krueger said and then be able to respond to it, which is terribly unfair, Martinez was not suitable for promotion but could only provide generalities as reasons for her position (Ex6(p.62)), and Krueger admitted that her prior experience with Martinez affected how she ranked Martinez. Ex6(p.63)

In a failure to promote claim, it is inappropriate to decide as a matter of law, that an employee is unqualified because he has failed to meet entirely subjective hiring criteria. Instead, an employee must demonstrate that he meets the objective hiring criteria at the prima facie case stage, and the issues of whether he meets the subjective hiring criteria is dealt with at the later stages of the analysis. *Medina v. Ramsey Steel Company, Inc*., 238 F3d 674 (5th Cir. 2001) DPS has not provided any objective hiring criteria that Martinez failed to meet. DPS only provided a single subjective statement for why Goodwin and Krueger did not select Martinez for promotion to Captain (he hadn't proven that he has learned from his mistakes like one other candidate [#57-1, Appx160(¶4)], Ex7(pp.57,86)) and is, therefore, "really the sort of nonspecific, content-less

---

[7] Chief Goodwin stated that not only did he not like that Martinez had lied, but others on the board also considered Martinez lie to be a factor in Martinez not promoting. Ex7(p.85) Again, Martinez didn't lie and his C1 discipline for that event from three years before says nothing about a lie. Ex8(p.10)

[8] This raises questions given the fact that Goodwin had a clear memory of Martinez's responses from the earlier September 2020 board about his C1 but not the later November 2021 board. Ex7(pp.80-84)

explanation that this court has found insufficient to satisfy an employer's burden of production." *Alvarado v. Texas Rangers*, 492 F.3d 605, 617 (5th Cir. 2007) (another DPS organization).

As for Martinez's disability discrimination denial of promotion claim elements: Martinez was a qualified individual with disabilities that both Krueger and Goodwin were aware of,[9] no other candidate was disabled to Martinez's knowledge and DPS had not produced evidence to the contrary, and Martinez's efforts to get back to El Paso the year before due to his disabilities were strongly opposed indicating the distinct possibility that Martinez was not wanted in El Paso by Krueger, if not also Goodwin for disability discriminatory reasons.

As for Martinez's retaliation denial of promotion claim elements: Martinez engaged in protected activities in 2017 and 2019 against Krueger, in 2019 opposing Hanson's and Koenig's comments and actions against McPherson, in 2020 complaining verbally to Koenig, in writing to Haddox and verbally to Haddox in 2020 about discrimination and retaliation from Krueger in working to deny Martinez's hardship request, in August 2021 to Captain Ohland and Major Ortiz about being harassed by Hanson and Saldivar for engaging in protected activities, and then in October 2021 to Captain Ohland about continuing to be harassed by Hanson and Saldivar for engaging in protected activities.

Martinez was denied a promotion, which would be sufficient to dissuade a reasonable employee from engaging in a protected action. As to the causal connection, Krueger was the subject of multiple complaints from Martinez assuring that she was provided notice through the DPS EEO/OIG intake and investigation process and also pointing to the consistent and unbroken series of negative actions by Krueger against Martinez. As for Goodwin, it is incredible that he

---

[9] When Martinez made his hardship transfer request disclosing his disabilities, Goodwin was the Assistant Chief under Ruocco and had to review the request prior to Ruocco denying and Krueger, as the supervisor over that Lt. position in El Paso also would have been provided a copy of the request. Ex5(¶20)

would deny being aware of Martinez's complaints as Goodwin being the Chief of CID statewide

and the Asst. Chief under Chief Ruocco before, would have been involved in reviewing Martinez's

requests for hardship transfer, reason for denial and Martinez's subsequent complaints against

Krueger's participation in that denial. Goodwin even admitted to being aware of Krueger having

filed the C1 against Martinez back in January 2019. Ex7(p.72) Martinez also relies on his evidence

of DPS's strong chain of command organized scheme of communicating complaints of

discrimination and retaliation to the perpetrators as a means of protecting and shielding them from

the consequences of their illegal actions.

In case the strong holding in *Alvarado* is not sufficient to support the Court's denial of DPS's

motion, Martinez presents the following evidence of pretext associated with DPS's denial of

promotion to Martinez. DPS reliance on the 9/30/18 incident to hobble Martinez going on four

years now, must stop. Martinez asserts the following evidence and argument raises genuine issues

of material fact as to pretext for a jury to have access to this issue:

- Goodwin and Krueger have made conclusory assertions that Martinez "has not learned from his mistakes" without providing any specific detail of what Martinez said in the interview, how he said it, or even what he could say that would be sufficient for Goodwin and Kreuger to determine that Martinez was ready for promotion to Captain, Ex6(p.62), Ex7(pp.57,86,87)
- Krueger did not raise an allegation or concern about Martinez lying to her on 9/30/18 and for some months later.  In fact, Krueger admitted that she did not write down her statement about what occurred on 9/30/18 until she filed her C1 complaint against Martinez in January 2019. Ex5(¶¶3-4), Ex6(p.23)
- Martinez has testified in direct contradiction to Krueger's characterization of Martinez's comments regarding the C1 incident, Ex5(¶15) *Cf.* [#57-1, Appx160(¶¶2,4)]
- Given that Martinez had the owner's permission to take out the fuses, that it did not violate the Court order, that it did not leave the ex-wife stranded since she had her own separate truck, and that Martinez did not do anything criminal or otherwise illegal, and that Martinez had told his Captain, Sanchez, everything that he had done before Krueger got there, it makes no sense that Martinez would lie about anything to Krueger, Ex5(¶¶1-8)
- Martinez had complained the year before about Krueger's discriminatory treatment against Hispanic males and in favor of white males, Ex5(¶17)

