# EX. 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JARI MCPHERSON,            )
JERALD SAMS, and           )
DANIEL MARTINEZ,           )
    Plaintiffs,           )
                         )
vs.                        )   CASE NO. 1:20-CV-01223-DAE
                         )
TEXAS DEPARTMENT           )
OF PUBLIC SAFETY,          )
    Defendant.            )


ORAL DEPOSITION

DANIEL MARTINEZ

APRIL 6, 2023

(TAKEN REMOTELY)


    ORAL DEPOSITION OF DANIEL MARTINEZ, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 6th day of April, 2023, from 10:06 a.m. to 3:42 p.m., before Dana Richardson, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine, the witness located in El Paso, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached here.

10

1    Q.   Which you completed in 2022?
2    A.   In -- I completed in spring of '22 and
3  graduated in the summer of '22.
4    Q.   Tell me about your experience in the Marine
5  Corps.  When did you enroll, and when did you leave?
6    A.   So I joined shortly after graduating high
7  school.  I believe it was -- it was in the summer of
8  2003.  And then I -- I did four years of active duty,
9  which I separated, 2007.  And then in 2008 to 2009, I
10  was recalled for another year of active duty.  So I did
11  five years active duty and then three years inactive
12  Ready Reserve.
13    Q.   And when was the last time that you served in
14  the Marine Corps or in any of the armed forces?
15    A.   That was -- from 2008 to 2009, I was recalled
16  for a -- a combat deployment to Operation Iraqi Freedom
17  in Al Asad, Iraq.
18    Q.   And when did you join DPS?
19    A.   I joined DPS in September of 2007.
20    Q.   So while you were at DPS, you were called into
21  the active reserves for the Marines and served in Iraq.
22  Is that correct?
23    A.   Yes, sir.
24         MR. NOTZON:  Objection.  Form.
25    Q.   (BY MR. HARRIS)  And were you injured while

11

1  serving in the military?
2    A.   Yes.
3    Q.   What were the circumstances of that?
4    A.   It was actually a multiple occasion, sir.  It
5  was -- it was both during -- during a couple of
6  operations where -- one, I fell off of a -- an MRAP,
7  which is a Mine Resisting Anti-Ambush Protected vehicle.
8         And another one was -- we were doing a
9  convoy security, and we had hit a -- at -- pretty much
10  what it is, it's an IED blast, the -- a hole that -- in
11  the road.  We were conducting operations at night, and
12  we didn't see the hole.  So we kind of bottomed out.
13  And I hit my head on the top of the Humvee, hurt --
14  those locations, there's a lot of injuries that I
15  sustained.
16    Q.   All right.
17    A.   I don't mean the Humvee.  Correction, sir, the
18  MRAP.  It was both -- it was Mine Resisting Ambush
19  Protected vehicle.
20    Q.   All right.  Well, as -- my understanding is
21  that you were bringing a disability claim in this case,
22  correct?
23    A.   Yes, sir.
24    Q.   All right.  Can you please tell me about your
25  disability and about how this was caused?

12

1    A.   So as a Marine Corps Veteran, sir, throughout
2  my military service, I'm been service-connected for
3  multiple medical conditions that I have, which I have
4  disclosed that to my counsel and made those documents
5  from the Veterans Affairs Administration available to
6  counsel; and eventually I'm sure you -- you-all have
7  them.  I have posttraumatic stress disorder.  I have
8  service-connected injuries for my back.  I have a lower
9  back condition.  I've just recently had back surgery
10  through the VA for those conditions.  My ankle, my
11  hearing and skin condition for scars.  That's all that I
12  can recall right now because I have a pretty extensive
13  medical record, sir, through -- and it's all
14  service-connected.  Service-connected disabilities.
15    Q.   Okay.
16    A.   Yes, sir.
17    Q.   Now, my understanding is that in 2022 you were
18  also in a vehicle accident.  Is that correct?
19    A.   Yes, sir.
20    Q.   And that was while working at DPS?
21    A.   Correct.
22    Q.   And that the -- this caused some back injuries,
23  that this vehicle accident caused some back injuries?
24    A.   Yes.
25    Q.   All right.  I'm trying to understand what

13

1  injuries were caused from your -- prior to these -- this
2  2022 car accident and what injuries are resulting from
3  the car accident.  And so far you have -- you've
4  indicated that a lower back condition was one of the
5  injuries that was caused by your Marine service.  Can
6  you tell me more about what exactly -- what lower back
7  condition or back injury you sustained?
8    A.   Yes, sir.  So it's -- it's various, I
9  would say, conditions; but I just summarize it lower
10  back condition because that's how the VA summarizes it
11  when they give you your -- your full list -- or your
12  summary of disabilities.  But I have herniated discs.  I
13  had -- and I'm sorry, sir, I'm not a -- I don't know the
14  exact details of it.  Radiopathy [sic], left leg, right
15  leg.  Residuals from laminectomy surgery that I had.
16         But as far as to answer your question, as
17  far as difference between in 2022 and my military
18  service, I already had a preexisting condition,
19  obviously, with -- that I disclosed to you from my
20  military service.  And the on-duty crash in my CID
21  vehicle exacerbated those medical conditions to the
22  point that I needed to have the surgery that I had been
23  putting off for a few years.
24    Q.   All right.  And so when did you get that
25  surgery?

26

1    A.   Yes.
2    Q.   So from 2014 to 2023, you've been treated for
3  PTSD?
4    A.   Yes.
5    Q.   And can you tell me what different forms of
6  treatment you've received over that time period?  Was it
7  pretty much all the same?
8    A.   It's -- it's all been the same, sir.  Here in
9  El Paso, we went to a seminar, like a retreat; but it's
10  been pretty much all just counseling and therapy with
11  the provider.
12    Q.   And what was the incident or what was the
13  experience that caused the PTSD, at least according to
14  the diagnosis of your doctors?
15    A.   I'm not sure exactly what the doctors wrote,
16  sir; but it all stems from my military service.  I've
17  experienced death.  I've -- I -- friends, I've
18  experienced -- seen burned bodies.  I've been in
19  stressful situations while serving in certain operations
20  and it's -- I -- I really don't know exactly what the
21  doctors wrote; but it -- it all stems from my personal
22  experience, service in the military.
23    Q.   Was there a particular experience that you
24  believe was particularly triggering?
25    A.   I've been through multiple experiences, sir.

27

1  So I can't narrow it to just one.
2    Q.   When your doctors were -- were using counseling
3  to treat you, was there a particular incident in Iraq
4  that they focused on?
5    A.   No, sir, because I -- I don't -- the way
6  counseling works, they don't really talk about reliving
7  the incident, just on how to -- I don't -- I guess the
8  answer to that would be no.
9    Q.   So there were several instances during your
10  experience in Iraq that caused your PTSD and not any one
11  particular?
12    A.   Yes, sir.  It -- it was through experiences in
13  Iraq and while I was at different duty stations, not
14  just Iraq.
15    Q.   Were there incidences outside of Iraq that
16  contributed to your PTSD while serving in the military?
17    A.   Yes, sir.
18    Q.   What were those incidents?
19    A.   So when I was in Okinawa, I was assigned as a
20  military policeman and I had a -- part of the
21  investigation process, we would have to go and see the
22  autopsies of -- of the -- the persons that -- that
23  passed from their injuries.  Also, outside of Iraq, I
24  had to help escort the -- the body of one of -- of one
25  my -- my best friends who was blown up in Afghanistan.

28

1  And I was actually -- I saw his -- saw his body.  And so
2  those are just some examples of that, sir, outside.  I
3  saw his remains.
4    Q.   I can understand how that would substantially
5  affect you.
6         Well, perhaps turning to a -- maybe a more
7  pleasant topic, can you tell me about joining DPS
8  initially?
9    A.   Yes, sir.  I -- like I said, I was fresh out
10  of -- like I said earlier, I -- fresh out of the Marine
11  Corps.  And I believe DPS was the same caliber as -- as
12  the Marine Corps when it came to the prestige and honor.
13  So I wanted to join the best of the best.  And I was
14  happy to have been given the opportunity to join DPS in
15  2007, shortly after I left active-duty service.
16    Q.   And where -- what was your starting position?
17    A.   We all start as -- I would say, in the academy,
18  as probationary trooper trainees.
19    Q.   And then what was your next position?
20    A.   A probationary trooper stationed in Alpine,
21  Texas, Big Bend area.
22    Q.   And at some point, can you tell me a little bit
23  about a summary of your history at DPS from 2007 to
24  about, say, 2015?
25    A.   2007, '15.  So 2007, I -- I began my career as

29

1  a -- as a trooper in Alpine working traffic enforcement
2  as -- all of us that come into DPS, we start our careers
3  as -- as troopers.  My goal was to get back home to
4  El Paso.  At that time, duty stations in El Paso weren't
5  open.  So I had to wait for a position to come open.  So
6  I did a little bit over a year in Alpine and I finally
7  got a -- a transfer to El Paso, but around that same
8  time, I received orders to return back to active duty,
9  to the Marine Corps.
10         So from 2009, I believe, 2009 to 2010, I
11  was a year of active duty in -- in the -- in the Marine
12  Corps.  Returned back in 2010 to El Paso, did traffic
13  enforcement as a trooper out there in El Paso for a few
14  years.  2012, I promoted to the Criminal Investigations
15  Division, CID.  And then in 2015, December of 2015, I
16  promoted to lieutenant in the CID of El Paso, overseeing
17  a gang unit.
18    Q.   All right.  So you received your promotion to
19  lieutenant in December 2015, correct?
20    A.   Yes.
21    Q.   All right.  Now, tell me a little bit about
22  your history or your work from 2015, when you were
23  promoted to lieutenant, to 2019.
24    A.   So during that whole period, I was overseeing a
25  gang unit.  We -- predominantly we -- we investigated

---

**30**

1 crimes that had a gang nexus. So we did a lot of
2 investigative work working gangs that were prevalent in
3 the El Paso area. They'd take all kinds of approach,
4 whether it was, you know, gang members doing drug
5 trafficking, moving firearms, prostitution, doing
6 assaults. Our main goal was to disrupt and dismantle
7 gang members and gang organizations. And I was pretty
8 successful in that with my unit and my squad because we
9 looked a lot with all agencies there in El Paso,
10 including the Texas Anti-Gang Center. I was one of the
11 key lieutenants that -- that got tasked out to
12 developing and starting that Texas Anti-Gang Center in
13 El Paso. I was very involved in -- in that initiative
14 from obtaining the -- the -- actual -- the buying
15 from all the agencies, from assisting and drafting
16 the -- the -- the MOU, the -- to request the funding
17 for -- you know, for the -- for the -- the -- the
18 initiative.
19        So in summary, Mr. Harris, I mean, it
20 was -- it was a pretty -- I was pretty successful in
21 that area, and my team as well.
22    Q. All right. How many people did you oversee in
23 your squad while in El Paso?
24    A. It -- it varied, Mr. Harris, because of, you
25 know, promotions and transfers, retirement. So I would

---

**31**

1 say anywhere from six to eight agents, you know.
2    Q. And you are currently assigned in El Paso,
3 correct?
4    A. Yes, sir.
5    Q. Are you still working with respect to
6 overseeing a gang unit?
7    A. No, sir. I currently oversee the special
8 investigations section.
9    Q. And when did you -- when were you assigned to
10 this particular section?
11    A. In November of 2022.
12    Q. So that was when you transferred back to
13 El Paso, correct?
14    A. Yes, sir.
15    Q. And how many agents are in that section?
16    A. Six.
17    Q. Okay. Then let's quick -- let's talk about
18 2019 to 2020. Can you very quickly summarize your work
19 history at DPS during that time period?
20    A. I started off year 2019 -- the first quarter of
21 2019, I -- I was at a leadership training in
22 Albuquerque, New Mexico. It's called the -- it's
23 Northwestern University. It's a -- it's a
24 supervisory -- kind of like a command college. So that
25 was my first quarter.

---

**32**

1        Second quarter, I was in El Paso, back
2 again at the -- at the -- overseeing one of the gang
3 units at the Texas Anti-Gang Center.
4        Third quarter, I had asked for a transfer
5 to the Capitol Region and -- which was granted around
6 October 15 of 2019.
7        Fourth quarter of 2019, I finished that --
8 that year in -- at the Capitol, overseeing an
9 investigations unit. Same with the year 2022, sir. I
10 was first-line supervisor lieutenant at Capitol
11 overseeing an investigations squad.
12    Q. All right. So you were a lieutenant in El Paso
13 up through October 15th, 2019?
14    A. Yes, sir.
15    Q. And then on October 15th, 2019, you transferred
16 to the CID in Austin?
17    A. Yes. Capitol Region.
18    Q. Capitol Region.
19        And then from roughly October 15th, 2019,
20 until November of 2022, you were overseeing Unit 7C1 in
21 the Criminal Investigations Division in the Capitol
22 Region, correct?
23    A. No, sir. I supervised the investigations unit
24 up to October of 2022, from October '22 to November '22.
25 My transfer became effective October 1st, 2022, from

---

**33**

1 Capitol to El Paso. October 1st to November of --
2 November 1st of 2022, I was temporarily, on paper,
3 overseeing the drug unit in El Paso. However, once I
4 arrived to -- to El Paso, there was some realignment
5 that was done; and I was moved to oversee the special
6 investigations spot.
7    Q. Okay. But from roughly October 2019 until
8 October 2022, you were overseeing Unit 7C1 in CID in the
9 Capitol Region, correct?
10    A. Correct. Yes, sir.
11    Q. And you submitted a -- oh, hold on. Let's --
12 when you transferred from -- from El Paso to the Capitol
13 Region, that was a voluntary transfer request, right?
14    A. Yes.
15    Q. And then your transfer from the Capitol Region
16 to El Paso, that was also a voluntary transfer request,
17 correct?
18    A. Yes.
19    Q. And when you put in that voluntary transfer
20 request, you're typically required to commit to two
21 years at the new duty station. Is that correct?
22    A. Yes, sir.
23    Q. And so you would have been required to stay in
24 Austin, typically, from October 2019 through
25 October 2021, correct?

