# EX. 3

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
                        AUSTIN DIVISION

JARI MCPHERSON, JERALD        )
SAMS, AND DANIEL MARTINEZ,    )
                              )
           Plaintiffs,        )
                              )  CIVIL ACTION
VS.                           )
                              )  NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC    )
SAFETY,                       )
                              )
           Defendant.         )
```

-----------------------------------

REMOTE ORAL DEPOSITION OF

JARI MCPHERSON

JANUARY 18, 2023

-----------------------------------

REMOTE ORAL DEPOSITION OF JARI MCPHERSON, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on January 18, 2023, from 9:41 a.m. to 3:08 p.m., via Zoom, before Vanessa J. Theisen, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

## Page 46

1  Q. Did he ever reduce your salary?
2  A. No, sir.
3  Q. Did he ever put you on discipline?
4  A. No, sir.
5  Q. All right. With respect to race
6  discrimination, how are you alleging that he
7  discriminated against you?
8  A. He allowed white lesser-tenured, lesser-
9  experienced troopers to promote into 7C2, when he
10 advised me, who was a tenured agent and had four
11 years total of investigative experience, that I had
12 to first go to 7C1 in -- in order to learn 7C1
13 investigations, when white agents did not. They were
14 allowed to go straight into 7C2.
15         I asked to go to 7C2 when I first got
16 here and was told that I could not because I had no
17 capital investigative experience, but I had field and
18 regulatory investigative experience. Those white
19 agents had no CID investigative experience whatsoever
20 and were able to go straight to 7C2.
21 Q. You said "those white agents." There is, in
22 fact, only one white agent with no experience who was
23 assigned to 7C2, correct?
24 A. There have been multiple white agents since
25 that time that have been able to come into 7C2

## Page 47

1  without going to 7C1.
2  Q. There's not a pay difference between
3  Unit 7C2 and 7C1, correct?
4  A. No, sir.
5  Q. I think the answer to my question is a
6  little confusing. Are you saying that it is correct
7  or not correct?
8  A. That there is a pay difference between the
9  unit?
10 Q. Yes.
11 A. No, there is no pay difference between the
12 units.
13 Q. So 7C1, 7C2, and 7C3, they all have the same
14 pay, correct?
15 A. Depending on you individually, how long you
16 have been with the --
17 Q. Right.
18 A. -- department and where you are, yes, sir.
19 Q. So in other words, depending on your tenure
20 or maybe any merits or any other whatever -- well,
21 strike that. Let's start over again.
22         Unit 7C1 and Unit 7C2 have different
23 responsibilities, correct?
24 A. Correct.
25 Q. And same thing with Unit 7C3, that it has

## Page 48

1  different responsibilities from the other two units,
2  correct?
3  A. Correct.
4  Q. But there's no pay difference between the
5  three units, correct?
6  A. Correct.
7  Q. It's just different job duty assignments,
8  correct?
9  A. Correct.
10 Q. Now, apart from you not being immediately
11 placed in Unit 7C2, are you claiming anything else
12 that Captain Koenig did that was race discrimination
13 against you?
14 A. Yes.
15 Q. What?
16 A. The whole situation regarding the vehicle.
17 Well, I would say that was probably more so
18 retaliation than race discrimination. But a lot of
19 the things that he -- again, his actions, the way
20 that he looked at me, the way that he spoke to me,
21 the way that he did not acknowledge me. Just those
22 -- those things were a lot of what Mark Koenig did at
23 that time.
24 Q. Now, I believe you testified initially that
25 when you had initial discussions with Mark Koenig, he

## Page 49

1  had proposed a way or he had let you just drive your
2  vehicle to your residence initially, correct?
3  A. Correct.
4  Q. So his initial approach in terms of how he
5  was handling your use of the vehicle, that wasn't in
6  any way discriminatory or retaliatory, correct?
7  A. Say that again?
8  Q. The way Mark Koenig initially handled your
9  request to drive the state-issued vehicle more than
10 50 miles, where he initially said that he would -- to
11 -- I believe you previously testified that he would
12 worry about it later, that that initial approach,
13 you're not claiming that that was discriminatory or
14 retaliatory, correct?
