# EX. 4

```
       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
                  AUSTIN DIVISION

JARI MCPHERSON, JERALD        )
SAMS, AND DANIEL MARTINEZ,    )
                              )
          Plaintiffs,         )
                              ) CIVIL ACTION
VS.                           )
                              ) NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC    )
SAFETY,                       )
                              )
          Defendant.          )
```

---

REMOTE ORAL DEPOSITION OF

JERALD SAMS

JANUARY 20, 2023

---

REMOTE ORAL DEPOSITION OF JERALD SAMS, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on January 20, 2023, from 10:03 a.m. to 4:45 p.m., via Zoom, before Vanessa J. Theisen, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

### 46

1  A. Okay. So, yeah. So as -- as best as I can
2  recall, maybe sometime in '20 -- David Davenport was
3  selected as sergeant, like, October of 2018. He
4  stayed approximately six to nine months. So that
5  would have put it around June or July when he left,
6  and Natee Wong was soon thereafter. So sometime in
7  2019. He didn't stay very long.
8  Q. So in 2019, when David Davenport left, the
9  chain of command decided to open the sergeant
10 position to lateral transfers of other sergeants,
11 correct?
12 A. Yes.
13 Q. And there was not a promotional opportunity
14 for people to be moved up to become sergeant,
15 correct?
16 A. Which I felt was -- which I felt was wrong
17 and discriminatory within itself.
18 Q. But that was -- the decision was that it was
19 intended to be open for lateral transfers, correct?
20 A. Correct.
21 Q. And Natee Wong was previously a sergeant
22 elsewhere, correct?
23 A. He -- yes, I believe he was. Yes.
24 Q. And so Natee Wong was transferred in as a
25 sergeant for the mounted unit, correct?

### 47

1  A. Correct.
2  Q. And he was the sergeant for the mounted unit
3  until the time that you -- through the time that you
4  transferred out of the mounted unit?
5  A. No, sir. He left -- he left prior to me.
6  Remember, I was telling you that Nathan Fox had taken
7  over the administrative duties of the -- of the
8  mounted patrol, sometime in 2020, prior to me
9  leaving.
10 Q. So was there not another opportunity for a
11 promotion to sergeant in the mounted patrol in 2019
12 or 2020?
13 A. No, sir. They changed the whole -- they
14 changed the whole process, which -- which prevented
15 any of the experienced mounted patrol members from
16 even applying for that -- that job.
17 Q. The transfer was open only to existing
18 sergeants, correct?
19 A. Correct.
20 Q. All right.
21 A. Whether or not they had experience in
22 mounted patrol or -- or not. Natee Wong had
23 absolutely no experience in horses, driving truck and
24 trailer, mounted patrol, or anything related to
25 horses.

### 48

1  Q. All right. Now you're not claiming that
2  Natee Wong discriminated against you, correct?
3  A. As I stated before, that list, I -- I -- it
4  wasn't the absolute -- I know that Natee Wong treated
5  me unfairly. I know that Natee Wong treated me
6  differently. He treated the African Americans on the
7  team differently. I mean, every African American on
8  the team he treated differently. So -- and unfairly.
9  If that qualifies as discrimination -- and to my
10 belief it was due to our race, so if that qualifies
11 as discrimination, yes, he did also.
12 Q. What did Natee Wong do to treat you
13 differently because of your race?
14 A. Well, there was -- there was a meeting that
15 had taken place. They called a DRO meeting -- I'm
16 sorry, they called it a progression meeting, which
17 was disguised as a dispute resolution meeting.
18       And during that meeting, it became --
19 and it seemed like it was well organized. And it
20 became a demoralize degrade Jerald Sams, Cynthia
21 Sparks, and the previous members on the team, Dexter
22 Freeman, all African Americans -- to degrade them and
23 basically tell us our work was in vain and didn't --
24 really didn't -- we didn't do anything right.
25       Another instance is where we had -- I

