# EX. 5

## DECLARATION

I, Daniel Martinez, am over 18 years of age with no restriction upon my ability to make this sworn statement.

1. I and two other DPS employees, while off duty, agreed to assist another off-duty DPS employee with a civil matter involving retrieving personnel property associated with court-ordered restrictions related to a divorce. I did not lie to Capt. Krueger, by omission or any other way. Capt. Krueger initially asked if we did anything to the battery and we all said no. However, in the same conversation, and not but a few seconds later, we also told her that we had removed the fuses from Hernandez's truck so that it would not be damaged or moved by his ex-wife until he could retrieve the truck. There was no reason to withhold that information from Capt. Krueger, since there was no harm in what we did to the truck, to the ex-wife, or to anyone.

2. Additionally, I had fully disclosed what I and the others had done to my supervisor, Capt. Sanchez, prior to Capt. Krueger arriving.

3. That evening, Capt. Krueger did not suggest that anyone, much less Martinez, had lied or withheld any information from her.

4. In fact, Martinez did not hear about being accused of lying by Capt. Krueger until months later.

5. The idea to remove the fuses was Gabe Nava's idea. Although, Gabe did not physically remove the fuses, he had been involved in the initial effort to remove the battery and when we were unable to remove it, Nava suggested removing the fuses, which Hernandez approved and we did.

6. I was the one that suggested and volunteered to go and buy a new set of fuses to replace the fuses that we removed from Oscar Hernandez's truck in case we could not find all of the fuses that we had removed.

7. Hernandez's truck in the garage was not the only vehicle that the ex-wife had to drive. In fact, she did not drive the white truck that was in the garage that we disabled. Instead, she had a red truck that was operating and was in the driveway while we were there and we did nothing to disable or harm that vehicle.

8. There was no real reason why Hernandez should not have been allowed to take his truck. The Court order did not restrict him from taking the truck, but Deputy Brinks said no, so we didn't take it and we didn't argue with him about that, but there was nothing unprofessional, in violation of the court order, or criminal about temporarily disabling Hernandez's own truck with his permission.

9. I was never threatened with arrest by any EPCSO Deputy either on September 30, 2018, or any other time. That evening, Deputy Brinks told me to leave the property and I immediately removed myself to across the street and I had no other interaction with any other Deputy for the rest of the evening giving the Deputies no cause to threaten to arrest me.

10. My 12/8/20 hardship request for a transfer back to El Paso prior to the conclusion of my 2-year commitment in Austin, included both my identifying my disabilities (not for the first time to DPS) and informing DPS that I was struggling with the effects of my

disabilities in Austin and that I would obtain relief as to these negative effects with my transfer back to El Paso,

11. Following the submission of my hardship request, I was not contacted or questioned regarding my disabilities, or my reasoning for my request. I was not invited to an interactive process. I was provided a written denial from CID Chief Ruocco that had no explanation as to why my request was denied.

12. **On 08/03/2021,** I met with Christopher Hanson and Ramiro Saldivar inside Lt. Saldivar's office. Saldivar told me that I couldn't be trusted because I reported everything to EEO/OIG and utilized the discrimination and harassment complaint filed by my admin Brenda Helton as an example. Hanson expressed the same concern and told me directly that he didn't trust me because I escalated all office matters to EEO/OIG. Hanson also accused me of coaching Helton to file the complaint. The conversation between the three of us became heated. Special Agents Nathaniel Head and Jack Johnson, who had an office next door to Saldivar, apparently heard our conversation, because immediately after I left that meeting, Jack Johnson approached me asking if everything was okay telling me that he overheard Saldivar and Hanson yelling at me.

13. **On 08/11/2021,** I had a meeting with Captain Ralph Ohland and Major Ortiz explaining my admin, Brenda Helton's, intent to resign. I expressed my concerns to Major Ortiz with on-going hostile work environment issues in the Capitol Region that I and the members of my 7C1 squad were continuing to experience. Major Ortiz agreed with me that those issues needed to be addressed. I also informed Major Ortiz of the comments from Hanson and Saldivar on 08/03/2021 and complaining about me encouraging Helton to file her EEO/OIG complaint. I did not encourage Helton, but even if I did, that should not be a cause for ridicule and harassment. In response to my report to him, Major Ortiz justified OIG's handling of Helton's complaint. Major Ortiz then asked me to first inform him of any discrimination complaints before the EEO/OIG learns of the complaint. Major Ortiz also blamed the issues on Capt. Koenig telling me that he did not thing that Koenig had told him everything that was happening and Ortiz considered Koenig to be in charge of the district.

