# EX. 6

```
              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

JARI McPHERSON, JERALD    §
SAMS, and DANIEL          §
MARTINEZ,                 §
                          §
     Plaintiffs,          §
                          §
                          §       CASE NUMBER
v.                        §     1:20-cv-01223-RP
                          §
                          §
TEXAS DEPARTMENT OF       §
PUBLIC SAFETY, and        §
Director Steven C.        §
McCraw, in his            §
official capacity,        §
                          §
     Defendants.          §
```

ORAL DEPOSITION
(VIA ZOOM VIDEOCONFERENCING)
OF
FACT WITNESS
HEATHER KRUEGER

TUESDAY, DECEMBER 6, 2022

- - -

INTEGRITY LEGAL SUPPORT SOLUTIONS

www.integritylegal.support

**Page 22**

1 spouse pointed out that they had loaded a four-
2 wheeler in the back of one of the trucks.  Also
3 some things stood out, it wasn't large, but a
4 shop vac, some tools, various items like that out
5 of the garage.
6     Q.  And was it your perception that those
7 should not have been removed?
8     A.  That is my understanding, yes, ma'am.
9     Q.  Do you know whether or not the spouse
10 and Agent -- is it Officer Hernandez -- had
11 agreed that those things would come with him?
12     A.  The spouse on scene had said no, they
13 could not go.
14     Q.  What ultimately happened to those
15 items?  Were they removed and put back?
16     A.  Yes.
17     Q.  What else did you learn, if anything,
18 from Officer Hernandez about items that -- that
19 he and his spouse had agreed would be removed
20 from the premises?
21     A.  His clothing, his toiletries, and any
22 medication.
23     Q.  And you spoke personally with the
24 spouse; is that correct?
25     A.  Yes, ma'am.  With the Deputy present.

**Page 23**

1     Q.  Did you take notes or create any kind
2 of record subsequent to this incident where these
3 various statements and claims were reported?
4         MS. COLLINS:  Objection;
5     form.
6         But you can answer.
7     A.  Yes.  During the course of the OIG
8 investigation, I did a written statement.
9 BY MS. SCHULMAN:
10     Q.  Okay.  When was that written
11 statement created?
12     A.  I don't know the date.
13     Q.  Okay.  Was it months later?
14     A.  I don't recall.
15     Q.  Prior to giving a written statement,
16 did you create any notes about this event?
17     A.  I did write up a Word document that
18 became the affidavit.
19     Q.  Okay.  And is the written statement
20 you were referring to for the OIG the same as the
21 affidavit that you're referencing?
22     A.  Yes, with a bit more detail because
23 it included the interview with the OIG.
24     Q.  So there are actually two documents.
25 There's a Word document that you created, and

**Page 24**

1 then there's the written statement, which I
2 presume is a Sworn Statement, that you submitted
3 to the OIG; is that correct?
4         MS. COLLINS:  Objection;
5     form.
6         You can answer.
7     A.  I did a copy and paste, and then got
8 rid of the notes because I had the affidavit.
9 BY MS. SCHULMAN:
10     Q.  Okay.  Did you communicate in any
11 form, such as an email or a text message, to
12 anyone in your chain of command regarding the
13 incident where you were called to the scene by --
14 at the request of Gabe Nava?
15         MS. COLLINS:  Objection;
16     form.
17         You can answer.
18     A.  I don't recall specifically.  I would
19 like to think there was probably some form of a
20 text at some point.  I know a lot of it was
21 handled by phone calls directly.
22 BY MS. SCHULMAN:
23     Q.  And who did you speak with on the
24 phone about this -- who was the first person that
25 you recall speaking on the phone about this

