# EX. 7

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION

JARI MCPHERSON, JERALD      )
SAMS, AND DANIEL MARTINEZ,  )
                            )
            Plaintiffs,     )
                            ) CIVIL ACTION
VS.                         )
                            ) NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC  )
SAFETY,                     )
                            )
            Defendant.      )
```

------------------------------------

REMOTE ORAL DEPOSITION OF

FLOYD GOODWIN

DECEMBER 1, 2022

------------------------------------

REMOTE ORAL DEPOSITION OF FLOYD GOODWIN, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on December 1, 2022, from 9:18 a.m. to 2:25 p.m., via Zoom, before Vanessa J. Theisen, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

### Page 22

1  based off of what they have received on the 113.
2      Then -- and that's where the majority of
3  the questions are, their personal questions based on
4  the 113 for each candidate, and then there are a
5  couple of questions that are core questions that are
6  asked to every single candidate.
7      Q.  And what are the core questions?
8      A.  Whatever the chair says the core questions
9  are going to be.
10     Q.  Okay.  What did the chair say the questions
11 -- the core questions were going to be?
12         MS. COLLINS:  Objection, form, but you
13 can go ahead and answer.
14     A.  I really can't remember verbatim what the
15 questions were.  I can tell you that I'm big on
16 accountability, what qualifies -- I think something
17 was to do with what qualifies -- what do you believe
18 qualifies you for this position and what qualities do
19 you think make a good CID captain.  A very general
20 question.
21         I can't remember if this was the first
22 board or the second board, but there was another one.
23 I know one had to do with accountability.  And then
24 -- that could have been the second one, I'm not sure.
25 There was one about social media.  What do you

### Page 23

1  believe about social media and law enforcement
2  especially, you know, at that time with just the
3  whole presence of negativity towards law enforcement
4  in general nationwide.
5      I think the question had to do something
6  along that like, you know, what do you believe in --
7  or it was along that line.  It was just a very
8  general question to deal with law enforcement.
9      Q.  (BY MS. SCHULMAN)  Okay.  So the -- there's
10 a -- I'm not quite understanding.  You said that the
11 packets were reviewed individually and then they were
12 reviewed again individually?  I'm not -- I'm a little
13 confused.
14     A.  Every single board member gets a file, that
15 file that has this, on every single candidate.  So on
16 this, every single board member got 32 packets.  And
17 you have to go through those 32 packets and they have
18 to draft questions for each of those candidates.
19         On that -- I did the core questions.  So
20 I did the core questions that were going to be asked
21 to everybody.
22         The other board members drafted the
23 personal questions that were only based to that
24 individual based off of their 113.
25     Q.  I think I understand.

### Page 24

1      A.  When they submit those questions, we put
2  them in a list to where everybody has a copy of them
3  so we can all follow the question during the board
4  when -- when that person asks the question and we can
5  keep track of where we're at.
6      Q.  Okay.  Approximately how many questions are
7  asked by the time you get the board members all
8  asking questions?
9      A.  I believe that it's two questions -- it was
10 two questions for that board.  I usually run the
11 boards the same.  So for that board I believe it was
12 two questions per board member, and then I either had
13 two or three core questions.
14     Q.  Okay.  Are the applicants ranked by the
15 individual board members prior to the interview
16 process?
17         MS. COLLINS:  Objection, form.  You're
18 free to answer.
19     A.  No, they're not.
20     Q.  (BY MS. SCHULMAN)  How do you determine
21 which board member -- I mean, I'm sorry, how do you
22 determine which applicants get interviewed first?
23     A.  That's very easy.  And I actually tell all
24 the board candidates as they come on, and you can
25 tell by the order of what they were done, it was done

### Page 25

1  in alphabetical order.
2      Q.  That does make it easy.
3      A.  Yes, it does.
4      Q.  After the -- so can you tell me what
5  questions were -- well, let me back up.
6         It's true, then, that not every
7  candidate is asked the same questions, correct?
8      A.  For total questions that's a true statement.
9  Every candidate is asked the same core questions, and
10 then every candidate is asked individual personal
11 questions based off of their 113 alone that are only
12 to them based off of the information they have
13 provided the board.
14     Q.  As the chair of the board, do you exercise
15 any limitations on what questions were asked by the
16 individual board members?
17     A.  Yes, I can.
18     Q.  Do you?
19     A.  Yes, I do.
20     Q.  Under what circumstances do you limit,
21 modify, or reject a proposed question?
22         MS. COLLINS:  Objection, form.  You can
23 go ahead and answer.
24     A.  The only limitations that I put as the board
25 chair on the board members was when it comes to the

26

1  core competencies, I selected certain core
2  competencies to be handled by different board
3  members.  To tell you how I broke it down, I have no
4  idea other than an example is I might have told Major
5  Sharon Jones, "Hey, you take leadership and liaison.
6  Major Mull, you take interpersonal ability and
7  communication.  Captain Gonzalez, you take
8  investigations and flexibility."
9           And I did do that.  And the reason I did
10  that is due to my past experiences with boards.  If
11  you don't do that, you end up with 10 leadership
12  questions or 10 liaison questions or 10 investigation
13  questions.  Everybody keys on the same because some
14  of those examples, when you read them on the 113,
15  people can actually use the same example for multiple
16  core competencies.  And it might be easier to draft a
17  question -- if you have the same example used in
18  multiple core competencies, it might be easier to
19  draft a leadership question off of that example than
20  it is a communication question or interpersonal
21  ability question.
22           So everybody tends to go to -- you know,
23  you've got 32 packets, so everybody tends to go
24  through, "Hey, I'm going to hit a leadership question
25  on this.  That's the -- that's the easiest deal."  So

27

1  what I do is I separate that to where they have to
2  touch that core competency.  That also allows me to
3  touch every core competency in the board instead of
4  just rating somebody on one core competency.
5      Q.  (BY MS. SCHULMAN)  Uh-huh.  I understand.
6  Okay.  And would that have been true for both the
7  September 2020 and the November 2021 board interviews
8  for the captain position?
9      A.  Yes.
10      Q.  Approximately how long do the board
11  interviews -- did the board interviews last per
12  person?  Do you have like a -- an approximate target
13  for how long you're going to allow a board interview
14  to go on?
15      A.  For 32 people, we had scheduled three days.
16  And once we start, we -- we divided them into three
17  equal sections of how many we were going to handle
18  each day.  And once we started, we kept going until
19  it finished.
20           To give you a -- an average would be
21  hard to do because some may last 15 minutes, some may
22  last 45 minutes.  It depends on, you know, some
23  people are very personable and like to talk.  Some
24  people don't.  Some people just give you a yes, a no
25  answer and they're in and out.  So it totally depends

28

1  on the candidate.
2      Q.  Well, that's certainly a lot of people to
3  talk to in three days.
4      A.  I agree.
5      Q.  What's the next step in -- undertaken by the
6  promotion board in the captain -- in the circumstance
7  where you have applications for the captain's
8  position?
9           MS. COLLINS:  Objection, form.  You can
10  answer.
11      A.  Did you say what's the next step after all
12  the interviews are done?
13      Q.  (BY MS. SCHULMAN)  Well, let me ask a better
14  question.
15           At the end of the day on day one, is
16  there a point where you stop and summarize those --
17  that group of applicants and make any kind of a
18  determination as for that first batch that you --
19  that you've interviewed?
20           MS. COLLINS:  Objection, form.  You can
21  answer.
22      A.  After every single interview, the board
23  takes a second before they invite another candidate
24  in.  And as the board chair -- well, actually before
25  we let the candidate go, I ask the board, the whole

29

1  board, is there any other questions or is there
2  anything that needs to be asked that maybe has
3  generated off of an answer of another question?  Is
4  there anything we need to clear up?  And at that
5  point, they might ask another question.  "Hey" --
6  reference the question that you had from such and
7  such, "I just want some understanding," and they have
8  an opportunity to do that.
