# EX. 9

            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

JARI MCPHERSON, JERALD        )
SAMS, AND DANIEL MARTINEZ,    )
                              )
            Plaintiffs,       )
                              ) CIVIL ACTION
VS.                           )
                              ) NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC    )
SAFETY,                       )
                              )
            Defendant.        )

        ------------------------------------

              REMOTE ORAL DEPOSITION OF

                   OSCAR HOLGUIN

                 NOVEMBER 15, 2022

        ------------------------------------

     REMOTE ORAL DEPOSITION OF OSCAR HOLGUIN, produced

as a witness at the instance of the PLAINTIFFS, and

duly sworn, was taken in the above-styled and

numbered cause on November 15, 2022, from 10:15 a.m.

to 2:47 p.m., via Zoom, before Vanessa J. Theisen,

CSR in and for the State of Texas, reported by

machine shorthand, pursuant to the Federal Rules of

Civil Procedure and any provisions stated on the

record or attached hereto.

34

1    Q.  Okay.
2    A.  You know, solve their differences.
3    Q.  I understand, I understand.  Did that work
4  out?
5    A.  At time -- at that time, it helped.  I'm
6  not -- I can't -- I cannot say that it was resolved,
7  but it helped.
8    Q.  Okay.  Did this occur just as Mr. McPherson
9  arrived at your unit in Temple?
10    A.  I don't believe so.  I think it was more --
11  after a few months.
12    Q.  Okay.  All right.  Did you sense that there
13  was anything racial about this underlying refusal or
14  reluctance by Mr. Buenger to work with Mr. McPherson?
15        MR. HARRIS:  Object to the form of the
16  question.
17    Q.  (BY MR. MUNGO)  Do you understand my
18  question?
19    A.  Yes.
20    Q.  Did you -- did you sense that there was any
21  racial elements to whatever degree it was that were
22  underlying this difference between Mr. Buenger and
23  Mr. McPherson?
24        MR. HARRIS:  Objection.  Calls for
25  speculation.

35

1    Q.  (BY MR. MUNGO)  You can go ahead, sir.
2    A.  I cannot speculate on that, because it
3  wasn't -- it wasn't addressed.  There was
4  no significant -- there wasn't anything that Buenger
5  said that was racial towards not helping or assisting
6  Jari.  I think it was more differences at the time.
7    Q.  Okay, all right.  So had you actually
8  eliminated race as a factor in that difference?
9    A.  At the time I'm more -- I thought it was
10  more of a work and -- work ethic and different
11  working strategies.  Yes, I did.
12    Q.  Okay.  But you weren't in a position to say
13  that race was not an issue, correct?
14    A.  No, no.
15    Q.  No, you were not in a position to say race
16  was not an issue.  That's what you're saying?
17    A.  Yes, yes.
18    Q.  Okay.
19    A.  Sorry, sorry.  Yes.
20    Q.  That's all right.  That's quite all right.
21        Did there come a time in which you had
22  conversations with -- well, strike that.
23        Who was your immediate supervisor at
24  that time?  At the time you were supervising the CID
25  unit, which you just described all of your special

36

1  agents, who was your direct supervisor?
2    A.  My direct supervisor was Captain Steven
3  Schwartz.
4    Q.  Steven Schwartz, okay.  Did there ever come
5  a time where you had conversations with Captain
6  Steven Schwartz regarding Mr. McPherson specifically?
7    A.  Yes.
8    Q.  Okay.  And I want you to take me back, as
9  best your memory will allow you, to the first
10  conversations that you had with Captain Schwartz
11  regarding Mr. McPherson.
12    A.  If you can give me a few -- let me see.
13        Well, he did advise that we were going
14  to -- we were going to receive a new agent from RSD
15  and his name was Jari McPherson.  And I did advise
16  Captain Schwartz that I knew McPherson from previous
17  working with him as a trooper.  And that was some of
18  the conversation that we had at first, yes.
19    Q.  Okay.  And do you recall Captain Schwartz --
20  any comments that Captain Schwartz made to you or
21  statements that Captain Schwartz made to you that
22  were negative concerning and about Mr. McPherson?
23    A.  At the time, no.  We were kind of glad that
24  we had another agent to assist us actually.  I was --
25  I was very, very delighted that we had two more

37

1  agents because we had a lot of investigations that we
2  needed, and I believe that Jari would have made a
3  good asset to our unit.
4    Q.  Okay.  And did Captain Schwartz ever say
5  anything to you negative or to speak down to you
6  about Mr. McPherson?
7    A.  Not at the time then, he never -- he didn't.
8  He didn't.  Not to me.  I cannot speculate in that.
9        As we went through and we had -- when I
10  was directed to monitor Jari, then, yes, we did.
11    Q.  Okay.  So then, just to make sure I got your
12  testimony accurate, I asked you the question if
13  Captain Schwartz ever spoke negatively about
14  Mr. McPherson.  He did, correct, as you're telling me
15  now that it's -- that began at a certain point in
16  time, but he did speak negatively about
17  Mr. McPherson.  Is that correct?
18    A.  He was concerned about the situations that
19  were arising with Mr. McPherson.
20    Q.  Okay.
21    A.  Yes.
22    Q.  So -- and in expressing that, Mr. Holguin,
23  did he speak negatively about Mr. McPherson, or did
24  he speak positively about him?
25        MR. HARRIS:  Object to the form of the

38
1  question.
2      A.  Again, he did express concern.  It wasn't
3  negative, but it was concern for the unit at the
4  time.
5      Q.  (BY MR. MUNGO)  Okay.  And did Captain
6  Schwartz indicate to you that he received comments
7  from his acquaintances about Mr. McPherson that
8  wasn't positive?
9      A.  Yes, I recall that.
10     Q.  Okay.  And as a result of that, did Captain
11 Schwartz ask you to monitor Mr. McPherson?
12     A.  I was being directed by Captain Schwartz to
13 monitor McPherson.
14     Q.  Okay.  Did Captain Schwartz ever ask you to
15 monitor any of your other special agents?
16     A.  Yes.
17     Q.  And who did he ask you to monitor?
18     A.  He asked me to monitor Greg Lanford.
19     Q.  Any others?
20     A.  No.
21     Q.  Okay.  And what did he ask you to monitor
22 regarding Greg Lanford?
23     A.  Mr. Greg Lanford was going through some
24 personal issues, and I had to monitor him in regards
25 to his investigations.

39
1      Q.  Can you expand on that at all?
2      A.  He was having marital problems, and I
3  helped -- I assisted him with giving him numbers to
4  counseling and also helped him whenever he needed
5  some time off to help him with his spouse.
6      Q.  Okay, okay.  And that was the kind of
7  monitoring you were doing for Lanford, correct?
8      A.  (Nodding head up and down.)
9      Q.  Okay.  Now what kind of monitoring did
10 Captain Schwartz ask you to perform with regard to
11 Mr. McPherson?  For example, did he ask you to
12 monitor his whereabouts with his vehicle or anything
13 else, or did -- you get my point?  So can you expand
14 as much as you can, as much detail in terms of the
15 monitoring that Captain Schwartz asked you to perform
16 with regard to McPherson?  Take them item by item.
17     A.  Yes.  He asked me to monitor when he came
18 into work, when he left.  Also supply him with gas
19 receipts through --
20     Q.  Okay.  Now, can we -- can I -- and I
21 apologize because I kind of -- I'm going to kind of
22 stop you at different points because it's a perfect
23 time rather than going back --
24     A.  Okay.
25     Q.  -- and straining your memory.

40
1          At this point in time, did Captain
2  Schwartz ask you to perform this kind of monitoring
3  on any of the white agents?
4      A.  At the time, no.
5      Q.  Okay.  All right.  Okay.  Go ahead.  So you
6  left off at monitoring and checking his gas receipts,
7  the time he came in, the time he left.  Okay.  Go
8  ahead.
9      A.  And supply him with his daily -- daily
10 activity, which was -- which was the weeklies.  Also
11 the gas receipts every month that we have to turn in
12 through -- which is required for all of the vehicles,
13 the CID vehicles -- the gas receipts and what time
14 they were -- he purchased gas and also just to
15 monitor the -- keep an eye on the weekly.  And his
16 investigations, which was also everybody else's
17 investigations.
18     Q.  Okay.  So Captain Schwartz wanted you to
19 provide him with a copy of Mr. McPherson's gas
20 receipts?
21     A.  Yes.
22     Q.  Did you provide Captain McPherson [sic] with
23 any of the other special agents' gas receipts?
24     A.  Not McPherson but the captain.  No, no.
25 There --

41
1      Q.  Okay.  So let me -- I need to go back on
2  that one again, if you don't mind, just to make sure
3  our record is clear.
4          Did Captain Schwartz ask you to provide
5  him with a physical copy of the gas receipts from any
6  of the other special agents?
7      A.  No, not at the time.
8      Q.  Okay, all right.  All right.  So, so far all
9  of these items in terms of monitoring that you are
10 citing that Captain Schwartz directed you to monitor
11 Mr. McPherson for was only asked of you to do in
12 regards to McPherson and none of the white agents.
13 Is that correct?
14         MR. HARRIS:  Object to the form of the
15 question.
16     A.  Okay.  Can you repeat that again?
17     Q.  (BY MR. MUNGO)  Yeah, yeah.  So, so far all
18 of the items of monitoring that you provided me that
19 Captain Schwartz directed you to conduct regarding
20 Mr. McPherson, Captain Schwartz had not directed you
21 to do this regarding the white agents, correct?
22         MR. HARRIS:  Object to the form of the
23 question.
24     A.  Correct.  We --
25     Q.  (BY MR. MUNGO)  Okay.

