# EX. 10



# TEXAS DEPARTMENT OF PUBLIC SAFETY
# OFFICE OF INSPECTOR GENERAL
## REPORT OF INVESTIGATION



**TO:** Adam Kinslow, Captain, Office of Inspector General

**FROM:** Raquel Matthews, Lieutenant, Office of Inspector General

**DATE:** April 22, 2019

**SUBJECT:** Administrative Investigation OIG#2018-0924

Complainant: Steven Schwartz - Captain/ Criminal Investigations Division (CID) - Central Texas Region, Waco

Accused: Jari McPherson - Special Agent/ Criminal Investigations Division (CID) - Central Texas Region, Temple

## SYNOPSIS

In May 2018, CID Lieutenant Oscar Holguin expressed concerns to CID Captain Steven Schwartz that Special Agent Jari McPherson allegedly misrepresented his work hours on his weekly reports and did not report to duty as assigned. In a separate event, on October 15, 2018, McPherson received a written counseling statement for failing to notify his chain of command for leaving work to take care of personal matters and did not account for the time off. As a result of the counseling statement, McPherson requested to meet with Schwartz and CID Major Steven McAdams separately. During the course of these meetings, it was discovered that McPherson allegedly utilized his state issued vehicle for personal use and then was less than forthcoming with his chain of command when questioned about the vehicle's use. The information was relayed to Regional Director Phillip Ayala who forwarded the information to the Office of Inspector General for investigation.

## ALLEGATIONS

### Allegation I

On multiple occasions from May 2018 to January 2019, McPherson did not accurately reflect the duty hours worked on his Criminal Investigations Division weekly reports.

If true, this is a violation of the following Department of Public Safety Policies:

**General Manual, Chapter 5, 05.56.00. DEPARTMENT REPORTS:** Members of the Department shall submit all required reports on time and in accordance with established departmental procedures. Reports submitted shall be truthful and complete, and no member shall

knowingly enter or cause to be entered any inaccurate, false, or improper information. Employees reporting false information shall be subject to severe disciplinary action.

**Allegation II**

On multiple occasions from May 2018 to January 2019, McPherson failed to report to duty as assigned.

If true, this is a violation of the following Department of Public Safety Policies:

**General Manual, Chapter 5, 05.06.03 REPORTING FOR DUTY:** All members of the Department shall report for duty at the time and place required by assignment or orders and shall be physically and mentally fit to perform their duties. They shall be properly equipped and cognizant of information required for the proper performance of duty so that they may immediately assume their duties.

**Allegation III**

On or about October 2, 2018, McPherson utilized his Department issued vehicle for a purpose other than state business.

If true, this is a violation of the following Department of Public Safety Policies:

**General Manual Chapter 5, 05.58.00 USE OF DEPARTMENT EQUIPMENT:** Members shall utilize Department equipment only for its intended purpose and shall not abuse or fail to maintain such equipment in accordance with established departmental procedures.

**Allegation IV**

In October 2018, during meetings with CID Captain Steven Schwartz and CID Major Steve McAdams, McPherson was less than forthcoming when questioned about the events that occurred on October 2, 2018.

If true, this is a violation of the following Department of Public Safety Policies:

**General Manual, Chapter 5, 05.13.00 RELATIONSHIP WITH SUPERIORS.** A member of the Department of Public Safety shall obey any lawful command issued by a superior officer or supervisor. All members of the Department shall be honest, truthful and straightforward with superior officers or supervisors regarding Department matters.

**General Manual Chapter 6, 6.20 STANDARD OF CONDUCT: a.** An employee shall not: **8.** knowingly make misleading statements, either oral or written, or provide false information, in the course of official business.

**General Manual Chapter 6, 06.10.01. DPS TEN GENERAL ORDERS: #7.** To conduct my duties in a straightforward, honest, and respectful manner, relying upon poise, competence, and soundness of character.

## INVESTIGATION

**Steven Schwartz – Captain/ Criminal Investigations Division (CID) - Waco**

On Wednesday, February 20, 2019, OIG conducted a phone recorded interview with Schwartz. Schwartz submitted a sworn affidavit addressing the issues discussed in the interview **(Tab 1 & Tab 21).**

In May of 2018, Holguin expressed concerns to Schwartz and claimed McPherson was misrepresenting his work hours on his weekly. Holguin mentioned an incident where McPherson failed to claim time after he had taken his wife to the doctor in May.

Holguin later mentioned another similar incident that occurred on Tuesday, October 2, 2018, in which McPherson failed to claim time off for taking his daughter to an appointment. Holguin addressed this inaccuracy with McPherson who *"did not offer any justification for the discrepancies."* Holguin mentioned he had *"serious concerns about the time that SA McPherson was claiming to come to work versus when SA McPherson actually arrived to work"* and referred Schwartz to the weekly reports and gas receipts **(Tab 10)**. According to the documents, McPherson *"routinely claimed a start time of 6:00 am in the morning, but failed to arrive to work until much later."* Holguin also made Schwartz aware of a *"conflict"* between him and McPherson about being the on call unit. As a result, McPherson requested to meet with Schwartz.