- Krueger's assertion that Martinez lied to her by omission as the major factor for her regarding Martinez's C1 and the reason that she feels Martinez is not ready for promotion to Captain is contradicted by the disciplinary action issued by Chief Ruocco since there is no mention of lying or misrepresentation included in the disciplinary action, therefore DPS's documents establish that Krueger's statement is false, or could not legitimately form the basis of her eliminating Martinez from the promotion eligibility list, Ex8(p.10) *Cf.* [#57-1, Appx160(¶¶2,4]]

- Lastly, the 9/30/18 incident has been used time and again to great effect to deny Martinez employment benefits and a better life based upon hearsay assertions of alleged grave or serious concerns ([#57-1, Appx181]) when it happened over three years before, no one has ever been identified from the EPCSO as the source for these alleged concerns about the working relationship between DPS and EPCSO ([#57-1, Appx181]), Krueger admit that she has never received any complaint in writing from EPCSO (Ex6(p.41)), and, perhaps most importantly, since 9/30/18, Martinez has worked with EPCSO from 10/1/18 through 10/14/19 and November 2022 to the present, with no conflict, no reported concerns and with multiple honors and awards. Ex2(pp.143-144),

Given the lack of evidence supporting that the 9/30/18 incident was of any import to anyone other than Krueger's discriminatory or retaliatory animus toward Martinez, Martinez respectfully requests that the Court deny DPS's motion regarding his claims for the denial of his promotion to Captain in November 2021.

**Hostile Work Environment.**

The Civil Rights Act of 1866 makes it illegal for an employer to require employees "to work in a discriminatorily hostile or abusive environment" because of race. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see also EEOC v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc). "A hostile work environment exists when the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Johnson v. Halstead*, 916 F.3d 410, 417 (5th Cir. 2019) (quoting *Harris*, 510 U.S. at 21). To prevail on claim for hostile work environment, a plaintiff must demonstrate that (1) he is a **member of a protected class**; (2) he suffered unwelcomed harassment; (3) the harassment was based on his membership in that protected class;

(4) the harassment affected a term, condition, or privilege of employment; and (5) Tyson knew or should have known about the harassment and failed to take prompt remedial action. *See West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020)(**emphasis added**). If the harassment comes from a supervisor with authority over the employee, only the first four elements need be shown. *See Lopez v Kempthorne, 684 F.Supp.2d 827 (S.D. Tex, 2010)*

For conduct to be considered sufficiently severe or pervasive, it "must be both objectively and subjectively offensive." *Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 617–18 (5th Cir. 2020) (quoting *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007)); *see Waltman v. Int'l Paper Co.*, 875 F.2d 468, 476 (5th Cir. 1989) ("[C]ourt[s] should review the pattern and frequency of the harassment and determine whether a reasonable person would feel that the environment was hostile throughout the period that formed the basis of the plaintiff's claim."). A hostile work environment is the cumulative effect of a thousand cuts and not just one particular stab. *See Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017).

To determine if a workplace environment is hostile or abusive, "courts closely consider the 'frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001) (quoting *Harris*, 510 U.S. at 21); *see Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 163 (5th Cir. 2007) ("[C]ourt[s] must look to the totality of the circumstances...."). "[N]o single factor is determinative," though, *West*, 960 F.3d at 742, and "[w]orkplace conduct is not measured in isolation," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). However, "hostile work environment jurisprudence is not designed to 'prohibit all verbal or physical harassment in the workplace.'" *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 443 (5th Cir. 2011) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 (1998)). "To be actionable, the work

24

environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

The Plaintiffs all include both racial hostile work environment and retaliatory hostile work environment claims. DPS argues that the Fifth Circuit has not recognized a retaliatory hostile work environment. [#57,pg.17] While true, the Fifth Circuit has not restricted the ability of this Court to finding that there is sufficient evidence and law to support the denial of DPS's MSJ as the Plaintiffs' claims for retaliatory hostile work environment. The following supports the Court's authority to deny DPS's MSJ:

First, the language in the first element of a hostile work environment claim requires only that the plaintiff establish that they are a **member of a protected class**, it is indisputable that an employee that has engaged in protected activity is a **member of a protected class** and that Title VII holds that "[i]t shall be an unlawful employment practice for an employer <u>to discriminate</u> against any of his employees…because [she] has opposed any practice made an unlawful employment practice by this subchapter [such as race discrimination]…" See 42 U.S.C. §2000e-3

Second, the Supreme Court has already established the standard employment plaintiffs must meet to show actionable retaliation:

> "We…reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions'….[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which…means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006)

Thus, if a plaintiff's evidence demonstrates actions by an employer that would tend to "dissuade a reasonable worker from making or supporting a charge of discrimination," stare decisis would

require the Fifth Circuit (as it does this Court) to allow a retaliation claim arising out of a hostile work environment to proceed.

Third, all other Circuits have recognized a cause of action for retaliatory hostile work environment.[10]

Fourth, this Court has previously found retaliatory hostile work environment actionable. See *Tejada v. Travis Assoc. for the Blind*, 617 Fed. Appx. 325, 328 (5th Cir. 2015). However, rather than find that the fourth element of a retaliatory hostile work environment should follow the retaliation standard established by *Burlington Northern*, this Court instead applied the same heightened standard for a substantive or discriminatory hostile work environment claim for the retaliatory version of the claim (and this Court found that Tejada had failed to present sufficient evidence to move forward). Plaintiffs respectfully request that this Court again find that a retaliatory hostile work environment claim actionable, but this time apply the *Burlington Northern* standard for retaliatory claims and find that the Plaintiffs have provided sufficient evidence to raise genuine issues of material fact for a jury to review these claims.