34

1    A.  Yes.
2    Q.  All right.  And then after October 2021, you
3  submitted a transfer request.  What -- was it in -- when
4  did you submit the transfer request in 2022 to go back
5  to El Paso?
6    A.  I believe it was September.  A vacancy came
7  open in September of -- of 2022 due to a promotion in
8  El Paso.  So that -- that creating -- created a
9  lieutenant vacancy in El Paso, which is the vacancy that
10  I applied for.
11    Q.  Now, did you have to apply for the position; or
12  did you submit a transfer request?
13    A.  Well, it's the same thing because the -- the --
14  the way the e-mails are written on the transfer -- on
15  the transfer notification, you pretty much have to apply
16  for it.  You have to submit paperwork and fill out the
17  request form, but you're still applying for that
18  transfer.
19    Q.  So prior to September 2022, in the year of
20  2022, there wasn't a vacancy for a lieutenant in
21  El Paso?  Is that correct?
22    MR. NOTZON:  Objection.  Form.
23    Can you repeat the question?
24    Q.  (BY MR. HARRIS)  Sure.  There was not a vacancy
25  for a lieutenant in El Paso in 2022 until September.  Is

35

1  that correct?
2    A.  I believe you -- that's correct.
3    Q.  Or no?
4    A.  I believe so because my intent was to go back
5  home, and -- and that was the only time in 2022 that I
6  applied for one.  So if there would have been another
7  one earlier, before that, I would have known and I would
8  have applied for it.  So I believe that was -- the one I
9  applied for was the only one in 2022.
10    Q.  All right.  So your two-year commitment to work
11  in the Capitol Region was over as of October 2021,
12  correct?
13    A.  Yes, sir.
14    Q.  But you didn't apply to transfer back to
15  El Paso until September of 2022, correct?
16    A.  Yes, sir.  There's -- there was no other --
17  there was no vacancies at the time, like I said.  I put
18  in for the vacancy that became available.
19    Q.  But as soon as a vacancy did become available,
20  you applied for that vacant lieutenant position,
21  correct?
22    A.  Yes.
23    Q.  And you got that lieutenant position, correct?
24    A.  Yes, sir.
25    Q.  And are you seeking to transfer from that

36

1  position to any other position?  Sorry, let me -- that's
2  badly phrased.
3    Are you seeking to transfer away from
4  El Paso to any other position?
5    THE REPORTER:  I'm sorry.  I need that
6  answer repeated.
7    A.  I -- I don't understand.  Can you -- I guess,
8  can you rephrase the question, Mr. Harris?
9    Q.  (BY MR. HARRIS)  Sure.  You're not seeking to
10  transfer away from El Paso again, correct?
11    A.  No.  I'm home.  It's where I wanted to be at.
12    Q.  So then in 2019, why did you request a transfer
13  to the Capitol Region?
14    A.  So, 2019, I put it on there, on my transfer
15  request, that I was seeking new challenges and
16  opportunities outside of El Paso because my intent was
17  to promote to captain.  And I believe that being in the
18  Austin area, I would be able to -- to highlight some of
19  the work that I've -- I was known to do and -- and
20  results that I was known to achieve in El Paso, that it
21  would be highlighted more closer to the Austin area.
22    Q.  Now, when you were in El Paso, there were some
23  disciplinary issues that you -- you had, correct?
24    A.  There was one disciplinary issue.
25    Q.  All right.  There was an allegation that you

37

1  engaged in racial profiling of a -- of a citizen.  Is
2  that correct?
3    A.  I don't recall that, sir.
4    Q.  Do you recall that in 2011 that someone that
5  you pulled over at a traffic stop made an allegation of
6  racial profiling against you?
7    A.  I don't -- I don't recall being investigated or
8  making that -- that complaint, sir, no.
9    Q.  You don't recall that on January 22nd, 2011,
10  that you conducted a traffic stop of Mario Balderrama
11  and that he then levied a race discrimination complaint
12  against you?
13    A.  I don't recall, sir.  Do you have a -- are you
14  reading, like, an OIG charging document or -- or --
15    Q.  Well, at this point, I'm trying to
16  understand -- I'm trying to get -- understand what you
17  recall at this time.
18    Well, let me -- let me put it this way:
19  Are you -- is it your testimony that you've never been
20  accused of either racial discrimination or unauthorized
21  use of force by a citizen that you interacted with?
22    A.  I have been, but I don't recall that specific
23  event, sir, from 2011.
24    Q.  Okay.  Do you recall in 2012 that there was an
25  allegation that you used excessive force against

58

1  to his property and getting the -- the items that he
2  needed to get out of that property as part of that
3  protection order.
4      Q.  So Captain Krueger came to the incident because
5  the El Paso County Sheriff's Office was threatening to
6  arrest you and Special Agent Hernandez, correct?
7          MR. NOTZON:  Objection.  Form.
8      Q.  (BY MR. HARRIS)  Was that your understand --
9  let me put it this way:  Was that your understanding?
10         MR. NOTZON:  Objection.  Form.
11     A.  No, sir.  That's not.
12     Q.  (BY MR. HARRIS)  All right.  What was your
13  understanding?
14     A.  So we were there, waiting.  We were -- we had
15  been waiting for a civil escort.  That was on the
16  Sunday.  He -- Officer Hernandez was arrested on a
17  Saturday night.  Sunday morning, he bonded out, got a
18  protective order.  We needed to get a civil escort to go
19  get his property, his essential property.  And we all
20  went to his property after waiting for the sheriff's
21  office to arrive.  It was only one deputy that arrived,
22  and that was Officer -- Deputy Shane Brinks.
23         Deputy Shane Brinks had a relationship
24  with the friend of Miriam Tarango, and he was assisting
25  them throughout the process.  And the things escalated

59

1  whenever the friend who was a relationship with the
2  deputy gave some advice that, "Hey, you know, they can't
3  be taking certain things and they're over here" --
4  they -- I saw them remove something from the vehicle or
5  mess with the vehicle.
6          So at that point in time, I was told -- I
7  told Shane Brinks that I didn't agree with how he was
8  handling the whole situation, and I asked him why he was
9  by himself and how come there was no supervisor on
10  scene.  I -- I did accuse him of flirting with the two
11  females because that -- that was my perception.  I asked
12  him if he had a -- if he knew the females, and he said,
13  "Yes.  I actually helped her" -- meaning the friend of
14  Ms. Tarango -- "with her domestic assault."
15     Q.  Let me refocus the question, perhaps --
16     A.  Yes, sir.
17     Q.  -- because I want to focus about -- on Captain
18  Krueger.  Captain Krueger arrived on the scene after the
19  vehicle had been disabled, correct?
20     A.  Yes.
21     Q.  And the El Paso County Sheriff's Office
22  indicated that you had disabled -- you and Special Agent
23  Hernandez had disabled the vehicle, correct?
24         MR. NOTZON:  Objection.  Form.
25     A.  No, sir.  That -- that was all -- the -- the

60

1  reason why Captain Krueger showed up was because -- as I
2  was -- as I was explaining my answer that you asked me,
3  sir, Deputy Shane Brinks was by himself; and he had a
4  personal relationship with the other female that was
5  Ms. Tarango's friend.
6          Now, when I pretty much called him out
7  on -- you know, that -- that that just didn't seem
8  right, he then got very upset at me and started asking
9  me for my badge number and name.  And I told him, "Sir,
10  I'm not here on duty.  I'm not here handling duty
11  matters.  I'm a friend helping a friend."  I'm
12  actually -- I was a real good friend of Ms. Tarango and
13  so was my wife, you know.
14         So he -- he -- immediately he told me to
15  leave.  I complied.  I left right across the street.
16  Then he proceeded to get on the radio and broadcast that
17  he had four hostile troopers at the scene.  So when you
18  broadcast something like that on the radio, of course
19  you're going to get support from whoever is listening on
20  the other end.  And that's how the deputy showed up.
21         Prior to the deputy showing up, I had
22  already notified my supervisor, my first-line supervisor,
23  everything that had occurred; and I was already asking
24  him to come over to the scene because I knew things were
25  escalating.

61

1      Q.  (BY MR. HARRIS)  All right.  Let me clarify.
2  So who was your first-line captain?
3      A.  Captain Jose Sanchez.
4      Q.  So you were not supervised directly by Captain
5  Krueger, correct?
6      A.  Correct.
7      Q.  She was a captain of some other division,
8  correct?
9      A.  Of another district.  In El Paso, there's two
10  captain districts.  So my captain under my district was
11  Joe Sanchez.  And Captain Krueger was the other district
12  captain, and she was the actual captain for Oscar
13  Hernandez.
14     Q.  And so Joe Sanchez was not able to get to the
15  scene.  So Captain Krueger went to the scene instead,
16  correct?
17     A.  Correct.
18     Q.  And Captain Krueger asked you if you had
19  disabled the vehicle, correct?
20     A.  Yes.
21     Q.  And you told her no?
22     A.  She -- she didn't ask if I had disabled the
23  vehicle.  She asked what happened to the battery.  And I
24  told her that nothing happened to the battery.  But she
25  never asked me if I had disabled the vehicle.

Daniel Martinez - 4/6/2023

62

1    Q.   And it is your understanding that she
2    complained that you essentially lied by omission by not
3    telling her that you had removed the fuses, correct?
4    A.   Correct.  All that information, I had notified
5    my captain on what exactly we had done, all the actions
6    that we had taken.
7    Q.   And the Office of the Inspector General
8    investigated these allegations and sustained the
9    allegations against you, correct?
10   A.   They investigated partial allegations, not the
11   entire investigate -- not the entire facts of the case.
12   Q.   You were alleged to have participated in the
13   unprofessional intentional act of disabling a motor
14   vehicle, correct?
15   A.   Yes.
16   Q.   And the OIG sustained that allegation against
17   you, correct?
18   A.   Correct.
19   Q.   And it was also alleged that you conducted
20   yourself in a discourteous and unprofessional manner
21   during interactions with the El Paso County sheriff's
22   deputy who was conducting official business, correct?
23   A.   Yes.
24   Q.   And the OIG sustained that allegation against
25   you, correct?

63

1    A.   Yes.
2    Q.   And the third allegation was that you failed to
3    provide the El Paso County sheriff's deputy with your
4    name and the name of your supervisor upon his request
5    while he was conducting official business, correct?
6    A.   Yes.
7    Q.   And the OIG sustained that allegation against
8    you as well?
9    A.   Yes.
10   Q.   And I believe you actually previously testified
11   that he asked for your name and your supervisor, but you
12   just instead told him you were not on official business.
13   A.   Correct.
14   Q.   And so you refused to provide your name and the
15   name of your supervisor to him.
16   A.   He asked for my name and badge number, not
17   supervisor.
18   Q.   All right.  And you did not provide that
19   information to him, correct?
20   A.   No, sir.  Because at that time, I had -- I -- I
21   wasn't committing --
22        MR. HARRIS:  All right.  Objection.
23   Nonresponsive.
24   Q.   (BY MR. HARRIS)  I just asked --
25   A.   Okay.

64

1    Q.   -- you know, yes or no.
2    A.   Yes, sir.
3    Q.   Your attorney can ask you further follow-up
4    questions if -- if he so chooses.
5         As a result of these sustained findings,
6    you were disciplined with five days without pay.  Is
7    that correct?
8    A.   Yes.
9    Q.   And this incident happened on September 30th,
10   2018; and then it was investigated some period of time
11   afterwards, correct?
12   A.   It was investigated in January of 2019.
13   Q.   And the discipline against you was assessed in
14   June of 2019.  Is that correct?
15   A.   I don't recall the date, sir, but it was
16   shortly after the -- it was shortly after I finished my
17   graduation at Northwestern University.
18   Q.   I don't believe you testified before about
19   Northwestern University.
20   A.   It -- it's North -- it's really not -- it's a
21   leadership school.  It's not a -- like, a degree kind of
22   type.  It's for police -- Northwestern School of Police
23   and Supervision.
24   Q.   But this sustaining, that happened before you
25   transferred to Austin.  Is that correct?

65

1    A.   Yes.
2    Q.   And you then appealed that finding afterwards,
3    correct?
4    A.   Yes.
5    Q.   And so as a result, the discipline was actually
6    not assessed until you had already transferred to
7    Austin, correct?
8    A.   No, sir.
9    Q.   When were -- the five days without pay, when
10   was that actually -- did that actually take place?
11   A.   Prior to my transfer to Austin.
12   Q.   And you transferred to Austin in October 2019?
13   A.   October 15 of 2019.
14   Q.   And when you transferred -- when you
15   transferred in, your understanding is that you were
16   transferred to whatever position is available in Austin.
17   Is that correct?
18   A.   No, sir.
19   Q.   Okay.  What was your understanding about what
20   position you were transferring in to?
21   A.   I had -- so I had spoken to Chief Tom Ruocco
22   and Major Gabe Ortiz.  And the position that was
23   opening -- there was going to be a new position at
24   Capitol that was going to be tasked out to investigate
25   threats to life, so that we're -- that -- that position

66

1  was -- was created with that intent.  So my transfer was
2  for that position because I wanted to seek an
3  opportunity to be pretty much like a -- the pilot
4  program, the pioneer on the State to do these kind of
5  investigations, because this was just right after the
6  Walmart shooting in El Paso and -- which I had responded
7  to that -- to that event, that tragedy, and I -- lot of
8  lessons learned from that and a lot of things that I
9  wanted to take on new challenges to do our part to
10 mitigate it.  And the Capitol Region at that time
11 already had physical security vulnerability threat
12 assessment program, and now they were going to be
13 initiating this new program.  So that was my
14 understanding of the opportunity, that I would transfer
15 with the intent of being in that position.
16    Q.   Okay.  But you ended up -- but that new
17 position would have been over a new unit that's referred
18 to commonly as Unit 7C3.  Is that correct?
19    A.   Yes, sir.  Uh-huh.
20    Q.   And Unit 7C3 was a newly created squad that was
21 focused on threat prevention, correct?
22    A.   Yes, sir.
23    Q.   And that was a new lieutenant position that
24 became available that you tried to transfer in to?
25    A.   Yes.