15 A. Correct.
16 Q. And then at some point he -- after there
17 were some complaints made or it became an issue, he
18 directed you to park it at a facility in Florence,
19 correct?
20 A. Incorrect.
21 Q. Okay. How did it come about that you were
22 directed to park the vehicle at a facility in
23 Florence?
24 A. Lieutenant Danny Martinez.
25 Q. Okay. And you're not maintaining that

142

1 responsibilities to do things as assigned if they
2 came up?
3     A.  Depending on the job.  Every -- every unit
4 had their specialty.  So if it was a CSU job that
5 came up, 7C1 wouldn't do it, 7C2 would.
6     Q.  But there was an exception for that during
7 the George Floyd riots, correct?
8     A.  Slightly.
9     Q.  So during the George Floyd riots, there was
10 a lot of activity at the Texas Capitol, correct?
11     A.  Correct.
12     Q.  In fact, there were riots at the -- around
13 the Texas Capitol, correct?
14     A.  Correct.
15     Q.  And all the units, 7C1, 7C2, and 7C3, were
16 all assigned to work those riots.  Is that correct?
17     A.  Not all the time, no.
18     Q.  Okay.  I'm not saying all the time.  But at
19 various times during the riots, all members of all
20 units were required to work counter-surveillance
21 during the riots, correct?
22     A.  That's correct.  Yes, sir.
23     Q.  But that was a unique -- now, has that
24 circumstance repeated since the George Floyd riots?
25     A.  No, sir.  Not until recently due to the

143

1 legislative session.
2     Q.  All right.  So during the legislative
3 session, again, there may be some occasion where
4 members of 7C1 or 7C3 may be assigned to do
5 counter-surveillance around the Capitol, correct?
6     A.  Correct.
7     Q.  Now, when you were working in Unit 7C1
8 before the riots, were you handling investigations?
9     A.  Yes.
10     Q.  And were you working overtime?
11     A.  Working overtime?
12     Q.  Yeah.  Did you work overtime at any point
13 during that time period?
14     A.  At any point?  Yes.
15     Q.  All right.  And did you work weekend shifts
16 at times?
17     A.  During -- it depends.  It depends.  Yes, we
18 did at times.
19     Q.  All right.  So during the riots in
20 particular you were --
21     A.  Yes.
22     Q.  -- working substantial overtime, correct?
23     A.  Correct.
24     Q.  And, in fact, pretty much everybody was in
25 your unit and the other units within Region 7,

144

1 correct?  Let me -- let me rephrase that question.
2         Pretty much most everybody in Unit 7C1,
3 7C2, and 7C3 were working overtime during the George
4 Floyd riots, correct?
5     A.  Some more than others, but yes.
6     Q.  And is it your contention that when you were
7 in Unit 7C1 you had to work more overtime than the
8 other two units?
9     A.  Yes, it felt that way.
10     Q.  All right.  It felt that way.  Have you --
11 do you have -- have you reviewed all the overtime
12 requests for compensation paid for the other units?
13     A.  No, I have not.
14     Q.  So you don't have personal knowledge of
15 whether or not you actually worked more overtime; it
16 just felt that way?
17     A.  I was there, and it felt that way, yes.
18     Q.  But all three units were required to work
19 overtime during the riots, correct?
20     A.  I will give you the same answer.  Yes, some
21 more than others.
22     Q.  Okay.  Now, after the riots were over, when
23 you were in Unit 7C1 were you able to return to just
24 doing investigations?
25     A.  No, because around about the time that the

145

1 riots were over, I ended up going to 7C2.  So when we
2 kind of got fully released from that -- because we
3 still carried that on just in case the riots came --
4 came up again.  So we didn't just stop immediately
5 when the last -- when we thought the last riot
6 happened.  So we carried that out.  So I don't -- I
7 don't -- I'm not sure, but it kind of felt like that
8 -- from what I can recall, I moved straight from 7C1
9 into 7C2.