### 49

1  was the -- Cynthia Sparks and I were the only
2  certified members to actually ride as a certified
3  mounted patrol officer, certified instructors, and
4  certified trainers. We had a white female that was
5  new to the team that was selected to train the horses
6  and start training the personnel without any
7  certifications, any trainings, or whatever.
8        She -- and Natee Wong, along with Tim
9  Blackmon and Anthony Rodriguez, basically told
10 Cynthia and I to step aside, this white female is
11 going to do the training of the horses and now do the
12 training of the personnel, without any type of
13 certifications.
14 Q. All right. Anything else? Any other
15 concrete acts of discrimination that you are
16 attributing to Natee Wong?
17 A. No, sir. Not at -- not that I can recall at
18 this time. I'm not saying that he didn't do anything
19 more. Just saying that I can't remember at this
20 time.
21 Q. All right. You also mentioned Tim Blackmon.
22 What did Tim Blackmon do that you are alleging was
23 discriminatory or retaliatory?
24 A. I can't prove that Tim Blackmon did
25 anything. I know that Tim Blackmon knew of the

**Page 50**

1  discrimination and retaliation, and he did nothing
2  about it.
3  Q. And what was Tim Blackmon's position?
4  A. He was my lieutenant.
5  Q. The other person that you mentioned was Joe
6  Ortiz. What did Joe Ortiz do that you are alleging
7  was discriminatory or retaliatory?
8  A. That basically accused or promoted the idea
9  that the mounted patrol -- that I was attempting to
10 make the mounted patrol an all-black unit and stated
11 that I called or named the mounted patrol the Buffalo
12 Soldier Unit, which was totally false and -- and just
13 untrue.
14 Q. Had you previously used the term "Buffalo
15 Soldier" with Joe Ortiz?
16 A. That day. I explained to him that his
17 allegations -- just because it was his perception,
18 that because we had -- I don't know if it was -- I
19 can't remember if it was three or four African
20 Americans on the team, you know, why was it such a
21 big deal? When he said something about the Buffalo
22 Soldiers, I repeated the fact that -- well, I told
23 him that the Buffalo Soldiers and history always had
24 a white member on the team, and that's when I
25 mentioned the word "Buffalo Soldiers."

**Page 51**

1          Prior to that and prior to hearing it in
2  an OIG investigation, I had not referred to our unit
3  as the Buffalo Soldiers.
4  Q. So Joe Ortiz shared with you that he thought
5  you were trying to make the mounted patrol into a
6  Buffalo Soldiers squad. Is that correct?
7  A. His statement was it was perception, and
8  that he -- he heard that that was my goal, was to
9  make the unit a Buffalo Soldier unit. And my
10 response to him was that "Your perception of just
11 because we have a majority of African Americans on
12 the team, no one says that about the dive team that's
13 all white. No one says that about the marine unit
14 that doesn't have any African Americans on it. No
15 one says that about the Texas Rangers that has
16 limited amount of African Americans inside of the
17 unit."
18         And at that time, you know, he -- you
19 know, he went, "Whoa, whoa, whoa, whoa, whoa,
20 Jerald," you know, "that's enough." And so, you
21 know, that's where that conversation ended, you know,
22 on that. But...
23 Q. But you are claiming in this lawsuit that
24 Joe Ortiz was discriminating against you based on
25 your race because of that comment?

**Page 52**

1  A. When he -- when he perceived that I was
2  trying to make the unit an all-black unit, yes.
3  Q. And was that an act of discrimination or of
4  retaliation or both?
5         MR. MUNGO: I'm going to object. That
6  calls for a legal analysis and interpretation. He's
7  not a lawyer.
8         THE WITNESS: Can I ask you --
9         MR. HARRIS: Well, let me -- I'll
10 rephrase the question.
11 Q. (BY MR. HARRIS) Are you alleging that Joe
12 Ortiz made those statements in retaliation against
13 you?
14 A. I just know those -- I just know those
15 comments was based on my race and the race of the
16 people that was on the mounted patrol team at the
17 time and they were African American.
18 Q. All right. So this is an example of the
19 race discrimination that you are complaining about?
20 A. It's a portion of it.
21 Q. All right. We've talked about Tim Blackmon,
22 Joe Ortiz, and Natee Wong and Nathan Fox. How about
23 Jeremiah Richards? What are you alleging that he did
24 that was contrary to law?
25 A. I can tell you that -- excuse me. Can I --