14. **On 10/21/2021,** I met with Captain Ralph Ohland and Lts. Hanson and Saldivar. Captain Ohland told us that he called the meeting to "hash out" all the issues the three of us had as co-lieutenants. In that meeting, once again both Hanson and Saldivar voiced their disdain towards me stating that I couldn't be trusted. Saldivar made yet more allegations that I had hired Helton for the sole purpose of keeping an eye on Hanson and reporting his misconduct to include those of his agents and Hanson's admin, Marisela Reynaga. Hanson accused me of coaching Helton to file her complaint and having her document notes to include confronting me for recording conversations. Hanson, just like Saldivar, stated that I escalated everything to EEO/OIG. I responded reminding them that I was doing my job as we've been trained as agents of notice and countered them by making them aware that I knew that Marisela had accused Saldivar of sexual harassment and she had told me that Hanson was made aware of the incident and that she believed that it was being addressed. Both Hanson and Saldivar should have reported that incident to EEO/OIG. During this recorded conversation between the four of us, I told Captain Ohland about more incidents that I perceived as retaliatory and creating a hostile work environment.

15. Heather Krueger alleges that during the November 2021 Captain promotion board interview, I made very short statements on the September 2018 incident and was not as thorough as compared to Gabriel Nava's responses regarding articulated lessons he had learned from that Sept 2018 incident. That is not true. I recall during my November 2021 promotion board interview, being very thorough in my communication about the Sept 2018 incident and that I expressed regret for having been involved in that incident and I specifically stated that I had learned and grown from that experience. In fact, I recall that I was the one that brought that subject up on my own. I found it a bit suspicious that I was not questioned about it, since it was the only negative aspect to my employment history. I was not directly asked by the board members. However, I had sought out advice from my prior supervisor, Capt. Sanchez about what I could do better after my September 2020 unsuccessful Captain promotional attempt. Capt. Sanchez recommended that I go into more detail about how I had learned from that incident and how I have applied those lessons. I took that advice to heart and so I elaborated on how that incident made me realize that I needed to have better emotional intelligence and not let feelings get in the way. I also explained how Oscar Hernandez, who I went to help back in September 2018, was a very dear friend of mine and although I thought I would be there to be a familiar face to the family, my personal relationship with Oscar made the incident personal. I explained that I should have separated myself from the incident and I went on to explain that because of that incident, I have learned to identify, mitigate, and avoid incidents if any other of my subordinates and peers encounter a similar situation. I went even further into explaining how knowing your employees and identifying their problems and providing them resources and support can help mitigate issues that will adversely affect the employee and the department. I also provided an example of how I currently provide guidance and resources to my subordinates regarding such situations and how to approach and avoid the mistakes.

16. None of my concerns that I complained about to DPS representatives (chain of command and EEO) were addressed. Instead, if anything, only time passed between the discrimination, harassment, and retaliation and me bringing some distance from prior forms of harassment, but there was never any evidence or sense that any of the harassment, discrimination, and retaliation had been confronted, addressed, or eliminated; thus leaving a very real concern that someone within DPS could and would return at any time to retaliate or harass me.

17. Specifically, since I complained about Capt. Krueger back in 2017 for treating me in a discriminatory manner. complained to Maj. Byrd and Capt. Sanchez in 2017 and 2018 that Capt. Krueger was racially discriminatory against Martinez by making false allegations against Martinez, for example, that Martinez was taking racially disparate actions against employees that were not Hispanic or did not speak Spanish, that Martinez was lying, and that Martinez was mistreating his employees- all of which were not based in fact. After that, I tried to avoid interacting with Krueger as a means of "taking the path of least resistance" or so I hoped.

18. Every time that I have interacted with Capt. Krueger, it has been a negative experience with her either making false allegations against me multiple times now, pushing to deny my requests, or negatively impacting and denying my promotion in November 2021, since Capt. Krueger admitted during her deposition that she discussed "what happened" during the September 30, 2018 incident by sharing the lie that I had lied to her and that Gabe Nava was not aware that we had disabled the truck, both statements are false.

19. I also complained about Capt. Krueger discriminating and retaliating against me in 2019 following my learning that she had lied against me in her C1 complaint that she filed against me related to the 9/30/18 incident, but that she had not written up and submitted for several months following the incident.

20. I also complained about Capt. Krueger discriminating and retaliating against me in 2020 following her participation in pushing for the denial of my hardship transfer request back to El Paso. As the supervisor of that Lt. position that I was requesting, Capt. Krueger would have had access to my request and provided input on my request.

21. Because of my complaints I am aware that she would have been notified of my complaint, questioned about "her side" of my complaint, thus Capt. Krueger would be on notice that I had complained against her discriminating and retaliating against me prior to her harassing and lying about me and denying my hardship disability accommodation request in December 2020 and also denying me a spot on the Captain promotion eligibility list in November 2021

22. I had several conversations with Chris Hanson, my co-Lt. under Capt. Koenig, informing him of the complaints of racial discrimination that me and my squad had made to Koenig and to DPS EEO regarding the unfair privileges and benefits that he received in not working as long as we were and having more vacation time and consecutive days off while we were working two weeks straight – as an example – and I also complained to him multiple times about his offensive and culturally, racially, and sexually inappropriate texts and pictures that he would send from prior to the pandemic and through the pandemic. Now I didn't complain to Hanson about every one of his texts, but I remember specifically talking to him about the black socks matter, fruit loop, and haiku texts as being offensive. My complaints occurred starting in approximately in May 2020. Hanson lied during his deposition stating that no one had ever let them know that they were offended by his texts. That simply is not true.