**Page 25**

1 matter?
2     A.  While it was playing out, I was
3 notified, as previously mentioned, by Lieutenant
4 Nova -- at the time, Lieutenant Nava, then I
5 notified Danny's Captain because I knew he lived
6 on the east side and could get there faster than
7 me, that he was not in a position to respond, to
8 hold the scene until I arrived.
9         And then I notified by Major, after I
10 called the other Captain, and that Major at the
11 time was Major Shane Byrd.
12     Q.  All right.  And you said you called
13 the other Captain, that other Captain being Danny
14 Martinez's supervisor?
15     A.  Correct.
16     Q.  And so after you got there and you
17 spoke with people.  I presume you spoke to
18 everybody on the scene at one point or another?
19     A.  Not every Deputy, no.
20     Q.  No, I'm sorry.  That was a really
21 unreasonable question.
22         I meant of the people that -- the DPS
23 people there, did you speak with all of them?
24     A.  Yes, ma'am.  The four, yes, I did.
25     Q.  And you spoke to the Deputy who had

38

1  DPS and what we allowed our personnel to do.
2       So long term we did modify.  We
3  honestly and obviously hope we don't have these
4  situations with our personnel in the future.  We
5  have modified it should this come up.  What we
6  would do in a civil standby is it will be
7  Captains and Majors to respond, not any other
8  rank, if at all avoidable.
9  BY MS. SCHULMAN:
10      Q.  Okay.  So you indicated that there
11 was a communication somehow from the Sheriff's
12 Department that this impacted their willingness
13 to work with Calvin Green and Danny Martinez; is
14 that correct?
15      A.  Yes, ma'am.
16      Q.  How do you know about that, that
17 unwillingness to work with these individuals?
18      A.  Direct conversation with the El Paso
19 County Sheriff's Department Commander.
20      Q.  And who was that?
21      A.  Urrutia.  Commander Urrutia.
22      Q.  Urrutia.
23           MS. COLLINS:  Could
24      you spell that for the court
25      reporter if you're capable of

39

1       doing so?
2            THE WITNESS:  I may be
3       off on the spelling and also the
4       pronunciation, but it's U-R-R-I-T-A
5       [sic].  I can look in my phone
6       contact to get his exact spelling
7       if you'd like that.
8            MS. COLLINS:  You can
9       do that on a break, if necessary.
10           THE WITNESS:  My
11      apologies.  I don't mean to
12      disrespect him for spelling his
13      name wrong.
14 BY MS. SCHULMAN:
15      Q.  So you had a telephone conversation
16 with that individual.
17      When did that telephone conversation
18 take place?
19      A.  So you said "telephone," but there
20 was an in person when I was directed to go pick
21 up the body cameras and statements.  That's who I
22 met with was the Commander, yes, ma'am.
23      So he set it up that moment.  He had
24 concerns regarding how our personnel were
25 behaving at the scene, and how they treated the

40

1  Sheriff's Department Deputies.
2       Q.  And so was that a -- at this point,
3  did Danny Martinez and Calvin Green's name come
4  up in that conversation, or was it just a
5  generic, "We have concerns about how things
6  happened" kind of comment?
7       A.  He specifically addressed those --
8  about those two, and in general the fact of the
9  entire situation of the civil standby, rightly
10 so.
11      And then I do not recall whose
12 written statements, but within the Sheriff's
13 Department report they were mentioned
14 specifically by one of the Deputies.  Their names
15 were mentioned in the report for their behavior
16 on scene.
17      And then also, later, months down the
18 road, I don't recall when, but there was
19 discussion about Lieutenant Martinez coming back
20 out, and I know to being -- wanting to transfer
21 back out to El Paso.  And obviously that was a
22 concern with working with another agency with
23 that impact or could everyone start moving
24 forward.
25      (Jerald Sams enters the videoconference.)