9           Then after that, I ask the candidate, do
10  you have any questions from the board?  And the
11  candidate has the opportunity to do -- to ask any
12  questions at that time.
13           Once that's done and everybody is good,
14  we thank each other for their time and their
15  participation and the interview ends.
16           Then, before the next candidate comes
17  in, we clear that packet and basically it's -- "Hey,
18  the next" -- I move pretty fast.  So I would say,
19  "Hey, the next one we have coming is this one.
20  They're scheduled for this time."  We're either
21  running behind or we're running ahead, "Does anybody
22  need to take a break?  If not, okay.  Does anybody
23  have any questions about this next candidate coming
24  in?"
25           I don't remember anybody having a

30

1  question about any candidate coming in before, and
2  then I say, "Okay, let's -- let's get them," and we
3  invite the next one in.
4         At the end of the day, of each
5  individual day, I tell them, "Hey, we've heard from
6  eight or nine," or whatever it was for that day.  "Go
7  ahead and just, you know, think about what you've
8  heard today of the people so -- because tomorrow
9  we're going to have another group."  And then at the
10 end of the next day I tell them the same thing,
11 "Tomorrow we're going to have another group."  And we
12 go just like that.  That's it.
13    Q.  (BY MS. SCHULMAN)  Do the board members take
14 notes about the individual candidates they've been
15 interviewing during the interview process?
16    A.  I actually give an instruction about that.
17 That's a DPS policy during promotional boards that if
18 formal notes are taken, then those notes will be
19 submitted to the board chair at the end of the
20 interviews, and those notes will be retained and
21 filed away and sent to HR with the packet.  So those
22 formal notes will be obtained.
23    Q.  When you say "formal notes," does that mean
24 that there are informal notes that are not retained?
25    A.  Well, that wouldn't be me saying I'm sure

31

1  there are, but the way that I handle the board is I
2  tell them, "Hey, if you-all have any formal notes
3  that have been taken, I need you-all to send those to
4  me right now."
5         I also let the candidates know that this
6  is not -- you know, you need to turn your phone off.
7         There's something that I read to the
8  candidates when they first come in.  I'm trying to
9  think of the name of that.  That's another form.
10 It's either the 110 or the 118.  I think it's the
11 118.  The 118 is the instructions to candidates.  And
12 when they first come in and before the questioning
13 ever starts or we introduce each other, I read them
14 the instructions.  And that just goes in that, you
15 know, you're not to leave here and talk to anybody
16 about the questions that were asked until the whole
17 proceeding is over.  There's not any notes taken.  If
18 there are notes taken and they're formal notes, they
19 will be turned in to me at the end of the process.
20        All of that is said at that time in
21 those instructions.  And then when the whole process
22 is over, I ask for them to submit any notes that they
23 have, if they have them, and then I take them and I
24 submit that to HR.
25    Q.  So when you're talking formal notes, I --

32

1  are you describing notes taken during the actual
2  board interview?
3     A.  Yes, ma'am.
4     Q.  What about notes taken by the individual
5  board members prior to the interview?
6         MS. COLLINS:  Objection, form.  You can
7  go ahead and answer.
8     A.  We each got individual packets sent to us
9  separately.  And if they had notes, I wouldn't know
10 if they had them or not.  What I ask is I ask them if
11 you have made any notes during this process, you need
12 to send them to me if they're formal notes.
13    Q.  (BY MS. SCHULMAN)  Again, I'm trying to
14 understand what is a formal note?
15    A.  Like a documentation of a -- I guess they
16 wrote something down.  Wrote something down and made
17 a note of something.  I've never taken formal notes,
18 so.  And the reason I -- "formal" is my word.  I mean
19 I'll -- you know, I might chicken scratch on a pen or
20 do something like that, but if I actually write
21 something down or have a problem with something and I
22 document it, then that's going to be a recorded
23 formal note.
24    Q.  After the entire process is over, do you
25 require the -- or, more precisely, are the board

33

1  members required to return the packets to you or to
2  HR?
3     A.  No.  Those are sent out to us in email.  I
4  don't know if everybody reads them in an email or
5  prints them off or how they handle it individually.
6  I can tell you what I do is I print them off to where
7  I have them separate and I can, you know, read them
8  and take them with me and everything else to where I
9  can study them and look through everything.
10        Some people work better on a computer.
11 I'm more of one that I like a hard copy that I can
12 highlight and print or read or look at.
13    Q.  Me too.  So we're in the process and at the
14 end of the -- for example, at the end of the first
15 day, you collect any packets and formal notes -- or
16 you collect all the formal notes that go with that
17 individual packet and do what with them?
18    A.  If I did collect any notes, then I would
19 have saved them to put with the final packet that I
20 submit to HR when the process is completely filled or
21 finalized.
22    Q.  In your recollection for the September 28,
23 2020, board interviews were there formal notes
24 collected and attached to the packets?
25    A.  No, ma'am.  I did not receive any notes from

34

1  any of the board members.
2      Q.  And what about for the November 15, 2021,
3  interview, board interviews?
4          MS. COLLINS:  Objection, form, but you
5  can go ahead and answer.
6      A.  No, ma'am.  I didn't receive any notes on
7  that one either from any of the board members.
8      Q.  (BY MS. SCHULMAN)  In your experience, is
9  that typical not to receive notes?
10     A.  I can tell you that I've chaired many boards
11 and I have participated in many boards in my career
12 with DPS, and as a board chair I have never received
13 notes from any board members and I have never kept
14 notes as a board person.
15     Q.  Okay.  So at the end of the first day when
16 you interviewed the first group of applicants, is
17 there any kind of ranking that goes into the process
18 on day one of the ones you have interviewed?
19         MS. COLLINS:  Objection, form.  You can
20 go ahead and answer.
21     A.  I don't think any official ranking other
22 than what I have said that I tell them is just, you
23 know, "These are how many we have heard today.  Keep
24 in mind that tomorrow we're going to hear a new batch
25 and the next day we're going to hear a new batch."

35

1  So that's basically what I tell them.  It's a
2  recorded process, so I mean that's -- that's what I
3  tell them.
4      Q.  (BY MS. SCHULMAN)  Okay.  You said it's a
5  recorded process as in a video or an audio interview?
6      A.  Yes, ma'am.  Every board is recorded.  So I
7  can tell you that the two boards that I chaired that
8  we're discussing right now, that was during the
9  COVID-19 scare.  So we actually just had a captain's
10 board this month to renew the eligibility list that
11 just expired and that one was the first one held in
12 person over the last three boards.
13         So they actually came up here and sat in
14 an interview room in front of a board and did that.
15 But these two were done over Webex, basically like
16 we're doing on this Zoom call right now.
17     Q.  Uh-huh.  Okay.  After all of the interviews
18 had been conducted or were conducted in September
19 of 2020, what was the next step in determining the
20 selection process for the captain position?
21         MS. COLLINS:  Objection, form, but go
22 ahead and answer.
23     A.  The department has a procedure they use at
24 the end of boards to link candidates and get to --
25 it's a process we go through to get to -- it's an

36

1  elimination, selection process, to get to the final
2  list of eligible candidates.
3          So once all the interviews are done,
4  then what the board members do is we stay together
5  and we compile those lists and compare them and work
6  them down through the steps -- I believe there are
7  five steps -- to where finally you end up with a
8  final list.
9          To tell you exactly how that process
10 happens without it setting in front of me to read the
11 instructions, because we have to read the
12 instructions and reread the instructions every time
13 we do it to make sure we're doing it exactly how
14 we're supposed to do it, I would not be able to go
15 step by step through that unless I had it in front of
16 me.