42

1    A. Yes. At the time.
2    Q. Okay. Thank you.
3       Okay. What else? What else did he ask
4  you to do in terms of monitoring Mr. McPherson?
5    A. Monitoring when -- the beginning of his
6  shift and the ending of his shift.
7    Q. Yes, sir.
8    A. That's what I was being directed by.
9    Q. Okay. Yes, sir.
10      Did Captain Schwartz ever discuss with
11  you or request of you to obtain any video
12  surveillance of Mr. McPherson?
13    A. He did request a video surveillance when he
14  was --
15    Q. When you say "he," who are you --
16    A. Oh, I'm sorry. Captain Schwartz did request
17  for me to get a video surveillance at his -- at
18  McPherson's child's school, but I refused to do that.
19    Q. And why did you refuse to do that, sir?
20    A. I did not believe that it was -- that it was
21  required.
22    Q. Did you --
23    A. And I didn't -- I didn't agree with that.
24    Q. And did Captain Schwartz express his
25  displeasure with you because of that, because of your

43

1  refusal to do that?
2    A. Well, he -- yes, yes, he did. But, I mean,
3  I'm not going -- I didn't do it.
4    Q. So can you articulate for the record -- it's
5  important that we have your account as to why you did
6  not do that, sir.
7    A. I felt that it was not adequate for me to do
8  that. I'm not going to be checking somebody. I
9  would -- I would rather have them tell me, or, if I
10  was to ask them, "Did you go here for this certain"
11  -- maybe he had a program to go -- to go and see his
12  child.
13      I gave -- I gave everybody the benefit
14  of the doubt because you do deal with the public each
15  and every day as an agent, as a police officer, and
16  my thought was he is pretty much getting to know his
17  neighborhood, letting them know that he is available,
18  that he is a police officer. And I don't -- I
19  wouldn't want to check up on something if -- those
20  are some of our police officer duties, to be with the
21  public.
22    Q. Yes, sir. Had Captain Schwartz ever asked
23  you at any point in time to retrieve or capture or
24  collect any video surveillance on any of the white
25  special agents?

44

1       MR. HARRIS: Object to the form of the
2  question.
3    A. Well, sir, I can't -- I can't speculate on
4  that. He -- at the time, no, he didn't.
5    Q. (BY MR. MUNGO) Had he ever asked you to
6  collect video surveillance on any of the -- any of
7  your white special agents, ever?
8    A. No.
9    Q. Okay.
10      MR. HARRIS: We've been going on for a
11  bit over an hour. Might this be a good time to take
12  a morning break?
13      MR. MUNGO: If you -- I'm good for that,
14  sir. I'm good for that.
15      MR. HARRIS: Okay.
16      MR. MUNGO: So let's set a time to
17  rendezvous back.
18      MR. HARRIS: How about 15 minutes?
19      MR. MUNGO: 15 minutes is fine. So
20  we're back then at, what, 12:30? You want to just
21  say 12:30? Well, wait a minute. It's 11:00 -- that
22  would be 11:30 your time, wouldn't it?
23      MR. HARRIS: Correct.
24      MR. MUNGO: Okay. 11:30 it is.
25      MR. HARRIS: All right.

45

1       MR. MUNGO: Thank you, sir.
2       MR. HARRIS: Yeah. 11:30. That sounds
3  good. Okay. 15 minutes?
4       THE REPORTER: Yeah, that's -- that's
5  eight minutes from now.
6       MR. MUNGO: I'm sorry. I'm sorry. Did
7  I -- we're coming back at 11:30 your time, correct?
8       MR. HARRIS: 11:30 my time. That's
9  correct.
10      MR. MUNGO: Oh, no. Sorry.
11      MR. HARRIS: Well, that's -- only gives
12  us eight minutes. Can we get 15 minutes so we can
13  use the bathroom?
14      MR. MUNGO: Yeah. I'm sorry. My math
15  is not very good right now, right? So yeah, just
16  give me the time. Give me the time.
17      THE REPORTER: How about 11:40?
18      MR. MUNGO: 11:40?
19      THE REPORTER: Yeah.
20      MR. MUNGO: Okay. Perfect. Thank you.
21      THE REPORTER: Thanks.
22      MR. HARRIS: Thank you.
23      THE REPORTER: Off the record at 11:23
24  Central Standard Time. Thanks.
25      (Recess from 11:23 a.m. to 11:42 a.m.)

46

1	THE REPORTER:  Back on the record at
2	11:42.
3	MR. MUNGO:  Thank you.
4	Q. (BY MR. MUNGO) Mr. Holguin, you indicated
5	that when Mr. McPherson first arrived in Temple as
6	part of your CID unit that Schwartz made comments
7	about him.  Do you recall what those comments were?
8	A. -- exactly what -- what those comments were.
9	THE REPORTER:  Yeah, I'm sorry.  Can you
10	start your answer over again?
11	THE WITNESS:  Oh, I'm sorry.
12	THE REPORTER:  No.  For some reason the
13	first few words didn't come through.
14	A. I said I do not recall what the comments
15	were towards McPherson.  I do know that later he
16	commented that his colleagues had told him about some
17	of the -- about McPherson.
18	I didn't know -- I don't know who it
19	was.  He never expressed the names of his colleagues.
20	Q. (BY MR. MUNGO) Yes, sir.  Did he -- he did
21	indicate, though, what some of those comments were,
22	or at least the nature of some of those comments,
23	correct?
24	A. That I recall, just that he had been under
25	an investigation.  I do -- I do recall that, that he

47

1	was under an investigation when he was in RSD.  I
2	don't know the outcome of that investigation.
3	Other than that, I don't recall anything
4	in regards to that, but there was a comment about
5	Mr. McPherson being under investigation.  I don't --
6	like, again, I don't know the whole con -- the whole
7	-- the allegations that were towards McPherson, but
8	it was commented that he was under some type of
9	investigation.
10	Q. Okay.  And this is what Schwartz shared with
11	you, correct?
12	A. Yes.
13	Q. Okay.  And when he shared that with you,
14	sir, did he share that with you as in present tense
15	or past tense, the investigation, or what is your
16	recollection?
17	A. My recollect -- it was past tense.  I think
18	that he had commented that it was a prior
19	investigation on McPherson.  Again, I don't recall
20	the whole -- the whole thing about it.  I know
21	that -- I don't think it was sustained that -- those
22	allegations.  So he did comment on that, yes.  I do
23	recall that.
24	Q. How did you learn that the results of the
25	investigation did not sustain the accusation?

48

1	MR. HARRIS:  Objection to the form of
2	the question.
3	A. Captain Schwartz advised me of that, that he
4	thought that it wasn't sustained.  Again, it was just
5	a conversation that we had in that.  I didn't know
6	the details, and I don't know if Steven Schwartz knew
7	the outcome, he just said that it was -- it was not
8	sustained.
9	Q. (BY MR. MUNGO) Okay, okay.  And as a result
10	of these kinds of comments that Schwartz received
11	from others, whom he did not identify to you, Captain
12	Schwartz pursued -- or Captain Schwartz requested
13	that you begin to monitor Mr. McPherson at least in
14	part because of that previous investigation.  Is that
15	correct?
16	A. I cannot testify to that because he
17	didn't -- he directed me to monitor him, but I can't
18	say because of the -- because of that allegation.
19	Q. All right.  So you're not a mind reader?
20	A. Exactly.  I --
21	Q. But the request to monitor him came after
22	Captain Schwartz made those comments, correct?
23	A. Well, after he told me that, he did direct
24	me to monitor him.
25	Q. So then the answer to my question is, yes,

49

1	right?
2	MR. HARRIS:  Objection to the form.
3	Q. (BY MR. MUNGO) That he asked you to monitor
4	-- he asked you to monitor Mr. McPherson after he
5	made those comments to you about a previous
6	investigation that Mr. McPherson was under, correct?
7	A. Well, after he said that, well, yes, he did
8	ask me to monitor.
9	Q. Okay, okay.  And this was done right upon
10	Mr. McPherson's arrival at Temple, correct?
11	A. Let me see, sir.  Because he arrived in May,
12	so probably after two months, three months.  I think
13	it was June, July, or August.
14	Q. Okay.  Very good --
15	A. I mean, that I recall.  I could be wrong,
16	yes.
17	Q. All right.  Did -- had any of the special
18	agents, any of the other special agents that were
19	reporting to you in your unit, Mr. Holguin, undergo
20	any investigations previous to them reporting to you?
21	A. I don't know.  The time that I was there, I
22	did not ask if they had prior investigations upon
23	them.  I can't answer that yes or no because I do not
24	know.
25	Q. Fair enough, fair enough.  You don't know.