On Thursday, October 11, 2018, Schwartz met with McPherson who brought up concerns regarding Holguin's supervision and lack of communication **(Tab 21).** When McPherson initially started in Temple, Holguin informed him he was *"not a stickler for time. Everything is going to come out in the wash. If you have to deal with anything pertaining to your kids, take care of your business, do it and come back and we're good."* McPherson proceeded to tell Schwartz *"I had to take my daughter to a physical therapy appointment. Now all I was doing was dropping her off and bringing her back. Well, dropping her off and my wife was going to pick her up from her physical therapy."* Schwartz questioned McPherson *"did you take her [daughter] in the state ride?"* McPherson replied, *"Nope, drove home, switched cars, took her, dropped her off, came back, got in the truck and went back to work."* Schwartz informed McPherson he had an issue with *"taking time out of your work day to take her to a doctor's appointment."* McPherson agreed with Schwartz *"100%"* and *"understood what policy states"* but again referred back to what Holguin told him when he first started. In response, Schwartz advised him *"you as an intelligent person should know that we would not be doing that..."* and *"know better that he's not giving you free reign to violate policy...Regardless of what he [Holguin] says, you should know policy...Policies are guidelines that we should attempt to follow. There are circumstances where common sense and good judgement should prevail."* Schwartz informed McPherson there were issues with weekly reports in all three lieutenant areas and advised, "*"we drive to work on duty. Policy dictates you can't operate a state vehicle unless on state time in a state owned vehicle."* With that being said, Schwartz informed McPherson that he would question why it was taking him 1 ½ hours to driver 24 minutes from his residence to the Temple DPS office **(Tab 7).**

**Schwartz follow-up interview March 6, 2019 (Tab 21)**

Schwartz provided CID Major Steven McAdams a summary of the meeting with McPherson and told him he *"felt that he [McPherson] had lied to me"* and McAdams suggested Schwartz to obtain the surveillance videos from the school where McPherson picked up his daughter.

On October 16, 2018, Schwartz attended a meeting with Holguin and McPherson at McPherson's request **(Tab 21)** regarding a written counseling (HR-31) McPherson received on October 15

**(Tab 3).** Similar issues from the October 11th meeting were discussed and Schwartz informed McPherson (5:34) *"to me this is a clear-cut black and white issue. You took you daughter to the doctor on state time or tried to claim state time for taking your daughter to the doctor."* As McPherson repeated what Holguin had first told him Schwartz informed McPherson, *"there have been people fired from this Department for doing the exact same thing you just did…regardless of what Oscar may have told you in regards to when you first got here…that has no bearing on the fact that you attempted to provide a weekly with false information."* Schwartz told McPherson he was not allowed to claim time when he did not work the hours nor was he able to "*…claim time worked for taking your family to the doctor. That is not a state function…The fact that he discussed it with you is not considered that the whole thing is finished…I don't agree with that level of punishment for what occurred"* the *"counseling record was going to stand."* As a result, McPherson requested a meeting with Major Steven McAdams.

On October 29, 2018, Schwartz made contact with Killeen ISD Police Department and requested surveillance video and paperwork for Tuesday, October 2, around the time McPherson picked up his daughter. After reviewing the videos and paperwork **(Tab 1 & Tab 20)** the following was observed and forwarded as attachments in an interoffice memo to McAdams dated November 6, 2018 **(Tab 4)**:

**Video #1 Cam 33**

- 08:58:37 Black Chevrolet pick-up pulls into the parking lot (Front Entry Camera)
- 08:59:24 SA McPherson walking to the front door of school from parking lot (Front Entry Camera)
- 09:00:00 SA McPherson enters school (Front Entry Camera)

**Video #1 Cam 48**

- 09:00:08 SA McPherson enters front office and signs out student (Office Camera)
  - Sign out sheet indicates Paola Joseph was signed out at 9:01 by Jari McPherson
- 09:03:16 Juvenile female enters front office (Office Camera)
- 09:03:27 SA McPherson and juvenile female exit front office (Office Camera)

**Video #1 Cam 33**

- 09:03:33 SA McPherson and juvenile female exit school (Front Entry Camera)
- 09:04:46 Black Chevrolet pick-up exits school parking lot (Front Entry Camera)

**Video #2 Cam 33**

- 10:14:51 Black Chevrolet pickup enters school parking lot (Front Entry Camera)
- 10:14:59 Black Chevrolet pick-up pulls to front curb of school (Front Entry Camera)
- 10:15:14 Juvenile female exits black Chevrolet pick-up (Front Entry Camera)
  - Doctor's note indicates Paola Joseph had a dentist appointment at Stephen K Brandt Dentistry on this date at 9:30 am. There is a handwritten notation on this doctor's note of 10:16. This coincides with the child's return to school.
- 10:15:30 Black Chevrolet pick-up exits field of view (Front Entry Camera)

Schwartz indicated McPherson was assigned a black Chevrolet pick-up (C16-0722) and did not have a personal vehicle identical to his state issued vehicle. Schwartz also utilized map quest to determine the distance from the Temple DPS office to Liberty Hill Middle School and from the school to the dentist office. Schwartz determined *"SA McPherson utilized no less than 2 hours of*