And Fifth, although the Fifth Circuit did not expressly use the phrase "hostile work environment," it reversed a summary judgment granted on facts very similar to this case in its 2013 *published* opinion, *Haire v. Board of Supervisors of Louisiana State University*, 719 F.3d 356 (5th Cir. 2013). In *Haire*, the Fifth Circuit first noted that in order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by the statute, (2) an adverse employment action occurred, and (3) a causal link exists between the

---

[10] See *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (collecting cases and joining all other circuits in recognizing the cause of action); see also EEOC Compliance Manual § 8-II.D.3 (5/20/98) (noting that "a violation will be found if an employer retaliates against a worker for engaging in protected activity through threats, harassment in or out of the workplace, or any other adverse treatment that is reasonably likely to deter protected activity by that individual or other employees.")

protected activity and the adverse employment action. *Haire*, 719 F.3d at 367. It was undisputed that *Haire* had filed a discrimination complaint, just as it is undisputed that all three Plaintiffs did so here. *Id*. The plaintiff in *Haire* alleged the she experienced the following adverse actions, that:

- the supervisor had ceased referring officers to her,
- the supervisor didn't talk to her anymore,
- she was ostracized from the administration and isolated, and
- she was no longer eligible for overtime – affecting her pay. *Id*.

The Fifth Circuit held this satisfied the "adverse employment action" prong:

> Haire has put forth modest evidence that her job has changed, that she has been excluded from meetings, and that her pay may have been affected. Collectively, these occurrences rise to the level of a Title VII "adverse employment action."…The anti-retaliation provision of Title VII, *unlike the substantive* [discrimination] *provision* is not limited to discriminatory actions that affect the terms and conditions of employment...Even though our precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for Title VII *discrimination* claims...retaliation claims require a closer look...Drawing all inferences in favor of Haire, the occurrences are more than "petty slights, minor annoyances, and simple lack of good manners…"[11]

Here, Martinez also alleges more than petty slights or minor annoyances – far worse retaliatory action by DPS than those by LSU in *Haire*. Specifically, Martinez was subjected to the following: false allegations against Martinez, pressure from Hanson and Koenig to engage in retaliatory actions against McPherson; observing racially disparate organizational structure, work assignments, and leave; observing disregard for his and his employees racial discrimination complaints; observing failure to investigate complaints of race discrimination; observing disregard for complaints of harassment and sexual harassment of subordinate employees; observing and experiencing retaliatory animus for himself and his employees; being instructed to participate in potentially retaliatory schemes by reporting complaints outside of policy requirements that could

---

[11] *Haire*, 719 F.3d at 368

lead to retaliatory actions without being able to establish causal connections;[12] being ostracized as untrustworthy because of actual and perceived protected activities; being ignored when reporting retaliatory ostracism to supervisor; denied promotions; denied recognition/award; denied hardship transfer for pretextual reasons; and offered a transfer that he desperately needed to address his disabilities and family well-being but only if agreed to "self-harm" by voluntarily demoting. Ex2(p.146)

Finally, even if Plaintiffs did have to demonstrate the adverse actions meet the higher "terms and conditions of employment" standard, they easily can. Taken as a whole, in the light most favorable to them, the Plaintiffs' summary judgment evidence includes sufficient types, levels, and duration of harassment that the consequences included changes to and denials of employment benefits such as promotions, leave, and a harassment-free workplace as set out throughout this response.

Cases accepting temporal proximity between an employer's knowledge of the protected activity and an adverse employment action as sufficient evidence uniformly hold that the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). "Close timing between an employee's protected activity and an adverse action against [him] may provide the 'causal connection' required to make out a prima facie case of retaliation. We note that a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir.2001)

Taking all of the evidence in the light most favorable to Martinez, and indulging all reasonable inferences in his favor, a reasonable fact finder could conclude that, as a result of Martinez's race

---

[12] Being told about McPherson's prior complaints of race discrimination and instructed to inform Maj. Ortiz about discrimination complaints prior to them being reported to the EEO or OIG, which are outside the policy notification process, create a potential opportunity for retaliatory actions without the target of the retaliation being able to prove that the retaliator was aware of the target's protected activity; an essential element to a retaliation claim.

discrimination and retaliation complaints, Martinez and the other plaintiffs have been subjected to a consistent and pervasive pattern of harassment. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236-237 (5th Cir. 2015) ("Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext…[A]fter deciding to fire [the employee, defendants] acted to create an exculpatory paper trail. . . . [Defendant] directly solicited [the employee's supervisors to provide 'documentation.'" For all of these reasons, DPS's Motion as to Martinez's retaliatory hostile work environment claim must be denied.

**Continuing Violation**

This Court has already held that "'[a]lthough there is no definitive standard for what constitutes a continuing violation, the plaintiff must demonstrate more than a series of discriminatory acts. He must show an organized scheme leading to and including a present violation.' *Lopez*, 684 F.Supp.2d at 860 (quoting *Huckaby v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998))." [#45] Plaintiffs respectfully argue that in this case, DPS's strong chain of command ethic and the aberrant consequence of loyal adherents to that chain of command structure bending the policies, laws, and truth to protect the chain of command instead of being bound to follow the laws that protect employees from harms caused by discrimination and retaliation are what forms the organized scheme necessary to support a continuing violation in this case.

The following examples support this Court finding an organized scheme to harass black employees and employees that report or complain of discrimination:

First, before filing his charge of discrimination against Schwartz, McPherson discussed it with his new Captain, Koenig. Ex12(pp.43,50) As an agent of notice, Koenig was required to report McPherson's complaint of discrimination to EEO or OIG, but Koenig instead warned Schwartz of McPherson's complaint and plans to file a charge of discrimination, which was a violation of DPS

policy since reports were called for to EEO, OIG, or chain of command not involved in the discriminatory conduct. Ex12(pp. 41,43,50)

Second, on Martinez's first day working at the Capitol, Lt. Hanson warned Martinez that one of his new employees, McPherson, had filed a complaint of race discrimination against McPherson's former Captain, Schwartz, and that Martinez needed to watch out. Ex2(p.150) Since Hanson was not in McPherson's chain of command or involved in McPherson's complaint, there would be no documentation or policy reason for Hanson to have this information, but had it he did.