67

1     Q.   But you were ultimately assigned to a different
2  unit.  Is that correct?
3     A.   Yes.
4     Q.   And you were assigned to the investigations
5  unit, which was Unit 7C1, correct?
6     A.   Yes, sir.
7     Q.   Are you claiming that the reason you were
8  assigned to Unit 7C1 instead of Unit 7C3 was because of
9  race discrimination?
10    A.   I -- I don't know what the intent was of Mark
11 Koenig.  He's the one that realigned everything the day
12 that I was effective to transfer in.  So I don't know
13 what his intent was.
14    Q.   All right.  Well, I'm trying to just get a
15 general understanding of what your claims are.  And --
16 and are you claiming here today that the reason why you
17 were assigned to Unit 7C1 instead of 7C3 was because of
18 your race?
19    A.   I don't -- I don't think I'm understanding your
20 question, sir.  I don't know what his -- what Mark
21 Koenig, his intent was.  All I know is that my intent
22 was to transfer in at 7C3, and I ended up in 7C1.
23    Q.   Okay.  And what is your ethnicity?
24    A.   Hispanic.
25    Q.   And the lieutenant who was put in charge of

68

1  Unit 7C3 was Lieutenant Saldivar, correct?
2     A.   Yes.
3     Q.   And he is also Hispanic, correct?
4     A.   Yes.
5     Q.   All right.  Can you explain to me your race
6  discrimination claims, why you are contending that you
7  were discriminated against based on your race, that is
8  Hispanic?
9          MR. NOTZON:  Objection.  Form.
10    A.   Mr. Harris, that's, like, a pretty broad
11 question.  And I know this all has to detail with --
12 with the lawsuit, but what -- what exactly do you mean
13 as far as my claims?
14    Q.   (BY MR. HARRIS)  Okay.  Are you claiming that
15 you were discriminated against based on your race?
16    A.   Yes.
17    Q.   By who?
18    A.   By Captain Mark Koenig.  By Lieutenant Hanson.
19 And -- so I -- I mean, I -- the -- the thing that I'm --
20 I have a hard time understanding, sir, is you -- you
21 first asked me about 7C1 and how was that related to my
22 discrimination claim and if I was put there because of
23 discrimination.  Well, I don't know why Mark Koenig put
24 me under that squad; but I can testify today on my
25 experience and the experience that I had while being

69

1  there in 7C1.
2     Q.   Unit 7C1 was primarily tasked with
3  investigations, correct?
4     A.   Yes.
5     Q.   But Unit 7C1 was also responsible for duties as
6  assigned, correct?
7     A.   I think -- all regions in the State CID have
8  duties as assigned, sir.
9     Q.   And if more urgent duties become assigned, then
10 you are supposed to put your investigations aside and
11 focus on the more urgent duties if the -- if Captain
12 Koenig were to direct it so, correct?
13    A.   You're supposed to follow orders.  And if
14 that's the order given, yes, sir.
15    Q.   All right.  And in 2020, there were some riots
16 after the George Floyd death.  Is that correct?
17    A.   Yes, sir.
18    Q.   And all units of CID in the Capitol area were
19 assigned Capitol security duties.  Is that correct?
20    A.   Yes.
21    Q.   All right.  Can you tell me generally about
22 what those duties were?
23    A.   Okay.  So 7C1, we're an investigation squad,
24 which it was a -- general, it's pretty much -- that's
25 what handled anything that happened at the Capitol from

Daniel Martinez - 4/6/2023

70

1  a misdemeanor to a felony offense.  In the Capitol
2  Region, that could be inside the Capitol, outside the
3  Capitol, government offices, et cetera.  So although the
4  Capitol experienced a lot of events during the -- the
5  George Floyd, you know, civil unrest and everything that
6  followed, we were still having to conduct our duties,
7  our generalist investigative duties, because crime
8  didn't stop in the Capitol Region.  The signs of what's
9  happening politically and -- and, you know, with -- with
10 the -- outside -- the factors that we can control, like
11 protests and demonstrations, we were still having to
12 cover our duties in addition to doing
13 counter-surveillance duties as 7C2 would, right?  Os
14 monitor rallies, monitor protests, handle threats,
15 harassment cases and also do the -- the physical
16 security vulnerability assessment.
17       So we were -- we were tasked out to do our
18 generalist investigations in addition to assisting the
19 other two squads.  However, the biggest thing was,
20 during the riots, the counter-surveillance would --
21 nobody else overtook investigations.  We still carry on
22 that workload.  Even though we're all sharing different
23 duties, my squad was still the only ones that were
24 delegated to do the generalist investigative duties, on
25 top of doing counter-surveillance, on top of assisting

71

1  with physical security vulnerability assessments.
2       So it -- I hope that answers the question
3  that you're asking me, Mr. Harris.  But we were still
4  doing our duties on top of assisting and/or overtaking
5  additional duties.
6   Q.  All right.  My understanding is that your claim
7  of race discrimination has to do with your Unit 7C1
8  being assigned more work than the other units.  Is that
9  a rough summary of your claim?
10  A.  No, sir.
11  Q.  All right.  Then can you explain your claim?
12  A.  Yes, sir.  My -- my squad was a segregated
13 squad.  I had all the black agents in my squad.  We had
14 more work hours.  We had more work responsibilities and
15 duties as assigned.  We were denied training
16 opportunities.  We were denied promotion opportunities.
17 And we were ostracized by the other squads pertaining to
18 us complaining about not having the same opportunities.
19 You know, in addition to that, not only did I have all
20 the black agents but I had -- all my black agents had
21 sustained complaints on them.  So we were mocked about
22 having complaints on our files and being the 7C1 squad,
23 meaning that we were -- that you -- you needed to have a
24 C1 in order to be able to be placed in 7C1.
25  Q.  So Jari McPherson was moved to Unit 7C2 in

72

1  2021, correct?
2   A.  Yes, sir.
3   Q.  So -- and before you arrived -- or before Chris
4  Hanson, the head of Unit 7C2 was an African-American
5  person, correct?
6   A.  I wasn't there during the time, sir.
7   Q.  So you don't know one way -- whether that's
8  correct or not?
9   A.  I -- I don't know the compositions of the
10 squads and assignments and supervisors over it prior to
11 me getting to the Capitol.
12  Q.  All right.  But my understanding is that you
13 have brought a race discrimination claim; and I'm trying
14 to understand what is your race -- what are you claiming
15 was caused by race.
16  A.  Going back, Mr. Harris, to the -- my squad
17 being segregated, before I transferred in to the
18 Capitol, there was already the -- the two squads were
19 already assigned.
20  Q.  Okay.  I'm sorry.  Maybe I -- let me clarify my
21 questions.  I apologize.
22  A.  Okay.
23  Q.  Because I don't want you to have to repeat
24 yourself.
25       I understand you have an allegation about

73

1  Unit 7C1 being a segregated squad and treated
2  disfavorably.  I'm trying to -- is there any other race
3  discrimination claim that you are contending like, for
4  example, your promotion denial?
5   A.  Yes, sir.  Promotion denial, my transfer denial
6  and -- and not only is it racial discrimination-related,
7  but it was in retaliation for engaging in protected
8  activity for reporting racial discrimination.  You
9  mentioned Jari McPherson got moved to 20 -- to 7C2 in
10 2021.  That was done after I had filed my complaint to
11 EEO, Nathanael Haddox.
12  Q.  And when did you file that complaint?
13  A.  In June of 2021.  Jari was moved in July of
14 2021.
15  Q.  And the -- my understanding is your allegation
16 about the workload issue was -- stems from the
17 additional work you had to do during the George Floyd
18 riots and protests, correct?
19  A.  No, sir.  This is even before the George Floyd
20 riots and protests.
21  Q.  What -- okay.  What -- how was Unit 7C1 treated
22 disfavorably before the protests?
23  A.  So I had an agent, Jonathon Oduwole.  He's a
24 black -- black agent, African American.  He aspired to
25 promote, and he wanted to take certain leadership

74

1 courses.  And Mark Koenig approved other agents which
2 were white males assigned to Chris Hanson's squad to
3 attend those leadership schools.  However, he denied --
4 he denied Mr. Oduwole to attend.
5        Patrick Alonzo had asked for a certain
6 office assignment, and that office assignment was denied
7 and given to Nathaniel Head, white male under Chris
8 Hanson.  Mark Koenig had knowledge of this.  And no
9 other reason was given other than -- even though Patrick
10 Alonzo had asked for a separate office space, it was
11 automatically given to Nathaniel Head.
12       Same thing with vehicle assignments.  My
13 squad would always get -- I mean, we're supposed to be a
14 covert unit.  They're driving covert vehicles that blend
15 in with, you know, regular traffic.  My squad got a
16 police vehicle, a Crown Victoria, that looks just like a
17 highway patrol sergeant's vehicle with lights visibly
18 that Mark Koenig assigned to my squad.  And all the
19 covert vehicles, especially the new ones, were assigned
20 to Chris Hanson.
21       The -- Chris Hanson was supposed to handle
22 the terroristic threats and harassment cases, yet my
23 squad would handle those investigations.  Chris Hanson
24 would make all kinds of excuses that, "You guys are the
25 on-call.  You guys are already there.  Just handle it."

75

1 And there's numerous cases, sir.  I don't -- I don't
2 recall the case numbers or the dates, but they're
3 documented in our SPURS reporting system.  This is
4 before COVID.  This is before the riots.  We would
5 handle those investigations.  They were supposed to be
6 the -- the threat-to-life unit handling threats.
7        I recall one specific incident, Mark
8 Koenig assigned me to handle that incident instead of
9 having Chris Hanson handle it because it was after
10 hours.  So on that investigation, it was my squad,
11 Patrick Alonzo, that ended up making up the -- making
12 the arrest.  Patrick Alonzo complained about why the
13 threat-to-life squad wasn't handling it.  And, you know,
14 they assisted; but it wasn't the whole unit that they
15 should have had come out to handle that case.  So that
16 was one -- one example.
17       When we were doing COVID checks, there
18 was -- the Governor gave a directive for DPS to go check
19 if people were doing quarantine and following the
20 quarantine procedures.  Mark Koenig instructed me to
21 make sure that my guys were actually knocking on the
22 doors, physically being there and making contact with
23 people because we had had a list that was generated,
24 pretty much every other -- every other day; and we would
25 have to make contact.

76

1        So Mark Koenig would allow Chris Hanson --
2 when it was Chris Hanson's duty day, Mark Koenig would
3 allow Chris Hanson to just make phone-call checks while
4 he would have us drive -- and we would drive all over
5 Central Texas.  We'd go all the way -- I think as far as
6 we went one time was almost towards Blanco County, which
7 is closer to San Antonio.  And, again, our guys would
8 have to physically go while Mark Hanson's [sic] guys
9 only had to call in.
10       Again, sir, I mean, there's -- there's so
11 many examples that I don't recall off the top of my
12 head.  This is the best I can remember.  But those were
13 some of the disparities.
14       Again, with -- with -- with training
15 opportunities, days off, I -- I was denied days off by
16 Mark Koenig.  However, the same days off, he would give
17 them to Hanson, claiming that Hanson had already asked
18 for days off first.
19       So it's -- it's a lot of information to
20 give you right now, sir, but that was pretty much the --
21 the base of this whole complaint because it -- not only
22 did I experience it, my agents also experienced it,
23 especially my agents that were of color.
24    Q.  One of your agents was Victor -- I think he's
25 referred to as Victor Bible?

77

1    A.  His name is Victor Bibiloni Sambolin.  And he
2 goes by Bible, yes, sir.
3    Q.  And Victor Bible is -- is from -- of Spanish
4 descent.  Is that correct?
5        MR. NOTZON:  Objection.  Form.
6    Q.  (BY MR. HARRIS)  Sorry.  I -- I believe it's
7 actually Italian.
8    A.  Sir, I don't know his background because I -- I
9 do know a couple of agents that are his classmates that
10 have personal knowledge of his background.  And there's
11 some -- there's people saying that he's Italian, that
12 he's Puerto Rican, that he's -- so I don't know.  I
13 don't know his -- but I know that he claims to be from
14 Italy, and he joined the Marine Corps while living in
15 Italy.
16    Q.  All right.  So one of your -- the members of
17 your units is not black; he's Italian.  Correct?
18    A.  Yes, sir.
19    Q.  And let's now focus on your promotion denial
20 claim.
21    A.  Uh-huh.
22    Q.  You -- you at one point claim that that was due
23 to race.  Is that correct?  What -- what -- let me
24 ask -- let me ask you this:  When did you apply for a
25 captain position?