10     Q.  All right.
11     A.  And that came as a result of the work that I
12 had done with Antifa and identifying a lot of the
13 suspects and subjects in the crowd.
14     Q.  So while you were in 7C1 but working during
15 the riots, you did a lot of undercover work, correct?
16     A.  Correct.
17     Q.  And you received a lot of recognition for
18 that undercover work, correct?
19     A.  Correct.
20     Q.  Can you tell me what recognition you
21 received?
22     A.  Most of that was just verbal.  I should have
23 received an award that I just recently got, which was
24 the Regional Director's Award.
25         THE REPORTER:  I'm sorry, the what?

146

1 Director?  Regional?
2            THE WITNESS:  Regional Director's Award.
3            THE REPORTER:  Thank you.
4     A.  I just got that earlier this month -- last
5  month.  Last month, I'm sorry.  But I should have
6  gotten one back then.  But from what I understand
7  from my chain of command, I was not put in for it.
8  Chris Hanson, that ended up being my lieutenant, he
9  received a Regional Director's Award that none of us
10 knew about.  So our lieutenant received one for the
11 work that we did, but we didn't receive one -- or I
12 didn't receive one.  Uh-huh.
13    Q.  (BY MR. HARRIS)  But I think you said that
14 in recognition of your work, your undercover work,
15 you ended up being reassigned to Unit 7C2.  Is that
16 correct?
17    A.  Correct.  And my recog -- the recognition
18 was verbal.  It -- nothing in writing.
19    Q.  And --
20    A.  No -- no significant anything.
21    Q.  -- and when was that move to Unit 7C2?
22    A.  I'll give you the same answer I gave
23 earlier.  I'm not sure of the exact time frame, but
24 it was that summer.  Sometime during that summer.
25           MR. HARRIS:  All right.  Why don't we go

147

1  off the record.
2            THE REPORTER:  Okay.  Off the record at
3  2:40.
4            (Recess from 2:40 p.m. to 2:54 p.m.)
5            THE REPORTER:  Back on the record.
6     Q.  (BY MR. HARRIS)  So Mr. McPherson, did
7  Lieutenant Hanson write a recommendation for you?
8     A.  A recommendation for?
9     Q.  For promotion?
10    A.  Did he write a recommendation?  That, I
11 don't know.
12    Q.  Do you know if he ever supported you in your
13 promotion efforts?
14    A.  No, I don't.  If he did, I didn't see it.
15 I'm not saying he was against me promoting, but I
16 never saw anything where he promoted me for -- for
17 promoting.
18    Q.  Did he write you a letter of recommendation?
19    A.  I've never seen it if he did.
20    Q.  All right.  Did you write something in
21 recommendation for Lieutenant Hanson?
22    A.  For recommendation?
23    Q.  Did you write some sort of recommendation or
24 something to support him in efforts for promotion?
25    A.  That, I don't think I did either.  If I --

148

1  if I did and you can refresh my memory, then I'll
2  speak on that.
3     Q.  Uh-huh.  All right.  With respect to
4  Lieutenant Martinez, you initially had some
5  complaints against him, correct?
6     A.  I had some complaints about the way he was
7  coming at me, yes.  But I later found out that that
8  was a tribute to the way that the chain of command
9  had painted me to him.
10    Q.  And so you initially had a negative
11 relationship, correct?
12    A.  Correct.
13    Q.  And then later on you two became friends?
14    A.  Correct.
15    Q.  And do you still text message with him?
16    A.  Do I text Danny?  No, I speak to Danny.
17    Q.  Okay.  You speak to him by phone?
18    A.  Yes.
19    Q.  And so he's currently in El Paso now,
20 correct?
21    A.  Correct.
22    Q.  And you have phone conversations?
23    A.  Yes, I spoke to Danny yesterday.
24    Q.  All right.  And have you exchanged any text
25 messages?

149

1     A.  Recently?  No, I have not text Danny in a
2  while.  The only text messages that we have is in our
3  text thread with the attorneys.