**Page 53**

1  can I have about two minutes?
2         MR. MUNGO: Can we take a break,
3  counsel?
4         MR. HARRIS: Well, we have a question
5  pending. So just for purposes -- can I rephrase a
6  quick question and then we can take a break?
7         MR. MUNGO: Sure.
8         MR. HARRIS: All right.
9         THE WITNESS: Just give me -- give me a
10 -- just give me a second.
11         MR. MUNGO: Give him a couple of
12 minutes. And -- and before we take a break and
13 he'll -- and then he can answer.
14 A. I think Jeremiah Richards probably performed
15 the most disrespectful -- one of the most degrading
16 acts that a supervisor can ever display and perform
17 with a support -- subordinate. I felt like a
18 prisoner. I felt like, for lack of a better term, at
19 that time I felt like he treated me like a dang old
20 slave.
21 Q. (BY MR. HARRIS) Okay. Can you tell me what
22 incident you are --
23 A. I'm about -- I'm about to tell you, and I
24 apologize for cutting you off. It's just super
25 emotional for me.

70

1  that's not in evidence.
2      A. I can't -- I can't recall. It -- unless it
3  was under the -- under the advice of my attorney.
4      Q. (BY MR. HARRIS) All right. Well, we're
5  still looking at this document that's part of
6  Exhibit 2. You testified that that was your
7  signature, correct?
8      A. Yes.
9      Q. And this is a charge of discrimination that
10 was dated January 4th, 2020, correct?
11     A. Yes.
12     Q. All right. So why did you file this second
13 charge?
14         MR. MUNGO: Objection, assuming a fact
15 that's not in evidence.
16     Q. (BY MR. HARRIS) Are you refusing to answer
17 the question, Mr. Sams?
18     A. No, sir. I'm just trying to be allotted
19 enough time to actually read the form. I'm sorry
20 that I didn't advise you of -- that I was reading the
21 form.
22         Do I have -- do I have time to read
23 that, or do I need to --
24     Q. Well, why don't we go ahead and take a
25 break, then, if you need time to read this form. We

71

1  can go off the record.
2          THE REPORTER: Are you good with going
3  off the record, Mr. Mungo?
4          MR. MUNGO: Yeah, we can go off the
5  record.
6          THE REPORTER: Okay. Off the record at
7  1:22 p.m.
8          (Recess 1:22 p.m. to 1:35 p.m.)
9          THE REPORTER: Back on the record at
10 1:35.
11     Q. (BY MR. HARRIS) All right. Mr. Sams,
12 before the break I had asked you what the
13 circumstances were for you filing another charge of
14 discrimination. Your attorney objected, and I have
15 not received an answer yet.
16     A. Okay. So simply because I was trying to
17 recall because it's been so long ago, I can't -- I
18 just -- I can't recall why there's two instances
19 there.
20     Q. But you do recall filing a second charge of
21 discrimination?
22         MR. MUNGO: Objection, asked and
23 answered. He just said he didn't -- can't recall.
24     A. Like I said, that at this time I cannot
25 recall why there's two instances there.

72

1      Q. (BY MR. HARRIS) All right. Well, the -- is
2  there anything materially different between the two
3  that you added?
4          MR. MUNGO: And if you need to review
5  those documents more carefully to answer that
6  question, Mr. Sams, ask counsel if you can do so.
7      A. Yeah, I'll have to see -- look at it again
8  to re --
9          MR. HARRIS: All right. We just took a
10 ten-minute break for you to review the documents.
11 You need to take another break to review them? Do
12 you?
13     A. If you -- if you want to stand by. I mean,
14 I don't -- I don't know how it works. This is my
15 first deposition. So I can -- I can read them now or
16 if you want to take a break, I mean, I can. You
17 know, maybe five minutes for me to look at them.
18         It was a different question that you
19 asked -- imposed so I was looking at the forms a
20 little bit differently.
21     Q. (BY MR. HARRIS) The first question I had
22 asked was simply why did you file another charge of
23 discrimination? And then the question I'm asking now
24 is, what -- is there anything materially different
25 that you are -- that you are -- that's different that