23. I never volunteered for additional duty for my squad prior to and during the pandemic. That allegation by DPS is a joke. We were already working harder and longer and with less days off doing Hanson's squads duties and our duties. There was no extra time to volunteer for, much less any motivation to work more since we were already not appreciated for the work we were already doing.

24. Capt. Koenig never had to rein me in or ever spoke to me about working too hard or over working. Again, this is laughable, since he was the one that was assigning us all the additional work.

25. There was never a policy while I was working under Capt. Koenig against or preventing special agents from switching squads. In fact, while McPherson was trying t get assigned to 7C2, Koenig allowed Wayne Cipriani to transfer from 7C3 to 7C2 in early 2020 before McPherson's transfer and Bibliosambolin was also allowed to switch from 7C1 to 7C3 in 2021,

26. It is not true that my employee Dori Livingston wanted to switch squad because she was having problems with me. In fact, Livingston wanted to get away from Bibliosambolin because he was harassing her.

27. Shortly after I arrived in Austin, Capt. Koenig told me that McPherson's allegations of race discrimination against Capt. Schwartz were bullshit and that McPherson was just being held accountable by Schwartz and he didn't like it"

28. In February 2020 I told Koenig that it would not be appropriate to target McPherson because that would only help McPherson make his case against DPS that he was being mistreated.

29. Koenig directed me to check up on McPherson's medical records, medical appointments, time records, VA records, funeral records, mortuary records when he went to a family funeral, and also travel records, those kinds of things. I remember that Koenig never asked me to do that with anyone that was not black or had not complained of discrimination. I remember that Special Agent Stenberg (white) also had a funeral around the same time as McPherson, but Koenig did not ask that Stenberg be investigated like McPherson.  There was no reason to subject McPherson to that level of harassment and scrutiny.

30. A few weeks after I arrived, Koenig directed me to tell McPherson that he could no longer drive is state vehicle from his home even though Koenig had approved it since McPherson had been working at the Capitol several weeks.  I declined to follow that contradictory direction. Later, after McPherson had been restricted from driving from his home, McPherson made a hardship request about being able to drive his vehicle just a couple of miles over the 50-mile limit. Koenig told me to deny McPherson's request so that we (management or chain of command) would be "speaking with one voice."

31. After McPherson was transferred to 7C2 in July 2020, a month after I filed my written complaint on June 10, 2020 regarding all the black special agents being segregated on 7C1, Koenig left me shorthanded instead of giving us Mario Reyes who had been removed from 7C2 to make room for McPherson. Koenig sent Reyes to 7C3 when they were not shorthanded.

32. Then when a new black employee promoted in August 2020, Koenig put him on 7C1, again overloading and segregating the number of black employees on 7C1.

33. In early 2020, Lt. Saldivar told me that prior to my arrival in Austin working at the Capitol, Saldivar had told me that Anna Lopez had told Saldivar that she thought Koenig was a racist because of the way that he was treating his employees including Saldivar. Saldivar then told me during that same conversation that he also thought that Koenig was a racist.

34. In 2020, McPherson appealed the denial of his hardship request to be able to drive from his home using the state issued vehicle since it was only a couple of miles further. DPS had offered as an alternative, that DPS would make an exception to the 2-year commitment of his transfer to Austin so that he could move back to work under Schwartz, who McPherson had left to remove himself from discrimination and retaliation. McPherson had turned down the obvious poison pill offer. In the office there was discussion of the fact that McPherson had turned down the offer to move back to Temple and Capt. Krueger responded to the group of supervisors that we should "turn up the heat" on McPherson.

35. I initiated an appeal to the C1 back in 2019, but feeling the futility of fighting the system, and taking the path of least resistance, or so I thought, I decided instead to transfer to the Capitol to start fresh without Capt. Krueger's negative influence over my career.

36. Upon my arrival for work in Austin at the Capitol, I began to experience multiple negative indicators that the Capitol was not going to be as positive an experience as I had hoped. I experienced these negative indicators gradually over time and I did not realize

the cumulative impact that they were having on me and my squad, however, when I started to view them as a whole, they became obvious, unbearable and impossible to ignore causing me to report discrimination and retaliation to try to fix the problems.

37. Shortly before arriving in Austin, I was in a meeting where Capt. Koenig had discussed shifting employees around between the three squads, however, it wasn't until I arrived and was assigned to 7C1 instead of 7C3, that I realized that the switches that Capt. Koenig had made resulted in every black employee ending up only on 7C1.

38. I was on a promotional board for a Lt. position and prior to the commencement of the interviews, the board chair asked each of us board members if there was any reason that we could not sit in review of the candidates without bias or conflict.

39. When I put in for the Lt. position in El Paso in September 2022, it is my understanding from the records available that no other Lt. put in for it, and without any other restrictions under DPS policy to prevent me from transferring to that position, the transfer was not discretionary.

40. Upon my return to El Paso, although I was thankful not to have to interact with Capt. Krueger, it was unsettling that DPS had reorganized the office just before my arrival ensuring that Krueger would not be required to work with or come in contact with me.


I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed this 2nd day of June, 2023.

Signature _____

Daniel Martinez