41

1       So that's when I was tasked by the
2  new Major to reach out to Commander Urrutia
3  because the new Major had not met him yet, and
4  just set up the call with the current Major,
5  which is Major Matt Mull, with the Commander.
6       So I called the Commander and then by
7  phone introduced him to the Major -- the new
8  Major, Major Mull, and then Major Mull talked to
9  the Commander regarding that whole situation.
10      Q.  Were you part of that telephone
11 conversation other than making the introduction?
12      A.  No, ma'am.  That was between the
13 Major and the Commander.
14      Q.  At any point did you receive any kind
15 of written communication from the Sheriff's
16 Department regarding -- I touched the wrong
17 thing.  I'm sorry.  Everything went away for a
18 minute.
19      At any point did you receive any kind
20 of written communication from the Sheriff's
21 Department regarding their concerns about working
22 with Danny Martinez or Calvin Green?
23      A.  No, I did not.
24      Q.  You indicated that there was a
25 Sheriff's report regarding this incident at

42

1 Hernandez's home.
2     Do you receive a copy of that
3 Sheriff's report?
4     A.  We have that through the OIG, yes,
5 ma'am.
6     Q.  Okay.  And did you read it, that
7 Sheriff's report?
8     A.  Yes, ma'am.
9     Q.  Do you recall who wrote it?
10    A.  No, ma'am.
11    Q.  You mentioned earlier that from your
12 perspective Gabe Nava immediately took
13 responsibility for his actions during the civil
14 standby and his contribution to the problems, and
15 that this was a mitigating factor, from your
16 perspective.
17        Is that a fair assessment of --
18 review of what you said?
19    A.  Correct.
20    Q.  Okay.  Did you perceive that Daniel
21 Martinez did not also take responsibility for his
22 actions at the scene of the civil standby?
23    A.  Correct.
24    Q.  Can you give me some perspective
25 about the difference between what Gabe Nava said

43

1 and did subsequently and what Martinez said and
2 did subsequently?  I'm just trying to understand
3 what it was he failed to do.
4        MS. COLLINS:  Objection;
5    form.
6        You can answer.
7    A.  So an example is when I talked to the
8 DPS personnel on scene, Lieutenant Nava stated to
9 the effect of "Whatever they're saying, we're
10 going to make this right."
11       He had not known the vehicle had been
12 tampered with, but worked to try to find a
13 solution to get it fixed, whereas my initial
14 question to all four of them, so that would have
15 been the two Lieutenants and two Agents, is what
16 I said, to the effect of -- because, again,
17 remember, the Sheriff's Department thought it was
18 a battery issue -- so I said, "What did you do to
19 the battery?  What can we do to make this fixed?"
20 I don't know anything about engines.  I'll be
21 upfront about that.
22       And they were evasive.  Oscar and
23 Gabe did not know what had been going on.  They
24 were in the back bedroom in the house collecting
25 the personal items, whereas Calvin and Danny were

44

1 in the garage in the outer area.
2        So it took several types of questions
3 for me to get out of them, and finally it was
4 Calvin who answered it, not Danny, about, "Well,
5 we pulled parts out."
6        And forgive me, because for the life
7 of me I can't remember what you call them, but
8 they're the -- they look like little chips.  So
9 they removed several of those.
10    Q.  Maybe fuses?
11    A.  Thank you; yes.  Pretty basic.  So
12 yes, they'd removed several of those.
13       And I said, "Well, then, fine."
14       When Calvin said, "This is what we
15 did," then I said, "Well, then, make it right.
16 We've got to fix the truck.  Now get me those
17 fuses and put them back."
18       Then they said they don't know where
19 the fuses were.  And by that, my understanding is
20 they had tossed them into some of the vehicles
21 and couldn't locate them.
22       So then again, to me, I'm about who's
23 going to solve this problem and get it done
24 professionally?
25       So then Gabe said, "Well, I can go to