17         But it -- basically every board member
18 makes a list, and then to explain this to you real
19 easy and real fast, what it does is if we were all
20 sitting on the board, each of us would have a list of
21 how -- of who we think should be a CID captain.  Out
22 of the 32 applicants that just came before us or
23 candidates that came before us, of those 32, which
24 ones do you think are ready to be a captain?  And
25 that's what the first list is.

37

1          It might -- you know, your list might
2  have 32 people on it.  My list might have 10 people
3  on it.  Vanessa's list might have five people on it.
4  I mean, you know, it totally depends.  So once
5  everybody is finished making that initial list, then
6  we start discussing.
7          And what we do is, as the board chair, I
8  go straight down the list in alphabetical order and I
9  call the name.  And I go, "Okay, Margaret," and I
10 point to all the boards, or I call their name and go
11 -- and they either say yes or no, that they have them
12 on their list.
13         And if there's five people on the board
14 and all people have you on their list, then you get a
15 five.  If I say, "Floyd Goodwin" and we go around and
16 only four of the people have them, then I get a four.
17 Then I'll do Vanessa, and if Vanessa is on
18 everybody's list, she gets a five.  I do Allison, she
19 gets a four.  I do Robert, he gets -- no offense,
20 Robert, I -- I can't see you, but let's say Robert
21 gets a three.  Okay.  He's on three of the people's
22 list, he gets a three next to his name.  And we go
23 through the entire list off that.
24         And then I look and go, "Okay.  How many
25 are we going to move to the next one?"  And that's

42

1  has been going on and that there's no new fresh, you
2  know, something happened or disciplinary or
3  something.  And then once they clear it, then it
4  comes to the chief.
5          The chief reviews it, signs off on it,
6  pushes it over to the director's office, the
7  lieutenants review it.  Lieutenant colonels review
8  it.  The director reviews it.  It's good.  Comes back
9  over, then it gets posted as an effective date, and
10 then it's good for 12 months from that effective
11 date.
12         And that all happens -- sometimes it can
13 happen in a day, two days, three days, but it's
14 usually pretty quick.
15    Q.  I want to back up, please, to -- because I
16 interrupted you.  You were describing a system where
17 you rank numerically among the five board members
18 who's a four, who's a five, and so on.  Is that
19 correct?
20    A.  Yes, ma'am.
21    Q.  All right.  So then when you have -- of the
22 more than 30 applicants, how many -- can you tell me
23 how many individuals ended up on the eligibility list
24 for the September 2020 captain's position?
25    A.  Are you asking me how many names we put on

43

1  the eligibility list for the -- for the captain
2  position?
3     Q.  How many people ended up ranked at the end
4  of the interview process for the 2020 --
5  September 2020 interview board?
6          MS. COLLINS:  Objection, form.  You can
7  answer.
8     A.  I'm not exactly sure what you're asking me,
9  but if you're asking me how many people ended up on
10 the final eligibility list, there was ten.  Ten out
11 of 32.
12         If you're asking me how many people we
13 ranked in different stages of the ranking process,
14 the selection process, I could not tell you that
15 unless I had it in front of me.
16    Q.  (BY MS. SCHULMAN)  Okay.  Well --
17    A.  We started out with 32.
18    Q.  Started with 32.  I understand.  And you
19 interviewed 32 people in this -- in this process,
20 correct?
21    A.  Yes, ma'am.
22    Q.  Okay.  So of those 32, somehow most of them
23 were eliminated from the eligibility -- during the
24 eligibility assessment.  Is that correct?
25         MS. COLLINS:  Objection, form, but you

44

1  can answer.
2     A.  When I talked about the selection process at
3  the end and when I went through and said the numbers
4  and everything, yes, when we move from one list to
5  another list, we only take -- we keep dwindling it
6  down, if that's what you're asking.
7          So when I go around the entire group and
8  I have my fives and my fours and my threes and my
9  twos and my ones and my zeros, then we determine a
10 cutoff point of who we're moving over to the next --
11 are we going to move just fives or are we going to
12 move fours or -- are we going to move fives or fives
13 and fours, or fives, fours, and threes, or fives,
14 fours, threes, and twos -- to where if we're trying
15 to make a list of five people, for instance -- and
16 this is just an example -- and I only have one five,
17 one four, one three, one two, and a bunch of ones,
18 then -- or two twos, then I'm going to go all the way
19 down to two, and I'm going to move those five over.
20         If I have five fives, then it makes it
21 easy and I'm not going to go below five and I'm going
22 to move all the fives over to the next list.  So I
23 mean that's -- that's how that happens.
24    Q.  (BY MS. SCHULMAN)  What factors determine
25 how many people you're going to put on the final

45

1  list?
2     A.  I can tell you as the assistant chief I
3  talked to Tom Ruocco, who was my chief at the time.
4  We were about to make an eligibility list and have
5  the board, and the only direction I was given was put
6  at least five and no more than ten on the board
7  because it's got to last for 12 months or you'll be
8  doing another board again.  That's all I was told.
9     Q.  So in this particular instance, do you
10 recall how many individuals you put on the final
11 list?
12         MS. COLLINS:  Objection, form.  Asked
13 and answered.  You can answer again.
14    A.  Yes, ma'am.  I put 10.  Ten of 32.
15    Q.  (BY MS. SCHULMAN)  All right.  And within
16 that list are the individuals -- say you have
17 multiple fives, presumably you had fives and fours.
18 Is that accurate or do you remember?
19         MS. COLLINS:  Objection, form.  You can
20 answer.
21    A.  I believe I had fives and fours, yes.
22    Q.  (BY MS. SCHULMAN)  Within those fives and
23 fours, how were those individuals ranked?
24         MS. COLLINS:  Objection, form.  Asked
25 and answered.  You can go ahead and answer, Chief

46

1 Goodwin.
2     A. Well, I don't really understand. I think I
3 know what you're asking me but I'm not a hundred
4 percent sure.
5     Q. (BY MS. SCHULMAN) Let me try again.
6     A. Because I've told you about how I go around
7 the table and -- and I make, you know, a five or a
8 four or a --
9     Q. I understand that. What I'm asking is,
10 okay, so you had a list of fives and fours. Is that
11 list in alphabetical order? Are they listed in
12 preference? How are they listed once you get to your
13 final 10?
14     A. Okay. Again, that goes into the process and
15 the instructions of the process, and that's where it
16 gets a little bit more difficult.
17         And the easiest way that I can give this
18 to you is let's say that I have five fives. Then we
19 have to look at how are we going to rank those five
20 people that all have a five.
21         So then we look at the first list where
22 somebody put them as a five, okay. Actually no, we
23 don't go to the first list. We go to the second list
24 where they have brought them over, because if -- I
25 tell them, "Okay, we're going with fives and fours

47

1 because this is how many we have," so they bring them
2 over to their second list.
3         Then let's say that we have five fives
4 and we need to build the third list that we need to
5 rank these five fives in order. Now we go and we
6 start talking and, "Okay. Where do you have Floyd
7 Goodwin?" "I have Floyd Goodwin as my number one."
8 "Okay. Where do you have him?" "I have him as my
9 number five."
10         So they rank them, they rank those five
11 in what order they want them in or that they think
12 that they should be in by their individual assessment
13 of their performance.
14         So -- and just to make this easy and
15 quick, if you have somebody that, let's say, four of
16 the five candidates listed them as their number one,
17 and one of the candidates has them as their number
18 two, and no other candidate has a majority like that
19 at that position, then that's an easy one, and that's
20 your number one. Put them as your number one.
21         Then we go to number two, and we go
22 through the whole process again. "Okay. Where is
23 this?" And we see how high they're ranked on each
24 person's list and where -- and it's actually a very
25 time-consuming and tedious process that -- because

48

1 especially when you get further down the list when
2 you're dealing with, you know, "Hey, I've got this
3 person at a seven, and I've got -- I've got him at
4 eight and I've got somebody at a six and I've got
5 somebody at a seven." And it's a difficult process,
6 but that's how the process happens. And that's how
7 they get ranked in order.