50

1       Had any of them undergone any
2   investigations subsequent to you supervising that
3   particular CID unit?
4       A.  No, not the time that I was there.
5       Q.  So you know that some of the white agents
6   were -- special agents were investigated, but they
7   weren't -- but not while you were supervising them?
8       A.  Not while I was there.  During the year and
9   a half that I was there with them, none of them were
10  under investigation.  There were -- oh, you know
11  what?  I'm sorry, I apologize.
12      There were a -- some -- some complaints
13  on the -- two of my agents, which was Chad Buenger
14  and Michael Boyett, but it was more of a criminal
15  aspect.  They complained that it was an illegal
16  search, which it was a legal search, and the person
17  was convicted.  But it was more of a citizen
18  complaint, which we reviewed it, and we sent it up to
19  OIG.  And OIG -- our OIG, which is Office of Internal
20  Affairs, they're the ones that investigated the
21  accusations, and they came out that they were not in
22  violation.
23      But yes, I do recall that, yes.  They --
24  but it was -- it wasn't an investigation.  It was
25  more of a complaint.

51

1       Q.  Okay.  But you don't know whether or not
2   they were investigated, correct?
3       A.  Correct.
4           MR. HARRIS:  Object to the form of the
5   question.
6       Q.  (BY MR. MUNGO)  I'm -- go ahead, you can
7   answer the question, sir.
8       A.  Correct, I didn't know.
9       Q.  Did Mr. McPherson ever tell you that there
10  were investigations, but Schwartz covered it up?
11  Captain Schwartz covered them up, the investigations
12  and the complaints against the white special agents?
13      A.  That I recall, I can't -- I apologize.  My
14  memory doesn't -- I don't know if you -- to say no --
15  no, I can't recall.
16      Q.  Did Captain Schwartz ever tell you not to
17  worry about those complaints?
18      A.  Yes, he said not to worry about those
19  complaints because he knew that -- I mean, we -- he
20  knew that there wasn't going to be a -- that it
21  wasn't going to push forward because it was a legal
22  search.
23      Q.  I'm sorry.  Repeat that.  I'm sorry.
24      A.  Yes.  He did tell me not to worry about
25  those complaints.

52

1       Q.  And what was the rationale that was given,
2   if any, by Captain Schwartz for you not to worry
3   about those complaints?
4       A.  He advised that they were legal searches and
5   that -- his opinion was that they were legal searches
6   and that they were -- they were okay.  So it wasn't
7   going to be any type of reprimand or any other
8   allegations to proceed with the investigation.
9       Q.  Okay.  That wasn't your opinion at the
10  beginning, was it?
11      A.  At the time -- at the time it was a legal
12  search because of the facts that were given to me,
13  and it was more of a complaint to my agents at the
14  time.
15      Q.  All right.  So then let me just make sure
16  I'm tracking you accurately.
17      That a complaint was made by citizens,
18  but no investigation was taken into the circumstances
19  and those events.  Is that correct?
20      A.  Correct.  That I know of, correct.
21      Q.  Okay.  Okay.  So then the -- all right.  So
22  then the -- do you recall the nature of the
23  investigation that Mr. McPherson was allegedly under
24  that Captain Schwartz referenced?
25      A.  Yes.

53

1       Q.  What was the nature, if you recall, of that
2   investigation?
3       A.  The nature that I recall was that he used
4   his vehicle to transport his child from his -- from
5   her school to the doctor's office.
6       Q.  I see.  So he took his child to the doctor's
7   office.  Is that unusual for special agents to use
8   the vehicle for such purposes?
9       A.  Well, sir, everybody has had to pick up
10  their child at one point or another because of an
11  emergency situation.  And --
12      Q.  Yeah, go ahead.
13      A.  And it's not -- it's against policy, but
14  what are you going to do if your child is in an
15  emergency?
16      Q.  Right.
17      A.  That's what -- you know, you would do that.
18      Q.  Uh-huh.  But other officers and special
19  agents have done that though, correct?
20      A.  I cannot say.  I don't know what others have
21  done, but it's not unusual for -- to go to your --
22  your child's school in case of emergency and pick
23  them up.  It's just -- it happens.  In certain
24  situations, it happens.
25      Q.  So you know this to be a common practice

54

1  amongst special agents and officers and troopers,
2  correct?  Even though you may not have any specific
3  instances that you may reference right now, you know
4  this to be a common practice either by what you've
5  heard, other people talking about it and/or directly
6  observed, you know this to be a common practice,
7  correct?
8       MR. HARRIS:  Object to the form of the
9  question.
10      A.  I cannot speculate.  I mean, there's been
11  situations where you have -- you, as a police
12  officer, have done that, yes.
13      Q.  (BY MR. MUNGO)  Okay.  Can you explain that
14  in a little bit more detail?
15      A.  A current -- an example would be if you are
16  assisting somebody on the side of the road, being a
17  police officer, it is against policy, I mean, to have
18  a person in your vehicle, giving them a ride to the
19  gas station, giving them a ride to somewhere because
20  you are doing a motorist assist.
21      We are required -- I mean us, as police
22  officers, we have that -- we are peace officers.
23  We're going to assist the public in any which way
24  that we can.  And there's instances where we may have
25  to use our vehicle to do that.  That's one example.

55

1       Another example would be that you are in
2  a parade and you have an individual that is riding
3  with you that is not a DPS employee or another police
4  officer in your vehicle.  So those are two examples
5  that we do have that.
6       And like I said, again, the first
7  example is for us to assist the public.  Our motto is
8  "Courtesy, Service, and Protection," and that's what
9  we do.  And if it be against policy, well, we would
10  have to -- we would have to do that and we would
11  notify our supervisor for it.
12      Q.  Okay, all right.  Are you knowledgeable of
13  anyone that has ever been disciplined for doing the
14  same?
15      A.  Yes.
16      Q.  Okay.  And who would that be?
17      A.  Myself.
18      Q.  Okay, okay.  And what did you do?
19      A.  There was a time that I was stationed in --
20  when I was stained in Temple, my child didn't make
21  the bus.  And it was raining outside, and I drove
22  her -- drove her and dropped her off at her school on
23  the way to work to my office there in Temple.
24      And I did advise my supervisor, which
25  happened to be Captain Schwartz, of what I had done.

56

1  I called him, told him that I was going to take my
2  child to school and then go on to the office.
3      Q.  Okay, all right.
4       MR. MUNGO:  Excuse me just a moment,
5  please.
6       (Brief pause.)
7      Q.  (BY MR. MUNGO)  Okay.  Have you known other
8  officers to do the same thing, sir?  Not the exact
9  same thing, but use their vehicles, as you were
10  describing earlier, to transport those who are
11  non-agency personnel?
12      A.  Yes.
13      Q.  Have you known them to be disciplined?
14      A.  Yes.
15      Q.  In every instance?
16      A.  No --
17      MR. HARRIS:  Object to the form of the
18  question.
19      A.  No, but I can't speculate.
20      Q.  (BY MR. MUNGO)  Yeah, but that's not
21  speculating when you say no.  When you gave me the
22  answer no just now, you weren't speculating, were
23  you?
24      A.  No.
25      Q.  Okay.