*work time to take his daughter to the dentist."* Furthermore, the video *"does not coincide with what SA McPherson stated."* Schwartz advised he has *"never dealt with any employee that handles his business this way..."*

**Oscar Holguin – Lieutenant/ Criminal Investigations Division (CID) - Temple**

On Thursday, February 21, 2019, OIG conducted a recorded interview with Holguin. Holguin provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 10 & Tab 21)**

Due to a reorganization in the Regulatory Services Division, McPherson was reassigned to CID in Temple in May 2018. It was at this time Holguin began to observe discrepancies on McPherson's weekly reports with regards to hours worked versus the hours he was claiming. Holguin recalled the first week of May, McPherson told him he had to take his wife to the doctor. The following week after his weekly report was turned in, Holguin noticed McPherson had not claimed any time off for the doctor appointment and asked him about it on May 7. In response, McPherson told him, *"You told me that everything would work out in the wash."* Holguin explained to McPherson he still had to justify his overtime on his weekly report. Holguin relayed this information to Schwartz who informed Holguin of his responsibilities and to ensure proper documentation was being reported on the weekly reports. Holguin mentioned he had reached out to McPherson's previous captain in RSD who informed him there had been discrepancies with regards to McPherson's time and it was addressed with the lieutenant but there was no documentation on the issue.

Holguin advised McPherson improved on the documentation he was including on his weekly reports for the months of June and July. On August 13 – August 24, and again on September 10 – September 14, 2018, Holguin assigned then special Agent Michael Mingst as acting lieutenant while he attended training. Mingst informed Holguin of discrepancies he observed on McPherson's weekly report in which McPherson was claiming 6 a.m. but *"coming in a little bit later."* Holguin advised Mingst that he was aware and for him to continue his documentation. During the OIG interview, Holguin was asked whether McPherson had a set time he needed to report to work and he replied *"yes ...I told him as long as they work 10 hours they can adjust their time but usually we always have an 8-5. But some of the guys get there a little bit earlier. They like to get their stuff done. I have two that come in about 6 AM and the others come in about 7."* Holguin told McPherson *"If you want to come in at 6 that's ok but the other guys just do it because they have cases going so I would suggest you come in a little bit later like about 7-8 o'clock."*

Holguin relayed the discrepancies to Schwartz. He took it upon himself during the week of October 1-5 and came in around 5:30 a.m. and waited to see what time McPherson arrived to the office. Holguin also mentioned he went by McPherson's house to see what time he was leaving in the morning:

- On 10/1 - McPherson left his residence at 6:45 AM and arrived to the office about 7:20 AM but claimed 6 AM on his weekly.
- On 10/2 – McPherson arrived to work at 7:20 a.m.
- On 10/3 – McPherson arrived to work at 6:45 a.m.
- On 10/4 – McPherson arrived to work at 7:15 a.m.
- On 10/5 – McPherson arrived to work at 6:59 a.m.

On October 2, 2018, at approximately 9:30 a.m., Holguin held a brief meeting agents and noticed McPherson was not present. Holguin called McPherson and was and was told he was taking his daughter to the doctor. Holguin asked why he him of where he was going and McPherson informed him that he told Mingst and C

On October 9, Holguin met with McPherson and informed him of the time inco observed on his previous weekly report and to correct the weekly for October 2 to r he took off for the appointment. When questioned why he was *"checking up on* Holguin explained he didn't need to check on other agents *"on this matter because the other agents had kept me well informed of where they were at during the day."* McPherson became defensive and agitated and stated he felt he was being *"alienated and targeted"* but eventually corrected his weekly report.

On October 10, during a meeting there appeared to be miscommunication between McPherson and Holguin about being on call with Special Agent Chad Buenger. As a result, Holguin ordered McPherson to be on call who then requested to meet with Schwartz. Meanwhile, Holguin informed Schwartz of what occurred as well as the time issues he observed with McPherson's weekly report. Holguin was instructed to issue an HR-31 to McPherson *"for his time and taking his daughter to the doctor."*

On October 15, Holguin issued McPherson an HR-31 as per Schwartz instructions for McPherson *"taking his daughter to the doctor and not documenting it correctly on the weekly."* McPherson became *"defensive"* and requested to meet with Schwartz. On October 16, McPherson met with Schwartz and Holguin **(Tab 21)**. During the meeting McPherson explained Holguin talked with him about his time and weekly reports and to consider the talk a verbal counseling and nothing more would be said about the matter. McPherson did not agree or understand why he received an HR-31 and requested to speak to Major McAdams because he felt it was retaliation.

On October 17, after observing continuous inconsistencies of McPherson's arrival time on his weekly report, Holguin reviewed McPherson's gas receipts From May 2018 to January 2019. The gas station McPherson mainly used was located 2-3 minutes from his house. Over the course of 9 months, there were numerous days where the start time he claimed on his weekly reports differentiated anywhere from 11 minutes to 3 hours 58 minutes from the time on the gas receipts **(Tab 6 & Tab 7)**.