Third, though Martinez made verbal and written complaints of discrimination to Koenig and Haddox in June 2020 (Ex2(pp.73,132,141)), those complaints were not investigated until after Martinez had joined this lawsuit two years later in 2022. Ex2(pp.101), [#39]

Fourth, Martinez was told multiple times from August to October 2021 that he was not trusted due to his protected activities and when Martinez reported that to his new Captain, Ohland, and his Major, Ortiz, they did not take any action to either report or stop such retaliatory and hostile communications. Ex5(¶¶12-14)

Fifth, Major Ortiz let Martinez know that he expected to be informed of any reports of discrimination or retaliation first before being reported to EEO/OIG. Ex5(¶13)

Several of these examples support a finding that DPS maintained a scheme of informing discriminators and retaliators of impending and existing complaints of discrimination and who was bringing them so that actions could be taken to avoid consequences to include denying targets (persons trying to protect theirs or other's rights) "proof" that the discriminator or retaliator was aware of the target's protected activities, thus making it that much more difficult to establish a causal connection between the protected activities and the adverse actions.

Martinez's examples of this scheme of organized retaliation include the fact that since 2017, after Martinez made his first complaint of discrimination against Capt. Krueger (Ex5(¶17)), every time that Capt. Krueger has been near or involved in Martinez's employment, it has resulted in Capt. Kreuger working to negatively impact his career (Ex5(¶18)), to include the following: false allegations of lying to Krueger in 2018 (Ex2(pp.143-144), Ex8(p.10)); successfully working to deny Martinez his hardship disability accommodation transfer request in 2020 based on the false allegation that there was "still" conflict with the EPCSO because of Martinez (Ex5(¶¶20-21),Ex6(p.41), [#57-1, Appx181]); successfully denying Martinez a promotion to Captain by Krueger not recusing herself from the process, communicating the promotion board members that Martinez had lied to her when that was not true and not a part of the discipline against Martinez (Ex6(p.67), Ex7(pp.53-54), Ex8(p.10)); and then having the El Paso CID reorganized prior to Martinez's arrival in November 2022 resulting in Krueger not having to interact with Martinez. Ex6(p.72)

As such, Martinez respectfully asserts that he has established sufficient evidence of an organized scheme of retaliation by multiple members of the chain of command creating imputed knowledge of protected activities between members of the chain of command despite any dearth of documented evidence of that knowledge and that the harassment visited on Martinez has consistently included and relied upon the false allegation that on 9/30/18 Martinez lied to Krueger and created an irremediable rift between DPS and the EPCSO going on five years now.  It is time for this scheme to stop. Martinez respectfully requests that this Court deny the Defendants' motion and order Martinez's claim of a continuing violation of retaliatory hostile work environment to be heard by a jury.

**Date Charge Filed – Relation Back to Filing Date of EEOC Questionnaire**[13]

If the formal charge appears to be untimely, the charge may relate back to an earlier filing date. For example, it may relate back to the date the EEOC questionnaire was filed, so long as that earlier document could reasonably be construed as a request for the EEOC to take remedial action to protect the employee's rights or otherwise settle the dispute between the employer and employee. *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389 (2008) (decided under ADEA).

Courts have applied *Holowecki* to claims under Title VII and the ADA, *e.g., Freeland v. Coors of Austin, L.P.*, No. A-14-CA-443-SS, 2015 WL 4744362, at *5 (W.D. Tex. Aug. 10, 2015) (ADA). Even before *Holowecki*, the law in the Fifth Circuit was similar. *See, e.g., Garcia v. Randall's Food & Drugs, LP*, No. 3:13-CV-1248-O, 2014 WL 12591882, at *2 (N.D. Tex. June 24, 2014).

Apparently not all questionnaires or other filings will satisfy the *Holowecki* standard. *See, e.g., Freeland v. Coors of Austin, L.P.*, No. A-14-CA-443-SS, 2015 WL 4744362, at *7 (W.D. Tex. Aug. 10, 2015) (rejecting reliance on questionnaires that failed to indicate a desire for agency investigative or remedial action).

After *Holowecki* the EEOC redrafted its questionnaire to allow complainants to select whether they intend to file a charge. If the complainant says yes, courts have accepted the questionnaire as a charge. *See Stone v. Acad., Ltd*., 156 F. Supp. 3d 840 (S.D. Tex. 2016); *Henderson v. Bank of Am., N.A.*, No. 2:14-CV-895, 2015 WL 2374519, at *2 (E.D. Tex. May 15, 2015). If they say no, courts have found that the charge does not relate back to the date of filing the questionnaire, and

---

[13] Based upon additional evidence and legal research, Plaintiff Martinez respectfully requests that the court reconsider its prior ruling regarding the actionable period for Martinez. See [#45, pg. 10 and fn6] As an aside, the Sept 2020 denial of promotion would still not be actionable, but the failure to accommodate on 12/18/20, would be actionable with the early filing date.

thus is untimely. *See, e.g., Fallon v. Trailblazer Health Enterprises, LLC*, No. 3:11-CV-1449-B, 2012 WL 4866498, at *4–5 (N.D. Tex. Oct. 15, 2012).