82

1    Q.  All right.
2          MR. HARRIS:  All right.  I'm going to
3    object to that as nonresponsive.
4    Q.  (BY MR. HARRIS)  I'll ask the question again.
5          For all four times that you applied while
6    in Austin, there was a requirement for you to disclose
7    any sustained C1 findings against you, correct?
8    A.  Yes, sir.  And also -- not just C1s but also
9    EEO complaints.  And although I hadn't -- I hadn't been
10   subject of one, I -- I had filed an EEO complaint also
11   during that period you mentioned.  So, yes.
12         MR. HARRIS:  I will object to that as
13   nonresponsive.
14   Q.  (BY MR. HARRIS)  Again, let me ask the question
15   one more time.  I'm just focused on -- for all the
16   applications that you submitted, all in Austin for
17   promotion, you were required to disclose your C1
18   sustained finding, correct?
19   A.  Yes.
20   Q.  And it is your understanding that that is
21   something that's going to negatively affect your chances
22   at promotion, correct?
23   A.  It shouldn't, but the board considers it.
24   Because you're still allowed to apply for the position.
25   Q.  And so the board would consider the findings by

83

1    OIG against you as part of their decision for who to
2    promote, correct?
3    A.  I'm not sure, sir.  It depends on the
4    composition of the board because numerous people with
5    C1s and checked -- have checked off that box and have --
6    that had different outcomes.  So I don't know.  It
7    depends on the board.
8    Q.  All right.  Let's talk about the four different
9    times that you applied for captain.  You mentioned one
10   of them was for an HR captain position?
11   A.  Yes, sir.
12   Q.  All right.  What were the other three?
13   A.  CID captain, Midland position.  This is before
14   they started doing the statewide CID promotions.  So
15   then they did away -- they did -- CID did away with
16   doing the regional promotions.  So after that board,
17   they started doing statewide promotions.  So the -- the
18   other two were CID statewide promotional boards.
19   Q.  Okay.  So tell me, when were those statewide
20   captain promotion boards held?
21   A.  When were they held?
22   Q.  Yes, roughly.
23   A.  I want to say the -- the one in 2021 -- 2021
24   and 20 -- I think they were all around the fall time,
25   sir, because what they do is they -- they make a

84

1    year-long list.  They select candidates.  And then after
2    that period, they start a new board.  So it should have
3    been the fall of each year that I applied for.
4          MR. NOTZON:  Mr. Harris, I know I told you
5    you could take a break for lunch anytime from now till
6    1:00; but I could really use a restroom break right now.
7    So --
8          MR. HARRIS:  All right.  How about this --
9    let's go ahead and go off the record.
10         THE REPORTER:  Off the record, 12:31 p.m.
11         (Lunch recess taken)
12         THE REPORTER:  We are back on the record
13   at 1:44 p.m.
14         MR. HARRIS:  All right.  I am putting
15   Exhibit 3 into the Chat, and I will go ahead and share
16   it on the screen.
17         (Exhibit 3 marked)
18   Q.  (BY MR. HARRIS)  Lieutenant Martinez, you
19   testified earlier about how in June 2020 was when you
20   made the internal complaint about 7C1 being -- having a
21   disproportionate workload.  Is that correct?
22   A.  Yes, sir.  Uh-huh.
23   Q.  All right.  Is Exhibit 3, which starts with
24   Bates No. -- I think is Daniel Martinez 769.  Is this
25   e-mail that appears to be sent initially on June 10th,

85

1    2020, is this the internal complaint that you were
2    talking about?
3    A.  Yes, sir.
4    Q.  And it looks like you initially sent the
5    internal complaint to your supervisor, Mark Koenig, and
6    his supervisor, Gabriel Ortiz.  Is that correct?
7    A.  Yes.  Uh-huh.
8    Q.  And this was after you already had a discussion
9    with them.  Is that correct?
10   A.  I had a -- no.  I had a -- a discussion with --
11   I had already -- I believe I already talked to Nathanael
12   Haddox -- or, no, I'm sorry.  Can you go down to the
13   e-mail, sir, see if there's anything --
14   Q.  Sure.
15   A.  -- else in that e-mail chain?
16   Q.  Yes.
17   A.  Okay.
18   Q.  So it's a three-page e-mail.  There's nothing
19   on the third page.  Here's the substance of the second
20   page.
21   A.  Okay.  Yes, that was the e-mail that I sent
22   that same day to Nathanael Haddox; and I followed up
23   with a phone call.
24   Q.  All right.  But you had already discussed these
25   concerns with Captain Koenig and with Major Ortiz,

86

```
 1   correct?
 2      A.  Yes.  Uh-huh.
 3      Q.  And I think you also testified that in the
 4   following month Jari McPherson was transferred from
 5   Unit 7C1 to Unit 7C2, correct?
 6      A.  Yes.
 7      Q.  And you sent this e-mail to Nathanael Haddox on
 8   June 10th, 2020, correct?
 9      A.  Yes, sir.
10      Q.  And you had a phone call with him afterwards,
11   correct?
12      A.  Yes.  I had a -- a phone call -- I don't recall
13   if I called him before sending the e-mail, but I had a
14   conversation with him about this correspondence that I
15   ultimately sent to him.
16      Q.  Okay.  But Nathanael Haddox did not open up a
17   formal OIG investigation into the matter, at least not
18   in 2020, correct?
19           MR. NOTZON:  Objection.  Form.
20      A.  I'm not -- I'm not sure what Mr. Haddox did or
21   didn't do, sir.
22      Q.  (BY MR. HARRIS)  Okay.  And this -- let's see.
23           MR. HARRIS:  Now I'm going to put
24   Exhibit 4 into the Chat.
25           (Exhibit 4 marked)
```

87

```
 1      Q.  (BY MR. HARRIS)  And Exhibit 4 is a two-page
 2   EEOC charge, Bates No. DPS 0014318.  And it appears to
 3   be signed by you on the second page.  Do you recognize
 4   your signature?
 5      A.  I don't see it up yet, sir.
 6      Q.  Oh.  Sorry.  Let me do that.
 7           Now do you recognize the signature on the
 8   second page?
 9      A.  I do recognize the signature, yes.  That's
10   mine.
11      Q.  All right.  And is this the EEOC charge that
12   you filed that led to this litigation?
13      A.  Can you give me a couple of minutes to read it,
14   sir?
15      Q.  Sure.
16      A.  Thank you.
17           Can you scroll to the second page,
18   Mr. Harris?
19      Q.  (Complying).
20      A.  Yes, sir, I do recall this document, yes.
21      Q.  Okay.  Is this the only EEOC charge that you
22   filed?
23      A.  No, sir.  There was another one.  Should --
24   should be another one accompanied by this document
25   because I reviewed it yesterday; and it's, like,
```

88

```
 1   handwritten.
 2      Q.  When did you file the other EEOC charge?
 3      A.  So I believe -- what's the date on this one?
 4   April.  So in -- if I'm not mistaken, sir, it was before
 5   this date.  It was around March.  And I -- I made a -- I
 6   filled it out, and I received a phone call from the
 7   EEO -- Federal EEO office in Dallas.  So I don't know if
 8   it --
 9      Q.  Okay.
10      A.  But it's not this form.
11      Q.  Are you referring to your EOC intake form?
12      A.  I believe so.  That's probably what it is.
13      Q.  Okay.  So my understanding is that this is the
14   only actual charge of discrimination that's been filed
15   in this case.  Do you have -- that there is also an
16   intake form that you filled out, but that this is the
17   only EEOC charge.  Is that correct?
18      A.  Yes.
19      Q.  And in this charge, on the second paragraph,
20   there is a reference to a June 2020 internal EEOC
21   complaint against your captain, Mark Koenig.  Do you see
22   that?
23      A.  Yes, sir.  Uh-huh.
24      Q.  Now, our Exhibit 3, we looked at the June 10th,
25   2020, complaint.  Is that, Exhibit 3, the internal EEOC
```

89

```
 1   complaint that you reference here in your charge?
 2      A.  That's, yes, the report that I made Mr. Haddox
 3   aware of, both e-mail and with a phone call.
 4      Q.  All right.  And you testified earlier that you
 5   grew up in El Paso.  Is that correct?
 6      A.  Yes, sir.  Born and raised.
 7      Q.  Were you born -- you were born in El Paso?
 8      A.  Yes, sir.
 9      Q.  So if you were born in the United States, your
10   national origin would be American, correct?
11           MR. NOTZON:  Objection.  Form.
12      A.  Yeah, I'm American.  Yes, sir.
13      Q.  (BY MR. HARRIS)  And in your EEOC charge, you
14   make a reference to the issue about members in your unit
15   complaining about the difference in workload, correct?
16      A.  Yes.
17      Q.  All right.  And so we had already talked about
18   that claim with respect to, you know, the complaint you
19   made in Exhibit 3.  That's the same complaint that's
20   referenced here in the charge, correct?
21      A.  The same -- the nature of the complaint, yes.
22   Uh-huh.
23      Q.  All right.  And then after, in July 2020, when
24   Jari was transferred to Unit 7C2, there were -- there's
25   no way -- you're not claiming that they were still
```

90

1  segregated -- racially segregated units, are you?
2          MR. NOTZON:  Objection.  Form.
3      A.  We still were, yes, sir.
4      Q.  (BY MR. HARRIS)  So even when Jari McPherson,
5  who was African American, was on Unit 7C2, you still
6  contend that Unit 7C1 and 7C2 and 7C3 were racially
7  segregated?
8      A.  Our unit still contained -- minus Jari, our
9  unit still contained all the -- the black, African
10 American, agents.  I was -- I was supposed to get Mario
11 Reyes in exchange -- well, at least what Mark Koenig
12 made -- made me understand was that I was going to get
13 Mario Reyes in exchange for Jari; but I never got Mario
14 Reyes.  Mario Reyes is Hispanic.
15     Q.  And so Unit 7C2 had members of -- who are
16 Hispanic, correct?
17     A.  Yes.
18     Q.  And after Jari McPherson transferred to
19 Unit 7C2, it also had an African American member,
20 correct?
21     A.  Yes.
22     Q.  And Unit 7C3 was headed by Lieutenant Saldivar,
23 who is Hispanic, correct?
24     A.  Yes.
25     Q.  And Unit 7C3 had Hispanic and Caucasian members

91

1  on it, correct?
2      A.  Yes.
3      Q.  And Unit 7C1 had Victor Bible, who was
4  Caucasian, correct?
5          MR. NOTZON:  Objection.  Form.
6      A.  I'm not sure as -- today, sir, I'm not sure of
7  his background.  It's questionable, from my firsthand
8  knowledge.
9      Q.  (BY MR. HARRIS)  All right.  In this charge,
10 you claim you were denied promotion to captain on
11 September 28th, 2020.
12     A.  Uh-huh.
13     Q.  Was that the Midland position?
14     A.  I don't recall, sir, if it was or not.  It --
15 it had -- it was for a CID captain position.
16     Q.  So what was the reason that you contend that
17 your denial of beginning promotion to captain in 2020
18 was because of your race?
19     A.  So it -- it's not just because of my race.
20 It's because I reported violations of discrimination.
21 And it was also in retaliation for engaging in protected
22 activity, at which I made it known in June of the same
23 year.
24     Q.  All right.  Well, then, what is your reason --
25 what evidence do you have that race played any role in

92

1  the September 2020 promotion decision?
2      A.  The -- like I said, sir, I believe it's going
3  to be retaliation for engaging in that protected
4  activity and reporting it.
5      Q.  Okay.  What is your evidence that your national
6  origin of American played any role in their promotion
7  denial?
8          MR. NOTZON:  Objection.  Form.
9      A.  It's -- that's not the only thing listed on
10 the -- on -- on my complaint, sir.  It's reasons of my
11 race, national origin, disability and retaliation for
12 protected activities, including filing my internal EOC
13 complaint.  It's not just one thing that I'm stating.
14     Q.  (BY MR. HARRIS)  All right.  But do you have
15 any indication that your national origin played any role
16 in your denial for promotion to captain?
17     A.  Being that my national origin is American?
18     Q.  Correct.
19         MR. NOTZON:  Objection.  Form.
20     A.  No.
21     Q.  (BY MR. HARRIS)  The answer was "no"?
22     A.  I'm -- I'm American.  I'd say -- yes, I'm a
23 minority; but I'm American.  I can be both.
24     Q.  So you're not contending that your national
25 origin of being American played a role in your promotion

93

1  denial, are you?
2          MR. NOTZON:  Objection.  Form.
3      A.  Sir, it's just I don't understand your
4  question.  I'm -- I'm just -- I know I'm American, but
5  as an American, I can be a minority and I'm a minority,
6  Hispanic.
7      Q.  (BY MR. HARRIS)  What reason do you have to
8  believe that your disability played any role with
9  respect to any of your promotion denials?
10     A.  Yes, sir.  So in December of 2020, I had
11 applied for a hardship transfer; and I listed all my
12 disabilities.  So the department was well aware of all
13 my disabilities.
14         And prior to that, when I had mentioned
15 earlier that in 2009 I had collapsed, it was based
16 because of my -- my back issues.  And I had a
17 conversation with Captain Koenig, Major Ortiz, Chris
18 Hanson and Sal, Ramiro Saldivar, subsequent to having
19 to -- to take some time off to seek treatment from the
20 VA, and Captain -- I'm sorry, Lieutenant Hanson was
21 making fun of my disability.  He called me a broke dick,
22 and he mocked me for my disability of -- you know,
23 that -- that I -- he knew was from my -- my combat --
24 my -- my veteran status.  And he was just making -- he
25 was mocking my -- my -- me being a disabled veteran as

98

1  lieutenant position that came available in El Paso in
2  December 2020?
3     A.  Yes, sir.
4     Q.  And then you would not be eligible normally for
5  that because you had transferred from El Paso to Austin
6  and you had a two-year commitment in Austin, correct?
7     A.  No, sir, not necessarily.
8     Q.  I believe you testified earlier that normally
9  there's a two-year commitment when you make a transfer,
10  correct?
11    A.  Yes.  Yes, sir.  There's a two-year commitment,
12  which can be waived.  Having a hardship is one of the
13  waivers.  So you can be under a two-year commitment; but
14  if you have a bona fide hardship, you can get that
15  transfer.
16    Q.  And so that hardship transfer denial occurred
17  on December 18th, 2020?
18    A.  Yes, sir.
19    Q.  And I'm trying to understand.  Why do you
20  contend that your race played any role with respect to
21  the hardship transfer denial?
22    A.  Again, Mr. Harris, it's -- it's not just my
23  race.  It's a combination to everything there that's
24  listed; my race, national origin, disability and
25  retaliation.