4     Q.  Okay.  We had requested your text messages
5  with Danny Martinez.
6     A.  Uh-huh.
7     Q.  Apart from the ones that were sent to your
8  attorney or that were exchanged with your attorney,
9  were there were any other text exchanges between the
10 two of you?
11    A.  Via work phone or via personal phone?  I'm
12 trying to figure out what you're talking about here.
13    Q.  Via personal phone.
14    A.  Via personal phone?  We probably had some
15 personal text messages I'm sure, yes.
16    Q.  And when was the last time you recall
17 texting Danny personally?
18    A.  I'm not sure.  I can't -- I can look and
19 see.  Do you want me to look and see?
20    Q.  Sure.
21    A.  All right.  (Witness checking phone.)
22 December 9th.
23    Q.  So that's December 9th, 2022?
24    A.  Yes.
25    Q.  Okay.  And were these just text messages

## Page 154

1   MR. SCHULMAN:  Nothing too thrilling.
2   We'll reserve our questions until the time of trial.
3       THE REPORTER:  Okay.
4       MR. HARRIS:  All right.  We're done.
5       (Deposition concluded at 3:08 p.m.)

## Page 155

1           CHANGES AND SIGNATURE
2   WITNESS NAME:  JARI MCPHERSON
3   DATE OF DEPOSITION:  JANUARY 18, 2023
4   PAGE     LINE     CHANGE       REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

## Page 156

1       I, JARI MCPHERSON, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5           _____
6               JARI MCPHERSON
7   THE STATE OF _____ )
8   COUNTY OF _____ )
9       Before me, _____, on this day
10  personally appeared JARI MCPHERSON, known to me (or
11  proved to me under oath or through _____)
12  (description of identity card or other document) to
13  be the person whose name is subscribed to the
14  foregoing instrument and acknowledged to me that he
15  executed the same for the purposes and consideration
16  therein expressed.
17
18      Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21          _____
22              NOTARY PUBLIC IN AND FOR
23          THE STATE OF _____
24  My commission expires: _____
25  ____ No Changes Made ____ Amendment Sheet(s) Attached

## Page 157

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2           AUSTIN DIVISION
3   JARI MCPHERSON, JERALD    )
    SAMS, AND DANIEL MARTINEZ, )
4                  )
        Plaintiffs,  )
5                  ) CIVIL ACTION
    VS.            )
6                  ) NO.: 1:20-cv-01223-DAE
    TEXAS DEPARTMENT OF PUBLIC  )
7   SAFETY,            )
                   )
8       Defendant.   )
9   REPORTER'S CERTIFICATION OF THE REMOTE ORAL
            DEPOSITION OF JARI MCPHERSON
10          JANUARY 18, 2023
11      I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14      That the witness, JARI MCPHERSON, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18      That the original deposition was delivered
19  to Mr. Drew Harris to obtain witness's signature.
20      That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  February 2, 2023.
23
24      I further certify that pursuant to FRCP
25  Rule 30(3) that the signature of the deponent:

1    _XX_ was requested by the deponent or a
2  party before the completion of the deposition and
3  that the signature is to be before any notary public
4  and returned within 30 days from date of receipt of
5  the transcript.
6        If returned, the attached Changes and
7  Signature Page contains any changes and the reasons
8  therefore:
9        ____ was not requested by the deponent or
10 a party before the completion of the deposition.
11       I further certify that I am neither
12 counsel for, related to, nor employed by any of the
13 parties or attorneys in the action in which this
14 proceeding was taken, and further that I am not
15 financially or otherwise interested in the outcome of
16 the action.
17       Certified to by me on this, the 2nd day
18 of February, 2023.
19
20       _____
         VANESSA J. THEISEN, Texas CSR, RPR
21       Texas Cert No. 3238
         Expiration Date:  10/31/23
22       Integrity Legal Support Solutions
         Firm Registration No. 528
23       9901 Brodie Ln., Ste. 160-400
         Austin, Texas 78748
24       (512) 320-8690
         www.integritylegal.support
25