73

1  you are alleging in the second charge of
2  discrimination?
3          MR. MUNGO: Objection, assuming a fact
4  that's not in evidence. He has not said he recalled
5  filing the second charge.
6          MR. HARRIS: All right.
7      Q. (BY MR. HARRIS) Let me ask it this way
8  then: Did you amend your charge of discrimination?
9      A. Like I said, sir, I mean, I can't recall
10 what the circumstances were, why there's two
11 instances. I can't recall at this time.
12     Q. All right. Then the answer -- what is your
13 answer to my prior question, which is what is
14 materially different about the second charge of
15 discrimination?
16     A. Okay. I'll just have to --
17         MR. MUNGO: Objection, assuming -- whoa.
18 Objection, assuming a fact that's not in evidence.
19     A. I'll just have to review the documents to
20 see if there's something different.
21     Q. (BY MR. HARRIS) All right then. We took a
22 break before. How long do you need to review the
23 document this time?
24     A. Five minutes.
25         MR. HARRIS: All right. I guess we will

74

1  take another five minute break.
2       THE REPORTER: Okay. Off the record at
3  1:39.
4       (Discussion off the record.)
5       (Recess 1:39 p.m. to 1:50 p.m.)
6  Q. (BY MR. HARRIS) All right. Mr. Sams, did
7  you consult with your attorneys during the break?
8  A. Yes.
9  Q. So while there was a question pending and
10 you were reviewing a document, you called and spoke
11 with your attorneys?
12 A. I did not call them.
13 Q. Did they call you?
14 A. Yes.
15      MR. MUNGO: So, Drew, what you have is a
16 scenario where the documents actually -- they speak
17 for themselves. And our client is not a lawyer, so I
18 think he's going to be able to give you a more full
19 and accurate response in accordance with those --
20 with the facts of those documents.
21      MR. HARRIS: I'm here to depose
22 Mr. Sams, not to depose his lawyers.
23      MR. MUNGO: Well, we understand that,
24 but you do want -- I mean, he's told you several
25 times he didn't recall, and you keep pressing him.

75

1  So we helped to refresh his recollection about some
2  matters that pertain to the documents that clearly
3  the documents themselves speak to in and of
4  themselves.
5       So his recollection is now refreshed,
6  and he can give you a more complete and accurate
7  answer in conjunction with and consistent with the
8  documents that clearly speak for themselves.
9       MR. HARRIS: All right.
10 Q. (BY MR. HARRIS) Going back to my question
11 before the break, before you spoke with your
12 attorneys, why is there a second charge of
13 discrimination?
14 A. I do not believe there is a second charge.
15 It's one charge number that I saw on the top of the
16 page. You asked me was there any differences? I saw
17 where there was -- where Anthony Rodriguez was added
18 to reflect that there was a transfer portion added to
19 that document, and -- but to remember how all that
20 transpired, how the process works, I cannot recall.
21 Q. So what are you alleging that Anthony
22 Rodriguez did to discriminate or retaliate against
23 you?
24 A. To change the process from a board interview
25 process, that would allow everyone in the department

76

1  to apply for the position, versus taking that
2  opportunity away from the most experienced personnel
3  for that job.
4  Q. And are you claiming that that was done on
5  the basis of race?
6  A. That's the way I feel, to prohibit me from
7  applying for that position, the -- for that position.
8  Q. And are you maintaining that that was done
9  to retaliate against you?
10 A. I am.
11 Q. Why would Anthony Rodriguez want to
12 retaliate against you?
13 A. Because his boss -- in my belief -- his boss
14 is Ron Joy, and he is very influential.
15 Q. Is there anything else you are alleging
16 Anthony Rodriguez did to discriminate or retaliate
17 against you?
18 A. I cannot recall at this time. I'm not
19 saying that he didn't do anything else. I just can't
20 recall at this time.
21 Q. And Ron Joy, what are you alleging he did to
22 discriminate against you?
23 A. Ron Joy demoted me after two investigations
24 that yielded nonsustained complaints and demoted me
25 for issues out of my control.