45

1 the auto store and buy the fuses.  It's not the
2 two that tampered with the vehicle that offered.
3 It was Gabe that offered to go get the parts to
4 fix it.
5        So then he went to Auto Zone.  When I
6 went back to the Deputies, I also -- please
7 understand that this was like a back-and-forth
8 going on, too.
9        "If you're not giving me the answer,
10 and I feel like you're lying by omission at this
11 stage to me, I have to go back to the Deputy to
12 get more information."  And it just dragged it
13 out; took more of our time to not fix a problem.
14       So then Gabe came back, and they
15 attempted to put the fuses back in -- and "they"
16 being -- I definitely know it was two Deputies at
17 the hood and Gabe, and I took no part of that
18 because I would have just damaged it more -- to
19 try to make it work, and it still wasn't working.
20       So it -- my understanding, not
21 directly coming to me from the spouse, is they
22 finally were able to get the truck working the
23 next morning, tied to what had been pulled out
24 and messed with.
25       So that is an example -- to me is

62

1   time.
2   BY MS. SCHULMAN:
3       Q.  Did you deem Lieutenant Martinez to
4   be suitable for promotion in November of 2021?
5       A.  No, I did not put him in my top
6   candidates.
7       Q.  And why did you not put him as one of
8   your top candidates?
9       A.  The primary reason is we had several
10  others that brought more to the table in their
11  interview form and for what they articulated on
12  the 113.
13      Q.  What specifically did you see in
14  these other candidates that you did think were
15  suitable for promotion that you did not see in
16  Danny Martinez?
17          MS. COLLINS:  Objection;
18      form.
19          You can answer.
20      A.  That's a variety of things, because
21  it's -- you look at each individual person, how
22  they've interviewed, how they've answered our
23  questions, what their experience is, and how they
24  articulate those experiences, because everything
25  comes off of the 113 -- well, not everything.

63

1       A large percentage comes off of the
2   113s that they submitted, on their work, and what
3   they've done so far to date in their career.
4           Now that said, too, there's some that
5   I put in my top ten that didn't move forward
6   because the system, when it moves, you have to
7   list in order of your top to the bottom, and then
8   it's gone by the Board Chair to then select how
9   many of us had the same ones at the top or not.
10  It's a process that works through that.  I know
11  you know that.
12          So I know some of mine didn't make it
13  through that I could hire, et cetera.
14  BY MS. SCHULMAN:
15      Q.  Did Danny Martinez's -- did your
16  experience with Danny Martinez affect how you
17  ranked him?
18      A.  The totality of everything that day
19  is what affected how I ranked him.
20      Q.  Is it your testimony that there was
21  no information based on your personal contact
22  with Danny Martinez prior to the Board interview
23  that affected your ranking?
24          MS. COLLINS:  Objection;
25      form.

64

1       You can answer.
2       A.  It's never personal.  It's the work
3   setting.  And so during the process of the Board
4   with Lieutenant Martinez, Danny, my recollection
5   is that the Board Chair did ask for us to
6   elaborate on the 2018 event, so that was
7   discussed.
8   BY MS. SCHULMAN:
9       Q.  Okay.  So the Board Chair -- and that
10  would have been Goodwin, perhaps?
11      A.  Our Chief, yes, ma'am.
12      Q.  Chief Goodwin.
13          Was he Chief or Assistant Chief at
14  that point, do you recall?
15      A.  I want to say Assistant Chief.
16  That's my -- yeah.  We just called them "Chief,"
17  "Assistant Chief," so I apologize.
18      Q.  Just called them "boss."
19      A.  Yeah.
20      Q.  It's your testimony that Chief
21  Goodwin asked everyone to articulate their views
22  on Danny Martinez's C-1?  I'm not really
23  understanding.
24      A.  So after each applicant, whatever
25  they stated as a Board we discussed.  It's

65

1   recorded, and any follow-up questions, any
2   clarification.
3           So I believe how it was introduced is
4   in his Closing Statement, Danny Martinez made
5   some effect -- a statement to the effect of, "You
6   know, there were issues in the past and I want to
7   move forward."
8           Those were not his exact words.
9   That's what I recall is my perception of what he
10  said.
11      Q.  Uh-huh.
12      A.  So then the Board had no knowledge of
13  it.  So then -- okay.  They had knowledge because
14  it's in the file, but to elaborate on it, that's
15  when Chief Goodwin had asked for me to state what
16  I knew since I had firsthand knowledge being on
17  scene.
18      Q.  And what did you say?
19      A.  I explained the events from when I
20  de-escalated it arriving on scene.
21      Q.  Did you express your opinion about
22  Danny Martinez and his level of culpability with
23  regard to that event?
24          MS. COLLINS:  Objection;
25      form.