8     Q. You had mentioned that there is some sort of
9 a set of criteria or steps that this follows. Is
10 there like a document that reflects that process that
11 you've been describing?
12     A. Yes, ma'am. The department has a document
13 that has those instructions and that whole process
14 done. And I apologize, I know I've been throwing out
15 like 110s, 118s, 114s, 113s. It's one of those. It
16 might be a 111, or a 111A or a 111B or a 112 or a --
17 it's -- it's one of those HR forms.
18     Q. And this is an HR form. Does it have a
19 name?
20     A. It will have a number. It will be an HR --
21 like this -- this one that you had me open is an
22 HR-113B, which is down at the bottom left corner of
23 every form. It will have like the instructions that
24 I was talking about earlier that I read to all of
25 them, that's an HR-118, I believe.

49

1         There is also an HR-113A. It will have
2 a number, but I'm not sure -- it will basically --
3 it's the instructions of how to rank the board
4 candidates.
5     Q. Is this a form number that you could find on
6 a break and provide that information?
7         MS. COLLINS: Meg, I will represent that
8 we will look into that and get the number over to
9 you.
10         MS. SCHULMAN: Okay.
11     Q. (BY MS. SCHULMAN) Do you recall -- do you
12 recall whether or not Plaintiff Martinez was on the
13 eligibility list, the final eligibility list, that
14 you created as a result of those interviews?
15         MS. COLLINS: Objection, form. Time
16 frame, please.
17         MS. SCHULMAN: I'm sorry, what did you
18 say, Allison?
19         MS. COLLINS: Could you provide a time
20 frame? There's two different boards at issue here.
21 Could you just clarify which one you're asking the
22 specific question to?
23         MS. SCHULMAN: Absolutely.
24         MS. COLLINS: Thank you.
25     Q. (BY MS. SCHULMAN) Do you recall where

Page 50

1  Plaintiff Martinez ranked on the September 2020
2  eligibility list that -- where you have described
3  this process?
4      A. He was not on the final 10 of the 32 on the
5  final list.
6      Q. Okay. Do you recall where he was on the
7  list that was created -- the initial list that was
8  created after the interview process?
9      A. No, ma'am. I can't recall that unless I had
10  it in front of me.
11      Q. Okay. Do those documents still exist?
12          MS. COLLINS: Objection, form. You can
13  answer.
14      A. Yes, they do. They're in HR. They're
15  submitted.
16      Q. (BY MS. SCHULMAN) Okay. Do you recall
17  anything about the Plaintiff Martinez's interview for
18  the 28th -- September 28th, 2020, captain's position?
19      A. Yes, ma'am, I do.
20      Q. What can you tell me about that?
21      A. What exactly do you want to know?
22      Q. What do you recall?
23      A. I recall that he came before the board. We
24  asked him questions. He answered them. That was it.
25      Q. Do you recall what questions were asked?

Page 51

1      A. I can tell you the core questions that were
2  asked. I can't tell you the individual specific
3  questions that were asked to him because they're not
4  in front of me. However, HR has a copy of those
5  questions.
6      Q. Do you recall why he was not -- were there
7  any particular issues that you recall anyone raising
8  with regard to Plaintiff Martinez's interviews?
9      A. Yes, ma'am, I do.
10      Q. Can you please tell me about that?
11      A. The issue that was raised with Danny is the
12  fact that he had had a sustained C-1, which was --
13  which had happened probably -- I'm not really sure, a
14  year, a year and a half right before this, which had
15  occurred out in El Paso.
16      Q. And does a sustained C-1 -- well, let me ask
17  you, what is a sustained C-1?
18      A. A C-1 is a complaint that's filed and it's
19  investigated. Whenever there is a complaint filed on
20  any member of the department, it gets investigated.
21  When it's investigated, it gets ruled as sustained,
22  not sustained, or unfounded. And if it's found to be
23  true and it did occur, then it's found to be
24  sustained.
25      Q. So this is a complaint in the particular

Page 52

1  circumstances of Danny Martinez. What was the
2  complaint? Do you recall?
3      A. Yes, ma'am, I do.
4      Q. Please tell me what you recall.
5      A. There was an instance out in El Paso that
6  involved a CID agent that was friends with Danny.
7  Danny was a lieutenant out in El Paso.
8          He was not this agent's supervisor.
9  This agent was going through a civil issue with his
10  spouse or ex-spouse. They were either divorced,
11  recently divorced, or separating to be divorced or
12  something. But anyway, El Paso County got involved
13  due to the agent had to be escorted over to the
14  residence to collect his property.
15          The judge listed exactly what the agent
16  could take from the house. So when the agent
17  responded with the deputy, Danny and another agent
18  showed up. Also the supervisor, who is another
19  lieutenant for DPS CID, showed up. All of this kind
20  of -- the tension there kept growing.
21          There were issues between Danny and the
22  deputy. There were also issues between the agent
23  that this was pertaining to and the deputy because
24  there was a vehicle involved that belonged to the
25  agent and his ex, and he was wanting to take the

Page 53

1  vehicle. And the deputy said, "You can't take the
2  vehicle because that's not on the list of property
3  that you can take."
4          The lady in question, who was the
5  ex-spouse or -- she was saying that she needed the
6  car for the kids and, you know, to grocery shop and
7  take them to school and whatever else. So when the
8  agent got escorted in the house with the deputy to
9  collect his belongings, Lieutenant Martinez and the
10  other agent went over and disabled the vehicle.
11          Once they disabled the vehicle, the
12  vehicle was left at the scene, everybody left. The
13  lady tried to start her vehicle, the vehicle wouldn't
14  work. She contacted the county. The county in turn
15  contacted DPS.
16          DPS CID, the major and the captain out
17  in that region, called Lieutenant Martinez and the
18  agent into their office, asked them if they had done
19  anything to the vehicle. They lied and said no, they
20  had not done anything to the vehicle.
21          So then DPS contacted the county, told
22  them that wasn't the case. The vehicle got sent to
23  the shops. It was found that the vehicle had been
24  disabled.
25          The CID captain called Lieutenant

**Page 54**

1  Martinez and the agent back into their office, told
2  them, "Hey" -- I'm not sure of the exact -- I'm just
3  giving you a general synopsis of it.  But he said
4  basically, "We know you-all did something to that
5  vehicle."  And they owned up to it at that point,
6  after lying to it originally, and said, "Yes, we did
7  disable the vehicle."  That's what the complaint was
8  based on.
9      Q.  Okay.  And was this a factor in eliminating
10 Danny Martinez from eligibility on the promotion
11 list?
12     A.  Me, personally, in my scoring he was not on
13 my list.
14     Q.  Was the C-1 the reason he was not on your
15 list?
16     A.  Yes, it was, ma'am.  I actually think -- and
17 I know it's not because he's on this call.  It's --
18 he's a very good worker.  He runs a very good squad.
19 But the fact that he lied to his captain and that he
20 did that on that board, yes, that was the reason I
21 didn't vote for him.
22     Q.  Okay.  Was that a factor as you recall with
23 the other members of the interview board?
24     A.  Yes, ma'am, I believe it was.
25     Q.  Okay.  Is a C-1 -- so I want to understand.

**Page 55**

1  Basically from your perspective, is a
2  C-1 an automatic disqualification for promotion in
3  the future?
4      MS. COLLINS:  Objection, form.  You can
5  answer.
6      A.  No, ma'am.  It's not an automatic
7  disqualification, because, if it was, he would have
8  never qualified to come before the board.
9      Q.  (BY MS. SCHULMAN)  Is this a circumstance
10 where having had a C-1, this individual will never,
11 in your mind, be qualified for promotion?