57

1      A.  No, I wasn't.
2      Q.  Okay.  All right.  Were any of these
3  individuals that you have known that have done it
4  before but were not disciplined, did you know what
5  their race was?
6      A.  No, I didn't.  It was a -- both white males
7  and Hispanic males that I worked with.
8      Q.  That engaged in the same conduct but was not
9  disciplined?
10      A.  Yes.
11      Q.  Okay, all right.  The same and similar
12  conduct that Mr. McPherson engaged in, correct?
13      MR. HARRIS:  Object to the form of the
14  question.
15      A.  Yes.
16      Q.  (BY MR. MUNGO)  Okay.  All right.  But you
17  have never known an African American trooper and/or
18  special agent that engaged in that same or similar
19  conduct that was disciplined or that -- that did it
20  and wasn't disciplined, correct?
21      MR. HARRIS:  Object to the form of the
22  question.
23      A.  Well, sir, I hadn't worked with African
24  Americans in El Paso.  Well, I take that back.  I
25  had, but they were not engaged in that, and they

58

1 weren't disciplined, no.  But the majority of the --
2 of my colleagues were Hispanic and white.
3    Q. (BY MR. MUNGO)  Yeah, but what I'm -- what
4 I'm asking is have you ever known an African American
5 to engage in that same or similar conduct and were
6 not disciplined?
7    A. I couldn't tell you.  No, no, I haven't.
8    Q. Okay, okay.  All right.  But you -- as you
9 testified just a moment ago, you have known white and
10 Hispanic special agents and/or troopers that have
11 engaged in the same or similar conduct but were not
12 disciplined, correct?
13        MR. HARRIS:  Object to the form of the
14 question.
15    Q. (BY MR. MUNGO)  What you just testified to,
16 correct?
17    A. Correct.
18    Q. Correct?
19    A. Yes, yes.
20    Q. All right.  All right.  Did you ever address
21 a situation -- did you ever address that situation, a
22 similar situation, in terms of the conduct by
23 Mr. McPherson, while under your supervision, that
24 prompted you to have some sort of counseling with
25 him?

60

1    Q. What did Captain Schwartz want you to do to
2 Mr. McPherson by way of discipline in addition to and
3 beyond your verbal counseling?
4    A. He wanted me to give him a written
5 counseling, which is an HQ-31, which is --
6    Q. Okay.
7    A. -- a written counsel.
8    Q. Okay, okay.  And for the record while we're
9 there, can you tell us the difference between a --
10 you call it a HQ or HR-31?
11    A. I mean HR, I'm sorry.  HR-31.
12    Q. HR.  That's okay.  And so tell us for the
13 record, what is the difference between HR-31 and a
14 C-1?
15    A. An HR-31 is a written counseling that is
16 placed in your personal file that you -- that
17 personnel file is only there for a year and then
18 it's -- then it's taken out of your personal file.
19        As a C-1, well, that's a complaint.  A
20 complaint is an allegation, and that complaint is --
21 can be four stages.  Well, back then it was four
22 stages.  It would be sustained, not sustained,
23 unfounded, or exonerated.
24        So that's the difference between a
25 written counseling and a complaint, which is a C-1.

59

1    A. Yes.
2    Q. And what was that occasion, sir?
3    A. The occasion was a -- an evidence -- it was
4 a cell phone in evidence that was taken out of
5 evidence and was supposed to be given to a -- the
6 rightful owner.
7    Q. Okay, all right.  And apparently that rose
8 to the level of you, as Mr. McPherson's supervisor,
9 addressing what you considered to be the matter not
10 handled quite the way you would have wanted it to,
11 correct?
12    A. Correct.
13    Q. Okay.  And as a result, you had a counseling
14 with Mr. McPherson.  Is that correct?
15    A. Yes, I had a verbal counseling with
16 Mr. McPherson.
17    Q. Okay.  And at the time of that verbal
18 counseling, you told Mr. McPherson that that was the
19 end of the matter, it wouldn't go any further,
20 correct?
21    A. Correct.
22    Q. Okay.  But there came an occasion in which
23 Captain Schwartz wanted you to take it further,
24 correct?
25    A. Correct.

61

1    Q. Is there a difference between an HR-31 and a
2 C-1 with regard to how long that is -- remains in
3 Mr. McPherson's record?
4    A. Yes.
5    Q. Can you tell us in the record?
6    A. Well, an HR-31 should just be placed in your
7 -- in your personnel file for a year.  A C-1, well,
8 that is permanent in your personnel file.
9    Q. And does a C-1 have any affect on a --
10 Mr. McPherson -- and we're talking about
11 Mr. McPherson -- Mr. McPherson's ability to be
12 promoted or his chances at being promoted?
13    A. It is looked upon, but if you can explain it
14 at the oral board, it depends on the board members of
15 certain situations and -- but it -- there is a big
16 weigh in it for -- on promotional purposes.  You just
17 have to explain.  Explain why you were complained on.
18 And if you have -- usually it happens is there's a
19 misunderstanding, and if you explain it on the oral
20 board, well, you can -- it can be bypassed.
21    Q. So it is an impediment to being promoted,
22 correct?
23    A. You can say that, yes.
24    Q. Okay.  It's certainly not -- it certainly
25 doesn't enhance Mr. McPherson's chances of getting

## Page 62

1 promoted, correct?  Correct?
2    A.  No, no.
3    Q.  It detracts from that, correct?  It detracts
4 from his --
5    A.  Yes.
6    Q.  -- ability to be promoted, correct?
7    A.  Yes.
8    Q.  It also detracts from his ability to acquire
9 career enhancing assignments, correct?
10    A.  Yes.
11    Q.  Okay.  So it's a negative thing, correct?
12    A.  Yes.
13    Q.  Okay.  And what Captain Schwartz wanted you
14 to do, after you told Mr. McPherson that a verbal
15 counseling was sufficient which would have resulted
16 in an HR-31, Captain Schwartz wanted you to pursue
17 the course that would lead to a C-1, correct?
18        MR. HARRIS:  Object to the form of the
19 question.
20    A.  Well, I wanted him to -- I mean, I did a
21 verbal complaint -- I mean, a verbal counseling.  I
22 didn't want it to go any further than that.
23        I was directed to give Agent McPherson a
24 HR-31, which is a written complaint.  I didn't agree
25 with it.  I didn't because I --

## Page 63

1    Q.  (BY MR. MUNGO)  Wait a minute.  I'm --
2    A.  -- kind of -- I felt that --
3    Q.  -- I'm so sorry.  I'm so sorry, I -- please
4 -- please forgive me for -- but you said you were
5 instructed to give Mr. McPherson a written complaint,
6 which was an HR-31.  You meant a C-1?
7    A.  No, no, no.  A written complaint, a written
8 complaint.  Not a C-1.
9    Q.  Okay, okay.  But does the written complaint
10 ultimately lead to -- can lead to a C-1?
11    A.  It can lead to a C-1.  Yes, it can later.
12    Q.  But it definitely is not an HR-31?
13    A.  No, it's not an HR-31.
14    Q.  It's more severe than an HR-31, correct?
15    A.  Yes.
16    Q.  And an HR-31 does not result in a C-1,
17 right?
18    A.  Correct.
19    Q.  Okay.  But a written complaint can result in
20 a C-1.  Is that correct?
21    A.  Yes.
22    Q.  Okay.  And had you written a written
23 complaint, he would have been -- Mr. McPherson would
24 have been investigated on that written complaint,
25 which could have led to a sustaining of that

## Page 64

1 complaint which would have -- could have resulted in
2 a C-1, correct?
3        MR. HARRIS:  Objection.  Calls for
4 speculation.
5    A.  I can't -- I mean --
6    Q.  (BY MR. MUNGO)  Do you understand my
7 question?  Do you understand I'm not -- I'm not
8 asking you if that would have happened, sir.  I'm
9 asking you that a written complaint could result in a
10 C-1.
11    A.  Yes, yes.
12    Q.  Okay.  That's all I'm asking.
13    A.  It could.
14    Q.  All right.  I know you're not a prophet
15 and --
16    A.  Yeah.  It --
17    Q.  -- and that's fine.
18    A.  It depends, you know, on the allegations.
19    Q.  I understand, I understand.
20    A.  Yeah.
21    Q.  But Captain Schwartz wanted you to pursue a
22 written complaint, which would have resulted in a
23 C-1, could have resulted in a C-1, whereas your
24 verbal counseling ended at a HR-31, which only
25 remained in his file for a year, correct?