**<u>Holguin Follow-up interview March 4 & April 1, 2019 (Tab 21)</u>**

When McPherson first began Holguin recalled telling him *"to justify his time and if he needed to take care of business - personal, take care of what he needed to take care of and that it would all work out in the wash. He had to make up what he needed to do, his time off. That's what I made him understand and I thought that's what he understood. If you take time off let me know and you can make it up that day..."* Holguin didn't approach McPherson about the time discrepancies until June or July and did so in general conversation. When asked why he didn't address this issue sooner, Holguin felt he was being skeptical and didn't want to give the impression of being a micro-manager. It wasn't until he began to compare McPherson's start time on the weekly reports with the time on his gas receipts and noticed several discrepancies. When asked if he ever had issues with other agents' weekly reports or had to monitor their times, Holguin replied, *"No they pretty much justified their weeklies, justified their time..."* When asked if McPherson told him he used his vehicle on October 2 to pick up his daughter, Holguin denied this occurred and was only told he took his daughter to the doctor.

**<u>Steven McAdams – Major/ Criminal Investigations Division (CID) – San Antonio</u>**
On Monday February 25, 2019, OIG conducted a recorded interview with McAdams. McAdams submitted a sworn affidavit addressing the issues discussed in the interview **(Tab 11 & Tab 21).**

Schwartz briefed McAdams about his meeting with McPherson on October 11. McAdams suggested they check the school surveillance video to ascertain whether McPherson used his Department issued vehicle to take his daughter to the appointment. McAdams stated *"there had been discussions before about the discrepancies in McPherson's weeklies and that was one of the strategies that we had. We weren't really going to bring that up. We were going to talk to him about his need to – we were going to counsel him basically and let him know that he needed to be truthful and accurate on his weekly…and see if anything occurred from there…"*

On October 19, McAdams met with McPherson at his request **(Tab 21)** regarding the HR-31**(Tab 3)**. McPherson explained what Holguin told him at the beginning when he first started in Temple with regards to his time and proceeded to tell McAdams (29:06) *"The day in hand that we're talking about here which is when I took my daughter to the doctor - to the doctor appointment. I didn't go and sit there with her. I got to work at 6:00 that morning. Ed & Mike were there. Hey guys my wife just called me, she's not going to be able to take my daughter to the appointment. She'll be able to get there and sit with her and get her back. I'm going to go get my daughter drop her off, come back and if Lt. is looking for me let him know. "*

McAdams questioned how long he was gone and McPherson replied (48:20), *"Man, I couldn't have been gone 45 minutes, 30-45 minutes because all I did was left, picked up my truck, dropped my truck off at my house, got in my truck went to my daughter's school, picked her up, dropped her off to the appointment, went back to my house, got my truck and drove back to the office. So I didn't sit at the appointment with her because all I had to do was get her there on time…my wife…she left work, got there while she [daughter] was at the appointment and took her back to school."*

McPherson also mentioned the meeting he had with Schwartz on October 11 and how the verbal counseling was going to remain. McPherson explained he had been with DPS for 17 years and has never tried to *"jip the state out of time"* and felt he was being accused of *"being a thief, stealing an hour of time from DPS."* McPherson read the HR-31out loud expressed he could *"not handle being called a thief on paper"* and being accused of *"knowingly"* taking time from the Department. McPherson advised McAdams if the HR-31 was going to remain he was going to *"keep going up." (This meeting never occurred because the information was forwarded to OIG for investigation.)*

Schwartz submitted an email to McAdams of pictures he retrieved from the school surveillance video which contradicted what McPherson told him in the meeting **(Tab 1)**. McAdams mentioned it *"struck me strange how he was reiterating over and over, he went home, changed cars. It was a long elaborate story about how he got his girl to the doctor, how he didn't stay with her…"*

**<u>Michael Mingst – Lieutenant/ Office of Inspector General - Austin</u>**
On Thursday, February 21, 2019, OIG conducted a recorded interview with Mingst. Mingst provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 12 & Tab 21).**

Mingst was stationed as a CID Special Agent in the Temple DPS office for approximately 6 years prior to his promotion to OIG Lieutenant in February 2019. During the time frame of August 12 – 25 and September 9 – 15, 2018, Mingst was assigned as acting lieutenant while Holguin was in

training. While reviewing paperwork, Mingst indicated McPherson showed a ( time but *"typically he would not get to the office until 7:45 - 8 o'clock."* He al was nothing noted on McPherson's weekly for this time period *"to justify tho:* *"relatively routine"* for McPherson which was noticeable to others in the ofi weekly reports *"did not account for the 1-2 hours that SA McPherson was not office. It wasn't until after Lt. Holguin met with him in reference to his hour: actually coming in at the 6 a.m. time."* Mingst was aware they had to justif conducted on their weekly reports to justify overtime hours and *"as long as you ţ that you worked you were fine."* Mingst mentioned he even explained to McPhe required on the weekly reports and he was receptive to the information.

With regards to October 2, Mingst recalled he and Special Agent Ed Crone were back in his office and McPherson *"told us that he was going to take his daughter to the doctor's office."* Mingst could not recall the specific time this occurred other than it happened in the morning and Holguin was in his office.