However, in this case, the intake form did not provide an option to indicate whether they intended to file a charge. This renders Martinez's circumstances distinct from the cases rejecting the date the intake questionnaire was filed as the filing date for the charge. In this case, Martinez has several reasons for the Court to find that Martinez's filing with the EEOC on October 4, 2021 was similar to the plaintiffs in *Holowecki*, *Stone*, and *Henderson* in that Martinez communicated his intent to file a charge with the submission of those documents to the EEOC, to include:

- Martinez had an attorney, Ex38(p.4)
- Martinez included an Attachment "A" to the intake questionnaire that refers to his filing as being his "charges", Ex38(p.5)
- Martinez also filed the intake questionnaire via email and referred to the filing as Martinez's EEOC Intake and Discrimination Complaint Form even though the form is only labeled as the EEOC Inquiry Questionnaire, Ex38(p.7)
- Martinez's attorney asked the EEOC to "file" the complaint form and mentioned looking forward to speaking with the EEOC in the future, Ex38(p.7)
- The EEOC representative responded back telling Martinez's attorney that they would forward the document to the Dallas EEOC Intake Department for processing, thus indicating that it was understood by the EEOC to be that Martinez had elected to file his complaint as a charge. Ex38(p.6)
- The EEOC representative continued on in the email advising Martinez's attorney to go through the Portal and referring to Martinez as the "Charging Party" in regarding to signing the charge and also setting up an appointment between the "Charging Party" and an investigator. Ex38(p.6)
- And lastly, once communication was established with the Dallas EEOC office, a formal Charge form was in fact prepared and executed. Ex39

As such, in keeping with the foregoing precedents, the original filing date for Martinez's charge should relate back to 10/4/21, Martinez's attorney's original email filing with the EEOC. This would make the actionable period for Martinez starting on 12/8/20, which was 300 days before that filing.

As a result, Martinez has the following actionable claims:

- Refusal to Engage in the Interactive Process and Failure to Accommodate – Denial of Hardship Transfer to El Paso 12/18/20,
- Denial of Promotion – November 2021 as a claim of Retaliation or Disability Discrimination,
- Racial Hostile Work Environment (with harassment existing both within the actionable period and before contributing to a continuing violation claim),
- Retaliatory Hostile Work Environment (with harassment existing both within the actionable period and before contributing to a continuing violation claim),

All evidence of racially discriminatory, national origin discriminatory, disability discriminatory, and retaliatory conduct and pretext are also relied upon to support the actionable claims given the relevance of that evidence to the actionable claims in keeping with this Court's previous ruling. [#45, pg.10 and fn6] and *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S. Ct. 1885 (1977)

**Disability Discrimination – Disparate Treatment v. Failure to Accommodate[14]**

The elements of a disparate treatment disability discrimination claim include that the plaintiff (1) is disabled or is regarded as disabled; (2) is qualified for the job; (3) was subjected to an adverse employment action on account of the disability; and (4) was replaced by or treated less favorably than non-disabled employees." *Miles-Hickman v. David Power Homes, Inc*., 589 F.Supp.2d 849, 858 n.15 (S.D. Tex. 2008).

A failure to accommodate claim has distinct elements and analysis to include (1) he is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the employer; and (3) the employer failed to make 'reasonable accommodations' for

---

[14] Director McCraw, in his official capacity, has suggested that all of Martinez's ADA claims brought under the Ex Parte Young theory against him should be dismissed because he "was never served … and has not otherwise made an appearance in this case." In reviewing the files, Martinez admits that no official citation was served, however, Martinez questions the fairness and equity of Director McCraw, in his official capacity "laying behind the log" until summary judgment to complain of a lack of service, when he did not complain following both the first and second amended complaints. As for "has not otherwise made an appearance," Martinez takes issue given Dir. McCraw served discovery and responded to discovery, and also participated in Joint motions ([#42], and [#49]) that were signed by **both Defendants'** counsel.  As such, Martinez respectfully requests that the Court deem Dir. McCraw, in his official capacity, equitably served in his official capacity, or in the alternative, grant leave to Martinez to serve a citation on Dir. McCraw in his official capacity, as is within the Court's discretion under F.R.C.P.4(m)

such known limitations. *Amedee v. Shell Chem., LP*, 953 F.3d 831 (5th Cir. 2020) (quoting *Feist v. La., Dep't of Justice, Office of Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731 (5th Cir. 1999), *See also, Taylor v. Phoenixville School Dist.*, 174 F.3d 142, ,1999 U.S. App. LEXIS 6067 and *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283-85 (7th Cir. 1996)(The failure to accommodate is a direct violation of the ADAAA.)

There is no need to show pretext and the *McDonnell-Douglas* burden-shifting method of proof is unnecessary and inappropriate here. *Id.* at 1284 Intent is generally not at issue in a failure to accommodate claim. *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004)

To determine the appropriate reasonable accommodation, it may be necessary for the employer to engage in an informal, interactive process with the qualified individual with a disability *See* 29 C.F.R. § 1630.2(o)(3); *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 699 (5th Cir. 2014) The interactive process requires input from both the employer and the employee, because both possess information that the other lacks. Thus, responsibility for fashioning the appropriate reasonable accommodation rests with both parties. *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 621–622 (5th Cir. 2009). An employer violates the ADA when its unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate the employee. *Delaval v. PTECH*, 824 F.3d 476, 481 (5th Cir. 2016)

In this case, Martinez establishes that DPS violated the ADA by refusing to engage in the interactive process to join Martinez in both understanding Martinez's request and what reasonable accommodation might address his needs. Ex5(¶¶10-11) In that written denial of Martinez's request, DPS provides no reason for the denial. Ex20(pg.4)

Martinez meets all three elements for his denial of accommodation claim as follows: 1) Martinez has both physical and psychological disabilities (PTSD, and back and ankle injuries) that have not been credibly challenged by DPS, Ex20(pg.3) 2) DPS previously knew of Martinez's disabilities and limitations[15] and then Martinez restated his disabilities and the consequential limitations that he was facing and trying to alleviate and did so in writing in his requested accommodation, Ex20(pg.3) and 3) DPS failed to engage in an interactive process with Martinez to try to identify a reasonable accommodation with Martinez or explain how or why Martinez's requested accommodation of a transfer back to El Paso would not be reasonable. Ex20(pg.4), Ex5(¶¶10-11)