99

1     Q.  Right.  But I'm trying to understand -- I was
2  trying to get clarification.  How did race play a role?
3  If -- if you're saying that it has retaliation, we'll
4  talk -- we'll ask -- I'll ask about that next.  But what
5  role did race play?
6     A.  So going back to the -- you -- you asked me the
7  question about the -- the -- you said if there was a --
8  a vacancy.  There hadn't been a vacancy in El Paso.
9  There was a vacancy.  There was -- there was a -- I'm
10  not sure -- okay.  So there was -- Lieutenant Brett
11  Varvel had -- which was under the supervision of Heather
12  Krueger -- Brett Varvel is a white male -- Brett Varvel
13  had been having disciplinary and performance issues.
14  However, it is my personal knowledge that Heather would
15  try to help him -- Heather Krueger would try to help him
16  and mitigate some of the accountability because instead
17  of being put on a performance improvement plan, he was
18  given the option to demote to agent.
19         When he demoted to agent, he was --
20  initially he was over the -- the human trafficking unit.
21  When he demoted to agent, that vacancy came open.
22  Another white male was already on the list up for
23  promotion, and that was Derek Pearson.  He goes by DJ.
24  Heather Krueger ultimately had the decision on who
25  filled that vacancy or had some influence because that

100

1  was a vacancy under her district.
2         Heather Krueger and I, as you -- you know
3  from -- from the complaint she filed on me, she had
4  issues with me in the past.  She did -- she
5  discriminated against males that were in -- in certain
6  positions of authority, called us machistas.  She
7  personally called me a machista, called Gabriel Nava a
8  machista, Joe Sanchez a machista.  And therefore, I have
9  reason to believe that not only -- all the other things
10  that are listed on -- on the reasons why I believe that
11  hardship was denied, race played a part in it because
12  she was able to influence the current major to not allow
13  the hardship, even though Chief Goodwin, everybody in
14  the chain of command -- or, I'm sorry, Chief Rockwell at
15  that time told me that I had a bona fide hardship to go
16  back to El Paso; and the ultimate decision was that I
17  couldn't go back to El Paso unless I demoted to agent
18  even though there was a lieutenant vacancy.  So the
19  reason why that happened was that -- so that DJ Pearson
20  could promote to -- to lieutenant, and I -- I didn't --
21  I wasn't going to demote to go back to El Paso if there
22  was a vacancy or any that I was entitled to if I had a
23  hardship, bona fide hardship.
24    Q.  After you filed this charge of discrimination
25  in April 2022, the Office of the Inspector General

101

1  contacted you to investigate your allegations, correct?
2     A.  Yes, sir.
3     Q.  And you declined to be interviewed by them,
4  correct?
5     A.  I -- I didn't decline to be interviewed.  I --
6  I -- I consulted with counsel, and I followed the -- the
7  advice of my counsel because at that time I was already
8  part of this lawsuit that -- a long time before I was
9  reached out by OIG.
10    Q.  So you refused to cooperate with OIG on advice
11  of counsel?
12    A.  No, sir, that's not what I'm saying.  What I'm
13  saying is that at advice of counsel -- and there's an
14  e-mail that I sent out to Lieutenant Negri that at the
15  advice of counsel, that I -- I would hold off on doing
16  the interview unless I was -- unless it was deemed
17  something that I needed to comply as a condition of my
18  job; but I never refused to -- to cooperate with them.
19         MR. HARRIS:  All right.  I'm going to put
20  Exhibit 5 into the Chat, and I'm going to put Exhibit 5
21  on the screen.  Exhibit 5 is Bates numbered DPS 0014798,
22  and it is a two-page e-mail.
23         (Exhibit 5 marked)
24    Q.  (BY MR. HARRIS)  And is this that e-mail that
25  you just referenced about how you e-mailed Brandon

Daniel Martinez - 4/6/2023

102

1 Negri, indicating that you were declining to -- to
2 submit to an interview request?
3   A. Yes, sir.
4       MR. NOTZON:  And we would object to the
5 naming of this document as it's currently named on the
6 computer file.
7   Q.  (BY MR. HARRIS)  And is it your understanding
8 that the Office of the Inspector General proceeded to
9 investigate the complaint without you interviewing
10 because -- at your request?
11   A. I'm sorry, Drew.  Can you repeat that, sir?
12   Q.  Was it your understanding that the Office of
13 the Inspector General did proceed to do an investigation
14 without your interview because you had refused to be
15 interviewed?
16   A.  The Inspector General's Office, neither
17 Mr. Negri or anybody from that office, made me aware
18 that the investigation was continuing.  I was made aware
19 through some of my subordinates that I was currently
20 supervising at the time, which that was a whole
21 different -- a new unit, complete new unit, that they
22 were being investigated for my claim of discrimination
23 and was -- were asking me about everything was okay.
24       The only conversation I had with Negri was
25 he was very broad when he was asking me about -- he

103

1 never told me he was investigating -- what he was
2 investigating.  He just told me about the -- my
3 complaint that I filed with EEOC and -- which is why I
4 sought the advice of my counsel, and -- and I deferred
5 to what my counsel told me the best course of action
6 would be.
7   Q.  And the outcome of this OIG investigation was
8 to find that your allegations were unsubstantiated,
9 correct?
10   A.  Yes.  I got served a letter that it was --
11 whatever -- whatever the result was, unfounded or
12 unsustained.  Don't recall.
13   Q.  Going back to your car accident in 2022, were
14 you given leave to not have to work as a result of your
15 injury?
16   A.  Can you -- can you clarify what -- were --
17 what's given leave?
18   Q.  Fair enough.  Let me -- let me put the
19 Exhibit 1 back on the screen.
20   A.  Uh-huh.
21   Q.  Okay.  So this is Exhibit 1 that you've already
22 testified about, about how you were basically off work
23 until -- I believe until October 26th, 2022.  Is that
24 correct?
25   A.  Yes, sir.

104

1       MR. NOTZON:  Objection.  Form.
2   Q.  (BY MR. HARRIS)  And that leave was given as an
3 accommodation for your disability, correct?
4       MR. NOTZON:  Objection.  Form.
5   A.  No, sir.
6   Q.  (BY MR. HARRIS)  In fact, you requested that
7 leave as an accommodation, correct?
8       MR. NOTZON:  Objection.  Form.
9   A.  No, sir, I didn't.
10   Q.  (BY MR. HARRIS)  All right.
11       MR. HARRIS:  Well, then, I'm putting
12 Exhibit 6 into the Chat.
13       (Exhibit 6 marked)
14   Q.  (BY MR. HARRIS)  And I'm putting Exhibit 6 on
15 the screen.
16   A.  Uh-huh.
17   Q.  And do you recall that after your accident you
18 had exhausted all of your Family Medical Leave Act
19 leave, correct?
20   A.  I'm sorry, again, because -- I mean, I'm
21 confused right now with the date, sir.
22   Q.  All right.  I'll rephrase this.
23       Do you see how this was the -- this
24 Exhibit 6 is Bates numbered DPS 0018945?  And do you see
25 that it lists that the employee's made a request for an

105

1 ADA accommodation?
2   A.  For what -- for what incidence or for what date
3 are you referring to?
4   Q.  This is related --
5   A.  Uh-huh.
6   Q.  This is dated December 7th, 2022, correct?
7   A.  Yes.
8   Q.  All right.  And this was with respect to the
9 leave that was given to you, correct?
10   A.  Sir, those dates coincide when my daughter Zoey
11 was born; and that was under different conditions, the
12 family leave.  I -- I never applied for FMLA subsequent
13 to my crash, my on-duty crash in 2020.
14   Q.  Okay.  But you were given -- if we look back at
15 Exhibit 1, you were -- you were listed as having a
16 temporary disability; and as a result, there were
17 limitations that were expected to end on October 26th,
18 2022.  Is that correct?
19   A.  Yes.  This was subsequent to my surgery, sir,
20 not to the crash.
21   Q.  Okay.  And you also had a disability
22 accommodation in 2016 -- I'm sorry, 2015.  Is that
23 correct?
24   A.  2015?  Yes, sir.  That was for a -- a back
25 injury as well that my symptoms started getting real bad

106

1  for my -- my discs.
2    Q.  All right.  So the disabilities that you
3  suffered regarding your back from your military service,
4  they were causing you some problems in 2015 that was
5  preventing you from being able to lift or do some of the
6  physical requirements of your job, correct?
7    A.  Yes, sir.  Uh-huh.
8    Q.  And you applied for a disability accommodation
9  in 2015, correct?
10   A.  Mr. Harris, the thing -- the thing that I'm --
11  I'm getting confused is I never applied for the -- for
12  disability accommodation.  It -- it was for light duty.
13  Now, what HR does aside from that, that's out of my
14  control.  But I remember filling out HR-87 -- I believe
15  it was a waiver -- to be on light duty because of my
16  back injury, but I -- I don't -- the other -- like, the
17  other form you showed me right now, that's an HR form
18  that I didn't fill out.  I just -- I know the dates
19  because I went -- I know that they're the birth of my
20  daughter.  Like, other HR forms that are filled out, I
21  don't know what's filled out on that --
22       MR. HARRIS:  Okay.  I'm putting Exhibit 7
23  into the Chat.
24       (Exhibit 7 marked)
25    Q.  (BY MR. HARRIS)  And I'm putting Exhibit 7 on

107

1  the screen.  Exhibit 7 is Bates numbered DPS 0018994.
2       And you talked about how there was a
3  paperwork that you submitted with respect to light duty.
4  And this appears to be a document signed by you.  Is
5  that correct?
6    A.  Yes, sir.  Uh-huh.
7    Q.  And it's a, again, waiver for your physical
8  readiness test, correct?
9    A.  Yes, sir.
10    Q.  And attached to it is a form completed by your
11  doctor with respect to your medical condition, correct?
12    A.  Yes.
13    Q.  And the doctor describes -- or lists that
14  employee being able to do physical readiness, correct?
15    A.  Yes, sir.  That's what I'm saying.
16    Q.  All right.  No in 2015, you submitted a
17  disability accommodation to -- because -- and supported
18  with this medical report, this HR-87 --
19    A.  Yes.
20    Q.  Is that the -- is that correct?
21    A.  Yes.
22       MR. NOTZON:  Objection.  Form.
23    Q.  (BY MR. HARRIS)  And the HR-87 indicated that
24  there were basically certain things that you were
25  totally restricted from.

108

1    A.  That's what it shows, yes, sir.  Uh-huh.
2    Q.  Things like lifting moderate or heavy weights,
3  correct?
4    A.  Yes, sir.
5    Q.  And these restrictions were fully removed in
6  2016.  Is that correct?
7    A.  I'm sure I was back to full duty.  I don't know
8  exactly what -- what year or what date, sir.
9    Q.  Okay.
10       MR. HARRIS:  And then I'll put Exhibit 8
11  into the Chat.
12       (Exhibit 8 marked)
13    Q.  (BY MR. HARRIS)  And I put it on the screen.
14  Exhibit 8 is Bates numbered DPS 0019 -- sorry -- 18990.
15  And this appears to be another From HR-87 that's dated
16  January 6th, 2016, submitted by your doctor.  Do you see
17  that?
18    A.  Yes.  Uh-huh.
19    Q.  All right.  And this indicated that you were
20  returned to full duty with no restriction as of
21  January 6th, 2016, correct?
22    A.  Yes.
23    Q.  All right.  So does this refresh your
24  recollection that you were returned to duty with full --
25  with no restrictions as of January 6th, 2016, correct?

109

1    A.  Yes, sir.
2    Q.  And this -- I will, you know, represent to you
3  that I have not seen another HR-87 submitted until 2022,
4  after your car accident.  Is that correct?
5    A.  So there's -- there's not going to be an HR-87
6  submitted when I collapsed in November of 2019 because
7  I -- during that time, I wasn't -- I -- Mark Koenig
8  never asked for the -- for the paperwork for it because
9  I was able to do a PRT test for that period.  The reason
10  why you see the HR-87 accompanied by the waiver is
11  because in order to be waived from the physical
12  readiness testing, the PRT, you need to have both an
13  HR-87A and a letter, along with other documentation,
14  that you're being waived for that testing period.
15    Q.  All right.  So you did not submit another
16  HR-17 -- sorry, HR-87 in 2019, correct?
17    A.  Right, because there was no -- no -- I was
18  not -- on that injury, I was not -- I was -- I was not
19  given a -- an accommodation for light duty or none of
20  that, sir.
21    Q.  And you didn't submit one in 2020, correct?
22    A.  No.
23    Q.  That is correct?
24    A.  That's correct.
25    Q.  And it's correct that you did not submit one in

Daniel Martinez - 4/6/2023

110

1   2021, correct?
2        A.  Correct.
3        Q.  But you did submit one in 2022, which was the
4   Exhibit 1 that we looked at before, correct?
5        A.  Yes, sir.  Mr. Harris, I stand corrected.
6   There's other HR-87s that were submitted through
7   St. David's Hospital as part of -- of my injury
8   immediately after the crash and I'm not sure where those
9   are at, but there's -- there's -- there's a lot of
10  issues with that because I'm still being -- I'm still
11  being charged for all those.  So I'm not sure.  Again,
12  I -- I don't know what HR does, but it was an on-duty
13  injury and someway, somehow, my account or my -- my case
14  wasn't filed correctly.  And I'm -- I'm not sure what
15  paperwork, who has it, because I'm still -- to this --
16  to this day, I'm still being billed for that crash and
17  for the other treatment from that crash.
18       Q.  And I'll -- sorry.
19       A.  Doctors from the workers' comp did submit
20  multiple HR-87s that they submitted.
21       Q.  Okay.  And I'll represent that I've seen a
22  number one -- of ones in 2022; but those are only after
23  your car accident that occurred in 2022, correct?
24       A.  Yes.
25            MR. HARRIS:  All right.  Now is probably a

111

1   good time to take a break.
2            MR. NOTZON:  Okay.
3            MR. HARRIS:  How about back in about
4   10 minutes?
5            THE REPORTER:  Yes, sir.  We are off the
6   record at 2:28 p.m.
7            (Recess taken)
8            THE REPORTER:  We are back on the record
9   at 2:36 p.m.
10       Q.  (BY MR. HARRIS)  All right.  Lieutenant
11  Martinez, you talked about -- you complained about -- in
12  your charge of discrimination about how in December 2020
13  you were denied a hardship transfer back to El Paso,
14  correct?
15       A.  Yes, sir.
16       Q.  And are you contending that the September 30th,
17  2000, incident, did that play any role in the denial of
18  the hardship transfer?
19       A.  That's in addition to the -- the -- the claim
20  that I'm making that day because that was my knowledge,
21  having a conversation with Chief Ruocco and Regional
22  Director Alanis, that the reasons why it wasn't --
23  their -- their explanation of the reason why I wasn't
24  approved was because of that incident.
25       Q.  So the September 30th, 2018, that incident that

112

1   resulted in a sustained C1 finding against you, that
2   played some role in the hardship denial, correct?
3            MR. NOTZON:  Objection.  Form.
4        A.  That's the explanation that I was given by the
5   chief's office and the regional director.
6        Q.  (BY MR. HARRIS)  And do you have any reason to
7   believe that that did not play a role in the decision?
8        A.  I do.
9        Q.  And what is -- what is that?
10       A.  Mr. Harris, they -- they said that I -- the
11  allegation was that because of that incident I ruined
12  relationships with the sheriff's office and other
13  agencies there at the El Paso Texas Anti-Gang Center.
14  And that incident, as you said, happened in September of
15  2018.  There's many operations and initiatives that I
16  worked jointly and closely with -- with a lot of the
17  agencies there at the TAG to include the sheriff's
18  office, and I was -- like -- like I mentioned earlier
19  from the beginning of this deposition, that I had a lot
20  of successful operations.  I even received awards by the
21  West Texas High Intensity Drug Trafficking Area, task
22  force there in El Paso which is led by the sheriff's
23  office.  And I was never made aware of any relationships
24  that I -- that I tainted because of that prior to
25  requesting a transfer to the Capitol.