77

1  Q. What were the issues that he demoted you
2  for?
3  A. He demoted me for leadership decisions that
4  he maintained that I made that I was not in control
5  of; i.e., the schedule in scheduling personnel to be
6  in various places and work assignments and -- and so
7  those -- those areas I had no control over.
8       It was a sergeant, which was a white
9  sergeant at the time, he received no disciplinary --
10 no disciplinary actions for his decisions in making
11 those leadership decisions.
12 Q. And in fact, Ron Joy also criticized your
13 work on the standard operating procedures for the
14 mounted unit, correct?
15 A. No, sir, he didn't, not from my -- the
16 only -- the only other item that he listed was there
17 should be documentation of training records.
18      And that was -- it was those -- it was
19 three things. It was the schedule, it was scheduling
20 work assignments, and a documented form of training
21 records. Those were the only things that, when I
22 spoke with him, was the -- well, he outlined for my
23 deficiencies. But none of -- neither my sergeant, my
24 lieutenant, my captain, none of those people were
25 accredited with any of the leadership deficiencies.

78

1     Me, being the only African American male
2  in that chain, I was the only one that was
3  disciplined.
4     Q. But Ron Joy also had criticisms regarding
5  your handling of standard operating procedures,
6  didn't he?
7     A. In regards to what?
8     Q. He criticized the fact that you seemed to
9  copy and paste some other agency's standard operating
10 procedures for the mounted unit even though there
11 were portions that were clearly not applicable to
12 DPS, correct?
13        MR. MUNGO: Objection, assuming a fact
14 not in evidence.
15     A. I have no idea where that came from.
16     Q. (BY MR. HARRIS) You did work on the
17 standard operating procedures for the mounted unit,
18 correct?
19     A. Of course, yes.
20     Q. And did you use portions regarded -- that
21 related from the border patrol?
22     A. Yes.
23     Q. And you copied some portions of the border
24 patrol's standard operating procedures, verbatim,
25 correct?

79

1     A. As it related to bits and colic and medical
2  procedures, yes. And that's pretty standard. When
3  you go to a train the trainer course, you would adopt
4  those practices.
5     Q. And is it your testimony that you have never
6  heard any criticisms regarding your handling of this
7  standard operating procedures?
8     A. Not until -- not until these proceedings
9  began. It was never -- it was never told to me by
10 DPS personnel, because I have asked for years, since
11 my demotion, for something in writing to explain why
12 I was demoted, for what particular reason, and I have
13 not -- I have yet to get that.
14     Q. But you were told that your communication
15 with some of the members of the mounted unit was a
16 factor, correct?
17     A. My communication?
18     Q. Yes.
19     A. Like I said, when I spoke to Chief Joy, he
20 had three concerns. It was when -- it was about the
21 schedule, it was about assigning personnel duties,
22 and it was about annotating the training schedule for
23 the animals.
24        If I had any idea of the
25 communication or -- I mean, if it was laid out to me,

80

1  I would have understood why I was demoted. I was
2  never given anything in writing or actually counseled
3  or anything preceding those -- that talk with Chief
4  Joy other than the disposition of the investigation,
5  which was a reduction in rank and -- which was a
6  reduction in rank and be put on a performance
7  improvement plan, sent to classes, and which none of
8  that actually happened.
9     Q. And are you claiming that Ron Joy did
10 that -- did the demotion to discriminate against you
11 or to retaliate against you?
12     A. Discriminate, retaliate. I mean, those
13 terms -- I just know that -- with talk I know that I
14 was treated differently. There was a white corporal,
15 I believe, up in the Dallas area, that had two
16 sustained complaints, and he wasn't demoted. But I
17 had two nonsustained complaints and was demoted
18 for -- I'm still yet to understand why.
19     Q. Now, the position of corporal is different
20 from, say, the position of sergeant or lieutenant in
21 that it's not always selected through an interview
22 board, correct?
23     A. I'm not familiar with that process other
24 than a selection process.
25     Q. And you served as a corporal at the