66

1  You can answer.
2  A. I don't recall my exact words, but in
3  stating the event, just like I have today, I
4  would have stated that there was concerns over
5  his acceptance of responsibility for it.
6  BY MS. SCHULMAN:
7  Q. During the Promotion Board interview,
8  did Danny Martinez express his perspective that
9  he had -- did he take responsibility for it
10 during his interview and during the Promotional
11 Board?
12 A. That's my recall, yes, ma'am.
13 Q. So he did -- he did at that point,
14 correct?
15     MS. COLLINS: Objection;
16 form.
17 A. This interview, yes, ma'am.
18     THE WITNESS: I'm
19 sorry.
20     MS. COLLINS: You're
21 fine, Captain Krueger.
22 BY MS. SCHULMAN:
23 Q. During the interview and during the
24 period of time when you were asked to give your
25 perspective about what happened to the other

67

1  Board members, was Danny Martinez present during
2  that portion of the Board proceedings, or was
3  this a private conversation between the Board
4  members after he had already left?
5  A. He was not present. I wouldn't say
6  it was private because it's recorded, the entire
7  conversation, as we discuss each applicant.
8  Q. Did the Assistant Chief or Chief
9  Goodwin express his views about the C-1 or any of
10 the events leading to it?
11     MS. COLLINS: Objection;
12 form.
13     You can answer.
14 A. I don't recall what the Chief said.
15 BY MS. SCHULMAN:
16 Q. Did you have any notes that you had
17 taken at the time that you reviewed each of the
18 Board packets?
19     Did you take any notes as you were
20 preparing for the Promotional Board?
21 A. So in advance we review the 113,
22 special -- we have to -- we had a lot of
23 candidates, so, yes, sir, I took notes, and then
24 during the actual interviews, I took notes.
25     Then you have a right as a Board

68

1  member at the end of the whole process to say
2  whether you get them shredded or you maintain
3  them, so I shred all my notes.
4  Q. Why do you shred your notes?
5  A. I don't need any more clutter. The
6  process is finished and it's a recorded event.
7  Q. Just to educate me, at what point do
8  you have the opportunity to say, "I want to shred
9  these notes" as opposed to "I want to turn these
10 notes over"?
11     MS. COLLINS: Objection;
12 form.
13     THE WITNESS: I can
14 answer, then?
15     MS. COLLINS: Yes. Go
16 ahead.
17     THE WITNESS: My
18 apologies.
19 A. At the very end of the process, the
20 Chair of the Board, whichever Board it may be,
21 will ask if -- we have to go on record saying if
22 we're retaining our notes or if we're shredding
23 our notes.
24 BY MS. SCHULMAN:
25 Q. Did you also interview Gabe Nava?

69

1  A. Yes, ma'am. On the Board?
2  Q. Yes. During this --
3  A. Yes, ma'am.
4  Q. He was on the same Board, was he not?
5  A. Correct.
6  Q. And did you perceive him to be
7  suitable for promotion to Captain at that point?
8      MS. COLLINS: Objection;
9  form.
10     You can answer.
11 A. Yes. I did rank him in my hire rank,
12 yes, ma'am.
13 BY MS. SCHULMAN:
14 Q. As between Gabe Nava and Danny
15 Martinez, why did you perceive Gabe Nava to be
16 suitable for promotion but not Danny Martinez?
17 A. So at that time Gabe Nava --
18 Lieutenant Nava had more in-depth cases that he
19 was reporting on his 113.
20     For instance, we had a transnational
21 case -- "we," because I was his Captain, so
22 really it was him and his Agents -- that was
23 presented into Washington D.C. for the unique and
24 methods used in the sense of we sent them several
25 times down to Mexico City working with multiple