12     MS. COLLINS:  Objection, form.  You can
13 answer.
14     A.  No, ma'am.  That's not the case.  I believe
15 people make mistakes.  I believe you can learn from
16 those mistakes, and you can continue on.  Especially
17 in my profession, people make mistakes all the time.
18 A lot of the things we do are in split seconds.
19 Sometimes they're right.  Sometimes they're wrong.
20     We base them a lot of times off of our
21 training.  If they're not based off our training and
22 they're in violation of the law or in violation of
23 anything like that, then that's a problem.  But I do
24 think that people can learn from mistakes they make.
25 They can correct them and grow from it.

**Page 56**

1  And so, no, my answer to you is I don't
2  believe that disqualifies somebody forever.  I do
3  believe that they need to show that they learned from
4  it and have grown from it and aren't going to make
5  the same mistake again.
6      Q.  (BY MS. SCHULMAN)  Did you have some reason
7  to believe that Danny Martinez would act in the same
8  manner again?
9      MS. COLLINS:  Objection, form, but you
10 can go ahead and answer.
11     A.  Ma'am, I'm going to tell you, there were two
12 candidates that came to that board that were involved
13 in that issue.  The other lieutenant that I talked
14 about that was the supervisor at the scene.  He was
15 not involved in disabling, but he was there.
16     I can tell you that played against him
17 too for the fact that he didn't handle the scene
18 better.  And neither one of them were picked for the
19 eligibility list due to that.  They were both
20 specifically asked a question about that issue.
21     I can tell you that one of them answered
22 the question and said that he made a mistake, he
23 learned from it, he actually uses that now to coach
24 other people so that they don't make the same mistake
25 and expressed to the board his regret and what he

**Page 57**

1  learned from it and how he's moving forward.  It was
2  a very sincere, in depth answer.
3      I can tell you that the other candidate
4  did not answer like that and basically just said,
5  "Yes, that happened, and it does not define me."  And
6  that was it.
7      But I can tell you that neither one of
8  those candidates in the September board made the
9  list.
10     MS. SCHULMAN:  Vanessa, could you reread
11 my question, please?
12     THE REPORTER:  Question:  Did you have
13 some reason to believe that Danny Martinez would act
14 in the same manner again?
15     MS. SCHULMAN:  I'll object to the
16 responsiveness of the last answer and ask you again.
17     Q.  (BY MS. SCHULMAN)  Do you have some reason
18 to believe that Danny Martinez would act in the same
19 manner again?
20     A.  Yes.
21     Q.  Can you please articulate what that is?
22     A.  I just did, ma'am.  I don't mean to be rude,
23 but his answer was "It doesn't define me."  Saying,
24 "Yes, it happened, but it doesn't define me," he
25 didn't say that he learned from it.  He didn't say

58

1  that he was sorry about it.  Anything.  So, I mean,
2  that's -- that's what I was trying to do was answer
3  your question.
4      Q.  Okay.  Thank you.
5          MS. SCHULMAN:  I would like to take a
6  break for a little bit.
7          MS. COLLINS:  I was just about to ask
8  for one.
9          MS. SCHULMAN:  All right.  Ten minutes?
10         MS. COLLINS:  Ten minutes sounds good.
11 Thank you.  And Chief Goodwin, if you could just go
12 ahead and mute your microphone and turn off the
13 video, we're going to just take a quick break.
14         THE REPORTER:  Off the record at
15 10:54 a.m.
16         (Recess from 10:54 a.m. to 11:10 a.m.)
17         THE REPORTER:  Back on at 11:10 a.m.
18         MS. SCHULMAN:  Could you please reread
19 my last question because I want to keep track of
20 where I was.
21         THE REPORTER:  "Could you please
22 articulate what that is?"  That's what the last
23 question was.
24         MS. SCHULMAN:  Maybe I'll need to go
25 back two.

59

1          THE REPORTER:  Hang on.  "I'll object to
2  the responsiveness of the last answer and ask you
3  again.  Do you have some reason to believe that Danny
4  Martinez would act in the same manner again?"  The
5  answer --
6          MS. SCHULMAN:  Okay.
7          THE REPORTER:  -- was, "Yes."
8          MS. SCHULMAN:  Okay.  Now I remember.
9  Thank you.
10         THE REPORTER:  Uh-huh.
11     Q.  (BY MS. SCHULMAN) Chief Goodwin, when you
12 talked to Plaintiff Martinez in his September 2020
13 evaluation promotion board and you interviewed him
14 and he said to you, "This doesn't define me" in
15 reference to the C-1, did you ask him what he meant?
16     A.  Ma'am, I can't recall if I asked him what he
17 meant or not.  I think -- I pretty much thought that
18 I understood his answer.
19     Q.  Did you follow up with him in any way about
20 his answer?
21     A.  I can't recall.  I don't -- I don't think --
22 I mean, I -- no.  I understand when somebody says
23 something doesn't define them, I understand what that
24 means.
25     Q.  What does that mean to you?

60

1      A.  It means that that's not the only thing
2  about me.
3      Q.  In the interview process and ranking process
4  that you have described where the various board
5  members rank who is your number fives, who is your
6  number fours and so on, is there a discussion in that
7  initial ranking about why someone is ranked a number
8  five or a four or a three or a two?
9      A.  No, we don't discuss why you put somebody
10 like that.  You don't question -- I mean, there's
11 discussions that are going on in there because we're
12 trying to figure out where everybody has people at,
13 but you don't question somebody why did you do this
14 or why did you put them there or anything like that.
15         It's more of broader discussion of where
16 do you have them and what does this equal out to
17 compared to where everybody else has them and
18 everything else at the end.
19     Q.  So there is -- as I am understanding it,
20 you're saying that there's no -- that you accept
21 that -- let me start over with that question.
22         As I understand it then, the ranking is
23 subjective as to who is placed -- who is assigned a
24 numeric value, what numeric value is assigned to
25 them?

61

1          MS. COLLINS:  Objection, form.  You can
2  answer.
3      A.  I wouldn't say that it's subjective how a
4  numeric number is assigned to them to the fact that
5  we tally who has them on their list and that's what
6  makes the number.  That's not subjective.  That's
7  defined.
8          What's subjective is how they make
9  somebody's list or how they end up on somebody's
10 list.  And the reason I would say that is subjective
11 is for the fact that I can tell you the weight that
12 Floyd Goodwin puts on every single competency or core
13 competency or trait or characteristic of a person,
14 but I can't tell you what -- Margaret, I can't tell
15 you what you put, you know.
16         Leadership might be, you know,
17 50 percent of what I think is important, and then
18 dependability and credibility and truthfulness and --
19 and everything else might be the other 50 percent.
20 That's not going to be the same for every single
21 board member.
22         You might think that honesty and
23 dependability are the two primary that make up
24 80 percent of the factors that you would put somebody
25 on your list.  So that's where I believe it becomes

70
1 less than that the following board. I believe it was
2 either 24 or 26 total candidates that came before
3 that board. Some of them new faces, some of them
4 they participated in the board back in September.
5         THE REPORTER: I'm sorry. Did you say
6 may have participated in the board back in September?
7    A. Some of them were ones that did come to the
8 September board that are coming again, and others
9 were new lieutenants that didn't -- that weren't
10 qualified at that time and were qualified now. But I
11 believe the total number was in the mid 20s,
12 somewhere between 24, 25, 26, something like that.
13    Q. (BY MS. SCHULMAN) And who were the board
14 members for the second -- for the November 2021
15 promotion board?
16         MS. SCHULMAN: I'm listening. I just
17 have to move to a different chair because this chair
18 is killing my back. Okay.