## Page 65

1    A.  Correct.
2    Q.  Okay.  All right.  And Captain Schwartz was
3 adamant about you changing your HR-31 verbal
4 counseling to a written complaint.  He was adamant
5 about that, correct?
6    A.  Okay.
7        MR. HARRIS:  Object to the form of the
8 question.
9    A.  Okay, Mr. Mungo.  A verbal complaint -- I
10 mean a verbal -- a verbal warning or a verbal --
11    Q.  (BY MR. MUNGO)  Counseling?
12    A.  -- is different from an HR-31.  An HR-31 is
13 a written -- a written reprimand, okay.  A verbal is
14 just we talk about it, and it is -- it's done and
15 over with.
16    Q.  Got it.  Thank you for that clarification.
17    A.  Okay.  All right.
18    Q.  Thank you for that clarification.  And so
19 HR -- in fact, what you had dispensed in terms of
20 dealing with that matter with Mr. McPherson on that
21 property issue was even less serious than an HR-31,
22 which would have remained in his file for only a
23 year.  And the verbal didn't go anywhere, it just
24 stopped right there, correct?
25        MR. HARRIS:  Object to the form of the

66

1 question.
2     A. Correct, sir. It would have stopped right
3 there.
4     Q. (BY MR. MUNGO) Okay. Thank you. Thank you
5 for that clarification. Appreciate that. Okay.
6         So what Captain Schwartz wanted you to
7 do was twice as severe as what you did with regard to
8 handling that issue with regard to Mr. McPherson and
9 that property, correct?
10         MR. HARRIS: Object to the form of the
11 question.
12     Q. (BY MR. MUNGO) Wouldn't that be fair to
13 say, it's twice as -- was twice as serious?
14     A. It's a level up. Not twice. It's -- it
15 would be a level up from just a verbal -- verbal
16 counseling.
17     Q. Well, a C-1 is actually -- well, a written
18 complaint is a HR -- I see what you're saying, okay.
19 Good enough. Thank you. Thank you for that
20 clarification.
21         How long after Mr. McPherson began to
22 report to you as a special agent did that incident
23 and event occur, one month, two months, three months?
24     A. I believe it was -- if I have my dates
25 right, it is probably -- let me see. He was probably

67

1 five months after, five or six months, because I
2 believe that the -- I verbal -- verbal counseling was
3 in October, and -- in first of October, and the HR-31
4 was in November of 2018, if I have my dates correct.
5     Q. I understand, I understand. There was also
6 an issue -- I want to move on to the next point, that
7 there was also an issue with regard that Mr. --
8 that Captain Schwartz had with Mr. McPherson on his
9 weekly reports and investigatory reports, correct?
10     A. Correct.
11     Q. And Mr. Schwartz [sic] asked you to
12 scrutinize Mr. McPherson on his weekly reports and
13 his investigative -- investigative reports. Isn't
14 that correct?
15     A. He advised for be more detailed, not to --
16 to be more detailed in the investigative reports and
17 in the weekly reports.
18     Q. That was for -- that was the instruction for
19 Mr. McPherson, correct?
20     A. Correct.
21     Q. But my question is Captain Schwartz had
22 specifically instructed you to pay close attention to
23 Mr. McPherson's weekly reports and investigatory
24 reports, correct?
25     A. Correct.

68

1     Q. Okay. And did he put -- did he instruct you
2 to do that with the other agents as well, the white
3 agents?
4     A. He instructed me in -- with Greg and
5 sometimes Boyett. Not as much as with McPherson, but
6 with them, yes.
7     Q. Okay. So how often did Captain Schwartz
8 request that you monitor the weekly reports and
9 investigatory reports of those two white agents that
10 you just mentioned?
11     A. Let's say a handful of times. That I
12 recall, a handful of times.
13     Q. Okay.
14     A. It was -- it was questioned.
15     Q. Okay. So -- but Mr. McPherson -- it is
16 clear that Captain Schwartz placed emphasis on you
17 monitoring Mr. McPherson's weekly reports and
18 investigatory reports, correct?
19         MR. HARRIS: Objection to the form of
20 the question.
21     Q. (BY MR. MUNGO) Correct?
22     A. It was more of a concerning factor because
23 of how he -- of how Captain Schwartz wanted the
24 reports written.
25         I did not agree to some of those

69

1 suggestions, and I wouldn't -- I, myself, would
2 promote those reports, and then I would -- I would
3 have them kicked back for rework because he wanted --
4 because Captain Schwartz wanted them in a different
5 -- different -- not language but different wording.
6 And to me, it sounded the same. I didn't -- I did
7 not agree with, but him being my supervisor, at the
8 end of the day, I would have -- at the end of the
9 day, I would acknowledge that to Jari.
10     Q. How frequently did he reject and kick back
11 Mr. McPherson's weekly reports and investigatory
12 reports?
13         MR. HARRIS: Object to the form of the
14 question.
15     Q. (BY MR. MUNGO) If you want to surmise it --
16     A. Some of the times.
17     Q. I'm sorry?
18     A. Some of the times.
19     Q. Some of the times. Okay.
20     A. Yeah.
21     Q. But he would -- but he would reject
22 Mr. McPherson's more than he rejected the other
23 agents' reports, correct?
24         MR. HARRIS: Object to the form of the
25 question.

70

1    Q. (BY MR. MUNGO)  Correct?
2    A. It was -- it was concerning on his part, but
3  again, I was just perfectly -- I did not agree. I
4  didn't.  And -- but he was also very, very adamant
5  with -- with the other reports as well.
6    Q. Okay.  But he didn't kick the other agents'
7  reports back as frequently as he kicked Mr. McPherson's
8  reports back, correct?
9    A. Not during the time, no.
10    Q. Okay.  Was there ever a time that that
11  happened, that he kicked back the white agents'
12  reports as frequently as he kicked back McPherson's
13  reports?
14    A. Yes, there was a couple of times.
15    Q. A couple of times?
16    A. Yes.
17    Q. Out of numerous times there were a couple of
18  times, right?
19        MR. HARRIS:  Object to the form of the
20  question.
21    Q. (BY MR. MUNGO)  So is it fair to say that
22  Mr. McPherson's reports were rejected more frequently
23  than the white agents' reports?
24        MR. HARRIS:  Object to the form of the
25  question.

71

1    Q. (BY MR. MUNGO)  Would that be -- would that
2  be fair to say?
3    A. I could say yes.
4    Q. Okay.  And wasn't there an occasion in which
5  you actually asked Mr. McPherson to kind of mimic the
6  way a white agent wrote his report, and McPherson did
7  that, and when Mr. McPherson submitted his report,
8  Captain Schwartz rejected it?  Isn't that true?
9    A. Yes.  Yes, I do recall.
10    Q. Okay.  But Captain -- as far as you know,
11  Captain Schwartz didn't reject the report that the
12  white agent -- that Mr. -- didn't reject the white
13  agent's report that Mr. McPherson mimicked or copied
14  so to speak, correct?
15    A. Well, he didn't actually copy it.  He just
16  -- he just mimicked.
17    Q. No, that's what -- I know, that was a bad --
18  that was a bad --
19    A. Yeah.  Yeah, yeah.  No, don't -- we don't
20  copy reports.
21    Q. That was bad.  I know.  Look, let me -- let
22  me do that again, okay, because that's not what I
23  meant, right?
24    A. Okay.
25    Q. Because obviously -- obviously McPherson's

72

1  activities are going to be different from somebody
2  else's.
3    A. Yes.
4    Q. I'm talking about the kind of concerns that
5  Schwartz had with McPherson's report, McPherson
6  corrected it by following the same model of the white
7  agent's report, correct?
8    A. Yes.
9    Q. Okay.  Fair to say, okay.  And still,
10  Captain Schwartz rejected Mr. McPherson's report,
11  correct?
12    A. Yes, I believe that it was more -- it was
13  more of my idea of I'm going to push this forward,
14  and I didn't agree with his rejection.
15    Q. Okay.
16    A. And I just pushed it forward.
17    Q. Okay.
18    A. And because I felt that that reports -- or
19  those reports were adequate.
20    Q. Okay.
21    A. And I did that because I didn't agree.
22    Q. Okay.  So then the same style and the same
23  format and the same phraseology and the things that
24  was followed by this white trooper whose report
25  wasn't rejected, Mr. McPherson followed that format,

73

1  that phraseology, and Mr. Schwartz -- and Captain
2  Schwartz rejected his.  Isn't that true?  That's
3  correct, right?  I did get that right?
4    A. Yes, yes.
5    Q. Okay.  All right.  In fact, wasn't there a
6  time that you had given Mr. McPherson an evaluation
7  and Captain Schwartz forced you to change it?
8    A. Yes, he forced me -- well, he directed me to
9  change McPherson's and the other agents.
10    Q. Yeah, not forced you.  You're not a man to
11  be toyed with like that.  But he insisted that you
12  change your evaluation of Mr. McPherson, correct?
13    A. Yes.
14    Q. Your evaluation was more positive at the
15  time Captain Schwartz saw it, correct?
16    A. Yes, I felt that he had -- was adequate
17  enough for an agent of his tenure to --
18    Q. Okay.
19    A. -- to get that evaluation that I had.
20    Q. Okay.
21    A. That I did.
22    Q. Yes, sir.  And Captain Schwartz wanted you
23  to mark him down, mark Mr. McPherson down in your
24  evaluation, correct?
25    A. On some categories, yes.