**Ed Crone – Special Agent/ Criminal Investigations Division - Temple**

On Monday, March 18, 2019, OIG conducted a recorded interview with Crone. Crone provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 13 & Tab 21).**

Crone has been stationed in the Temple DPS office for approximately 8 years. Crone confirmed the Special Agents do not have a specific time they need to report to the office but generally arrive anywhere from 6:30 – 7 a.m. He explained he was of the understanding *"when we are in the vehicle we are on duty."* When it came to taking care of personal matters, time needed to be taken and accounted for. When Holguin transferred to the Temple office in May 2017, he informed the special agents that he was not a micro-manager that if they had something to do or an errand they needed to run take care of their business as long as they put in a full day's work.

When asked about the events of October 2, Crone could not recall the time of day it was but remembered McPherson telling him and Mingst that he was going to be *"right back."*

**Chad Buenger – Special Agent/ Criminal Investigations Division - Temple**

On Tuesday, March 19, 2019, OIG conducted a recorded interview with Buenger. Buenger provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 14 & Tab 21).**

Buenger has been stationed in the Temple DPS office for approximately 4 1/2 years and has always known his duty time started when he left his residence. When questioned about the time McPherson arrived at the office, Buenger stated he *"would come in later...closer to 8."* Buenger mentioned Holguin believed McPherson *"was falsifying his weekly..."* and was arriving to work later than what he was reporting on his weekly. Buenger recalled being asked by Holguin to *"conduct surveillance of Jari McPherson, which I did not do. I didn't feel like that was my job to do."* He found this *"strange and did not feel right about it...I didn't really think he [McPherson] worked 10 hour days...but I don't know what he did honestly from 6-8 before he got to the office."*

**Gregory Lanford – Special Agent/ Criminal Investigations Division - Temple**

On Tuesday, March 19, 2019, OIG conducted a recorded interview with Lanford. Lanford provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 15 & Tab 21).**

Lanford has been stationed in the Temple DPS office for approximately 12 years. Lanford generally works from 8 a.m. to 6 p.m. or 7 a.m. to 5 p.m. and *"my duty day starts when I leave the residence."* He advised McPherson was usually at the office by the time he arrived to work. Lanford indicated *"on occasion he has been given permission by Lieutenant Holguin to take an hour or two off during the day in the middle of the work day to attend appointments, etc. I have been given the option to work extra hours to make up the time off or to burn time to cover the time spent off duty."*

**Michael Boyett – Special Agent/ Criminal Investigations Division - Temple**

On Monday, March 19, 2019, OIG conducted a recorded interview with Boyett. Boyett provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 16 & Tab 21).**

Boyett has been stationed in the Temple DPS office for approximately 8 years. Boyett indicated Holguin was flexible on the hours they worked and *"kind of left it up to us."* The duty hours were *"subjective"* and the agents worked the hours that conformed to their duties. Boyett arrived to the office between 6:15 a.m. and 6:30 a.m. and McPherson, *"would typically arrive at the office well after I did."*

Boyett was of the understanding *"that my duty hours start when I leave my residence to head to my duty station and likewise terminate upon my arrival back home. This has been my understanding since entering into CLE in 2005 and through current. It is my belief that driving your state vehicle is done while on-duty."* Boyett was asked whether he had ever heard Holguin use the term *"it will work out in the wash"* with regards to duty hours and taking time to conduct personal errands. Boyett acknowledged he had heard something along those lines but claimed there were *"numerous occasions"* where Holguin would leave the office around 7:45a.m. or 8:15a.m. to take his daughter to school and *"did not hide what he was doing."* It was unknown whether the time was claimed but Boyett mentioned this *"as a benchmark for the relaxed environment of "time accountability" or duty time."*

**Jill Rhoden – Administrative Assistant/ Criminal Investigations Division - Temple**

On Tuesday, March 19, 2019, OIG conducted a recorded interview with Rhoden. Rhoden provided a sworn affidavit addressing the issues discussed in the interview. **(Tab 17 & Tab 21).**

Rhoden who is Holguin's administrative assistant advised *"everyone in our office is pretty routine with their schedules unless they have other plans for the day."* When McPherson transferred to the office in May 2018, *"I did notice that I didn't see him in the mornings mostly until around 8:00-9:00 a.m. I sometimes asked where he was to the Lieutenant, but the Lieutenant would just answer "I don't know."* McPherson would *"leave the office at around 2:00 pm in the afternoons, and again, no one would know where he was. This seemed to go on for a couple of months, but no one questioned him."*

Rhoden recalled Mingst telling her of the discrepancies he observed on McPherson's weekly reports and it was at this time Holguin *"started taking an interest in Jari's time."* Holguin began to compare McPherson's start time on his weekly with the time on his gas receipts and observed several discrepancies. She claimed Holguin *"never seemed to know what was going on in the office, or even asked. He seemed wrapped up in his own personal business."* He would arrive to the office around 7 a.m. and *"on most days leaves around 8:30 a.m. to take his daughter to school. He then returns one to one and a half hours later…"* She was unsure whether he accounted for the time but compared this to the HR-31 McPherson received.