DPS has tried to assert several conflicting, if not irrelevant, positions regarding Martinez's request that have varied over time and, in the end, all fail to establish legally recognized defenses. Martinez lists DPS's varying excuses followed by his refutations:

- No reason given to Martinez in writing (this never changed), Ex20(pg.4)
  - There is no legal justification that avoids an ADA violation here;
- Martinez was not disabled and had not been since 2016 because Martinez was "returned to work" without restrictions at that time; Ex2(p.108), [#57, p.20]
  - DPS misunderstands or confuses a disability with a workers comp condition in that a person with a disability is not "returned to work" at the conclusion of his disability, but instead performs the essential functions of his job with or without an accommodation and Martinez's request sets out his disabilities and DPS did not question Martinez on his disabilities. Again, no avoidance of ADA violation;
- Martinez did not use the proper form for requesting a reasonable accommodation, Ex2(p.109)
  - This is not a viable defense to an ADA violation since telling the supervisor is enough[16] and there is no statutory or case law requirement that a request must use a particular form or follow a particular procedure;[17]

---

[15] Ex2(pp.93,98)

[16] *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) and *Campbell v. IPsoft Incorporated*, 2021 WL 4248861 (S.D.N.Y. 2021)

[17] *Sandel-Garza v. BBVA Compass Bancshares, Inc.*, 2020 WL 2309828, at *12 (S.D. Tex. 2020), *Dandridge v. Principal Management Group of North Texas*, 2021 WL 1688438, at *11 (N.D. Tex. 2021) ("But PMG has not cited any binding authority indicating that an accommodation is only reasonable when explicitly recommended by a medical provider."), *Texas Department of Transportation v. Lara*, 625

- Martinez wanted a different medical provider, [#57, pp.20-21]
  - Martinez never made such a statement, nor is there any evidence to support that assertion and even if true, failing to engage in the interactive process renders this a meaningless excuse since DPS cannot establish that the requested accommodation was fully understood or unreasonable;
- Martinez just wanted to go home to El Paso, [#57, p.14]
  - Same as the prior response;
- Martinez's request was about his family's condition and nothing to do with him, [#57, pp.13,14,20]
  - This is demonstrably false as seen on his request (Ex20(p.3)) as well as the prior response;
- Martinez's request was not "reasonable" because it would not be in the best interest of DPS because of alleged conflict that Martinez had created as a result of a single interaction on 9/30/18 with a single El Paso County Sheriff's Office Deputy, Ex2(p.118) and [#57-1, appx181]
  - This is, at best, a fact question mandating a denial of summary judgment[18] since DPS did not engage in the interactive process to discuss this issue and attempt work out a resolution with Martinez, but more likely this is simply untrue, though, of course, credibility is not at issue in a summary judgment inquiry.

DPS's claim that Martinez's request was not reasonable or would pose an undue burden, is in question and therefore not a basis for summary judgment, if not an unsupportable and ineffective defense, given the following facts:

- The alleged incident occurred on one evening more than two years prior to the requested accommodation (9/30/18 v. 12/8/20) and there was no evidence of any alleged criminal conduct, physical contact or threat, arrest or threat of arrest, or any other serious conduct or conflict that occurred that evening, Ex5(¶¶8-9)
- Following that evening, there was no conflict or discord between Martinez and anyone in the El Paso County Sheriff's Office (EPCSO) for the entire year following that incident from 9/30/18 through his last day in El Paso, 10/14/19, Ex2(pp.143-144)
- Following that evening, Martinez worked closely with EPCSO personnel and personnel from other agencies on successful and award-winning operations without any discord or other alleged issues, Ex2(pp.143-144)
- The Mull memo that DPS has cited to contains no actual evidence of any discord, any identification of any individual within the EPCSO that is an alleged source of any detailed conflict or concern and no identified issue or date of any occurrence of an

---

S.W.3d 46 (Tex. 2021) (citing federal law), and See also *Gleed v. AT & T Mobility Services, LLC*, 613 F. App'x 535, 539 (6th Cir. 2015) and *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000)

[18] At summary judgment, the employer's failure to engage in the interactive process shifts the burden to the employer to prove the unavailability of a reasonable accommodation. *Snapp v. United Transportation Union*, 889 F.3d 1088 (9th Cir. 2018)

issue by which anyone could refute or verify the contents of that memo. [#57-1, appx181] Also, Martinez was not aware of the Mull memo until he saw if for the first time during his deposition on April 6, 2023, Ex2(p.119) and

- Lastly, since Martinez has been back in El Paso, there has been no discord or other issues between Martinez and anyone within the EPCSO, or anyone else. Ex2(p.144)

Martinez respectfully requests that this Court deny DPS's motion as to Martinez's claims of denial of an interactive process, denial of a reasonable accommodation, and denial of promotion in November 2021.

### McPherson's Legal Arguments[19]

Retaliation claims can be actionable even if the underlying discrimination claim is not. To establish a retaliation claim, plaintiff must show: 1) he engaged in a protected activity, 2) the employer took an adverse employment action, and 3) a causal relationship between the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry v White, 548 U.S. 53, 67-68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).*

When McPherson was transferred to Temple in 2018; he was the only African-American (a protected class) in the CID unit in Temple. Upon his arrival, Lt. Holguin outlined a relaxed environment regarding vehicle use and accounting for time; nevertheless, his use of his service vehicle was elevated to a C1 Complaint. He was also subject to racially disparate intense scrutiny regarding his weekly time sheets and his investigation reporting. His personal evaluations were downgraded at the direction of Schwartz. He was denied career enhancing opportunities, such as the denial of appointment at the sex offender compliance office, raid entry training and work on a surveillance operation.