113

1            It wasn't until, you know, the -- what,
2   2018, three -- three years later, I'm being told that I
3   ruined relationships at -- at the -- with the sheriff's
4   office and other agencies as the -- at the TAG, which,
5   to me, it's -- I was in disbelief because I -- even --
6   even though I was in Austin, I still continued to assist
7   those same agencies with investigations.  And some of
8   the work that we initiated continues, even to this day,
9   after I've been back and I've been -- I'm working --
10  this whole month, I've been working the violent crimes
11  task force with El Paso County Sheriff's Office, El Paso
12  PD, FBI, HSI.  And it's been very successful.  I'm --
13  I'm the supervisor over -- overseeing the initiative,
14  and I haven't had any issues with any agencies or ruin
15  any relationships.  I've -- I've grown, even, to
16  expanding that networking.  So I don't -- I don't agree
17  with however that came to fruition, that it was -- that
18  I ruined those relationships because of that incident.
19       Q.  So you don't agree with that conclusion, but
20  was it your understanding that that was what -- the
21  belief that the regional director in the El Paso area
22  believed?
23            MR. NOTZON:  Objection.  Form.
24       A.  The -- the regional director, Mr. Harris, he's
25  not involved in the day-to-day actions of every

114

1  division.  Just to kind of give you a bird's-eye view
2  of -- of what the regional directors do is they oversee
3  all the divisions in their area of the State.  So they
4  rely a lot on their majors and captains from each
5  division to give them an overview of -- of what's going
6  on in their divisions.
7        So at that time, back when chief -- or
8  RD Alanis was there, him and Major Shane Byrd didn't get
9  along.  So that was already friction between the RD and
10 the major.  So during the course of me -- and being in
11 Austin, Major Shane Byrd retired; and they appointed a
12 new major, Major Matt Mull.  Matt Mull was new to the --
13 to the region.  So, again, he's not as plugged in.
14 Similar to the regional director, he's not plugged in to
15 the day-and-day activities of -- of the CID lieutenant
16 areas.  He relies on his captains to let him know
17 exactly, you know, the details of what's going on with
18 their area.
19       So the major had a lot of influence from
20 Captain Krueger as far as Captain Krueger's opinion of
21 me, and that played a lot into what the major told the
22 regional director.  And ultimately, because of that,
23 there was an assumption that I ruined all these
24 relationships with the El Paso law enforcement
25 community.

115

1    Q.  (BY MR. HARRIS)  So Matt Mull was the regional
2  director at the time you made your hardship transfer
3  request, correct?
4    A.  No, sir.  Matt Mull was the major overseeing
5  the criminal investigations division in El Paso.  Shane
6  Byrd had just recently retired.  Major Matt Mull had
7  promoted.
8    Q.  You were never directly supervised by Heather
9  Krueger, correct?
10   A.  It depends, sir, because at times we were
11 still -- similar to right now, we're working Operation
12 Lone Star.  Every wave -- which they consider a wave a
13 week period of -- of assignment to the -- to the special
14 operation -- there's different supervisors.  So if I
15 have a -- if I'm overseeing the OLS wave this week, it
16 can be a -- a -- a different captain than my current
17 captain, Captain Nava.  Similar, it was just like that
18 back when I was in El Paso.  Before -- before Operation
19 Lone Star, it was Operation Secure Texas.  So we would
20 work Operation Secure Texas and at times -- actually, at
21 many of times, Captain Heather Krueger would be my -- my
22 supervisor on this operation.  So although she wasn't my
23 first-line supervisor, on special operations she would,
24 even to date.
25       MR. HARRIS:  I'm putting Exhibit 9 to the

116

1  Chat, and I'm placing it on the screen.  Exhibit 9
2  starts at Bates No. Daniel Martinez 222.
3         (Exhibit 9 marked)
4    Q.  (BY MR. HARRIS)  And my understanding is that
5  this is your hardship transfer request along with the
6  outcome of that.  Do you recognize at least the second
7  document in this?
8    A.  Which would be the denial or the memorandum,
9  sir?
10   Q.  Well, here.  I'm going to start on the first
11 page.
12   A.  Uh-huh.
13   Q.  And the first page appears to be an
14 announcement for a vacancy of lieutenant in El Paso,
15 correct?
16   A.  Yes, sir.
17   Q.  And so prior to this vacancy being opened,
18 you've made no effort or no attempt to move back to
19 El Paso, correct?
20   A.  I -- I couldn't, sir, because in order to
21 transfer into a position, there has to be a vacancy.  So
22 the --
23   Q.  Okay.
24   A.  Yeah.
25   Q.  So there was no possibility of transfer prior

117

1  to December 3rd, 2020, correct?
2    A.  Correct.
3    Q.  And this vacancy appears to be announced on
4  December 3rd, 2020.  Is that correct?
5    A.  Yes, sir.
6    Q.  And then a few days later, on December 8th,
7  2020, you submitted a hardship transfer request,
8  correct?
9    A.  Yes.
10   Q.  And this is that hardship transfer request --
11   A.  Yes, sir.
12   Q.  -- with your signature?
13       Now, my understanding is you're contending
14 that you made a request for a disability accommodation
15 in connection with your hardship transfer request.  Is
16 it this document in Exhibit 9 that -- what you are
17 contending is your disability accommodation request?
18   A.  Yes, sir.  I was -- I was asking not only for
19 my family's -- you know, for my daughter's issues and --
20 and I was also asking for mine, so I could be closer to
21 El Paso to take care of my back and continue with my --
22 my treatment there at the -- at the VA, sir.
23   Q.  All right.  And you were being treated by the
24 VA in Austin, correct?
25   A.  Yes, sir.  Uh-huh.

Daniel Martinez - 4/6/2023

118

1   Q.   And you eventually had a surgery in Austin,
2   correct?
3   A.   Yes, sir.
4   Q.   And that was paid for through the VA?
5   A.   No, not necessarily, sir.  You're still
6   responsible for some copay on it.
7   Q.   Okay.  But the VA paid for some portion of the
8   surgery cost, correct?
9   A.   Yes.
10  Q.   And the outcome of this is on the last page
11  where Chief Ruocco wrote to tell you that your request
12  was not approved on December 18th, 2020, correct?
13  A.   Yes.
14  Q.   And you were told that the reason why this
15  transfer was denied was because the leadership in
16  El Paso believed that you had damaged relationships with
17  other government law enforcement agencies like the
18  El Paso County Sheriff's Department, correct?
19      MR. NOTZON:  Objection.  Form.
20  A.   So I was told many things from different
21  people, sir.  The -- the main -- the main person that
22  told me about the issues was the regional director,
23  Regional Director Alanis.  But I was made aware of that
24  by -- same circumstances why I was denied by Chief
25  Ruocco and also Major Ortiz.  But Regional Director

119

1   Alanis actually met with me in his office in El Paso,
2   and we had a long conversation about why he -- why
3   ultimately the decision was made to not allow me to
4   transfer as a lieutenant to El Paso.  However, he would
5   allow me to return to El Paso by demoting to special
6   agent, which I -- I didn't take that option.
7   Q.   (BY MR. HARRIS)  And so he offered -- he
8   explained that you coming back to El Paso in a
9   supervisory position was not acceptable to him, correct,
10  but that you could come back if you were demoted?
11      MR. NOTZON:  Objection.  Form.
12  A.   He said -- he said that he understood, that
13  he -- he's -- he himself is a family man and he
14  understood my hardship and he would allow me to come
15  back as an agent if I needed to come back.
16      MR. HARRIS:  All right.  I am placing
17  Exhibit 10 into the Chat, and I'm placing Exhibit 10 on
18  the screen.  And Exhibit 10 is Bates labeled
19  DPS 0014837.   (Exhibit 10 marked)
20  Q.   (BY MR. HARRIS)  And do you recall seeing this
21  document before?
22  A.   This is the first time seeing it, sir.
23  Q.   All right.  And I think you previously
24  testified that Matt Mull was the major in the El Paso
25  area for the Criminal Investigations Division, correct?

120

1   A.   Yes, sir.
2   Q.   And I think you testified that you heard from
3   Regional Director Orlando Alanis about the reason for
4   the denial of the hardship transfer, correct?
5   A.   Yes.
6       MR. NOTZON:  Have you had a chance to read
7   this, Mr. Martinez?
8       THE WITNESS:  No, sir.  This is the first
9   time seeing it.
10  Q.   (BY MR. HARRIS)  All right.  I'll give you a
11  minute to read it.
12  A.   (Witness reviewing document.)
13       Okay.
14  Q.   All right.  Do you see that there's an
15  explanation here about how you were involved in a
16  September 2018 incident involving the El Paso County
17  Sheriff's Department?
18  A.   Yes, sir, I can read it.
19  Q.   And is it your understanding this is referenced
20  to the September 30th, 2018, incident that we talked
21  about earlier?
22  A.   Yes.
23  Q.   And as a result of that incident, one of your
24  subordinates was terminated, correct?
25  A.   That's not true, sir.  Oscar Hernandez was

121

1   never a subordinate of mine.
2   Q.   All right.  Well, Oscar Hernandez was
3   terminated as a result of the September 30th, 2018,
4   incident?
5   A.   No, sir.  There was multiple reasons why he was
6   terminated, not because of this incident.
7   Q.   And --
8   A.   Not just because of this incident.
9   Q.   But this -- that was one of the reasons why he
10  was terminated, correct?
11      MR. NOTZON:  Objection.  Form.
12  A.   I -- I'm not sure exactly.  I wasn't there on
13  his hearing whenever he got terminated, but this
14  memorandum is not accurate because it's saying that's --
15  one, it's one of my subordinates and that he was
16  terminated because of this incident.  That -- that's not
17  an accurate statement.  And -- and also that I strained
18  relationships with the sheriff's office.  That's not an
19  accurate statement as well.
20  Q.   (BY MR. HARRIS)  Okay.  So you disagree with
21  this document, correct?
22  A.   Yes, sir, I disagree with it.  And if I was
23  made aware of this document in December of 2020, I would
24  have appealed it and I would have presented my side
25  of -- of the reasons why I didn't agree with this.  This

122

1 is the first time seeing this document.
2    Q.  But this document about how the relationships
3 with the El Paso Sheriff Department was strained, that
4 was the reason that was explained to you by Regional
5 Director Alanis, correct?
6    A.  That was one of -- of the reasons, yes, sir.
7    Q.  All right.  Well, were there other reasons that
8 were explained to you as to why you were denied the
9 hardship transfer?
10    A.  Regional Director Alanis also believed that I
11 was better off at the Capital, and he told me that I --
12 I just -- I'd be better off staying at the Capitol.
13    Q.  So is it your testimony -- or your -- let me
14 start that again.
15        Is it your contention that the
16 September 30th, 2018, played no reason, no role in the
17 denial of your hardship transfer?
18        MR. NOTZON:  Objection.  Form.
19    A.  It is my contention, sir, that that's what
20 they're using to justify not allowing me to transfer
21 back, because, as you can see, this is the first time
22 I'm seeing that document.  And that document is not
23 accurate.  What is accurate is that I filed an EEO
24 complaint in June of 2020.  And after that, I started
25 receiving lots of adverse action against me from the

123

1 department.
2    Q.  (BY MR. HARRIS)  And you were told back in
3 December 2020 that because of this September 30th, 2018,
4 incident, that that was at least one of the reasons why
5 your hardship transfer was being denied, correct?
6    A.  Yes, I was told that.
7    Q.  All right.  And were you told that the
8 September 30th, 2018, incident also played a role in you
9 not getting a promotion to captain?
10    A.  I was never told that, sir.  I learned that
11 through the deposition of Chief Floyd Goodwin.
12    Q.  And is it your contention that the
13 September 30th, 2018, incident played no role in your
14 promotion denial?
15    A.  Can you repeat that again?
16    Q.  All right.  Well, surely the board knew about
17 your C1 from the September 30th, 2018, incident,
18 correct?
19    A.  Yes, sir.  One of the board members on the last
20 board was Heather Krueger.  She was one of the
21 participants that did the evaluation on the applicants.
22 She was one of the persons present that interviewed me
23 as part of that promotional process.
24    Q.  And that could have been the reason -- well,
25 let me stop that.  We'll rephrase the question.