81

1  discretion of Chief Ron Joy, correct?
2     A. I'm assuming that every rank and file in the
3  THP service, you know, serves at the chief's will, I
4  guess. Everybody -- excuse me -- everybody is
5  appointed -- the chief has the final say-so of every
6  progression in the highway patrol service.
7     Q. So if the chief did not believe that you had
8  the leadership skills for the corporal position, it
9  was within his rights to make the decision to demote
10 you, correct?
11     A. To the best of my knowledge, yes, he can do
12 that with any position, not just the corporal
13 position.
14     Q. All right. Is there anything else that
15 you're alleging Chief Ron Joy did to discriminate or
16 retaliate against you?
17     A. Yes, I believe that the final decision to
18 promote me lies upon him, and I allege that he failed
19 to promote me to sergeant over the mounted patrol.
20     Q. Now, you were not recommended, though, for
21 promotion by the oral interview board for the
22 sergeant position, correct?
23     A. Yes, that is correct.
24     Q. So are you maintaining that he should have
25 promoted you to sergeant even though the oral

82

1  interview board did not recommend you for the
2  position?
3      A. Well, it's his job and his responsibility to
4  make sure the oral board is handled properly. And
5  it's my charge that the oral board was not handled
6  properly by Jeremiah Richards. And so it's his, Ron
7  Joy's, job to ensure that there is no discrimination,
8  no disparate treatment that goes on in that oral
9  interview board. And he did not do that and nor did
10 he correct the actions of that oral interview board
11 for the mounted patrol.
12     Q. All right. After the demotion decision had
13 been made and apart from you not getting the
14 promotion to sergeant later on, what other acts of
15 discrimination are you claiming in this lawsuit?
16         MR. MUNGO: Objection. First, assuming
17 facts that is not in evidence and then
18 mischaracterizing his testimony.
19         Your limitations on what he has
20 testified to are not consistent with what's been put
21 in the record, counsel.
22         MR. HARRIS: I need an answer from the
23 witness.
24     Q. (BY MR. HARRIS) What other acts of
25 discrimination or retaliation are you claiming in

83

1  this lawsuit?
2      A. I cannot recall at this time. I'm not
3  saying that there wasn't any other acts. I'm just
4  saying that I can't recall at this time.
5      Q. Are you making a claim for racial harassment
6  in this case?
7      A. It is my belief that I've been continually
8  harassed.
9      Q. All right. Can you -- let's start with
10 after -- after the decision was made on October 2nd,
11 2018, not to select you for sergeant, okay?
12     A. Uh-huh.
13     Q. After that, what acts of discrimination or
14 harass -- of harassment are you claiming in this
15 lawsuit?
16     A. Fraudulent investigations such as not
17 shaking a white man's hand the traditional way.
18 Being led into a meeting described as a progression
19 meeting and being bombarded with demoralizing talk,
20 being screamed at, yelled at, being accused of
21 abusing the horses, having my duties as a mounted
22 patrol instructor stripped and taken away from me.
23 And there's -- I'm sure there's much more; I just
24 can't remember them all at this moment.
25     Q. And all of these events would have happened

84

1  before you left the mounted patrol in April 2020,
2  correct?
3      A. Yes.
4      Q. Who screamed or yelled at you for
5  mistreating the horses?
6      A. The current sergeant over the mounted patrol
7  now, Jessica Springer.
8      Q. And what was she concerned about regarding
9  the horses?
10     A. She stated that I abused the horses, wasn't
11 training them the proper way. And it was Sergeant
12 Wong, in his retaliation, concurred, which none of
13 them have actually -- neither one of them had spent
14 any considerable amount of time with me during my
15 training or operations in the mounted patrol service.
16     Q. When were you stripped as duties as the
17 mounted patrol structure instructions or?
18     A. When the white female came aboard.
19     Q. When was that?
20     A. I believe sometime in 2020. I can't
21 remember the exact date. Upon my -- my best
22 recollection is sometime in 2020.
23     Q. And it is your claim that all these actions
24 were because you were black?
25     A. Yes.