70

1 countries. It's that type of case that's very
2 rare in our Department; it that's level.
3         In working with the other agencies,
4 the type of resources that were utilized were
5 unique. And I don't know how much this goes
6 open, so it would be just a certain type of wire
7 that hadn't been used within law enforcement in
8 this area. May I be vague like that?
9         MS. COLLINS: I'm
10    going to instruct her to be
11    vague like that. The case is
12    ongoing --
13         MS. SCHULMAN: That's
14    fine.
15         MS. COLLINS: Okay.
16    Thank you.
17    A.   It was a notification that -- okay.
18 So the amount of work, and the different type of
19 work, and the level of work that he had done.
20         He had also conducted multiple
21 controlled deliveries out of state, working with
22 multiple agencies, so just the type and nature of
23 work and level that had been done. Not taking
24 away, because, again, my belief is Danny is a
25 very good worker and he does great work.

71

1         Moving into Austin and then his 113
2 at the time, what we look at is what's more
3 current work and where are you well-rounded, and
4 the type of work he's been doing.
5         So that's the difference that I saw
6 between Lieutenant Martinez and Lieutenant Nava,
7 Gabe and Danny.
8 BY MS. SCHULMAN:
9    Q.   Did the Chief ask for you to speak to
10 the issue of Gabe Nava's C-1?
11   A.   Yes.
12   Q.   And what did you say with regard to
13 that?
14   A.   I presented the same situation of
15 what I've said here, that, yes, he was on scene,
16 yes, I had to de-escalate a situation, it was --
17 but I still -- he's accountable for his behavior,
18 but also the same thing is there is another
19 supervisor who was held more accountable on
20 scene, in my opinion.
21   Q.   Lieutenant Martinez has now
22 transferred back to El Paso; is that correct?
23   A.   Correct.
24   Q.   In the process of his transfer or
25 return -- well, do you recall when he actually

72

1 returned back to El Paso?
2   A.   I don't have an exact date, and to
3 know this, I was out of the country for the whole
4 month of October. So when I came back, I know he
5 was here, and due to the nature of my work, I
6 have yet to see him since I returned to work and
7 since he's transferred to El Paso.
8    Q.   Okay. So is he now -- are you now
9 his direct report?
10   A.   No, ma'am.
11   Q.   And to whom does he now report?
12   A.   He now reports to Captain Nava,
13 formally known as Lieutenant Nava.
14   Q.   Was there some sort of a
15 reorganization in the El Paso office involving
16 who was a direct report and -- and kind of
17 reconfiguring everything at about the same time
18 that Lieutenant Martinez returned to El Paso?
19         MS. COLLINS: Objection;
20    form.
21         You can answer.
22   A.   So there was a reconfiguration, but
23 the changes occurred before I even left out of
24 the country.
25         The triggering event was we had

73

1 Captain Wilburn, who I mentioned earlier, he
2 retired, and that way we were able to move
3 forward with our Major -- who previously I would
4 have said "the new Major"; he's been here a
5 couple of years now -- so Major Matt Mull wanted
6 to align our unit similar to what's been going on
7 across the state, and basically making it a TAG
8 Captain, where the units would be -- we have
9 three units in the TAG, so those three
10 Lieutenants would now fall under the direct
11 supervision of a Captain.
12         So that created -- because of the
13 Captain retiring and pushing forward now with
14 what the Major had had a goal to do, that was a
15 restructuring.
16 BY MS. SCHULMAN:
17   Q.   What is a TAG, please?
18   A.   I'm sorry. Yes, ma'am. The Texas
19 Anti-Gang. So it's a building that's run by the
20 Executive Board. I mean, they are all in the
21 same building, but it's multi-agency.
22         So we have -- SO, DPS, PD, all -- A,
23 B, C, D, E, all of the Federal agencies, they are
24 all housed together in the TAG, and what we have
25 is Human Trafficking and two Gang Lieutenants in