19    A. I was the board chair. The second board was
20 Major Terry Preston, Captain Heather Krueger, Major
21 Matt Sweeney, and Captain Manny Quilantan.
22    Q. (BY MS. SCHULMAN) Who was that last name?
23    A. Manny Quilantan. Manual Quilantan.
24    Q. You had mentioned earlier that these people
25 are selected randomly by the human resources

71
1 department. When you say "randomly," do you have any
2 idea do they pick names out of a hat? How does --
3 how do those random -- how are those selections made?
4 Do you know?
5    A. Specifically, no, ma'am. I could answer
6 that generally, but specifically no, you would have
7 to talk to human resources. I just know that some of
8 the -- some of the stipulations is it's a CID board
9 so it's going to be CID personnel. And if it is a
10 captain's board, then nobody on the board is going to
11 be below the rank of captain. If it's a lieutenant
12 board, nobody below the rank of lieutenant and stuff
13 like that. That's -- that's all I know.
14         They usually shoot to have one female on
15 the board, and they usually shoot to have at least
16 one minority on the board.
17    Q. Is there any effort to avoid conflicts of
18 interest with somebody who has already had an issue
19 with a candidate?
20         MS. COLLINS: Objection, form. You can
21 answer.
22    A. Ma'am, I don't know if there are or not. I
23 know that there's 11 majors in CID, and there's 30 --
24 I'm going to get this number wrong, I know I am --
25 32 maybe captains. So -- and they -- and they make

72
1 up districts and regions throughout the state and
2 headquarters. So, I mean, that's -- that's the pool
3 they use.
4    Q. (BY MS. SCHULMAN) Were you aware when this
5 board was formed that Heather Krueger was the person
6 who had filed the C-1 against Danny Martinez?
7         MS. COLLINS: Objection, form. You can
8 answer.
9    A. Yes, ma'am, I was.
10    Q. (BY MS. SCHULMAN) Did that seem to you to
11 be problematic?
12         MS. COLLINS: Objection, form. You can
13 answer.
14    A. No, ma'am, it didn't.
15    Q. (BY MS. SCHULMAN) In forming a board, are
16 you looking for individuals who are neutral before
17 they start their evaluation process of the
18 candidates?
19         MS. COLLINS: Objection, form. You can
20 answer.
21    A. Yes, ma'am.
22    Q. (BY MS. SCHULMAN) Did it seem to you that
23 there might be a possibility that somebody who had
24 filed a complaint against one of the candidates might
25 not be neutral?

73
1         MS. COLLINS: Objection, form. You can
2 answer.
3    A. Ma'am, we all have to answer for what we've
4 done. And our supervisors are -- you know, if
5 someone is your direct supervisor and you do
6 something wrong, they're the one that's name is going
7 to be on that complaint. That's how it happens in
8 the department.
9         Again, we're accountable for our own
10 actions. So, I mean, in the first board Major Mull
11 was for Region 4. He was the major out in El Paso.
12 I mean, that's going to happen. There's other people
13 that come to the board from other regions that
14 they're board members from their regions. I mean,
15 there's -- you know, that's how it happens.
16    Q. (BY MS. SCHULMAN) I understand that's how
17 it happens. The question I asked you, though, is did
18 it seem to you that the fact that Heather Krueger
19 filed the C-1 complaint against Plaintiff Martinez
20 might make her less than neutral in the process of
21 evaluating him?
22         MS. COLLINS: Objection, form. Asked
23 and answered. You can answer again.
24    A. No, ma'am, I didn't.
25    Q. (BY MS. SCHULMAN) Is it accurate to state,

78
1 So I don't know how they come up with their list. I
2 told you I -- I did not know the specifics or how
3 they come up with their board members, that's
4 something that you would have to get from our human
5 resources.
6  Q. (BY MS. SCHULMAN) Okay.
7  A. I don't know what checks and balances they
8 have.
9  Q. It also would be fair to say that you don't
10 know if they have any checks or balances at all?
11     MS. COLLINS: Objection, form. You can
12 answer.
13  A. Again, you would have to talk to human
14 resources.
15  Q. (BY MS. SCHULMAN) So when the board list --
16 the eligibility list came out, and I'm not sure I'm
17 using the proper vocabulary here, so -- the
18 eligibility list is the initial list of people who
19 are allowed to interview. Is that correct?
20  A. No, that's not correct. The eligibility
21 list is the final list.
22  Q. Okay. What's that initial list called? The
23 interview list?
24  A. A list of candidates.
25  Q. List of candidates. So -- and then the

79
1 subsequent list is the eligibility list, correct?
2  A. The final product is the eligibility list,
3 yes.
4  Q. All right. Do you recall where Danny
5 Martinez ranked on the November 15, 2021, eligibility
6 list?
7  A. He wasn't on the eligibility list.
8  Q. He wasn't on it at all. Do you recall any
9 questions that you might -- that he might have been
10 asked during his interview?
11     MS. COLLINS: Objection, form. You can
12 answer.
13  A. Ma'am, very similar, like extremely similar
14 to the prior board that we talked about, I broke it
15 down to the board members, gave them -- assigned them
16 different core competencies to draft some questions
17 off of. I drafted the core questions, and the core
18 questions were asked of every single candidate.
19     The individual specific questions were
20 asked to the specific candidate based on their 113
21 that was given. There was a list of those questions
22 at HR. We have to provide the list of questions.
23 But for me to tell you exactly what those questions
24 were, I can't recall.
25  Q. (BY MS. SCHULMAN) Do you recall whether the

80
1 issue of the C-1 came up again?
2     MS. COLLINS: Objection, form. You can
3 answer.
4  A. Yes, ma'am, it did.
5  Q. (BY MS. SCHULMAN) What can you tell me
6 about your conversation with the board members about
7 the C-1?
8     MS. COLLINS: Objection, form. You can
9 answer.
10  A. I mean, other than -- I believe Lieutenant
11 Martinez was asked about it again. He gave another
12 answer. I mean, that's -- that's about all I can --
13 I can tell you.
14  Q. (BY MS. SCHULMAN) Do you recall what his
15 answer was?
16  A. That one I don't recall as specifically as
17 the first one. And there is a reason. But, no, I
18 don't -- I don't specifically recall his question to
19 the second one as much as I do the first one.
20  Q. You said that there was a reason that you
21 didn't recall the second -- the answer the second
22 time?
23  A. No, there is a reason that I recall the
24 first one.
25  Q. Oh. I'm sorry. And the reason you recall

81
1 the first one was because of what he said. Is that
2 correct?
3  A. It was based on what he said and how he said
4 it and his whole demeanor, yes.
5  Q. So that was -- that's that subjective piece
6 we're talking about, his demeanor and --
7     MS. COLLINS: Objection --
8  Q. (BY MS. SCHULMAN) -- his --
9     MS. COLLINS: I'm sorry.
10  Q. (BY MS. SCHULMAN) Let's see if I can get a
11 question out there.
12     MS. COLLINS: I'm very sorry. I thought
13 you were done.
14     MS. SCHULMAN: No, I -- I'm kind of
15 wandering around on that one.
16  Q. (BY MS. SCHULMAN) Would you agree with me
17 that as regards Danny Martinez, we are talking about
18 a subjective evaluation of his attitude in response
19 to a question about a C-1?
20     MS. COLLINS: Objection, form. You can
21 answer.
22  A. Not a hundred percent sure what you asked
23 me, but if you're asking me did I have a problem with
24 his answer about his C-1, yes, I did.
25  Q. (BY MS. SCHULMAN) And that was true --

82

1  A. I thought I had already answered that.
2  Q. And that was true with regard to the answer
3  -- the second interview that you can't remember?
4  A. I thought we were talking about the first
5  one. I thought we had gone back to the first one.
6  Q. I'm trying to understand why -- what he said
7  the second time and why -- what he said and -- I'm
8  just trying to understand why you understood -- why
9  you -- why you remember the first one but not the
10 second one?