74

1    Q.  But overall it was a mark down, right?
2    A.  Yes.
3    Q.  Okay.  And you disagreed with that, as you
4  just said you didn't agree with that?
5    A.  Exactly.
6         MR. HARRIS:  Object to the form of the
7  question.
8    A.  And as well I didn't agree with the -- with
9  the other -- the others that -- evaluations and mine
10  as well, so.
11    Q.  (BY MR. MUNGO)  Okay.  All right.  So far
12  you've mentioned the -- well, I'll hold that question
13  until a little later.
14         The next question that I have for you is
15  that Mr. McPherson was denied training by Captain
16  Schwartz, correct, to attend the FBI-LEEDA classes in
17  Georgetown?  Do you recall that?
18         MR. HARRIS:  Object to the form of the
19  question.
20    A.  He was not denied.  He was -- at first he --
21  I'm -- let me rephrase that.  He was already in the
22  FBI-LEEDA when he was in RSD when he transferred to
23  CID.  Captain Schwartz's thoughts were that CID had
24  to pay for those -- for those classes, and they were
25  already under -- I mean, they were already paid for

75

1  by RSD.  So --
2    Q.  (BY MR. MUNGO)  So why did -- so why did
3  Captain Schwartz have problems with Mr. McPherson
4  attending that LEEDA FBI class?
5    A.  I believe that he was trying to save CID
6  money budget at the time.  But --
7    Q.  But wasn't it -- I'm sorry.
8    A.  I'm sorry.  Go ahead.  Go ahead, sir.
9    Q.  But wasn't it clear at that moment in time
10  that the class was already paid for?
11    A.  At the time it wasn't.  I had to call and
12  verify that the class was paid for and was already --
13  Mr. McPherson was already registered for that class.
14    Q.  Okay.  And was it appropriate to insist that
15  the unit that Mr. McPherson came from be responsible
16  for paying for that training?
17    A.  I cannot -- I cannot answer that.  I don't
18  know.
19    Q.  You don't know.  That --
20    A.  That's -- that's a budget --
21    Q.  That's fair.
22    A.  -- budgetary issue.  I can't answer that,
23  Mr. Mungo.
24    Q.  That's fair enough.  That's fair enough.
25  How long had Mr. McPherson been in your unit, your

76

1  CID unit, at the time this issue of the training
2  surfaced, roughly?
3    A.  Probably about three or four months.  Let's
4  say that.
5    Q.  Three or four months?
6    A.  Yeah, three or four months.  Because --
7  because he came in -- yeah.  Yes, I can say three or
8  four months.
9    Q.  Okay, okay.  Had the other agents, the white
10  agents, attended this training -- or any of them
11  attended the FBI LEEDA training?
12    A.  No.
13    Q.  None of them had attended the training?
14    A.  No.
15    Q.  Okay.  Did any of them attend training
16  subsequent to the issue when it surfaced regarding
17  Mr. McPherson attending?
18    A.  Not the FBI training.
19    Q.  Okay.  Was Mr. McPherson denied any other
20  training by Mr. Schwartz that you can recollect?
21    A.  That I recall -- I can't recall.
22    Q.  Okay.  Fair enough.
23         MR. HARRIS:  It's about 12:30 now.  Can
24  we just at least go off the record to discuss lunch
25  plans?

77

1         MR. MUNGO:  Okay.  I've got one more
2  question before we do.  Can we do that, just one more
3  question?
4         MR. HARRIS:  Sure.
5         MR. MUNGO:  Okay.  Thanks.
6    Q.  (BY MR. MUNGO)  There came a time in which
7  Captain Schwartz had brought up the subject of
8  placing a tracking device on Mr. McPherson's vehicle,
9  correct?
10    A.  Correct.
11    Q.  Okay.  And you disagreed with that, correct?
12    A.  Correct.
13    Q.  Okay.  And, in fact, you made it known to
14  Captain Schwartz in so many ways that you disagreed
15  with that, correct?
16    A.  Correct.
17    Q.  Okay.  And can you explore the details of
18  how that conversation -- how the subject first came
19  up and how it unfolded and the result?
20    A.  The conversation came up in regards to
21  monitoring him.  He did suggest that -- "he" being
22  Captain Schwartz, suggest that if he had to that it
23  would have to be placed a tracker.
24         I advised Captain Schwartz that it was
25  against policy to do that, that I didn't agree, and

78

1  I'm not going to do that to one of my agents at the
2  time.  Even if it was -- you know, he was using it
3  for other purposes.  I would rather him -- "him"
4  being my agent -- to tell me, you know, his honesty,
5  his integrity on why he was using it, you know, other
6  than criminal investigations.  And I totally
7  disagreed with that.
8     Q.  Had Captain Schwartz ever asked you to place
9  or discuss the possibility of placing a tracking
10  device on the vehicles of any of the white agents
11  that reported to you?
12     A.  No.
13     Q.  Okay.  All right, all right.  So --
14        MR. MUNGO:  And Drew, I know I told you
15  that was my last question.  This is the very last one
16  here and we can talk lunch.
17     Q.  (BY MR. MUNGO)  So far we went through a
18  series of events in terms of your supervising
19  Mr. McPherson and dealing with different issues that
20  came up, some that involved verbal counseling, some
21  involved investigations, some involved a training,
22  weekly reports, etcetera.
23        In most of these -- in most of these
24  occasions, Captain Schwartz was involved in
25  addressing Mr. McPherson on those points, correct?

79

1     A.  Correct.
2     Q.  Okay.  And on most of these points, there
3  was a series of these issues that came up that you
4  disagree with Mr. Schwartz on how Mr. McPherson would
5  be handled in relationship to those issues.  Isn't
6  that correct?
7     A.  Correct.
8     Q.  Okay.  And how long after these sequence of
9  events in which you disagree with Mr. Schwartz on his
10  treatment of Mr. McPherson were you demoted?
11     A.  Let me see.  If I -- if I can recollect,
12  probably after Mr. McPherson got his C-1, and it was
13  somewhat sustained, and I totally disagreed with what
14  Schwartz was doing at -- you know, during those --
15  during that time span.  Probably about nine -- let me
16  see.  January -- eight months afterwards.
17     Q.  So, you know --
18     A.  Eight -- eight to ten.
19     Q.  Thank you.  So then the C-1 that you just
20  mentioned that Mr. McPherson received shortly before
21  you were demoted, resulted from Captain Schwartz
22  insisting that you do a written complaint against
23  Mr. McPherson on the phone property issue, correct?
24        MR. HARRIS:  Objection.  Calls for
25  speculation.

80

1     A.  Well, if I recall, the C-1 was for taking
2  his child -- using the vehicle to take his child
3  to -- I mean, for having his child in the vehicle.  I
4  think that was the C-1 that was sustained.
5     Q.  (BY MR. MUNGO)  Fair enough, fair enough.
6  And for that incident, you did not file a written
7  complaint on Mr. McPherson, did you?
8     A.  No, no.
9     Q.  And how did you handle that with
10  Mr. McPherson when you learned that Mr. McPherson had
11  to pick his child up from school at a time in which
12  she was questionably vulnerable?
13     A.  I spoke with Mr. McPherson.  I asked him
14  about the situation, and he did say that he had
15  picked her up.  And to me, if -- family is first.
16  And I would have done the same thing.
17     Q.  And so you did not take any action against
18  Mr. McPherson for picking his daughter up, correct?
19     A.  No, I didn't.
20     Q.  But --
21     A.  I instructed him that -- you know, that, you
22  know, he shouldn't be doing that but I understand.
23     Q.  All right.  But Captain Schwartz forced the
24  issue, and it resulted in a C-1 against Mr. McPherson
25  which now remains in his file throughout his career,

81

1  correct?
2     A.  I believe so, yes.
3     Q.  Okay.  But you do know that it was Schwartz
4  who pushed the disciplinary action against
5  Mr. McPherson for picking his daughter up, correct?
6        MR. HARRIS:  Objection.  Calls for
7  speculation.
8     A.  Yeah.  Yes, I would assume, yes.
9     Q.  (BY MR. MUNGO)  Okay.  So then you know that
10  -- did Mr. McPherson explain to you the circumstances
11  under which he picked his daughter up?
12     A.  Yes, he did.  I can't recall the whole --
13  the whole situation because I didn't -- I mean, I
14  would have done the same, I mean, in an emergency
15  situation.  But I cannot recall the exact
16  conversation that -- that we had in pertaining to the
17  -- him picking up his daughter.
18     Q.  But was your recollection -- generally was
19  it that it was the kind of situation where it was
20  important and urgent that he pick his child up?
21     A.  Yes, I took his word for it.
22     Q.  Okay.  What did -- oh, you don't recall what
23  he said.  Okay.  Very good.
24        MR. MUNGO:  We can talk lunch now.
25        MR. HARRIS:  Off the record?