**Jari McPherson – Special Agent/ Criminal Investigations Division (CID) – Temple**

On Monday, February 25, 2019, McPherson was served with Administrative Investigation OIG#2018-0924 **(Tab 1 & Tab 21).** On Wednesday March 27, 2019, OIG conducted a recorded interview with McPherson who was accompanied by CLEAT Attorney Michael Rickman. McPherson was informed of the Garrity Warning **(Tab 2)** and later provided a sworn affidavit addressing the issues discussed in the interview **(Tab 18).**

McPherson has been employed with DPS for over 16 years. In December 2016, he promoted to Special Agent in the Regulatory Services Division (RSD) where he worked for 6 years. In May 2018, due to a reorganization in RSD, McPherson was re-assigned to CID in Temple.

McPherson was provided spreadsheets for May 2018 – January 2019 which contained his duty start and end times along with the time stamp of the unit gas receipts **(Tab 6):**

a. There were approximately (34) days *[yellow highlight]* when McPherson obtained gas 30 minutes or more after his duty start time noted on his weekly.

- (33) Days McPherson obtained gas at the Mickey's gas station located .5 miles and 2 minutes from his residence.

- (1) Day McPherson obtained gas at the Circle K located 4.9 miles and 11 minutes from his residence.

b. There were approximately (26) days *[light blue highlight]* when McPherson obtained gas less than 30 minutes after the start duty time he claimed on his weekly at Mickey's gas station located .5 miles and 2 minutes from his residence

When asked to explain the differences in time he replied, *"Going back to May? I couldn't tell you what I did...last Monday. What I do know is that I was told when I first got here that my time started once I got to my truck...and this was per my lieutenant. Whatever I was doing, if I was getting my truck ready, preparing my truck for the day, if I had to get my vest out, my weapons out. Anything I had to do to prepare myself for the day. Walking around my truck, checking vehicle maintenance, tires. Checking emails on my phone, this is what was told to me."* When asked if this pertained to all 34 times he replied, *"Yes ma'am, because I've never in my career did anything wrong as far as time is concerned."* He was asked whether he ever left his residence later than what he claimed on his weekly and he replied no, *"my lieutenant doesn't want us claiming like 6:15, 6:30, 6:45, he wants even hours on the weekly."*

McPherson claimed he was never addressed about his time discrepancies until October 2018 and stated *"I was only doing what my lieutenant said was ok in his area."* In May 2018, during his *"welcome to the area"* meeting, Holguin told him and Special Agent Barbara Dean that he was not a *"stickler for time, would not be monitoring our time nor would he be on us about time...Lt. Holguin stated that if we had to take our kids to school or to an appointment, do so, come back and not worry about claiming time off unless we were not returning."* Holguin also mentioned as long as they wear their gun and badge they *"should not have to clock off."* McPherson recalled Holguin telling him *"while taking our kids to school or an appointment it was considered surveillance..."* and *"not to worry about the time it would all come out in the wash."* When asked

what he thought this meant McPherson replied, *"Don't worry about claiming time because it will all come out in the wash. In RSD it's kind of the same way. If you have something to do you go ahead and you take care of your business, There were times when we had to work late...and you didn't go back to change your weekly you just say hey, I'll just chalk that up."* When asked if he thought Holguin would have him intentionally violate policy, McPherson stated, *"Yes, he does it...This is how he is saying he runs his area."*

On October 9, Holguin mention to McPherson he noticed issues with the time the agents were getting to the office and *"wanted us to be doing everything by the book"* because Schwartz was monitoring the agents' hours. Holguin *"brought up when I took my daughter to the doctor"* and for him to correct his weekly report to reflect the hour he took off on October 2. Holguin advised McPherson to consider this talk a *"verbal counseling"* and nothing more was going to be mentioned. McPherson mentioned to OIG he had *"previously informed Holguin about the time I took my daughter to her appointment and informed him that I had used my work truck to pick her up, go get my personal vehicle and took her to the dentist, go back home to get my work vehicle and drop her back off at school before returning to work."* McPherson claimed Holguin told him *"that's ok, everybody's done it at some point in time. Just make sure you use your personal vehicle for when you do this stuff to keep us out of trouble because the Captain is on our ass."*

When asked about the events on October 2, McPherson had told Mingst and Crone he was taking his daughter to an appointment because Holguin was not in the office. McPherson mentioned his daughter had many appointments during this time and *"was confused at times during the conversations"* when it came to his daughter's appointments. Upon his return to the office, McPherson informed Holguin where he went and that he had mentioned he told Crone and Mingst. He was told the next time he needed to take his daughter to an appointment to let Holguin know.