McPherson's race was a factor in this heightened scrutiny and the enlargement of the investigation to a C1 complaint. There is direct evidence of discrimination: McPherson's

---

[19] McPherson incorporates the legal arguments regarding general elements and burdens in Martinez's section into McPherson's section as well in an attempt to reduce redundancy.

supervisor, Lt. Holguin, testified that McPherson's race was a factor in the disciplinary process. Ex9(p. 89) Schwartz discussed the use of a tracking device on McPherson's vehicle; Schwartz never did this with any non-black agent under his chain of command. Ex9(p. 37) No other white or Hispanic agents were subject to discipline who engaged in the same or similar conduct as McPherson. Ex9(pp. 37, 41, 43-44, 57)

This hostile work environment had a direct effect on the terms and conditions of his employment. At the direction of Schwartz, his 2018 evaluation stated "needs improvement on the accountability, interpersonal skills and ethics and integrity parameters"; thus reducing his over-all annual rating to 2.78 (out of 4.0). Ex16 The C1 Complaint also goes into the agent's permanent record and must be revealed in any promotion hearing. Ex9(pp. 61-62) The presence of a C1 Complaint can be an impediment to promotion for minority members. Ex17(p. 173)

He was also denied career enhancing assignments, like participating in raid entry training (because I was under . . . a C1 investigation I was more than likely going to be terminated . . . he wasn't going to waste a spot on me) [57-1, Appx21(p77)] or working on a wire detail; I was told that I could not do it. [57-1, Appx19(p69)] Following his transfer, the Capital CID, McPherson filed an EEOC charge against Capt. Schwartz. Before filing the Charge, McPherson discussed his discrimination Complaints against Capt. Schwartz with Captain Koenig who failed to report these Complaints to OIG or EEO, but Koenig did discuss the charge with Capt. Schwartz Ex12(p. 41), thus protecting Capt. Schwartz and giving him a warning.

This stigma of the C1 followed McPherson when he transferred to the Capital unit in October, 2019. Initially, Capt. Koenig tried to block the transfer. Ex12(pp. 73, 85-86) Because McPherson had years of investigative experience, he requested assignment to unit 7C2. This request was denied by Capt. Koenig and he was placed in the 7C1 unit, a racially segregated unit, consisting almost entirely of African-Americans with C1 Complaints in their file. At the time, Capt. Koenig

39

told him that he needed capitol investigative experience to be considered for placement in 7C2. Later, when he applied for a position in unit 7C2, his request was denied and a newly promoted white trooper, Nate Head, who had no experience was given the position. After McPherson was later transferred to 7C2, other white troopers (Ray Roberson and Adam Zieschang) were also directly promoted into 7C2 even though they had no investigative experience at all-contrary to Capt. Koenig's rule applied to McPherson. [57-1, Appx22(p81)]

Further evidence of the retaliatory character of the harassment is demonstrated by the uneven enforcement of the 50-Mile rule. This requirement is not uniformly enforced: a white co-worker, Mary Nieronow, lived outside the 50-mile radius and was allowed to use a state vehicle to drive home. [57-1, Appx22(p78)]

Schwartz also allowed Lt. Chris Hanson to park a tractor trailer in Waco and claim that as his permanent residence. Hanson never corrected his driver's license to reflect the trailer address as his permanent address: a violation of state law. Derrick Evans, another lieutenant who reported to Koenig, also maintained a trailer near the Austin office, skirting the 50-mile limit policy without actually complying with it.

Plaintiff's proofs provide direct evidence of discrimination while he served in the CID office in Temple: Holguin's testimony establishes that McPherson was treated less favorably because of his race when compared to similarly situated white agents. In the Austin office, he was denied a transfer to unit 7C2 in favor of a lesser qualified white candidate who was only a newly promoted special agent. Further, the denial of his transfer took place after he discussed his discrimination complaints with Koenig. Under this evidence, the McDonald Douglas burden shifting paradigm is not triggered and these proofs create a genuine issue of material fact as to a hostile work environment.

As to circumstantial evidence, McPherson's proofs establish that he was treated less favorably than similarly situated white agents in these CID offices and gives rise to a prima facie case and creates a rebuttable presumption that a statutory violation has occurred. *See Tex. Dept of Cmty. Affs. v. Burdine, 450 U.S. 248, 252-254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* Here, there is evidence of uneven enforcement of the service vehicle policy (both in the use of the vehicle for personal errands and the uneven application of the 50-mile rule), denial of job assignments (denial of assignment to unit 7C2, a surveillance operation and appointment to sex offender compliance officer) and training opportunities (denied raid entry training.)

Defendant's proofs fail to put forward legitimate, non-discriminatory reasons for the disputed employment actions. While it is true that the C1 complaint was partially sustained, that evidence, however, fails to address the broader issue: that, as the only African American in the CID unit in Temple, he was subjected to intense scrutiny over his use of his service vehicle and reporting duty hours when the unit provided a relaxed environment for time accountability for other agents. According to Lt. Holguin, no white or Hispanic agent was subject to this scrutiny and harassment. He was also denied job assignments and training when compared to his white and Hispanic co-workers.

Similarly, in Austin, the proofs show that he was initially assigned to the racially segregated 7C1 unit (in spite of his investigative experience in RSD and CID in Temple) and later denied a transfer to the 7C2 unit in favor of a lesser qualified white candidate, (who was a newly promoted special agent) The proofs show that the denial of this transfer was retaliatory as it took place after McPherson discussed discrimination complaints. Although DPS asserts that this assignment of Nate Head to unit 7C2 was to share the training load, after McPherson was eventually transferred to unit 7C2 in July or August, 2020, other lesser qualified white candidates were directly assigned

to the unit in direct contradiction to the original reason proffered to McPherson when he initially sought the assignment.