124

1        We looked at the complaint that you made
2 against Mark Koenig, correct?
3    A.  We -- we just looked at the written complaint,
4 not the oral complaint that I -- that Mr. Haddox took as
5 part of the intake.
6    Q.  Was there anything in that oral complaint that
7 was not also captured in substance in your written
8 complaint?
9    A.  I was more in detail on my written -- my verbal
10 complaint to him where I -- I -- I explained to him
11 exactly what I experienced, what my agents were
12 experiencing and that I -- that I feared retaliation.
13    Q.  And you did not submit a written complaint
14 against Mark Hanson -- or, sorry, Lieutenant Hanson --
15 or let me strike that up again.
16        You did not submit a written complaint
17 against Lieutenant Chris Hanson, correct?
18    A.  No, sir.
19    Q.  You were copied on some text messages sent by
20 Lieutenant Hanson where he made some various
21 inappropriate jokes.  Is that correct?
22    A.  Yes, sir.
23    Q.  And those happened in 2020 and 2021, correct?
24    A.  Yes, sir.
25    Q.  But you did not make any complaint about the

125

1 content of those jokes, correct?
2        MR. NOTZON:  Objection.  Form.
3    A.  No, that's not correct, sir.  I did.
4    Q.  (BY MR. HARRIS)  When did you make a complaint
5 about them?
6    A.  To OIG investigator Deanna Thurman and to ICT
7 supervisor Stephen Meiners.
8    Q.  But that was not until 2022, correct?
9    A.  No, sir.  That was both in 2020 and -- both in
10 2020.
11    Q.  So in 2020 you made a written complaint
12 regarding Chris Hanson's texts?
13    A.  Actually 2020 and 2021, during Brenda Helton's
14 complaint that she filed.  So although I didn't file
15 directly or I didn't, you know, put something in paper,
16 the -- Deanna Thurmond conducted investigation on --
17 against Patrick Alonzo.  And I informed her of those
18 text messages.  I made her aware of them.  And I did the
19 same with the counter-complaint that Patrick Alonzo
20 filed against the person that filed against him.  And
21 neither of them looked into it because they didn't --
22 for some reason, I don't know, I'm not sure -- I'm not
23 responsible if they do or don't do, but I did make them
24 aware of the text.
25        And then again in 2021, when my admin

Daniel Martinez - 4/6/2023

126

1  who -- who ended up leaving DPS, resigning because of
2  the hostile work environment that she was claiming she
3  was under, I made aware of those text messages to
4  Lieutenant -- I forget his name -- Middleton or -- the
5  lieutenant that handled Ms. Brenda's complaint.
6      Q.  And what did you tell these people, in -- in
7  substance?
8      A.  I -- I explained -- I explained the -- the
9  nature of the text messages and how they were utilizing
10  self -- so the -- initially with Patrick Alonzo, his
11  complaint was about the double standard, that white
12  agents were being allowed to say certain things on group
13  texts as compared to the minorities.  So I -- I remember
14  putting out a group text threat whenever I started
15  hearing some unprofessional comments about something --
16  it was a sexual comment about a Slurpee.  And it was
17  regional -- regional information -- or Regional
18  Manager -- Intelligence Manager Rebecca Butler had
19  engaged in some conversation with another agent, Wayne
20  Cipriani, talking about Slurpees; and it had, like, a
21  sexual reference to it.
22          So on that group text, it was during the
23  George Floyd civil unrest, right?  So we all had a group
24  text to share intel.  I was the only supervisor that
25  spoke up and put a stop to it.  And because of that, I

127

1  was mocked during the briefing by Hanson, Chris Hanson,
2  with numerous witnesses that were there, mocking me
3  that -- that I had, you know, to be careful because,
4  "Oh, Danny's here.  Don't put -- don't put anything
5  out."
6          So I made her aware of not only just that
7  text message because Rebecca Butler had a complaint
8  against Patrick Alonzo, and Rebecca Butler had engaged
9  in similar text messages with other agents.  But
10  whenever Patrick Alonzo sent something in that nature,
11  she went ahead and filed a complaint against him.  So I
12  made Ms. Thurmond aware about all the other text
13  messages and I -- I -- and I -- to this day, the
14  only person that asked me for text messages was the last
15  OIG investigator, which at that time I was already part
16  of this lawsuit and I was not going to do anything
17  without my advice of counsel and I -- I -- I didn't
18  because that's -- they should have investigated that
19  back in 2020, not 2022 or 2023.
20      Q.  Were there any complaints against you that were
21  investigated after 2019?
22      A.  Yes, sir.
23      Q.  All right.  Which ones?
24      A.  After 2019, during my first months here at the
25  Capitol, Special Agent Victor Bibiloni Sambolin made an

128

1  allegation that Jari McPherson had claimed that I was
2  being racist towards him.  So I being an agent of
3  notice, I filed on myself or I reported myself to
4  Nathanael Haddox and let him know about that activity,
5  that somebody had made an allegation that I was
6  discriminating.  Nathanael Haddox investigated it.  He
7  followed up with an e-mail and a phone call that -- that
8  he had spoken to Jari and that Jari had never made those
9  comments and just to continue enforcing policies and --
10  and pretty much just nothing's there, just continue
11  doing your job.
12          I had asked Victor Bibiloni Sambolin for a
13  memorandum detailing exactly what Jari told -- told me;
14  and to this date, he never gave me one.  And it was --
15  it was because Mark Koenig had told him that he
16  needed -- he didn't need to file one, that the EEO
17  complaint was already -- found that it was -- there's
18  nothing there.  So that's one that -- that I recall.
19          Another complaint after that, I -- I
20  don't -- I don't recall any.  Drew, I don't know if --
21  if you have something to prove otherwise, but that's all
22  I -- all I recall.
23      Q.  I think that's the only one that I'm aware of.
24      A.  Okay.
25      Q.  At least with respect to race.

129

1          Are you aware of a complaint that you
2  volunteered your Unit 7C1 for additional work,
3  additional work duties?
4      A.  No, sir.
5          MR. NOTZON:  Objection.  Form.
6      Q.  (BY MR. HARRIS)  All right.  You did, in fact,
7  volunteer Unit 7C1 for additional work duties at times,
8  correct?
9          MR. NOTZON:  Objection.  Form.
10      A.  During what period are -- are you asking, sir?
11      Q.  (BY MR. HARRIS)  Well, let's start for 2020,
12  during the George Floyd riots or the protests.  You
13  volunteered Unit 7C1 for some additional duties,
14  correct?
15          MR. NOTZON:  Objection.  Form.
16      A.  No, sir.
17      Q.  (BY MR. HARRIS)  It's your testimony that you
18  did not take on any -- or voluntarily take on any
19  additional work assignments in 2020 for Unit 7C1?
20          MR. NOTZON:  Objection.  Form.
21      A.  Can -- can you exactly -- can you describe what
22  do you mean by volunteering for -- for what additional
23  duties, sir, because --
24      Q.  (BY MR. HARRIS)  We're -- my understanding
25  is -- is that the work assignments were done with the

130

1  three -- you lieutenants of the three different
2  divisions meeting with Mark Koenig and discussing work
3  assignments and words schedules, correct?
4         MR. NOTZON: Objection. Form.
5    A.  No.
6    Q.  (BY MR. HARRIS)  Isn't -- isn't that how
7  assign -- the work schedule is created?
8    A.  No, sir.  The work schedule that was created
9  was independently done just between Mark Koenig and
10  Hanson initially during the -- the COVID 19 and the
11  civil unrest, without any input from myself or
12  Lieutenant Saldivar or any other agents.
13   Q.  It's your testimony that you did not
14  participate in any meetings where assignments -- work
15  assignments were divvied up and agreed to?
16   A.  Sir, that's the reason why I'm asking during
17  what period, because there was one period where it
18  was -- I had very little input on the assignments that
19  were being made.
20   Q.  But there were some other period where that was
21  the -- typically the way that work assignments were
22  agreed upon, correct?
23   A.  No, sir.  It wasn't after we complained -- by
24  "we," myself and Lieutenant Saldivar -- about the
25  unfairness on the schedule, that it -- it benefited

131

1  Lieutenant Hanson, that Captain Koenig and the major had
2  to get involved because the dis -- the disparages
3  were -- were pretty obvious in the work assignments that
4  everything was benefiting Chris Hanson.
5         So after that period, we had a meeting
6  with the major, the captain and came up with a schedule.
7  And the schedule -- it is to my understanding that the
8  regional director, David Cabrera, had some input in
9  decision-making on -- on making it fair.  But that was
10  after the complaint was filed of the disparities and
11  discrimination.  That's why I keep asking during what
12  period, sir.
13        And then just to follow up on -- on more,
14  after -- after Captain Koenig retired, we had a
15  different -- a new captain that was very -- very
16  proactive and supported a different vision of the
17  captain.  So -- which is why --
18   Q.  When did Captain Koenig retire?
19   A.  I want to say he retired --
20        MR. NOTZON: Finish your answer,
21  Mr. Martinez.  Did you finish your answer?
22        THE WITNESS: Yes, sir.  I --
23        MR. NOTZON: Okay.
24        THE WITNESS: Yes, sir.  I lost my train
25  of thought, honestly.

132

1    Q.  (BY MR. HARRIS)  All right.  When did Captain
2  Koenig retire?
3    A.  May -- I want to say May of 2021.
4    Q.  And prior to Mark Koenig retiring, he had
5  already implemented an approach where you were consulted
6  on the work schedule, correct?
7    A.  After the regional director had to get
8  involved.  Yes, sir.
9    Q.  So you made your complaint in June of 2020,
10  correct?
11   A.  Yes, sir.
12   Q.  And in July of 2020, Agent McPherson was
13  transferred to Unit 7C2, correct?
14   A.  Yes.
15   Q.  And after June of 2020, there was an effort
16  made to make sure that you gave input on the schedule,
17  correct?
18   A.  Yes.  After the regional director was involved,
19  yes, sir.
20   Q.  And that would have happened by July of 2021,
21  correct -- or, sorry, that would have happened by July
22  of 2020, correct?
23   A.  I don't recall the date, sir.  I'm sorry.  It's
24  been a while ago.
25   Q.  All right.  Well, it was certainly before Mark

133

1  Koenig retired in May 2021, correct?
2    A.  Yes.  Uh-huh.
3    Q.  And who was the new captain after that?
4    A.  Captain Ralph Ohland.
5    Q.  And Captain -- with Captain Ralph Ohland, you
6  did not experience any sort of disparate workload
7  between your units, correct?
8    A.  I wouldn't say disparate workload.  It's just
9  the -- the tempo increased because he's -- like I said,
10  he had a different -- he has a different vision of the
11  Capitol, of being more proactive.  So our work product
12  did increase, and the other shifts -- so what Captain
13  Ralph Ohland did, he brought structure to the Capitol
14  Region.  So everybody understood their role, their
15  assignment.  He created a strategic plan as compared to
16  Koenig, who just did everything at the -- you know,
17  on -- on the fly.
18        Just to give you perspective, sir, I --
19  through my whole time with Koenig, I never -- he -- and
20  I asked for the opportunity to sit down with him and to
21  give me the goals, expectations.  He never did.  And
22  Ralph Ohland was a -- a breath of fresh air because he
23  came in with a vision to -- to have units do specific
24  jobs and had a strategic plan and an action plan, where
25  before we didn't -- we didn't have none of that.  We

138

1    A.   Gabriel Nava.  He goes by Gabe, Gabe Nava.

2    Q.   And there is one other captain position in

3  El Paso that's currently being held by Heather Krueger,

4  correct?

5    A.   Yes, sir.

6    Q.   And Captain Krueger has been captain at least

7  since before 2018, correct?

8    A.   Yes, sir.

9    Q.   So when you applied for the HR captain

10  position, that would not have been in El Paso, correct?

11    A.   That would have been at headquarters, while I

12  was at headquarters, at Austin.

13    Q.   And what economic damages are you claiming in

14  this case?

15         MR. NOTZON:  Objection.  Form.

16    A.   Sir, it -- it placed a lot of strain on my

17  family, which is why I'm saying that I'm not moving my

18  family anymore.  I don't know the -- the exact number,

19  you know, that my counsel has; but I can tell you it --

20  it put a lot of strain in -- in our -- my family unit

21  and our -- our -- our income and our savings.  To this

22  day, I haven't been able to sell the house in -- in --

23  Manor, you know.  So there is some monetary issue there;

24  but I -- I don't have that information to give to you,

25  sir, what's -- from all that, you know.

139

1    Q.   (BY MR. HARRIS)  Do you have -- know if there's

2  an economic expert that's made an assessment with

3  respect to your damages?

4    A.   Yes, sir, he has.  And he'd probably be the

5  best suited to answer that question because he -- I

6  don't -- I don't know the -- the amount or none of that.

7    Q.   Did you have any conversations with this

8  economic expert?

9    A.   I did.

10    Q.   All right.  What is his name?

11    A.   Sir, it's been a while.  I -- I don't remember

12  his name or -- I just talked to him once throughout this

13  whole process.  And I had to provide a lot of documents

14  to him that I don't -- I don't know what he did with all

15  that.

16    Q.   Now, you mentioned about the economic strain on

17  your family.  Your move back to El Paso in 2022, that

18  was a voluntary transfer, correct?

19    A.   Yes, sir.

20    Q.   All right.  So that was not caused by this

21  lawsuit, correct?

22         MR. NOTZON:  Objection.  Form.

23    A.   So when -- when I had a -- initially asked for

24  a hardship, we hadn't purchased a house yet in -- in

25  Austin.  We were renting.  Once my transfer was denied,

140

1  we had to make a decision whether to extend the lease or

2  purchase a property.  And the -- the -- the option we

3  had at that time was, you know, might as well just

4  pay -- you know, buy -- buy the house.  So we purchased

5  a house.  We had to sell the property in El Paso to put

6  as down payment for the -- for our current house that we

7  still have in Austin.  So I think it's all still

8  related, sir.  If I was granted that hardship back in

9  2020, we wouldn't be here right now having to sell my

10  property in El Paso and now having to worry about paying

11  two mortgages.