85

1      Q. You and Jessica Springer had disagreements
2  over how to handle the horses, correct?
3      A. I wouldn't say it was disagreement as much
4  as there was training -- training differences as she
5  has no experience in mounted patrol operation, and I
6  have extensive experience in mounted patrol
7  operations.
8          She's a show person; I'm a practical
9  mounted patrol person.
10     Q. So based on her experiences, she thought
11 that your treatment of the horses was not proper,
12 correct?
13     A. I can't speak for her.
14     Q. Did she voice to you that she thought your
15 treatment of the horses was improper?
16     A. Yes.
17     Q. Did you have any reason to believe that she
18 did not think that you were doing it improperly?
19     A. Say that again, please.
20     Q. Do you have any reason to believe that she
21 was not believing that you were improperly treating
22 the horses?
23     A. I'm trying to -- I'm trying to understand
24 that question.
25     Q. I'll rephrase it.

158

1  A. It's -- it looks like it's a document from
2  Barry Grant, Economic Specialist.
3  Q. Okay. Does he serve as an expert in your
4  case?
5  A. Yes.
6  Q. Okay. To calculate your economic damages?
7  A. Yes.
8  Q. Your dollar losses as a result of the
9  discrimination perpetrated against you by the
10 defendants in this case?
11 A. Yes.
12 Q. Okay. Can you determine -- and are you
13 going to rely on your expert for calculating what
14 your actual economic losses are?
15 A. Yes.
16 Q. Okay. Can you determine from the figures
17 given on this chart what your economic losses are?
18 And I'm going to turn this where you can see it.
19 Hold on a second. Uh-oh. Uh-oh. Not now. Nope.
20 Get rid of you. Okay. All right. I just want to --
21 oh, come on here now.
22 A. I believe I can see it. If you would scroll
23 down just -- I'm sorry, up. If you'd scroll up --
24 Q. All right. Hold on.
25 A. -- I should be able to make it out.

159

1  Q. Hold on a second. Do you -- can you
2  determine what Barry Grant's calculation of your
3  economic damages are as of the date of this report?
4  A. Yes. A little over $2.1 million.
5  Q. Okay. Thank you.
6          MR. MUNGO: All right. Give me just a
7  couple of minutes, please. Just a couple of minutes.
8  And we'll be right back. I'm going to stop the
9  share. And give me just one moment.
10         THE REPORTER: Off the record at
11 4:38 p.m.
12         (Brief pause.)
13         THE REPORTER: Back on the record at
14 4:40 p.m.
15         MR. MUNGO: Thank you. Thank you.
16 Apologize.
17 Q. (BY MR. MUNGO) So, sir, I want to ask you,
18 do you have -- well, what kind of credentials and/or
19 licensing are required in the State of Texas for you
20 to do what you do in -- in your special area of
21 handling, training, caring for, and anything else
22 that's -- which you would be legally obligated to
23 have a license for handling and dealing with horses?
24 A. So --
25         MR. HARRIS: Object to the form of the

160

1  question.
2  A. -- there's no -- so there is no specific law
3  that says you have to be licensed or a licensed
4  trainer to train horses to instruct in the Texas
5  Department of Public Safety and/or award individuals
6  that are members of police agencies, you have to be a
7  certified instructor through the Texas Commission on
8  Law Enforcement. And you have to have -- or you have
9  to be specifically credentialed in that area.
10         And my credentialing came from Sun Coast
11 Equine, which is a basic certification for mounted
12 patrol, to become a mounted patrol instructor, and
13 then I have an advanced mounted patrol instructor
14 certification through the Border Patrol, United
15 States Border Patrol.
16 Q. (BY MR. MUNGO) Okay.
17 A. And also approximately 25, if not more,
18 years of experience in my field.
19 Q. Okay. And Nieronow, the white female
20 trooper who was a member of the mounted unit, alleged
21 that you did you not have proper credentialing to
22 handle and care for horses, correct?
23 A. Correct.
24 Q. Okay. And that complaint and those
25 allegations against you that you did not, that she