## 74

1  that area.
2      MS. SCHULMAN: I need to
3  take a quick break, but I think I'm
4  almost done.
5      MS. COLLINS: Okay.
6  Sounds good.
7      THE COURT REPORTER: We're
8  going off the record at 10:49 a.m.
9  (Recess held from 10:49 a.m. to 10:52 a.m.)
10     THE COURT REPORTER: We're
11  going back on the record at 10:52
12  a.m.
13     MS. SCHULMAN: Captain
14  Krueger, thank you for your time.
15   I will pass the witness.
16     MS. COLLINS: We will
17  reserve our questioning for trial.
18     We would request a read and
19  sign copy of the transcript for the
20  witness.
21     THE COURT REPORTER: Okay.
22  Would you like to order a copy, as
23  well?
24     MS. COLLINS: Yes,
25  please.

## 75

1      THE COURT REPORTER: Okay.
2  We're going off the record at 10:52
3  a.m.
4  (Deposition concluded at 10:52 a.m.)

## 76

1           CHANGES AND SIGNATURE
2  HEATHER KRUEGER              DECEMBER 6, 2022
3  PAGE   LINE       CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## 77

1  _____
2  _____
3
4          _____
5          HEATHER KRUEGER
6  STATE OF _____ )
7  COUNTY OF _____ )
8
9    Subscribed and sworn to before me by the
10 said witness, HEATHER KRUEGER, on this the
11 _____ day of _____, 2023,
12 subject to the aforementioned corrections/
13 changes, if any.
14
15
16
17
18       _____
         Notary Public in and for
19       the State of _____
20
21 My Commission Expires: _____
22
23
24
25

78

1        REPORTER'S CERTIFICATE
2        I, TOMMI RUTLEDGE GRAY, TEXAS CSR NO.
3   1693, Certified Shorthand Reporter, Registered
4   Professional Reporter, and Certified Realtime
5   Reporter, certify:
6        That the foregoing proceedings were taken
7   remotely before me via Zoom videoconferencing, at
8   which time the witness was remotely put under
9   oath by me;
10       That the testimony of the witness, the
11  questions propounded, and all objections and
12  statements made at the time of the examination
13  were recorded remotely stenographically by me and
14  were thereafter transcribed;
15       That the foregoing 78 pages are a true and
16  correct transcript of my shorthand notes so
17  taken.
18       I further certify that I am not a relative
19  or employee of any attorney of the parties, nor
20  financially interested in the action.
21       I further certify that before the
22  completion of the deposition, the Deponent, FACT
23  WITNESS HEATHER KRUEGER, and/or Counsel for the
24  DEFENDANTS, TEXAS DEPARTMENT OF PUBLIC SAFETY,
25  AND DIRECTOR STEVEN C. MCCRAW, IN HIS OFFICIAL

79

1   CAPACITY, ___XX___ did _____ did not request
2   to review the transcript.
3        I declare under penalty of perjury under
4   the laws of Texas that the foregoing is true and
5   correct.
6        Dated this 26th day of December, 2022.
7
8
9
10
11
12
13
14
            _____
15          TOMMI RUTLEDGE GRAY, Texas CSR 1693
            Expiration Date:  10/31/23
16          Firm Registration #528
            INTEGRITY LEGAL SUPPORT SOLUTIONS
17          9901 Brodie Lane, Suite 160-400
            Austin, Texas  78748
18          Telephone - 512.320.8690
            www.integritylegal.support
19
20
21
22
23
24
25