11 A. Well, I can explain.
12 Q. Please.
13 A. Well, at the first one he came across very
14 arrogant. It's a promotional board that when it's
15 held in person everybody is sitting at a table right
16 in front of one another. When it's held over a
17 system like we are today, just like we're all talking
18 right now, that's how everybody basically looks.
19 Everybody is at their screen and their computer
20 talking to you.
21      He was the only candidate that day that,
22 if I could show you, he was sitting back like this
23 (indicating), kind of nonchalantly, addressing the
24 whole board. And that, with the -- coupled with the
25 answers of how he answered his questions, I

83

1  believe -- well, I can tell you it rubbed me the
2  wrong way.
3  Q. Okay. Would it be fair to say then that he
4  did not rub you the wrong way during his second
5  interview?
6       MS. COLLINS: Objection, form. You can
7  answer.
8  A. I can tell you that I don't believe he
9  was -- he came across as arrogant in his second one
10 as he did in his first one.
11 Q. (BY MS. SCHULMAN) Do you recall that he
12 brought up the issue of the C-1 in the context of the
13 question about accountability and spoke to the kind
14 of issues that you expressed concern about when we
15 were talking about the September 28, 2020 interview?
16      MS. COLLINS: Objection, form. You can
17 answer.
18 A. Ma'am, to tell you the truth, I can't
19 remember. I mean I -- I really can't. I'm -- I'm
20 trying to remember and I can't.
21 Q. (BY MS. SCHULMAN) All right. Did the board
22 speak about the C-1 in the ranking process? Did the
23 other board members speak about it?
24 A. It's recorded, so, I mean -- I would -- I --
25 I know it came up. I know we talked about it. Just

84

1  when we talked about it, I'm not a hundred percent
2  sure. I'm not -- I'm unsure if we talked about it
3  then or if we talked about it right after we had
4  interviewed him. I'm not sure. But it was brought
5  up, yes.
6  Q. Did Heather Krueger express an opinion about
7  the C-1?
8  A. I can't recall if she did or not, to tell
9  you the truth. And I hate to assume, but I'm going
10 to go ahead and assume that I'm sure every single
11 board member did. Because we openly discuss the
12 candidate. And I'm sure that I went around and asked
13 every single person.
14 Q. In evaluating Mr. -- Plaintiff Martinez the
15 second time, did you still feel that he was not an
16 appropriate candidate for promotion?
17      MS. COLLINS: Objection, form. You can
18 answer.
19 A. I believe he wasn't -- it's a competitive
20 process, ma'am. And just like in the first one,
21 there was 32 candidates. In the second one, there
22 was 26 candidates. It's a competitive process. I
23 don't think that he was in the top group of
24 candidates that we put on the list or he would have
25 been on it.

85

1  Q. (BY MS. SCHULMAN) In your estimation, in
2  November of 2021, was Danny Martinez an appropriate
3  candidate for promotion?
4       MS. COLLINS: Objection, form. You can
5  answer.
6  A. Can you ask me that one more time?
7       MS. SCHULMAN: Could you -- Vanessa, can
8  you please reread that question?
9       THE REPORTER: Yes, ma'am.
10      Question: In your estimation, in
11 November of 2021, was Danny Martinez an appropriate
12 candidate for promotion?
13      MS. COLLINS: Same objection. Just go
14 ahead and answer.
15 A. I believe he qualified. That's the reason
16 he came before the board. But, no, I did not rank
17 him on my list as to be put as a captain at that
18 time.
19 Q. (BY MS. SCHULMAN) Was the reason for your
20 decision the same as it was the first time?
21      MS. COLLINS: Objection, form. You can
22 answer.
23 A. Yes, ma'am.
24 Q. (BY MS. SCHULMAN) And why was that?
25 A. Well, it was the same reason that we've

## Page 86

1 already talked about him once.  I'll bring him up
2 again.  It's the same reason that Lieutenant Martinez
3 and Lieutenant Nava did not promote the first time.
4 And the second time Lieutenant Nava did make the
5 list.  Lieutenant Martinez didn't.
6         So based on how Lieutenant Martinez
7 performed on the first board and the second board
8 together, I believe he had still not proven that he
9 was ready to promote.  In turn, Lieutenant Nava had
10 proven otherwise.
11    Q.  So as I understand it, you don't remember
12 what his answer was -- "his" being Danny Martinez's
13 answer -- but you do recall that it wasn't adequate
14 to your evaluation -- for your evaluation?
15         MS. COLLINS:  Objection, form.  You can
16 answer.
17    A.  Ma'am, I -- I told you earlier the reason I
18 remember his first one is the whole combination of
19 his demeanor, the way he sat, the exact words he
20 said.  It stuck with me.  That's why I remember that
21 one.
22         The other one, I don't believe it came
23 across like that.  But I don't remember that one as
24 vividly as -- as I do the first one.
25    Q.  (BY MS. SCHULMAN)  I understand that.  The

## Page 87

1 question I'm asking you is what did he say about the
2 C-1 the second time that offended you, I guess.
3         MS. COLLINS:  Objection, form.  You can
4 answer.
5    A.  Well, nothing offended me because I don't
6 have anything personal against any of these
7 candidates.  As a matter of fact, I respect every
8 single one of them.
9    Q.  (BY MS. SCHULMAN)  What did he say during
10 the second interview that led you to believe that he
11 still hadn't grown or matured as a result of the C-1
12 that he received in 2019?
13    A.  Me, personally, is it's a combination of how
14 he answered the first one compared to how he answered
15 the second one.  And like I said earlier with the
16 first one, the same reason that Nava didn't make the
17 list in the first one is he said something, but then
18 he has to go and prove it.
19         So if Lieutenant Martinez at some time
20 between the first one and the second one, you know,
21 had grown and -- and understood that -- why that was
22 a bad decision he made and had come to recognition of
23 that and then expressed that to the board in the
24 second board, then I would try to stay consistent and
25 give him an opportunity to live up to it.  I mean,

## Page 88

1 that's the best reasoning that I can give you of what
2 my reasoning is.
3    Q.  So how -- was it possible for Danny Martinez
4 to have demonstrated through the year that had
5 transpired that he had grown and learned from his
6 experience, or did he have to do another interview,
7 say more articulately that he was sorry, and then do
8 something?
9         MS. COLLINS:  Objection --
10    Q.  (BY MS. SCHULMAN)  Is that a three-step
11 process?
12         MS. COLLINS:  Objection, form.  You can
13 answer.
14    A.  Ma'am, I think what you're getting lost in
15 is there's no set number of how many interviews.  You
16 might do one, you might do a hundred.  It's a
17 competitive process.  And in the first board there
18 were 31 other candidates that were competing against
19 him.  In the second board there were 26 -- or 25
20 other candidates competing against him.
21         And it's the same with me and with
22 everybody else in the division.  It might hurt your
23 feelings if you don't make the promotional board and
24 make a final list.  Let me tell you, it has happened
25 to me many a times, just like it might have happened

## Page 89

1 to them, but it is a competitive process.
2         And we promote the ones that come before
3 us that we believe are the best candidates.  That's
4 -- that's what we do.  It's a competitive promotional
5 process.
6         MS. SCHULMAN:  I'll object to the
7 responsiveness of that answer.
8    Q.  (BY MS. SCHULMAN)  And again ask you, you
9 have articulated that -- I believe you have
10 articulated that between the first interview and the
11 second interview that he was -- had not demonstrated
12 that he had grown through this experience.  I'm
13 asking you, how could he have demonstrated that?
14         MS. COLLINS:  Objection, form.  You can
15 answer.
16    A.  Ma'am, again, I'll repeat what I told you a
17 second ago, and I'm sorry if you -- I'm just trying
18 to give you my reasoning.  You're trying to get me to
19 give you an answer of what I was thinking and I
20 trying to give you maybe some reasoning to what I
21 possibly was thinking at the time.