82

1        THE REPORTER:  Yes.  Off the record at
2    12:37.
3        (Recess 12:37 p.m. to 1:42 p.m.)
4        THE REPORTER:  Back on the record at
5    1:42.
6        MR. MUNGO:  Thank you very much.
7    Q.  (BY MR. MUNGO) Okay.  So I have a series of
8    questions that's not going to take long at all to get
9    through here.  I don't know what happened to my other
10   glasses.  I guess I've got to use the -- some
11   substitutes here, okay.
12       So, Mr. Holguin, were you ever told at
13   any time that Mr. McPherson could not assist another
14   special agent with a wire due to him possibly being
15   terminated?
16   A.  That I recall -- I don't recall.  Can --
17   Q.  Because some -- of some sort of disciplinary
18   action was pending and he -- the possibility he may
19   not be employed and his contribution may not be
20   useful?  That doesn't help refresh your recollection?
21       MR. HARRIS:  Object to form --
22   A.  Yes, I recall.
23       MR. HARRIS:  -- of the question.
24   A.  Yes.  Yes, I recall.
25   Q.  (BY MR. MUNGO) Okay.  Can you tell us about

83

1    that occasion, sir?
2    A.  I do believe that there was a situation
3    where one of -- Greg Lanford was on a wire.  It was
4    his case.  And I was instructed -- I was instructed
5    by Captain Schwartz that McPherson -- for him not to
6    -- not to partake in the investigation surveillancing
7    and also because there were some reports that needed
8    to be done as well.
9        So it was a combination of -- of two,
10   but he did direct him to -- directed me to not have
11   Jari partake in the surveillance.
12   Q.  For reasons that Jari may not be around to
13   support his input into the investigation?  I'm
14   specifically interested in you addressing that
15   component of what was told you by Schwartz.
16   A.  I cannot recall the exact words about that,
17   if it was.
18   Q.  Okay, all right.  Have you ever known the
19   agency to ever preclude or exclude an agent or a
20   trooper from participating in an investigation
21   because they may not be around as a result of some
22   potential disciplinary action?
23       MR. HARRIS:  Objection to form.
24       MR. MUNGO:  I knew you were going to say
25   that.

84

1    A.  I don't recall, no.
2    Q.  (BY MR. MUNGO) Okay.  Is that a little
3    unusual, though?  Does that make sense, that -- that
4    particular reason?  I know you said there was also
5    some reports that needed to be done, but -- by the
6    way were they Mr. McPherson's reports?
7    A.  Yes.
8        MR. HARRIS:  Object to the form of the
9    question --
10   A.  Yes.
11       MR. HARRIS:  -- because there was
12   several questions there.
13   Q.  Well --
14   A.  Yes, to the reports.
15       MR. MUNGO:  Madam Court Reporter, did
16   you get the answer?
17       THE REPORTER:  Yes.
18   A.  Yes, to the reports.
19   Q.  (BY MR. MUNGO) Okay.  Those were
20   Mr. McPherson's reports?
21   A.  Yes.
22   Q.  Okay.  So was anything unique about those
23   reports that would trigger and justify him not
24   participating in a -- in this particular wire
25   investigation?

85

1        MR. HARRIS:  Object to the form of the
2    question.
3    A.  Not that I recall.
4    Q.  (BY MR. MUNGO) So can you describe to us
5    the state of these reports and the circumstances
6    under which these reports existed that needed to be
7    completed?
8    A.  I can't recall on those.  I can't recall.
9    Q.  So nothing stands out in your mind to make
10   those reports so urgent that he couldn't participate
11   in doing the work of a criminal investigation,
12   correct?
13   A.  Correct.
14   Q.  Okay.  So at any point in time, all of the
15   special agents had reports that they hadn't completed
16   to some degree or another.  Isn't that fair to say?
17   A.  Yes.
18   Q.  So why was McPherson singled out in this
19   instance that he couldn't participate in the work
20   that he was hired to do as a special agent because of
21   those reports?  Anything in your mind that would make
22   sense?
23       MR. HARRIS:  Objection.  Calls for
24   speculation.
25   A.  I can't speculate on that.

86

1    Q.  (BY MR. MUNGO)  No, no.  No, no.  Don't --
2  I'm so sorry.  And maybe the question was not as
3  artfully posed to you, Mr. Holguin, okay.  And I take
4  -- that's my bad.
5         But my question is is there anything
6  that stands out in your mind that would make those --
7  the first question would be that would make those
8  particular reports so urgent that Mr. McPherson could
9  not and should not participate in a criminal
10  investigation that he was, as a special agent, hired
11  to do?
12    A.  No.
13    Q.  Okay.  All right, all right.  And the other
14  question was -- and I think you answered yes to this,
15  I believe, but just correct me.  I'm -- I'm not
16  sure -- that all of the agents to a lesser or greater
17  degree always had reports that needed to be completed
18  that were not completed during their workday,
19  correct?
20    A.  Yes.
21    Q.  Okay.  And that they went on doing other
22  duties separate and apart from -- different from
23  completing those reports during that workday,
24  correct?
25    A.  Yes.

87

1    Q.  Okay.  So -- and I guess the question was
2  then, and your answer was, you didn't want to
3  speculate.  Well, I don't want you to either, sir,
4  but I'm asking you what you know.
5         Was there anything outstanding about
6  those reports, so outstanding about those reports
7  that Schwartz wanted or prevented McPherson from
8  participating in that wire criminal investigation
9  that would take precedence over him participating in
10  that wire criminal investigation?
11    A.  No.
12    Q.  Okay.  Nothing.  Okay, all right.
13         Did Mr. Schwartz ever preclude any of
14  the white special agents from engaging in their work
15  as special agents, prevent them from going into the
16  field or disengaging in their work as special agents
17  and sent them to complete their reports?
18    A.  No.
19    Q.  Okay.  At any time did you and Mr. McPherson
20  shed tears over the way that you -- that the both of
21  you were being treated by Schwartz?
22    A.  Yes.  Yes, we did.
23    Q.  Can you tell us just a little bit about that
24  occasion?
25    A.  Well, I was emotional at the time.  I did

88

1  advise Mr. McPherson that it was -- I should have --
2  I should have stood up more as a supervisor.  Being
3  in a supervisor leadership place, this is -- this is
4  -- my opinion on that is that you need to take care
5  of your -- your constituents and, you know, stand up
6  for them.
7         And I believe that I miss -- I missed
8  that, and I should have.  I should have -- I should
9  have stood up in those other -- in regards to the
10  HR-31 and stuff like that.  But that's -- that's my
11  opinion on the leadership.  And, yes, we did, we did
12  shed tears.
13    Q.  Did you believe that both you and
14  Mr. McPherson were being discriminated against and/or
15  retaliated against because of your race and/or
16  because of your protesting being treated in a
17  discriminatory fashion?
18         MR. HARRIS:  Object to the form of the
19  question.
20    A.  At the time, sir, I was emotional and I
21  did -- I did believe.
22    Q.  (BY MR. MUNGO)  Okay.  Did you have reason
23  subsequent to that time to believe otherwise?
24    A.  The way I was treated there in Temple, after
25  the fact, after a year or so that I was -- I was, but

89

1  that is -- that is my case.  And I did believe
2  towards myself, yes.
3    Q.  Okay.  What about towards Mr. McPherson,
4  that he was being discriminated against because of
5  his race?
6         MR. HARRIS:  Objection -- object to the
7  form of the question.
8    A.  At the time that's my opinion.  And, yes, he
9  was.  But I cannot speculate because I'm not a mind
10  reader with what is going through Captain Schwartz's
11  -- and I didn't agree with what was happening and,
12  again, it's -- I should have done something about it.
13    Q.  (BY MR. MUNGO)  I understand.  Because you
14  believed that Mr. McPherson was being treated less
15  favorably than his white similarly-situated
16  coworkers?
17         MR. HARRIS:  Object to the form of the
18  question.
19    A.  At that time.
20    Q.  (BY MR. MUNGO)  Were you told by Captain
21  Schwartz that Mr. McPherson was going to be demoted
22  or terminated at any time?
23    A.  I can't recall the exact words that Schwartz
24  advised, but -- I can't recall.  I'm trying.
25    Q.  So did he use words to that effect that