OIG referred to the school video and still camera pictures for October 2 **(Tab 4 & Tab 20)**. McPherson admitted he picked his daughter up at her middle school in his state issued vehicle and told Holguin, *"Hey fyi, just so you'll know, my wife contacted me because I wasn't supposed to take my daughter and I was in a hurry. I picked my daughter up in the truck [DPS vehicle] and went and changed vehicles came back from the appointment got back in the truck, dropped her off at school and came back to work."* McPherson mentioned *"at no point since I've been here do I ever recall taking my daughter to an appointment in the work truck."* When asked if he was allowed to take unauthorized people in his state vehicle he answered, *"No ma'am."*

When asked about his meeting with Schwartz on October 11, McPherson explained why he requested to meet with Schwartz and referred to an incident the day before when Holguin informed him he was to going to be on call with Buenger. McPherson mentioned to Buenger he had already made plans for the weekend for his wife's birthday. After discussing this with Holguin, there appeared to be some confusion and miscommunication and Holguin asked McPherson if he was *"refusing a direct order to be on call..."*

On October 11, during the meeting with Schwartz **(Tab 21)**, McPherson explained to him what occurred with the confusion of being on call as well as other issues he had experienced with Holguin regarding *"lying, paperwork and communication skills."* Schwartz acknowledged this information and *"was not the only one who had issues with Holguin..."* Schwartz informed McPherson of issues he had been observing on weekly reports in all three lieutenant areas and mentioned Holguin had observed issues with his time back in May. In response, McPherson informed Schwartz that Holguin *"had never mentioned anything to me."*

As the conversation continued McPherson explained how he had to take his daughter to a *"physical therapy appointment. Now all I was doing was dropping her off and bringing her back. Well dropping her off and my wife was going to pick her up from physical therapy."* OIG referred McPherson to the section of the interview with Schwartz, where Schwartz asked him about using his state ride and he replied, *"Now that's for a physical therapy appointment. That's two separate instances. The whole time I was confused of which instance they were talking about."*

When asked why he didn't obtain clarification McPherson replied, *"Because I assumed that I knew which one they were talking about. The physical therapy appointment and the dentist appointment is two very different appointments."* When questioned about the therapy appointment, McPherson was not able to provide a date and time and instead replied, *"that was the most recent appointment I had taken her too..."* Due to the confusion of this other appointment, OIG asked McPherson to contact the physical therapist to obtain a date but he mentioned she had appointments every week and didn't know which appointments he took her to.

On Tuesday, October 16, McPherson met with Schwartz and Holguin after receiving a Counseling Record (HR-31) on Monday October 15 **(Tab 21).** At the beginning of the meeting McPherson referred to the HR-31 and advised Schwartz that he received the counseling *"for the same information"* that he was told would be a verbal counseling. Schwartz informed McPherson he instructed Holguin to issue a written counseling on October 10 and explained in his *"perspective a verbal counseling session is not sufficient when you're providing false information on your weekly."* Furthermore, he told McPherson he could not claim time worked for *"taking your family to the doctor. That is not a state function."* McPherson felt this was retaliation and requested to speak to McAdams.

On October 19, McAdams met with McPherson **(Tab 21)** and explained what Holguin had told him when he first started. OIG made reference to McAdams question about how much time he took to take his daughter to the appointment McPherson *"that's referring to the physical therapy. That's what my wife did."* When OIG asked again what therapy appointment he was referring to McPherson answered, *"One of 'em ma'am. One of my daughter's many physical therapy appointments."* OIG clarified with McPherson his reason for meeting with McAdams was because of the HR-31 which pertained to the October 2 appointment and then mentioned, *"Yeah, I'm not sure whichever date that was."* McPherson mentioned *"with the two dates there was a lot of confusion between the two dates. I didn't know which appointment they're talking about. Again, I'm taking my daughter to four different types of appointments at that time."* OIG played a segment of the recorded meeting (29:05) where McPherson is told McAdams; *"The day in hand that we're talking about here which is when I took my daughter to the hospital, to the doctor, to her doctor appointment..."* Due to the confusion, McPherson was asked again if he was referring to the appointment on October 2 and he stated *"yes."*

**McPherson Follow-up interview April 17, 2019 (Tab 21)**

McPherson claimed he was confused because his daughter *had appointments every week"* and thought Schwartz and McAdams was referring to another appointment. OIG obtained the Liberty Hill Middle School sign in/ sign out log sheet for October 2018. According to the form, there was one other appointment on October 5 where McPherson signed out his children and this occurred after he was off duty **(Tab 9).** McPherson admitted, *"From what I recall that was the appointment. The dentist appointment"* of October 2. OIG confirmed with McPherson the HR-31 dated October 15 was in fact discussed in both meetings and had even read out loud the HR-31 in the meeting with McAdams. **(Tab 8).**

According to his affidavit, McPherson did not recall every appointment he took his kids to in 2018, *"but I do recall picking up my daughter from school once in my unmarked and dropping her back off because I was in a hurry and the school is on the way to my home on October 2, 2018."* OIG commented McPherson did in fact use his state vehicle to pick his daughter up at the school for the appointment and McPherson replied, *"yes but that's not what the question asked...I'm assuming he asked if I took her to the appointment."* When asked why he didn't pick up his personal vehicle first before picking up his daughter since there was a mile from his residence to the school he replied, *"coming in off of 190 you hit the school first turn around come in then come back out."* OIG asked whether it was out of convenience and he replied, *"Yes ma'am."*