Finally, in Austin, McPherson was originally allowed to drive his service vehicle home even though it was about two miles outside the 50-mile limit; this authorization was later reversed; a compromise, parking the vehicle in Florence was also rejected and a later request for a hardship exemption, was denied. This was likely retaliatory because the proofs show that this rule was unevenly enforced: another employee, Mary Nieronow, was allowed to drive her service vehicle outside the 50-mile limit, and the department routinely allowed other white employees, like Chris Hanson and Derek Evans, to skirt the policy by parking travel trailers within the limit and claiming them as their primary residence for purposes of the policy. DPS provides no legitimate business justification for this unequal treatment.

Even if DPS's reasons are true, McPherson can establish that they are pretext by showing that DPS's reasons are but a single reason and unlawful discrimination was another motivating factor in the employment action. *See, Burdine, 450 U.S. 455-456)* The employee may establish pretext through disparate treatment. *See Watkins v. Tregre, 997 F.3d 275 (5th Cir. 2021)* Precise equivalence is not required; the circumstances must be comparable in all material respects. *Machinchick v. P.B. Power, Inc., 398 F.3d 345 (5th Cir, 2005)* These proofs show disparate treatment and retaliation; as to disparate treatment, white agents were not subjected to the same scrutiny in timekeeping and use of their service vehicles, or received comparable C1 sanctions for similar conduct; nor were white agents denied training or job assignments based on deficiencies in report writing. The proofs also show retaliation since McPherson's initial transfer request was denied after he discussed discrimination claims with Capt. Koenig who failed to notify OIG or EEO in an effort to protect and warn Capt. Schwartz. Viewed in the light most favorable, Plaintiff's

proofs create a material issue of fact as to discrimination and retaliation and the motion for summary judgment should be denied.3

**B.   Sams's Legal Arguments**[20]

**1.   Sams's Claims Are Not Time Barred**

On July 25, 2023, Sams filed his EEOC complaint and was assigned charge number 450-2019-05843. Sams Amended his complaint on January 4, 2020 to include class action allegations, Sams's original and amended complaint bears the same charge number (450-2019-05843). Sams's claims of discrimination, failure to promote on October 2, 2018 and July 2019, the dates of both adverse actions are within the applicable statute of limitations, i.e. September 28, 2018 to July 29, 2019. Defendants' adverse action, the October 31, 2017 demotion, is actionable under the continuing violation doctrine along with the numerous other discriminatory incidents occurring between 2016 thru January 4, 2020 together contributed to and or constituted the racially hostile environment Sams was subjected to by DPS. Ex34 **and Sams's EEOC original and amended charges.** Therefore all of Sams's claims are actionable.[21]

**2.   Sams Subjected to Racially Hostile Work Environment**

During the period of 2017-2020, Sams was subjected to a series of ongoing unlawful racially discriminatory actions by DPS, beginning in 2017 (with his demotion), to include but not be limited to the unsupported race-based allegation by his supervisors that he attempted to turn the DPS Mounted Unit into a "Buffalo Soldiers Unit", denial of promotion to Sergeant twice, harassed by supervisor for not shaking the hand of a White co-worker in a "traditional way", false accusations by supervisors and White co-workers of abusing horses, being stripped of duties as an

---

[20] McPherson incorporates the legal arguments regarding general elements and burdens in Martinez's section into McPherson's section as well in an attempt to reduce redundancy.
[21] Refer to the general case law referenced and discussed within Martinez Argument above on Date Charge Filed.

instructor in the Mounted Unit, being subjected to two investigations for the same false accusations by White co-workers, each investigation concluded that the accusations were not sustained but Sams was demoted from his position as Corporal based on said false accusations notwithstanding. A White female Trooper sent a racially offensive and insulting image to Sams and Trooper Starks. Sams has been demeaned, ridiculed, and generally treated harshly and disrespectfully by his White supervisors and co-workers. Sams, in violation of DPS's policies and rules, was escorted by Captain Richards and others whenever he was given assignments to complete at the site of the Mounted Unit no non-African American Troopers were subject to this base degrading mistreatment, (Ex22(**164:1-25, 165:1-10**); Ex25(**235:23-25, 236-237, 238:1-8**) and was racially harassed by Capt. Richards while performing maintenance on a horse and subjected to the racist rantings of Sgt. Bradshaw (his supervisor) about how he hated Japanese people.  See factual background above.

Said above enumerated conduct was racially offensive, harassing, and created a racially hostile work environment. Ex4(**82:24-25, 83:1-25 – 84:1-25**) Maj. Chris Jones, during his deposition testified that he felt Sams's communication to him that the DPS environment was racially hostile was a fair description of the DPS environment Ex25(**163:25, 164:1-20**)

The above enumerated facts satisfy the legal standards Sams is required to meet to support his racially hostile and retaliatory hostile work environment claim.[22] DPS has failed to meet the summary judgment standard sufficient to deny Sams's right to bring his case to a jury on his Racially and Retaliatory Hostile Work Environment claims.

---

[22]Refer to the general case law referenced and discussed within Martinez Argument above on Hostile Work Environment.

## IV.     CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that Defendants' motion for summary judgment be denied and such other relief as justice and equity so require.

Respectfully submitted,

Leonard Mungo
Mungo & Mungo At Law, PLLC
31700 Telegraph Rd., Ste 250
Bingham Farms, MI 48025
caseaction@mungoatlaw.com
(248)792 7557
LEAD ATTORNEY FOR PLAINTIFFS

_/s/ Robert Notzon_
Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563

Joseph Lucas
Skupin & Lucas, P.C.
290 Town Center Dr., Ste 324
Dearborn, MI 48126
jlucas@skupinandlucas.com
(313) 961 04325
CO-COUNSEL FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been sent by electronic notification to all counsel of record through ECF by the United States District Court, Western District of Texas, Austin Division, on June 2, 2023 to:

Drew Harris, Assistant Attorney General
General Litigation Division
300 W. 15th Street, 11th Floor
Austin, Texas 78701
Drew.Harris@oag.texas.gov

_/s/ Robert Notzon_
Robert Notzon