12    Q.   (BY MR. HARRIS)  Are you happy being back in

13  El Paso?

14    A.   You know what, sir, my -- my daughters are the

15  ones that are -- I mean, it's a completely different --

16  little girls, you know, with their -- with their cousins

17  and grandparents and -- and family -- all our family is

18  here.  They're happy.  So I'm happy, you know.  We do

19  all this for family.  I'm sure you work hard and

20  everybody works hard to -- to -- for their families and

21  the legacy they leave behind.  And my -- my daughters

22  are happy.  My wife is happy.

23         MR. HARRIS:  All right.  Well, at this

24  point, I will pass the witness.

25

141

1              EXAMINATION

2    Q.   (BY MR. NOTZON)  Okay.  Mr. Martinez, I'm going

3  to ask you a couple of follow-up questions; and I'm

4  going to bounce around a little bit because I'm not

5  going to try to plow new -- new ground.

6         Prior to June of 2020 when you made your

7  written complaint of discrimination at DPS in Austin,

8  had you made any verbal reports of discrimination to

9  members of management?

10    A.   Yes, sir, I had.

11    Q.   And who in management did you make reports of

12  discrimination to prior to your written complaint?

13    A.   To Mark Koenig and also Gabriel Ortiz, our

14  major.

15    Q.   Okay.  And are you aware if any other employees

16  at the -- in the Capitol Region also had made complaints

17  of racial discrimination prior to your written

18  complaint?

19    A.   Yes, sir.

20    Q.   And -- and who are those individuals, and who

21  did they complain to?

22    A.   Dori Livingston complained to Mark Koenig.

23  Patrick Alonzo complained to Mark Koenig as well, the

24  captain.  That's all -- all I'm aware of, sir.

25    Q.   Okay.  And those two individuals are black?

**142**

1   A.  Yes.
2   Q.  Okay.  The vehicle that you participated in
3 disabling, were you the only person that disabled the
4 vehicle?
5   A.  No, sir.
6   Q.  Who else did?
7   A.  Calvin Green and Gabriel Nava.
8   Q.  Okay.  And did they get a C1 as well?
9   A.  Yes, sir.
10   Q.  Okay.  And despite having a C1, Mr. Nava is now
11 a captain?
12   A.  Yes.  He's my captain.
13   Q.  So that didn't -- that didn't disqualify him
14 from being a captain?
15   A.  No.
16       MR. HARRIS:  Objection.  Leading.
17   Q.  (BY MR. NOTZON)  Did -- did -- well, is it
18 simple deduction that because Gabe Nava is a captain,
19 that his C1 didn't preclude him from doing that?
20       MR. HARRIS:  Object to the form of the
21 question.
22   A.  Yes, sir, that's -- he -- he -- it was the same
23 investigation as I, and he was able to promote to
24 captain.
25   Q.  (BY MR. NOTZON)  Okay.  And whose truck was

**143**

1 that?
2   A.  Oscar Hernandez.
3   Q.  And did Mr. Hernandez give you permission to
4 disable that vehicle?
5   A.  Yes, sir, to all three of us, Calvin Green and
6 myself and Gabriel Nava.
7   Q.  Okay.  So you didn't disable a vehicle to harm
8 anybody's rights to that vehicle?
9   A.  No, sir.
10   Q.  Okay.  And there were some questions about
11 whether or not you have an opinion as to whether or not
12 you ruined relationships between DPS and the sheriff's
13 office in El Paso.  Do you recall those questions?
14   A.  Yes.
15   Q.  Is it your opinion that you did not ruin
16 relations, or is it -- do you have -- are you saying
17 that there's evidence that you did not ruin relations?
18   A.  I have factual evidence, sir, that I -- I
19 didn't ruin those relationships.  From the period of
20 September 2018 to the time I left the El Paso in October
21 of -- 15 of 2019, I maintained relationships with the
22 sheriff's office.  As I mentioned, I even got an award
23 by the HIDTA through the sheriff's office, intel support
24 section, and worked a lot of investigations with many
25 agencies at the TAG and worked with one specific

**144**

1 sergeant who -- because of the work we did, it still
2 continues at the TAG.  Sergeant Graciano, he was over
3 the warrants division; and we did a warrant roundup.
4 And this was all during the period that -- that I was --
5 after the September 2018 issue.  And to date, even --
6 you know, while I got back -- when I got back in -- in
7 October, November to now, I mean, I'm -- I'm working
8 with the sheriff's office.  We've helped them out on
9 many investigations.  They help us.  And like I
10 mentioned before in deposition, this deposition, that
11 we're currently working a violent crimes task force
12 operation and every day we're out there work alongside
13 the sheriff's office, constables, FBI, ATF and no
14 relationships have been strained.
15   Q.  Okay.  So has anyone from the El Paso sheriff's
16 office told you or indicated to you that there's any
17 strain in the relationships that you've had and DPS has
18 had with the sheriff's office since September 30th of
19 2018?
20       MR. HARRIS:  Objection to the form of the
21 question.
22   A.  No, sir.  No, sir.  And I -- I consistently
23 meet with a lot of the deputies, the sergeants,
24 lieutenants, commanders; and nobody to date has
25 disclosed that to me.

**145**

1   Q.  (BY MR. NOTZON)  Okay.  And I think earlier you
2 testified about Heather Krueger having problems with
3 males.  Do you recall that testimony?
4   A.  Yes, sir.
5   Q.  It -- is it your observation that she has
6 problems with males or with Hispanic males?
7   A.  Hispanic males in -- in authority, places of
8 authority.
9   Q.  And then the -- the term you said that she used
10 against you, the derogatory term, what was that?
11   A.  Machista.
12   Q.  And is that directed at your Hispanic heritage?
13   A.  Yes, sir, especially -- I used to have a
14 mustache back in the day, and she considered my mustache
15 as being machista.
16   Q.  Okay.  And then there was some questions about
17 your national origin.  Do you understand what the legal
18 requirements are related to qualifying as a national
19 origin claim?
20   A.  No, sir.
21   Q.  Do you understand that national origin isn't --
22 is or isn't related to your citizenship?
23   A.  No, sir.
24   Q.  Okay.  Are you an American citizen?
25   A.  I am.

146

1    Q.  Okay.  Do you know if you can be of a different
2  national origin than white and still be an American
3  citizen?
4    A.  Yes, sir.
5    Q.  Okay.  And on the hardship disability that you
6  were asking for, they were willing to allow you to
7  transfer if you demoted, correct?
8    A.  Yes.
9    Q.  So is the two-year commitment -- does the
10  policy about a two-year commitment after you transfer,
11  is it -- it's a two-year commitment unless you agree to
12  demote?  Is that what the policy says?
13         MR. HARRIS:  Object to the form of the
14  question.
15    A.  No, sir.
16    Q.  (BY MR. NOTZON)  (Indicating).
17    A.  No, sir.
18    Q.  Okay.  So as long as you penalized yourself,
19  then you could have transferred in your situation?
20         MR. HARRIS:  Object to the form of the
21  question.
22    A.  Yes.  I wasn't willing to -- to demote and give
23  up my rank and what I've worked hard for.
24    Q.  (BY MR. NOTZON)  Right.  But -- but they
25  were -- they were willing to do that for you if you

147

1  self-hurt yourself?
2    A.  Yes.
3         MR. HARRIS:  Objection.  Leading.
4  Objection to the form of the question.
5    Q.  (BY MR. NOTZON)  Is there any legitimate reason
6  that you were provided for why OIG waited over two years
7  to start an investigation of your complaint of
8  discrimination?
9    A.  No, sir.
10    Q.  In Exhibit 10, which was that document you'd
11  never seen before, do you recall it said there was a
12  major off-duty incident?
13    A.  Yes.
14    Q.  What was major about that off-duty incident?
15    A.  I -- I don't know, sir.  There's -- I don't
16  know how they're perceiving that as being major.
17    Q.  Okay.  And I -- I think you already testified
18  that the entirety of that document was -- was -- was it
19  accurate?
20    A.  No.
21    Q.  You compared a Rebecca Butler with Patrick
22  Alonzo.  Is Butler white?
23    A.  She is, yes, sir.
24    Q.  And Alonzo's black?
25    A.  Yes.

148

1    Q.  So were you drawing a racial comparison between
2  the difference in the -- the way those two were treated?
3    A.  Yes, sir, I was.
4    Q.  You talked about how Mr. Bibiloni Sambolin had
5  made a false complaint that Jari McPherson had made a
6  racial discrimination complaint against you.  Do you
7  recall that?
8    A.  Yes.
9    Q.  And was Mr. Bibiloni Sambolin, was he ever
10  disciplined for making a false complaint?
11    A.  No, sir.
12    Q.  And Chris Hanson is white.  Is that correct?
13    A.  Yes.
14    Q.  Jari McPherson, there was some testimony about
15  he was allowed to transfer to 7C2 from 7C1 in July of
16  2020.  Do you recall that?
17    A.  I do.
18    Q.  Do you recall that Mr. McPherson had tried to
19  get on 7C2 from the beginning of when he came to Austin
20  to Temple?
21    A.  Yes, sir, I do.
22    Q.  And was he denied that opportunity?
23    A.  Yes.
24    Q.  And were those denials based on false
25  information that kept him from being placed on 7C1

149

1  instead of 7C2?
2    A.  Yes, sir.
3         MR. HARRIS:  Object to the form of the
4  question.
5    Q.  (BY MR. NOTZON)  What was the answer?
6    A.  Yes.
7    Q.  And -- and do you remember the -- the false
8  reason and -- and why it was false?
9    A.  Yes, sir.  So he was denied -- my
10  understanding, he was denied by Captain Koenig the
11  transfer over to -- to the 7C2 squad for multiple
12  reasons.  One being that he needed to learn his job as
13  in the Capitol district.  Also, that, you know, he was
14  there because he was the most senior tenured -- or that
15  he had the most people of experience with an
16  investigation squad, which it does kind of counter each
17  other.  But at -- at the end of the day, there was a lot
18  of misinformation about Jari at that time based on the
19  reasons why he left Temple.  And that kind of influenced
20  a lot of people's perceptions and opinions on Jari,
21  which ultimately that transfer was denied by -- by
22  Capital Koenig.
23    Q.  And was his leaving Temple related to race or
24  race discrimination complaints?
25         MR. HARRIS:  Object to the form of the

Daniel Martinez - 4/6/2023

150

1  question.
2     A.  Yes, sir, it was.
3     Q.  (BY MR. NOTZON)  And -- and how do you know
4  that?
5     A.  Personal knowledge from the -- first day
6  that I was picked up by Chris Hanson to report to the
7  Capitol.  Chris Hanson made me aware of the issues that
8  allegedly Jari had while under the supervision of
9  Captain Schwartz and, you know, that allegedly he had
10  already filed some kind of -- some kind of complaint or
11  lawsuit pertained to race.  And he was just kind of
12  making me aware of Jari and to be careful of Jari and
13  that Jari was known to raise the -- the -- play the race
14  card whenever there was accountability being held
15  against him.  And he said he knew this because he worked
16  in -- in Waco district and that he helped out during
17  Jari's investigation that Captain Schwartz conducted.
18  And, also, he did a line inspection.  Line inspection is
19  done at CID every two years where you inspect the area;
20  you try to find any issues with the area pertaining
21  from -- anything from morale, discipline issues and
22  trusted property.  There's a laundry list of things to
23  check.  And Chris said he had knowledge because of
24  those -- those two things.
25     Q.  And Mr. McPherson was allowed to go to 7C2

151

1  after you had made your verbal and written complaint of
2  discrimination against Mr. -- Captain Koenig?
3     A.  Yes, sir.
4     Q.  And did your complaint against Captain Koenig,
5  did it include the fact that all the blacks were in one
6  unit?
7     A.  Yes.
8        MR. NOTZON:  All right.  I'll pass the
9  witness.
10        MR. HARRIS:  Pass the witness back or
11  reserve the rest of the questions for trial.
12        MR. NOTZON:  Okay.  We would like the
13  opportunity to read and sign.
14        THE REPORTER:  Yes, sir.  So at this time,
15  we will be concluded.  The time is 3:42 p.m.
16        (Deposition concluded at 3:42 p.m.)
17
18
19
20
21
22
23
24
25

152

1              CHANGES AND SIGNATURE
2  PAGE LINE  CHANGE            REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

153

1
2
3
4
5
6
7
8     I declare under penalty of perjury that the
9  foregoing is true and correct.
10
11      _____
12           DANIEL MARTINEZ
13
14
15     SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned
16  authority, by the witness, DANIEL MARTINEZ, on this the
17  _____ day of _____, _____.
18
19      _____
20           NOTARY PUBLIC IN AND FOR
21           THE STATE OF _____
22
23  My Commission Expires: _____
24
25

154

1  STATE OF TEXAS
   COUNTY OF MONTGOMERY
2          REPORTER'S CERTIFICATE
3     I, Dana Richardson, a Certified Shorthand Reporter
4  in and for the State of Texas, do certify that this
5  deposition transcript is a true record of the testimony
6  given by the witness named herein, after said witness
7  was duly sworn by me.  The witness was requested to
8  review the deposition.
9     I further certify that I am neither attorney or
10 counsel for, related to, nor employed by any parties to
11 the action in which this testimony is taken and,
12 further, that I am not a relative or employee of any
13 counsel employed by the parties hereto or financially
14 interested in the action.
15    I further certify that the amount of time used by
   each party at the deposition is as follows:
16
      Mr. Drew Harris - 04:02
17    Mr. Robert Notzon - 00:14
18    SUBSCRIBED AND SWORN TO under my hand and seal of
   office on this the 18th day of April, 2023.
19
20
   _____
21    Dana Richardson, RPR, TX CSR 5386
      Expiration:  01/31/24
22    Integrity Legal Support Solutions
      Firm Registration No. 528
23    9901 Brodie Lane, Suite 160-400
      Austin, Texas 78748
24    (512) 320-8690
      www.integritylegal.support
25