161

1  made, were not sustained, correct?
2  A. Correct.
3  Q. Okay. And do you know whether or not she
4  was disciplined for making false allegations against
5  you?
6  A. I do not know, sir.
7  Q. Okay. So do you feel that the Texas
8  Department of Public Safety entertains and harbors a
9  racially hostile environment?
10 A. Yes.
11 Q. Okay. And do you believe that you have been
12 discriminated against based upon your race in --
13 during the course of your employment with the Texas
14 Department of Public Safety?
15 A. Yes.
16 Q. And specifically during the period of time
17 in which you were a part of the mounted unit and --
18 and the period thereafter?
19 A. Yes.
20 Q. Okay. And are you aware of other African
21 American troopers, either in management and not in
22 management, who complained and have -- and have
23 shared with you anecdotal scenarios in which they
24 have been discriminated against based on their race?
25 A. Yes.

162

1  Q. Okay. Is it true that the Texas Department
2  of Public Safety harbors an environment that
3  promotes, rewards, and tolerates retaliatory conduct
4  against its troopers for making complaints of
5  discrimination against it?
6  A. Yes.
7  Q. Okay. Have you experienced that personally
8  yourself?
9  A. Yes.
10  Q. How has this affected you emotionally, sir?
11  A. Very deeply. As we stated before, I have
12  been diagnosed with posttraumatic syndrome due to the
13  trauma that has been imposed upon me by the
14  department.
15  Q. Okay. And that trauma is race based?
16  A. Yes.
17  Q. Okay. All right. Let's see.
18        MR. MUNGO: Okay. I have no further
19  questions, counsel.
20        MR. HARRIS: All right. No further
21  questions.
22        THE REPORTER: Off the record at
23  4:45 p.m.
24        (Deposition concluded at 4:45 p.m.)
25

163

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TEXAS
2        AUSTIN DIVISION
3  JARI MCPHERSON, JERALD   )
   SAMS, AND DANIEL MARTINEZ, )
4                            )
        Plaintiffs. )
5              ) CIVIL ACTION
   VS.          )
6              ) NO.: 1:20-cv-01223-DAE
   TEXAS DEPARTMENT OF PUBLIC )
7  SAFETY,        )
               )
8      Defendant. )
9  REPORTER'S CERTIFICATION OF THE REMOTE ORAL
        DEPOSITION OF JERALD SAMS
10        JANUARY 20, 2023
11      I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14      That the witness, JERALD SAMS, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18      That the original deposition was delivered
19  to Mr. Leonard Mungo to obtain witness's signature.
20      That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  February 8, 2023.
23
24      I further certify that pursuant to FRCP
25  Rule 30(3) that the signature of the deponent:

164

1  ___ was requested by the deponent or a
2  party before the completion of the deposition and
3  that the signature is to be before any notary public
4  and returned within 30 days from date of receipt of
5  the transcript.
6      If returned, the attached Changes and
7  Signature Page contains any changes and the reasons
8  therefore:
9  _XX_ was not requested by the deponent or
10  a party before the completion of the deposition.
11      I further certify that I am neither
12  counsel for, related to, nor employed by any of the
13  parties or attorneys in the action in which this
14  proceeding was taken, and further that I am not
15  financially or otherwise interested in the outcome of
16  the action.
17      Certified to by me on this, the 8th day
18  of February, 2023.
19
20      _____
        VANESSA J. THEISEN, Texas CSR, RPR
21      Texas Cert No. 3238
        Expiration Date: 10/31/23
22      Integrity Legal Support Solutions
        Firm Registration No. 528
23      9901 Brodie Ln., Ste. 160-400
        Austin, Texas 78748
24      (512) 320-8690
        www.integritylegal.support
25