22         And for me to answer this question, how
23 -- what could he do?  He could go and do his job
24 every day, not violate law, violate policy, take care
25 of his people, investigate crimes, protect the

106

1   MS. COLLINS: Objection, form. You can
2  answer.
3   A. It was an El Paso County deputy that had the
4  issue with Lieutenant Martinez back when Lieutenant
5  Martinez disabled the vehicle. Those agencies -- all
6  the agencies around that area, they -- they know of
7  that incident.
8   Q. (BY MS. SCHULMAN) How was the deputy -- you
9  said -- explain to me again, I'm sorry. What does
10 the deputy in a different agency have to do with the
11 issue of the C-1?
12  A. Has nothing to do with the issue of the C-1.
13 And we're talking way above the deputy now, we're
14 talking agency level. The agency, which was the El
15 Paso County sheriff's office, expressed concern for
16 allowing Lieutenant Martinez to come back and work in
17 the Texas anti-gang center there in El Paso, which
18 houses multiple local agencies and DPS, and they all
19 work together.
20  Q. Why would they have been notified of a
21 request for a transfer?
22   MS. COLLINS: Objection, form. You can
23 answer.
24  A. I have no idea how they found out about --
25 how -- or him putting in for a transfer. Maybe he

107

1  called them? Maybe he let people know that he was
2  coming back? I have no idea, and I can guarantee you
3  it wasn't out of this office.
4   Q. (BY MS. SCHULMAN) Is there some
5  documentation somewhere about whatever objections
6  were made -- raised by someone outside the agency
7  about this transfer?
8    MS. COLLINS: Objection, form. You can
9  answer.
10  A. Yes, ma'am. There -- there is.
11  Q. (BY MS. SCHULMAN) Where would I -- where
12 would that information be?
13  A. There is a denial letter that says that the
14 request has been denied. And then I believe there is
15 correspondence between the major RD chief at the time
16 and the deputy director at the time talking about
17 El Paso County S.O. expressing concern.
18  Q. When you say, "major RD," what does that
19 mean? I'm sorry, I don't understand that.
20  A. Each region has a major that represents the
21 division. That would be Major Mull. And then each
22 region has a regional director that represents the
23 director's office, and that would have at the time
24 been Orlando Alanis.
25  Q. So there is email -- there are emails

108

1  between Mull and Ortiz that relate to the denial of
2  this request for hardship transfer?
3    MS. COLLINS: Objection, form. You can
4  answer.
5   A. Yes. And Ruocco. And Randy Prince.
6   Q. (BY MS. SCHULMAN) Who is Randy Prince?
7   A. He's the retired deputy director.
8   Q. Is there any documentation of the factual
9  basis for the objection from El Paso County?
10    MS. COLLINS: Objection, form. You can
11 answer.
12  A. Ma'am, that I do not know. I do not know if
13 there's a letter from them or phone conversation or
14 -- I don't know. All I can tell you is what I have
15 seen.
16  Q. (BY MS. SCHULMAN) Is it common to have a
17 circumstance where there is an outside entity that
18 gets to chime in on whether somebody gets a transfer?
19 Is that -- is that something that typically happens?
20    MS. COLLINS: Objection, form. You can
21 answer.
22  A. While I would like to say that typically we
23 do not conduct ourself in a manner that would make
24 another agency not want us around or a member of our
25 agency around. But when that does occur, yes, there

109

1  have been times in the past where, because we have to
2  work with other agencies, we're a division of 600 and
3  we cover the entire state, so we have to work with
4  local and federal agencies throughout the region as a
5  force multiplier to be able to, you know, do our jobs
6  effectively.
7     So, I mean, I -- so, yes, that -- that
8  is an occurrence. Whenever those do occur and some
9  agency that we work close with expresses concern,
10 then we do have to take that into consideration.
11  Q. I wanted to circle back for a moment,
12 please, to the -- still in your corporate capacity
13 here. I wanted to circle back for just a moment to
14 the issue of the November 2021 captain's vacancy and
15 the eligibility list that Daniel Martinez didn't
16 make.
17     What I understood you to say, and I just
18 wanted to make sure I'm clear on this, is that from
19 your perspective Danny Martinez was still not on your
20 list because of the C-1. Is that correct?
21    MS. COLLINS: Objection, form. You can
22 answer.
23  A. My personal scoring sheet, that is correct.
24  Q. (BY MS. SCHULMAN) Okay. And I understood
25 you to say that that was because -- but that -- that

## Page 138

1   MR. HARRIS: And be sure to ask for --
2   MS. COLLINS: Yep. I was about to ask
3   for a -- to read and sign, please.
4   THE REPORTER: All right.
5   MS. SCHULMAN: Thank you, Chief Goodwin.
6   THE WITNESS: Oh, thank you.
7   THE REPORTER: And, Allison, do you-all
8   want a copy as well?
9   MS. COLLINS: We will, yes.
10  (Deposition concluded at 2:25 p.m.)

## Page 139

1   CHANGES AND SIGNATURE
2   WITNESS NAME: FLOYD GOODWIN
3   DATE OF DEPOSITION: DECEMBER 1, 2022
4   PAGE     LINE     CHANGE     REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

## Page 140

1   I, FLOYD GOODWIN, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5   _____
    FLOYD GOODWIN
6
7   THE STATE OF _____ )
8   COUNTY OF _____ )
9   Before me, _____, on this day
10  personally appeared FLOYD GOODWIN, known to me (or
11  proved to me under oath or through _____)
12  (description of identity card or other document) to
13  be the person whose name is subscribed to the
14  foregoing instrument and acknowledged to me that he
15  executed the same for the purposes and consideration
16  therein expressed.
17
18  Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21  _____
    NOTARY PUBLIC IN AND FOR
22
23  THE STATE OF _____
24  My commission expires: _____
25  ____ No Changes Made ____ Amendment Sheet(s) Attached

## Page 141

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF TEXAS
2   AUSTIN DIVISION
3   JARI MCPHERSON, JERALD    )
    SAMS, AND DANIEL MARTINEZ, )
4                             )
    Plaintiffs,   )
5                 ) CIVIL ACTION
    VS.           )
6                 ) NO.: 1:20-cv-01223-DAE
    TEXAS DEPARTMENT OF PUBLIC )
7   SAFETY,                    )
                               )
8   Defendant.   )
9   REPORTER'S CERTIFICATION OF THE REMOTE ORAL
    DEPOSITION OF FLOYD GOODWIN
10  DECEMBER 1, 2022
11  I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14  That the witness, FLOYD GOODWIN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18  That the original deposition was delivered
19  to Ms. Allison Collins to obtain witness's signature.
20  That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  December 20, 2022.
23
24  I further certify that pursuant to FRCP
25  Rule 30(3) that the signature of the deponent:

142

1    _XX_ was requested by the deponent or a
2    party before the completion of the deposition and
3    that the signature is to be before any notary public
4    and returned within 30 days from date of receipt of
5    the transcript.
6        If returned, the attached Changes and
7    Signature Page contains any changes and the reasons
8    therefore:
9        ____ was not requested by the deponent or
10   a party before the completion of the deposition.
11       I further certify that I am neither
12   counsel for, related to, nor employed by any of the
13   parties or attorneys in the action in which this
14   proceeding was taken, and further that I am not
15   financially or otherwise interested in the outcome of
16   the action.
17       Certified to by me on this, the 20th day
18   of December, 2022.
19
20       _____
         VANESSA J. THEISEN, Texas CSR, RPR
21       Texas Cert No. 3238
         Expiration Date:  10/31/23
22       Integrity Legal Support Solutions
         Firm Registration No. 528
23       9901 Brodie Ln., Ste. 160-400
         Austin, Texas 78748
24       (512) 320-8690
         www.integritylegal.support
25