90

1  caused you to believe that that's what he meant?
2     A. Not to me. No, not directly to me.
3     Q. Okay. To who then?
4     A. I don't know. But when I was present, it
5  wasn't directed -- I mean, it wasn't when we were --
6  when we were together.
7     Q. Did you ever learn that Schwartz had made
8  such a statement regarding Mr. McPherson through
9  anyone, through any source?
10    A. I don't recall that.
11    Q. Okay. Did Mr. McPherson -- do you recall
12 Mr. McPherson putting in for the position of sex
13 offender compliance?
14    A. Yes.
15    Q. Okay. And you approved it, didn't you?
16    A. Yes, I advised that I would highly recommend
17 him for that position.
18    Q. But Schwartz denied it, his opportunity to
19 do same, correct?
20    A. At the time, yes.
21    Q. Was there another time that Mr. McPherson
22 sought that position and Mr. Schwartz didn't oppose
23 it?
24    A. Not that I recall, no.
25    Q. Okay. Did the department allow you to drive

91

1  from Temple to Austin every day once you were
2  demoted?
3        MR. HARRIS: Object to the form of the
4  question.
5     A. Yes, they did.
6     Q. (BY MR. MUNGO) About how many miles was --
7  was that, one way?
8     A. Gosh.
9     Q. Or approximately, if you -- or you can ask
10 Siri. I'm sorry.
11    A. I know, I can -- I can probably check.
12 Probably 70 miles or more. I don't know. I couldn't
13 tell you.
14    Q. Okay. And that was between -- well, it was
15 more than 50, right?
16    A. Yes, it was. It was more than 50 straight
17 -- actual miles.
18    Q. Okay. And about how long of a period of
19 time did that drive take place?
20    A. Okay. I was demoted in two thou -- in
21 November 2019. About a year.
22    Q. That -- do you recall the year?
23    A. 2019 to 2020. Well, actually less than
24 that. No, I'm sorry, let me see. November, 2020.
25 About ten months.

92

1     Q. Okay. Mr. Holguin, do you know why
2  Mr. McPherson transferred from Temple to Austin?
3        MR. HARRIS: Objection. Calls for
4  speculation.
5     A. No. I mean, he -- it was a better position
6  for him there -- there in Austin. He's -- he
7  transferred from RSD, so I kind of figured he wanted
8  to get back.
9     Q. (BY MR. MUNGO) Did he ever tell you -- did
10 Mr. McPherson tell you why? At one point he told
11 you, at least on one occasion he explained to you
12 why?
13    A. That I recall, he just -- he just wanted to
14 leave the Temple area. It wasn't fit for him. Yes,
15 he did.
16    Q. And he told you why, too. He gave you a
17 reason why he felt it wasn't fit for him, didn't he?
18    A. Yes, he did. Yes, he did.
19    Q. And what did he -- what did he say?
20    A. I can't recall the exact words.
21    Q. Well, not the exact words but you got the
22 effect of why he wanted to leave, right?
23    A. Yes, yes. He felt that he was being singled
24 out, and he was in a work environment that was
25 inadequate for him, yes.

93

1     Q. Okay. And he believed that his race was
2  part of the reason for his troubles, correct?
3     A. That I recall, yes.
4     Q. Okay. Mr. Holguin, are there any -- is --
5  are there any documentation that you may have with
6  regard to Schwartz -- Captain Schwartz directing you
7  to monitor Mr. McPherson?
8     A. I do have a -- requesting the gas receipts.
9     Q. Okay. And that -- is that in the form of an
10 email or a memo?
11    A. Email.
12    Q. Email. Do you have that with you today?
13    A. No, I don't.
14    Q. Okay. Can you -- can you provide that to
15 counsel?
16    A. Sure, yes.
17    Q. Okay.
18       MR. MUNGO: Counsel, is it okay, you
19 could receive that for us and -- and supplement?
20       MR. HARRIS: Sure.
21       MR. MUNGO: Thank you.
22    Q. (BY MR. MUNGO) Are there any other
23 documentation that you may possess, sir, that
24 evidences the request and/or involvement of Schwartz
25 in your monitoring Mr. McPherson?

122

1 them from doing what is required for them for the
2 advancement of themselves.  You are preventing them
3 from doing what they should be doing, in other words,
4 to improve themselves.
5     Q.  Thank you, sir.  So Counsel asked you if you
6 had evidence of using the N word or other derogatory
7 terms to express discriminatory intent.  That's what
8 we call direct evidence.  But you just described
9 another form evidence of proving discriminatory
10 intent, correct?
11     A.  Yes.
12     Q.  Okay.  Is that the basis upon which you
13 derive that your conclusion and your thinking and
14 your opinion that race and retaliation was a basis
15 for your demotion and the ill treatment of
16 Mr. McPherson?
17         MR. HARRIS:  Object to the form of the
18 question.
19     A.  For my demotion, yes, and the treatment of
20 McPherson, yes.
21     Q.  (BY MR. MUNGO)  Thank you.  I have nothing
22 further.
23         MR. HARRIS:  All right.  Nothing further
24 at this time.
25         MR. MUNGO:  Thank you, sir.  All right.

123

1 Madam, we do -- well, okay.  You're our court
2 reporter.  We'll make arrangements to get the
3 transcript.
4         THE REPORTER:  Okay.  Mr. Harris, do you
5 want a copy of the transcript?
6         MR. HARRIS:  Yes, please.  Can I get
7 one -- a copy to read and sign, a copy for the
8 witness to read and sign,123 of transcript but I
9 would also like a pdf miniscript.  Just one pdf
10 miniscript.
11         THE REPORTER:  All right.
12         (Deposition concluded at 2:47 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

124

1         CHANGES AND SIGNATURE
2 WITNESS NAME:  OSCAR HOLGUIN
3 DATE OF DEPOSITION:  NOVEMBER 15, 2022
4 PAGE      LINE       CHANGE            REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

125

1     I, OSCAR HOLGUIN, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5         _____
             OSCAR HOLGUIN
6
7 THE STATE OF _____ )
8 COUNTY OF _____ )
9     Before me, _____, on this day
10 personally appeared OSCAR HOLGUIN, known to me (or
11 proved to me under oath or through _____)
12 (description of identity card or other document) to
13 be the person whose name is subscribed to the
14 foregoing instrument and acknowledged to me that he
15 executed the same for the purposes and consideration
16 therein expressed.
17
18     Given under my hand and seal of office, this
19 _____ day of _____, _____.
20
21         _____
             NOTARY PUBLIC IN AND FOR
22
23         THE STATE OF _____
24 My commission expires: _____
25 ____ No Changes Made ____ Amendment Sheet(s) Attached

126

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION
3  JARI MCPHERSON, JERALD      )
   SAMS, AND DANIEL MARTINEZ,  )
4                   )
          Plaintiffs,  )
5                   ) CIVIL ACTION
   VS.              )
6                   ) NO.: 1:20-cv-01223-DAE
   TEXAS DEPARTMENT OF PUBLIC   )
7  SAFETY,            )
                   )
8          Defendant.   )
9      REPORTER'S CERTIFICATION OF THE REMOTE ORAL
          DEPOSITION OF OSCAR HOLGUIN
10          NOVEMBER 15, 2022
11      I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14      That the witness, OSCAR HOLGUIN, was duly
15  sworn by the officer and that the transcript of the
16  oral deposition is a true record of the testimony
17  given by the witness;
18      That the original deposition was delivered
19  to Mr. Drew Harris to obtain witness's signature..
20      That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  December 5th, 2022.
23
24      I further certify that pursuant to FRCP
25  Rule 30(3) that the signature of the deponent:

127

1      _XX_ was requested by the deponent or a
2  party before the completion of the deposition and
3  that the signature is to be before any notary public
4  and returned within 30 days from date of receipt of
5  the transcript.
6      If returned, the attached Changes and
7  Signature Page contains any changes and the reasons
8  therefore:
9      ____ was not requested by the deponent or
10  a party before the completion of the deposition.
11      I further certify that I am neither
12  counsel for, related to, nor employed by any of the
13  parties or attorneys in the action in which this
14  proceeding was taken, and further that I am not
15  financially or otherwise interested in the outcome of
16  the action.
17      Certified to by me on this, the 4th day
18  of December, 2022.
19
20      _____
          VANESSA J. THEISEN, Texas CSR, RPR
21      Texas Cert No. 3238
          Expiration Date:  10/31/23
22      Integrity Legal Support Solutions
          Firm Registration No. 528
23      9901 Brodie Ln., Ste. 160-400
          Austin, Texas 78748
24      (512) 320-8690
          www.integritylegal.support
25