When questioned about being less than forthcoming during his meetings with Schwartz and McAdams McPherson explained, *"I was forthcoming with all of my information it's just with me being flustered and me being upset about everything. Everything maybe didn't come out clearly but I wasn't trying to deceive anybody. Again, I requested those meetings. They didn't call me up there. So I'm not going to go in there and purposely lie to them about something."* OIG clarified, *"but you knew what you were going in there for and the content of the conversation as to why you were in there. It was about October 2, correct?"* McPherson replied *"right."*

**Barbara Dean – Retired Special Agent/ Criminal Investigations Division (CID) – Temple**

On Thursday, March 28, 2019, OIG conducted a recorded phone interview with Dean. Dean later provided a sworn affidavit addressing the issues discussed in the interview **(Tab 19 & Tab 21).**

In April 2018, due to a reorganization in RSD, Dean was re-assigned to CID in Temple and recently retired in January 2019. When Dean and McPherson first started in CID, Holguin met with them and informed them of his expectations. He advised that he was not a micro-manager and *"as long as you're basically showing that you're on duty he's not going to be worrying where we are at...do what you're doing and don't worry about it, time makes up for itself."* Dean recalled McPherson asked about his drive since he lived in Killeen *"so his time started when he left the house."* She stated, *"Sometimes he would be there before me. A lot of times it would be the opposite, I'd get there at 7 and he would role in after me, 7:30 – 8 o'clock. Normally at the beginning he'd always be there like 7."* Dean was asked if she ever heard Holguin tell them if they had an errand to run for them to take care of their business and come right back because it will all *"work out in the wash."* When asked to explain Dean stated, *"Go take care of it, don't worry about. Don't change out your car, take the state car whatever..."* When asked if Holguin mentioned this to them to purposefully break policy she replied, *"I don't think it's to break policy because I think he breaks policy..."* Dean mentioned Holguin was known to pick up and drop off his daughter at school regularly and lived further than Dean from the office. She couldn't say for certain but stated that there was no way he could drive to his residence, change cars, take his daughter to school, drive back to his residence and change out cars and drive back to the office in the time it took him. Dean also mentioned Holguin did not want them to use ½ hour increments but instead to round off to the hour. Dean referenced there were many issues with Holguin's *"dishonesty"* and was *"very disappointed and let down and lied to by Lt. Holguin on numerous occasions."*

## EVALUATION

**Allegation I & II**
There was insufficient evidence to support that McPherson did not accurately reflect the duty hours he worked on his weekly reports. There was also insufficient evidence that McPherson failed to report to duty as assigned.

McPherson was informed his duty start time began when he left his residence and this was confirmed with other witnesses who were interviewed. McPherson was unable to recall or provide details for the days he obtained gas. McPherson provided several possible circumstances that could have occurred to explain the differences in time but indicated since this was *"so long ago I cannot tell you exactly what I did prior to every time I got gas in 2018 and it depended on the day and what was going on..."* Several witnesses indicated they saw McPherson arrive to the office around 7:30 or 8. Due to the time period being referred to, information was unable to be verified. Additionally, contact was made with DPS auto shops to ascertain whether GPS was available on McPherson's assigned vehicle and was told that the vehicle was not equipped with the navigation system nor was the vehicle equipped with an in-car computer system to secure location information.

**Allegation III**
There is sufficient video evidence to indicate McPherson utilized his Department issued vehicle on October 2, 2018, for a purpose other than state business. By his own admission, McPherson picked up his daughter on this date for an appointment and later returned her to school in his state issued vehicle.

**Allegation IV**
OIG ascertained McPherson was not forthcoming during his meetings with Schwartz and McAdams regarding the events of the October 2 appointment. During the meetings, McPherson continued to revert back to what Holguin told him that he was *"not a stickler for time. Everything is going to come out in the wash. If you have to deal with anything pertaining to your kids take care of your business, do it and come back and we're good."* McPherson understood *"...this was something that was able to be done."*

Schwartz asked McPherson about the October 2 appointment, *"did you use your state ride?"* and McPherson replied, *"No."* McPherson acknowledged his meeting with Major McAdams was about the HR-31 which involved his daughter's October 2 appointment and even read the HR-31 out loud to Major McAdams.

McPherson mentioned he confused the October 2 appointment with a *"physical therapy"* appointment because his daughter had appointments *"every week"* and *"assumed"* they were talking about the *"physical therapy appointment."* However, this does not appear reasonable since the meeting that McPherson requested was specifically scheduled to discuss the October 2 appointment.

Additionally, documentation obtained from the middle school indicated there was no other appointment that could have confused McPherson during this timeframe.



**CLASSIFICATION**

**Allegation I** - ***Recommendation to Not Sustain***

**Allegation II** - ***Recommendation to Not Sustain***

**Allegation III** - ***Recommendation to Sustain***

**Allegation IV** - ***Recommendation to Sustain***

Respectfully submitted,

Raquel Matthews, Lieutenant
Office of Inspector General

I concur.
AKWinslow, CPT.

I CONCUR
RHONDA FLEMING
INSPECTOR GENERAL