# EX. 12

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION

JARI MCPHERSON, JERALD      )
SAMS, AND DANIEL MARTINEZ,  )
                            )
            Plaintiffs,     )
                            ) CIVIL ACTION
VS.                         )
                            ) NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC  )
SAFETY,                     )
                            )
            Defendant.      )
```

------------------------------------

REMOTE ORAL DEPOSITION OF

MARK KOENIG

NOVEMBER 17, 2022

------------------------------------

REMOTE ORAL DEPOSITION OF MARK KOENIG, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on November 17, 2022, from 9:33 a.m. to 3:22 p.m., via Zoom, before Vanessa J. Theisen, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

## 38

1  A. Yeah, I was aware that he -- that he was a
2  party to an investigation in Temple.
3  Q. You were aware that he complained?
4     MR. HARRIS: Object to the form of the
5  question.
6  A. I was aware that he was a -- that he was a
7  party to an investigation in Temple.
8  Q. (BY MR. NOTZON) What -- in what role was he
9  a party that you are aware of?
10  A. The part that I'm aware -- that I'm aware of
11  was that he was a respondent to a -- to a complaint
12  investigation.
13  Q. Did that relate to discrimination,
14  harassment, or retaliation?
15  A. Not that I'm aware of.
16  Q. Okay. We're talking about discrimination,
17  harassment, and retaliation in these complaints and
18  the buckets that we were putting them in. So --
19  A. Okay.
20  Q. -- so you're saying that you have -- sitting
21  here today, you do not know that -- or you didn't
22  know, at the time that you were a captain in Austin,
23  that Special Agent McPherson, when he came to Austin,
24  that you were aware that he had made complaints of
25  discrimination in Temple?

## 39

1  A. I wasn't aware that he made complaints. We
2  did have a discussion when he first showed up, and he
3  did say something to the extent that he believed he
4  was treated unjustly by his previous supervisor in
5  Temple, that -- and it was racially motivated.
6     And at that point, I had asked him, I
7  said, "So do you want to talk about this more," or
8  something to the extent of this, I'm not -- this is
9  not verbatim. But something to the extent of "Do you
10  want to talk about this more and let me know more
11  about it?"
12     And he said at this time his attorney is
13  aware of the situation and has advised him not to
14  discuss it, but they will be doing something in the
15  future.
16     So he, in a sense, made notification
17  that he felt like he was being racially targeted by
18  his supervisor in Temple.
19  Q. And that was Captain Schwartz?
20  A. He was speaking about Lieutenant Oscar
21  Holguin is who --
22  Q. Okay.
23  A. -- my understanding.
24  Q. Did he name Lieutenant Holguin?
25  A. Yes, he named his lieutenant in Temple.

## 40

1  Q. Okay. And he didn't name Captain Schwartz?
2  A. I don't specifically remember if he said
3  Captain Schwartz. I don't think so, but I do
4  remember Lieutenant Holguin.
5  Q. Okay. And you heard that directly from
6  Special Agent McPherson when he came to meet with you
7  before he transferred?
8  A. Correct.
9  Q. That was that first meeting you had with
10  him?
11  A. Correct.
12  Q. And did you ever hear from anyone else that
13  Special Agent McPherson had made a complaint of
14  racial discrimination from his experience in Temple?
15  A. Yes. Captain Steven Schwartz.
16  Q. What did he tell you?
17  A. He just -- he was very general and
18  nonspecific in just saying that he was having to deal
19  with Agent McPherson and McPherson alleging racial
20  discrimination, but he didn't go into the absolute
21  specifics.
22  Q. Did he say who Special Agent McPherson was
23  complaining about?
24  A. I mean, other -- I mean, himself, Captain
25  Schwartz, and his lieutenant.

## 41

1  Q. So Schwartz confirmed for you that he was a
2  respondent as well as Lieutenant Holguin?
3  A. Yes.
4  Q. From McPherson's complaint of
5  discrimination?
6  A. Yes.
7  Q. And when was that conversation that you had
8  with Captain Schwartz?
9  A. It was, I guess, sometime -- I don't
10  remember specifically, but after Special Agent
11  McPherson had arrived to work at the capitol. So I
12  don't know specifically. Within months, I would say.
13  Q. Did you call Captain Schwartz or did Captain
14  Schwartz call you?
15  A. I don't remember the direction of the call.
16  Either that or we were at a captain's meeting. We
17  had monthly or quarterly captain's meetings. It
18  could have been at a captain's meeting. I don't -- I
19  can't specifically say if it was a phone call or if
20  it was in person, that conversation. I want to say
21  it was in person, that it was at a captain's meeting
22  and just discussing what was -- you know, his -- what
23  was going on in general.
24  Q. When McPherson told you in that first
25  meeting that he had with you before he came and it

42

1  was just the two of you, that he had been
2  experiencing race discrimination in the workplace,
3  didn't you become an agent of notice at that time?
4      A. He didn't specify anything. He said that it
5  -- that he had it under control and under the
6  advisement of his attorney that he wasn't to discuss
7  it.
8          MR. NOTZON: Object as nonresponsive.
9      Q. (BY MR. NOTZON) Didn't you become an agent
10 of notice, according to the policies and the way
11 you're trained, when someone reports to you that they
12 have experienced race discrimination in the workplace
13 at DPS that you become an agent of notice regardless
14 of what they say they want you to do or not do?
15         MR. HARRIS: Object to the form of the
16 question.
17     A. So I say the answer to the question is I do
18 -- I -- a person does become an agent of notice when
19 they become aware.
20     Q. (BY MR. NOTZON) You. You.
21     A. Whenever the --
22         MR. HARRIS: Object to the form of the
23 question.
24     Q. (BY MR. NOTZON) Right. You said "a person,"
25 but I'm actually asking about you in that situation.

43

1          MR. HARRIS: Object to the form of the
2  question.
3      A. Yes. I should have been an agent of notice.
4      Q. (BY MR. NOTZON) And that agent of notice
5  would have caused you to report that to EEO or OIG,
6  correct?
7      A. Correct.
8      Q. And/or -- and maybe this is the path you
9  took -- to actually ask Schwartz about it as your
10 co-capt -- as your -- I guess I'd say co-captain, not
11 really, your compatriot in Temple?
12     A. It would have been a topic of discussion,
13 yes.
14     Q. With Captain Schwartz?
15     A. Correct.
16     Q. As part of your training are you supposed to
17 contact Captain Schwartz about that, or are you just
18 supposed to contact EEO or OIG and let them do the
19 investigating?
20         MR. HARRIS: Object to the form of the
21 question.
22     A. The notification is to the EEO or the OIG or
23 to your chain of command. There's not a requirement
24 that you have to go directly to them, but you are
25 allowed to go directly to them to file a complaint.

44

1      Q. (BY MR. NOTZON) And "to them," meaning the
2  major above you?
3      A. To OIG and EEO. You're not required to go
4  directly to OIG or EEO to file a complaint or make
5  notice. You can go -- you can do it through your
6  chain of command also. But you're allowed to go
7  directly to them if you choose.
8      Q. Okay. And your chain of command would have
9  been Major Ortiz at that time?
10     A. Yes.
11     Q. Okay. Did you report that to Major Ortiz?
12     A. I would -- I would say yes.
13     Q. You don't remember?
14     A. Not specifically. I mean, we had a very
15 open relationship in conversations, and I can't tell
16 you that I specifically remember that conversation.
17 But, due to the nature of our relationship, I would
18 say yes, he was made aware of that.
19     Q. Okay. It wasn't required of you to report
20 it to Major Ortiz. But, because of your
21 relationship, you think you would have?
22     A. Correct.
23     Q. Okay. There would be no requirement for you
24 to talk to Captain Schwartz about it, correct?
25     A. Correct.

45

1      Q. Would there be a prescription from you
2  talking to Captain Schwartz about it?
3      A. A what?
4      Q. Would you be prohibited, according to the
5  policy, from contacting Captain Schwartz about
6  Special Agent McPherson's complaint of
7  discrimination?
8      A. No, I don't think so.
9          MR. HARRIS: All right. We've been
10 going for a bit over an hour. Would this probably be
11 a good time to take a first morning break?
12         MR. NOTZON: We can take a break.
13         THE REPORTER: Okay. Off the record at
14 10:39 a.m.
15         (Recess from 10:39 a.m. to 10:52 a.m.)
16         THE REPORTER: Back on the record at
17 10:52.
18     Q. (BY MR. NOTZON) Okay. Mr. Koenig, still
19 talking about complaints of discrimination,
20 harassment, or retaliation, and I had said that I
21 wanted to ask -- also ask you about verbal
22 complaints, not necessarily formal written
23 complaints.
24         Do you recall that Lieutenant Martinez
25 had brought some complaints to you verbally before he

50

1  A. Not yet.
2  Q. And your role as an agent of notice is not
3  to only report it to your supervisor, it is to report
4  it to OIG or EEO, correct?
5       MR. HARRIS: Object to the form of the
6  question.
7  A. I don't recall the specific requirements.
8  Q. (BY MR. NOTZON) Okay. But what is clear in
9  your memory is that you didn't report it to OIG or
10 EEO, correct?
11 A. I don't believe I did.
12 Q. Anything else that you wanted to add to your
13 prior testimony based upon the break that we had
14 where you talked to your attorney?
15      MR. HARRIS: Object to the form of the
16 question and object to the characterization.
17 A. No.
18 Q. (BY MR. NOTZON) So I had been asking you
19 about whether or not you recall Lieutenant Martinez
20 making a verbal complaint of discrimination to you
21 and you say you don't recall that happening?
22 A. Specifically, no.
23 Q. Do you recall -- and these are situations
24 where you have not recalled these up to now.
25      Do you recall that Dori Livingston had

51

1  made a complaint of race discrimination to you?
2  A. Yes.
3  Q. Okay. And you didn't recall that earlier.
4  Do you know why?
5  A. Her race discrimination complaint was she
6  asked me if I thought the DPS promotional system was
7  racist.
8  Q. Okay.
9  A. Therefore, it wasn't a complaint. It was a
10 question.
11 Q. And why -- what did she -- what was the
12 situation that she was asking about?
13 A. She thought that the DPS promotional
14 practice was racist, and she asked if I thought that
15 the DPS CID promotional process was racist.
16 Q. And what was your answer?
17 A. My answer was, "Well, let me think about
18 this, Dori."
19      When I promoted into DPS or when I
20 promoted into the CID narcotics service, my first
21 supervisor was a Hispanic male. I then transferred
22 to the Austin office, to which my second supervisor
23 was a non-commissioned white female, shortly
24 thereafter followed by a white male supervisor, then
25 a white female supervisor, commissioned.

52

1       Then it went to a Hispanic male
2  supervisor to another -- following that a Hispanic
3  male supervisor. Then out to the field, which is a
4  white male supervisor, then a black female
5  supervisor, and then my final supervisor was a
6  Hispanic male.
7       So out of nine supervisors, three were
8  white males. I said -- I told Ms. Livingston, I
9  said, "No, I do not think that the CID promotional
10 practice is racist, given my experience."
11 Q. And what did she say as her reasons -- or
12 did you ask her what her reasons for thinking it was?
13 A. No.
14 Q. So you didn't ask her why she thought it
15 might be?
16 A. No.
17 Q. And she didn't volunteer that?
18 A. Not that I remember.
19 Q. Did she have any other complaint to you
20 about race discrimination?
21 A. No.
22 Q. So she never said anything about the way
23 that she was told she could or couldn't do her hair
24 for her job?
25 A. At one point there was -- I think she had

53

1  wanted to do a specific type of hairstyle. I
2  don't -- I don't recall specifics about that, but
3  that was a dress code policy.
4  Q. My question is did she make a complaint of
5  race discrimination to you about her hair?
6  A. Oh, no.
7  Q. Did she make a complaint about the way that
8  her squad was being treated by the other squads?
9  A. No.
10 Q. Did anyone make a complaint to you about the
11 way their squads were being treated by the other
12 squads?
13 A. Just for clarification, you're asking did
14 anyone complain about how they were being treated by
15 their peers?
16 Q. Yes.
17 A. From different -- from different squads?
18 Q. Yes.
19 A. Not that I recall.
20 Q. Do you recall that Patrick Alonzo had
21 complained about the way 7C-1 was being treated by
22 the other squads?
23 A. Can you specify "being treated"? What do
24 you mean by being treated?
25 Q. Mocking, ostracizing, degrading comments,

58

1  the alternate schedule.
2      Q.  Isn't it true that 7C2 never had nine days
3  in a row that they were working while 7C1 had four
4  days off during that period of time?
5      A.  I'm not aware of that.
6      Q.  Isn't it true that 7C1 in 2019 and 2020,
7  from the time that Special Agent McPherson and
8  Lieutenant Martinez got there in October of 2019,
9  that the only black special agents were on 7C1 and
10 none were in 7C2 and 7C-3?
11     A.  I would have to look at the schedule.  I
12 don't -- I don't know.  I don't specifically recall
13 that.
14     Q.  You don't recall that being a part of the
15 complaint that was made?
16     A.  I recall that the assumption was that 7C1
17 was comprised of all minorities, yes.
18     Q.  Okay.  And that there weren't any blacks on
19 the other squads?
20     A.  I don't recall if there was or not.
21     Q.  Okay.  Do you recall that that was part of
22 the complaint?
23     A.  I do recall that their assumption was
24 there's a disproportionate weightiness of minorities
25 on that one squad.

59

1      Q.  So the answer is no, you don't recall that
2  the -- part of the complaint was that there were no
3  blacks on the other two squads?
4      A.  I don't remember if there wasn't no blacks
5  on the other two squads or not without looking at the
6  schedule.
7      Q.  I'm asking if you recall that was the
8  complaint?
9      A.  If I recall right, it was they -- it was
10 stating that the 7C1 was an all-minority squad.
11     Q.  So the answer is no, you don't recall that
12 -- the fact that there were no blacks on the other
13 two squads was also a part of the complaint?
14     A.  Specifically that there were no blacks on
15 the other two squads, no, I don't recall that
16 specifically.
17     Q.  And is it true that every person on 7C1, or
18 most of them anyway, had C-1s in their record?
19         MR. HARRIS:  Object to the form of the
20 question.
21     A.  A number of the folks on 7C1 did have C-1s.
22     Q.  (BY MR. NOTZON)  Everybody but one maybe?
23     A.  If you give me a specific timeframe, I mean,
24 I would have to regurgitate my memory.  I don't have
25 anything to sit down -- the whole time I was there I

60

1  would not say that it was all but one.  It could have
2  changed because -- as people moved on and off, yes,
3  it could have changed.
4      Q.  Well, you were only there two and a half
5  years, right?
6      A.  Yes.
7      Q.  And I'm referring to October of 2019 through
8  the time of your retirement.  So a year and a half
9  or -- right?
10     A.  Okay.
11     Q.  Yeah, a year and a half.  So does that help
12 you?
13     A.  I still don't know the breakdown.  I mean, I
14 don't remember specifically.  We -- during my tenure
15 there, we went from 10 agents to 15 agents.  We added
16 a squad.  7C1 squad when I first got there was not
17 the same makeup as the 7C1 squad was during mid-time
18 I was there or even at the end.
19     Q.  Did you use race as a basis for populating
20 7C1?
21     A.  Absolutely not.
22     Q.  So it's just happenstance that it happened
23 to be that all the blacks in your unit were only on
24 7C1?
25     A.  All of our most profound investigators that

61

1  we believed were the top notch investigators and were
2  better suited for that position were placed on 7C-1;
3  however, to include that is also our starting point
4  for our new agents for training purposes.
5      Q.  Okay.  And was that your decision or whose
6  decision?
7      A.  It was a combined agreed decision between
8  myself and Major Ortiz.
9      Q.  Okay.  And was that during the entire time
10 that you were the captain over 7C1, that you would
11 have the new agents start at 7C1?
12     A.  Correct.
13     Q.  Were there any exceptions to that?
14     A.  There were exceptions to that when we had
15 more openings than opportunity.
16     Q.  What do you mean by that?
17     A.  We had -- when we had more openings
18 available than, like, to sit there and put a whole
19 bunch of new agents on a lieutenant is a -- is a --
20 what do you call it?
21     Q.  Burden?
22     A.  It's a burden.  It's disproportionate.  You
23 can't sit there and expect a lieutenant just to have
24 a whole list -- a whole litany of new agents on it.
25 So we needed to break it up and share the training

62

1  responsibilities amongst the lieutenants.
2       So the goal was that brand new agents
3  off the promotional list from troopers would go into
4  the CID squad. That was the goal; however, there was
5  one point where -- that wasn't something that we
6  could -- we could do that would be fair to the whole.
7     Q. Did Lieutenant Martinez, who is the
8  lieutenant that you were trying to protect from a
9  burden on 7C1, did he ever complain about having too
10 many new special agents?
11    A. No, Lieutenant Martinez had a fantastic
12 attitude. He was -- he was --
13    Q. So the answer is no? The answer was no?
14    A. No.
15    Q. He never complained about that?
16    A. Complained, no.
17    Q. Comment?
18    A. Comment, yes.
19    Q. Concern?
20    A. Maybe a concern but not a complaint.
21    Q. Did he ask for assistance? Did he say, "I
22 don't want any more new agents"?
23    A. I don't specifically remember him saying, "I
24 don't want anymore new agents."
25    Q. Because when you -- when you have this rule

63

1  that all the new special agents go to 7C1
2  investigations and then you change that and don't
3  allow agents to go to 7C2 that wanted to go to 7C2 to
4  begin with, you see the perception of a problem
5  there, that maybe you're not actually having a rule
6  and being fair about it, that maybe you're using
7  other criteria --
8     A. No.
9     Q. -- besides giving Lieutenant Martinez a
10 break?
11    A. No.
12    Q. You don't see that?
13    A. No.
14    Q. When Special Agent McPherson specifically
15 asked to go to 7C2 to begin with, since he wasn't a
16 new agent, yet you still put him on 7C1 and didn't
17 put him on 7C2, correct?
18    A. He went to 7C1, correct.
19    Q. Right. But you put him on 7C1 you're saying
20 because he was a new agent, but he wasn't a new
21 agent?
22    A. No. No. That's where the opening was.
23    Q. There were no openings on 7C2 --
24    A. Not that I recall.
25    Q. -- when he came in?

64

1     A. No.
2     Q. Okay. And then when an opening came open,
3  he could have taken that opening and had the new
4  person go to 7C1, correct?
5     A. At that point in time, the decision for
6  interoffice transfers wasn't taking place --
7  interdistrict transfers wasn't taking place.
8     Q. Whose rule was that?
9     A. That was my rule. Major Ortiz's rule.
10    Q. Why was that rule in place?
11    A. Because we --
12    Q. Is it because Mr. McPherson wanted to
13 transfer and you weren't going to let him do it?
14    A. No, no. That's not the case at all.
15    Q. Because he had complaints of race
16 discrimination and retaliation on the books?
17    A. No, no.
18    Q. And DPS was giving him a hard time?
19    A. No.
20    Q. So what's the reason?
21    A. The reason to -- the reason for what? Ask
22 -- ask me that question one more time.
23    Q. You said you had a rule all of a sudden that
24 there were no interagency transfers or
25 interdistrict --

65

1     A. Oh.
2     Q. -- or you didn't have a word for it. You
3  just kept coming up with new words.
4     A. We didn't want agents lieutenant shopping,
5  basically, just jumping from lieutenant to
6  lieutenant. Maybe at that point in time they're
7  having maybe -- for whatever reason, they want to
8  transfer, other than the -- I mean, that's it. We
9  just -- we just didn't allow them just to keep
10 bouncing around.
11    Q. What bouncing around was going on that you
12 were stopping?
13    A. That's just it. We were -- we -- the
14 culture that I came from, NCID was that in offices
15 where you had multiple squads, that the bouncing
16 around, going from one lieutenant to the other
17 lieutenant, was not something that we practiced.
18         MR. NOTZON: Object as nonresponsive.
19    Q. (BY MR. NOTZON) I'm specifically asking in
20 the fall and winter of 2019, what jumping around were
21 you stopping?
22    A. Like I said --
23    Q. Who was jumping around?
24         MR. HARRIS: All right. Can you let him
25 answer the question?

66

1  A.  During that time, the general rule was is
2  that no one was going from -- jumping -- going from
3  one lieutenant to another lieutenant within the same
4  district.  That's it.  That's all there is to it.
5      Q.  (BY MR. NOTZON)  And was that in writing?
6  Was there a directive that was put out?
7      A.  No.
8      Q.  So nobody in the three squads knows that,
9  this rule, other than you and Major Ortiz?
10     A.  No, that's not true.  I had meetings with
11 the agents.  That they --
12     Q.  Okay.  So the agents did -- were told?
13     A.  They were aware of it, yes.
14     Q.  And the lieutenants were told?
15     A.  Yes.
16     Q.  That there's this rule there's not going to
17 be any switching?
18     A.  Not just flippantly switching, no.
19     Q.  Flippantly switching.  Okay.  What made you
20 think that McPherson wanted to switch to C-2 when
21 there was an opening two months after he got there
22 was a flippant switch?
23     A.  Part of the deal was that Agent McPherson
24 was on a performance improvement plan.  And to sit
25 there and start this stuff over again with a

67

1  different lieutenant on a different squad, it just
2  wasn't conducive to a productive environment.
3      Q.  Who put him on a performance improvement
4  plan?
5      A.  It was -- it was brought over from where he
6  transferred from, from Temple.
7      Q.  So he could have started at 7C2 instead of
8  7C1 because he wasn't a new agent?
9      A.  No.
10     Q.  All right.  You said new agents start at
11 7C1.  So he could have started at 7C2?
12     A.  The opening was in 7C1.  The 7C2 was full.
13 In order to put him on 7C2, I would have had to
14 displace someone at that time.
15     Q.  And why do you think he was on a PIP?
16         MR. HARRIS:  Object to the form of the
17 question.
18     A.  It carried over from his previous duty
19 station.
20     Q.  (BY MR. NOTZON)  And is -- you've seen
21 documentation of that?
22     A.  The -- yes.  I mean, we -- we got from --
23 the decision memo from the chief's office and that
24 laid out the results of what he had going on in
25 Temple and what we had to do when he trans -- when

68

1  they -- whenever he transferred to us to carry out
2  the, I guess, lack of a better term, the punishment
3  process.
4      Q.  If there's no PIP in his record, are you
5  possibly confusing him with someone else?
6      A.  I could be.
7      Q.  Therefore, if he didn't have a PIP on his
8  record, what would be the reason why he couldn't have
9  taken that position when it came open?
10     A.  So -- say that again.
11     Q.  You're aware that McPherson was qualified to
12 do surveillance -- counter-surveillance work,
13 correct?
14     A.  Yes.
15     Q.  He wasn't -- he had experience in it and he
16 wasn't a new agent, correct?
17     A.  He wasn't a new agent, yes.
18     Q.  And he had experience in
    counter-surveillance?
19
    A.  Personally at that point I don't know.
20
    Q.  You don't remember, or you don't -- or you
21
   didn't -- or you didn't know?
22
    A.  He wasn't -- I never worked with him.  I
23
   didn't know what his -- what his previous experiences
24
   were.
25
    Q.  Yeah, but when he came to see you, you asked

69

1  him what he wanted to do, and he told you he wanted
2  7C2, correct?
3      A.  He did state that he wanted to be on the
4  counter-surveillance squad.
5      Q.  And then he told you why and he told you he
6  had undercover experience, didn't he?
7      A.  I don't recall that.
8      Q.  You could have asked him what his experience
9  was?
10     A.  Maybe I did.
11     Q.  Right.  You just don't recall?
12     A.  Correct.
13     Q.  But he's there for two months, and then you
14 end up putting a new agent onto that unit instead of
15 him and that new agent was Mr. Head, correct?
16     A.  Correct.
17     Q.  And then you did it again, you put another
18 new agent on that unit, too, that had no experience
19 instead of putting them onto 7C1, correct?  You
20 didn't just do it once; you did it at least two
21 times, correct?
22     A.  Let me think about this.
23     Q.  Remember the guy Randy?
24     A.  I think so.  Yeah, I think he was short
25 term.

70

1  Q. Start with --
2  A. That's whenever we -- that was at the time
3  whenever we -- yeah, whenever we were allowed to
4  expand and -- yeah, at that point in time we had to
5  spread out our new agents for training purposes.
6  Q. Says who?
7  A. Says myself and Major Ortiz.
8  Q. Okay. Just between the two of you? This
9  wasn't a DPS-wide directive?
10  A. No, it's a process. They were -- they
11  needed to be trained in CID as new agents. And once
12  again, to not put all the burden on one lieutenant,
13  it was spread out.
14  Q. When -- do you recall your -- the first time
15  you became aware of Lieutenant Martinez?
16  A. Vaguely, yeah.
17  Q. Was it before or after he put in for a
18  transfer to Austin?
19  A. I don't remember.
20  Q. In other words, was his -- when he put in
21  for a transfer to Austin was that the first time you
22  became aware of him?
23  A. Yes.
24  Q. Okay. Same question for Mr. McPherson, did
25  you first become aware of Mr. McPherson when he put

71

1  in for a transfer to Austin?
2  A. His interest in coming to the capitol or,
3  like, just -- like hearing about him, or what do you
4  mean?
5  Q. Yeah, the -- so you don't know all the
6  special agents that are out there, right? You come
7  upon them when they come across you for one reason or
8  another, and I'm asking did you have any knowledge of
9  McPherson prior to him putting in or expressing an
10  interest to come to Austin?
11  A. I would say superficial, just in passing
12  knowledge of him.
13  Q. What -- and what was that?
14  A. That he was inside the regulatory service
15  division and that's it. I really didn't know the
16  guy. I didn't.
17  Q. Okay. I mean, why did he get brought to
18  your attention when he was in RSD?
19  A. No, just in passing, like, you go -- you see
20  people in the office, "Hey, how you going? I'm so
21  and so," they meet, you know. I -- I don't remember,
22  just in passing, in general, I mean.
23  Q. Okay.
24  A. I was also in -- I did a lot of training. I
25  put on a lot of training, and I met a lot of people.

72

1  So, I mean, I can't remember exactly every time I met
2  somebody.
3  Q. Who first asked to come to -- well, let me
4  just confirm. Martinez and McPherson both came to
5  Austin in October of '19. Is that consistent with
6  your memory? They came a couple of weeks from each
7  other?
8  A. Yes.
9  Q. So my question is which one put in first to
10  come, if you can recall?
11  A. Not McPherson. Lieutenant Martinez.
12  Q. Okay. And why do you think that's the case?
13  A. Well, in his own words, he wanted to start
14  new from El Paso. He thought it was a great
15  opportunity to come down and to work down at the
16  capitol, to work a diverse case load, to just
17  basically improve his promotional capital.
18  Q. And -- but why do you think it was him that
19  put in first before McPherson?
20  A. The openings, I don't know. No, I don't
21  know.
22  Q. Are you -- do you remember it that way or
23  you're -- you're sure about it or you just -- you're
24  not sure?
25  A. No, I'm not sure. I don't know.

73

1  Q. Okay. Do you recall that there was a Mark
2  Berry that you were interested in having promote to
3  lieutenant for that position?
4  A. Yes.
5  Q. And he was on a promotional board, that if
6  that position was open he could have -- you could
7  have filled it with Mr. Berry?
8  A. Correct. Well, I vaguely remember that.
9  Q. But Lieutenant Martinez put in for the
10  transfer --
11  A. Uh-huh.
12  Q. -- and he could -- he could take the
13  position and not allow Mr. Berry to take it because
14  he would put in as a transfer?
15  A. I don't remember that specifically but --
16  no, I don't remember it specifically.
17  Q. Okay. But it's true that the way the
18  transfers work that coming from El Paso to Austin, if
19  there's an opening and he qualifies for it, he gets
20  it?
21  A. Yes.
22  Q. Was there ever any effort to block
23  Martinez's transfer?
24  A. Yes, there was.
25  Q. And who engaged in that effort?

78

1  A. No.
2  Q. So McPherson had just as much right to
3  transfer to Austin like Martinez did, regardless of
4  having a C-1?
5  A. Correct.
6  Q. If there was -- if there was an opening?
7  A. If -- yes.
8  Q. If there -- yeah. Okay. And it's your
9  testimony that the only opening at Capitol CID under
10  you was on 7C1?
11  A. That's what I recall.
12  Q. Okay. So do you also recall asking
13  Mr. McPherson when he came to meet with you, telling
14  him about your three squads and which one he wanted
15  -- he wanted to be on? Do you remember asking him
16  that?
17  A. Yes.
18  Q. And why would you ask him that if he had to
19  start at 7C1?
20  A. Professional goals.
21  Q. Okay. And why would you ask him that if you
22  weren't going to allow any of the special agents to
23  transfer between squads?
24  A. Once again, professional goals.
25  Q. So it had no relevance to whether or not he

79

1  would ever get to 7C2 or get what he wanted. You
2  just wanted to know it?
3  A. No, it -- I wanted to know what his
4  professional goals were.
5  Q. Okay. But not so that you could help him
6  achieve them?
7  A. No, that's not correct.
8  Q. Well, you didn't, did you?
9  A. Did I -- I didn't do what?
10  Q. You didn't help him to achieve it when an
11  opening came open on 7C2 two months after he got
12  there?
13  A. I did help him achieve it.
14  Q. You didn't help him achieve it two months
15  later when an opening came open and he could have
16  taken that spot on 7C2 and have the new,
17  unexperienced, no criminal investigation, no
18  undercover work experience Head take over the 7C1
19  training spot, correct?
20  A. No, that's not correct.
21  Q. Why not?
22  A. Because we had a number of agents that were
23  transferring that were promoting, and we needed to,
24  as best we could, even out the training opportunities
25  for them to make it fair for them and for the

80

1  lieutenants.
2  Q. So getting the job done is not as important
3  as making it fair for the lieutenants and the special
4  agents to have access to experiences that they're not
5  as qualified for as McPherson?
6  A. I disagree with that. That is --
7      MR. HARRIS: Object to form. Sorry.
8  Just let me --
9  A. -- that is the --
10     MR. HARRIS: -- get my objection in
11  first. Object to the form of the question.
12  A. I disagree with you. I think that is
13  getting the job done.
14  Q. (BY MR. NOTZON) Even though you admit
15  McPherson had actual experience, years of experience
16  with counter-surveillance work and Head didn't?
17  A. Incorrect. I didn't --
18     MR. HARRIS: Object to the form of the
19  question.
20  A. I did not know his experience level in
21  counter-surveillance.
22  Q. (BY MR. NOTZON) You're the captain over
23  this unit, correct?
24  A. Yes.
25  Q. And you had access to the personnel files of

81

1  all your agents, correct?
2  A. Yes.
3  Q. And you had a conversation with McPherson
4  before he even showed up about what he wanted and why
5  he wanted it?
6  A. Yes.
7  Q. And so when you say, "I didn't know what his
8  experience was," that doesn't really ring true, does
9  it?
10  A. You said his surveillance experience. I did
11  not know his surveillance experience.
12  Q. It was knowable, wasn't it?
13  A. It was potential, but I did not know.
14  Q. No, but you had access to his file. You had
15  access to him. You could have asked him if he didn't
16  already tell you.
17  A. Like I said, I did not have firsthand
18  knowledge.
19  Q. That's your testimony?
20  A. I did not have firsthand knowledge of his
21  surveillance experience prior to coming to --
22  Q. Okay.
23  A. -- the capitol.
24  Q. And you're saying he didn't tell you what
25  his experience was either, correct?

82

1    A. Not spec -- I don't remember specifically,
2  no.
3    Q. Okay. When he told you he wanted 7C2, you
4  don't remember him telling you why he thought that
5  would be good for him?
6    A. No, I don't -- I vaguely remember him, you
7  know, saying that he really enjoys it.
8    Q. All right. And --
9        MR. HARRIS: All right. We've been
10 going now for --
11   Q. (BY MR. NOTZON) -- that would have been a
12 nice -- that would have been a nice time to ask him,
13 do you have any experience in it, but you don't
14 recall if you did that or not?
15   A. Correct.
16   Q. And when you were assigning McPherson to a
17 position on your three squads, you didn't try to make
18 it fair for him and put him in the best light of his
19 career like you did with Head and the others, like
20 you testified just a little while ago?
21   A. That's incorrect.
22   Q. Okay. What did you do for Mr. McPherson to
23 make it as fair for him as possible and promote his
24 career?
25   A. I put him on Lieutenant Danny Martinez's

83

1  squad, who at that time --
2    Q. Yeah.
3    A. -- had a 100 percent -- to my knowledge at
4  that time, did not know Agent McPherson from anyone
5  else.
6        Lieutenant Hanson, on the other squad,
7  the counter-surveillance squad, had previously been
8  working in Temple where Agent McPherson was coming
9  from. Okay. So to avoid any type of issue that I
10 could potentially foresee, I wanted to give Agent
11 McPherson the best opportunity available to sit there
12 -- he wanted -- he wanted to basically start new,
13 then, and start fresh. My opinion was the best way
14 to do that was to put him under the tutelage and
15 oversight of Lieutenant Martinez.
16   Q. Didn't Hanson work in Waco and not Temple?
17   A. You're correct. So it is --
18   Q. They didn't work together, correct?
19   A. They were in the same district.
20   Q. They didn't work together, correct?
21   A. They were in the same district.
22   Q. They weren't in the same office?
23   A. They weren't in the same office.
24   Q. And did you have conversations with Hanson,
25 I guess it was Lieutenant Hanson at the time, about

84

1  Mr. McPherson's complaint of discrimination, or did
2  Hanson tell you about his knowledge about --
3    A. I'm going to say --
4    Q. -- Mr. McPherson's complaint of
5  discrimination?
6    A. No. I don't think he told me about -- I
7  don't recall him telling me about complaints of
8  discrimination from Agent McPherson.
9    Q. Did you ever have a conversation with
10 Lieutenant Hanson about McPherson's complaints of
11 discrimination in that district?
12   A. Discrimination, I don't believe so.
13   Q. Did you ever have any conversations with
14 anyone other than Captain Schwartz and Special Agent
15 McPherson about his -- about McPherson's complaints
16 of discrimination up in Temple?
17   A. Not that I recall.
18       MR. HARRIS: All right. Like I said,
19 we've been going on for about another hour. So is
20 this a good time to take a break?
21       MR. NOTZON: Yeah, let's go ahead and go
22 off the record.
23       THE REPORTER: Off the record at
24 11:59 [sic].
25       (Recess 11:49 a.m. to 12:23 p.m.)

85

1        THE REPORTER: Back on the record at
2  12:23.
3    Q. (BY MR. NOTZON) All right. So I had talked
4  to you about efforts to block Lieutenant Martinez
5  from coming down. Were there any efforts to block
6  McPherson from coming down to Austin?
7    A. Yes.
8    Q. And who participated in those efforts?
9    A. I want to say it was -- well, it was
10 definitely myself -- I say myself, I was
11 communicating with Major Ortiz and then also Director
12 Dwight Mathis.
13   Q. Okay. And what was the -- who was the one
14 that came up with the idea first?
15   A. I don't -- I don't recall.
16   Q. Was there anybody else besides the three of
17 you?
18   A. No.
19   Q. Okay. Did anybody disagree with the three
20 of you? In other words, did somebody say, "We
21 shouldn't be trying to block him," or something to
22 that effect?
23   A. Not that I'm aware of.
24   Q. Okay. And what was the reason for the three
25 of you wanting to block McPherson's transfer to

## Page 86

1 Austin?
2   A.  Just for the mere reason of how -- what we
3 were trying to do was build the elite culture of the
4 capitol, and, you know, re-image it, I guess for lack
5 of better terms.  And bringing, you know, people in
6 with sustained C-1s, under investigations, issues
7 like that, tarnishes it.  Primarily amongst with the
8 agents there at the time.
9   Q.  Were there any agents that were already
10 there with C-1s?
11   A.  So I'm sure there were.
12   Q.  Okay.  And how did they apply to get in, or
13 were they already there?
14   A.  They were already there.
15   Q.  Do you remember who that was?
16   A.  No.
17   Q.  Did more people come to CID under your
18 supervision in Austin after McPherson and Martinez
19 came that had C-1s?
20   A.  Yes.
21   Q.  And did you try to block them?
22   A.  Yes.
23   Q.  And who were they?
24   A.  Lieutenant Ramiro Saldivar.  Special Agent
25 Chase Oduwole.  I'm trying to -- I think that was it.

## Page 87

1   Q.  Did you ever have a conversation with
2 Lieutenant Martinez where you talked to him about
3 what you knew about McPherson up in Temple?
4   A.  Yes.
5   Q.  And when did that conversation take place?
6   A.  At the preliminary process.  Whenever --
7 placement of the -- Agent McPherson on Lieutenant
8 Martinez's squad.
9   Q.  Are you aware that McPherson came two weeks
10 before Martinez?
11   A.  So he was -- yes, he did physically show up
12 there, yeah, before Lieutenant Martinez.
13   Q.  So did you have that conversation with
14 Martinez before Martinez showed up or after Martinez
15 showed up?
16   A.  After Martinez showed up.
17   Q.  And who else was in that meeting besides you
18 and Lieutenant Martinez?
19   A.  Lieutenant Hanson, I believe.
20   Q.  Okay.  Anyone else?
21   A.  Not that I specifically remember.
22   Q.  Okay.  Did you mention that McPherson had
23 made a complaint of race discrimination -- not
24 necessarily using those words, but did you use the
25 word "race" in part of your communication with

## Page 88

1 Lieutenant Martinez?
2   A.  Not that I recall.
3   Q.  Is it possible that you did because you knew
4 about it?
5   A.  Not that I recall.
6   Q.  So it's not possible?
7   A.  I don't recall saying that.
8   Q.  I'm asking you is it possible that you did,
9 because you've already testified that you knew about
10 his complaint of race discrimination up in Temple.
11 I'm asking if you're saying that you would not have
12 said anything about race to Martinez, or you don't
13 recall?
14   A.  I don't recall.
15   Q.  Okay.  So just to be clear, you're not
16 ruling out the possibility that you mentioned race to
17 Martinez when you were talking about McPherson and
18 what you knew about him up in Temple?
19   A.  I don't recall.
20   Q.  That's not an answer to my question.  Are
21 you saying it's -- you're not able to say it's not
22 possible?  Is that what you're saying?
23   A.  What I'm saying is I don't -- I don't recall
24 saying that.
25   Q.  Okay.  Do you recall using the word

## Page 89

1 "lawsuit" -- that McPherson had a lawsuit that he was
2 filing against Schwartz -- to Martinez in your
3 conversation with Lieutenant Martinez?
4   A.  Not that I recall.
5   Q.  Other than Hanson, Schwartz, and McPherson,
6 did you have any other conversations about
7 McPherson's time in Temple regarding McPherson?
8   A.  With Major Ortiz, yes.
9   Q.  Okay.  And Major Ortiz, did he know things
10 about Temple that you didn't know, or were you
11 reporting to Major Ortiz what you were learning?
12   A.  I don't recall him providing information.
13   Q.  Okay.  Anyone else that you spoke to about
14 Special Agent McPherson and his time in Temple, other
15 than the people we just talked about?
16   A.  Regional Director Mathis.
17   Q.  Okay.  Same thing with him, you were just
18 reporting to him what you had heard?
19   A.  Yes.
20   Q.  Was that part of the conversation about
21 blocking McPherson, or was it some other conversation
22 you were having?
23   A.  It was conversations about blocking him.
24   Q.  Okay.  Anyone else that you talked to about
25 McPherson?

                                                                                                                    90
1    A.  Not that I recall.
2    Q.  Okay.
3    A.  Not that I recall.
4    Q.  Did you ever have any conversations with
5  anyone about McPherson where they were saying
6  positive things about McPherson and not just about
7  the C-1 and his complaint of discrimination up in
8  Temple?
9    A.  Not that I recall.
10   Q.  Did anyone in Austin ever communicate to you
11 that they felt it was unfair of -- or to McPherson to
12 not give him a chance to prove himself here without
13 the negative comments about Temple?
14   A.  I believe Chief Ruocco had mentioned about
15 that situation that you're describing.
16   Q.  And was that his communication to you or --
17 while -- I'm sorry.  I'll withdraw that question.
18       Who was in that communication that you
19 received, that from Chief Ruocco?
20   A.  Major Ortiz.
21   Q.  Just the three of you?
22   A.  Yes.
23   Q.  Okay.  And do you remember when that was?
24   A.  During the time that the -- he had put in
25 for the transfer.  So during -- it was a short amount

                                                                                                                    91
1  of time but during the time he had put in for a
2  transfer.
3    Q.  Okay.  So Chief Ruocco is saying it in a
4  prospective light, like you should give McPherson a
5  chance when he gets here?
6    A.  Yes, yes.
7    Q.  Okay.  Anyone else express a similar
8  sentiment?
9    A.  No.
10   Q.  I'm going to try to take you further in time
11 and say did anybody ever express to you, looking
12 back, to say, "Hey, we weren't very fair to
13 McPherson.  We should have given him a shot and not
14 reacted to the negative information we were receiving
15 from Temple when he got here"?
16   A.  In that specific dialogue, no.
17   Q.  Well, no.  I -- words to that effect.  I'm
18 not trying to quote anybody.
19   A.  Not that I'm aware of.
20   Q.  Okay.  No one expressed regret of how
21 McPherson was viewed in a negative light based upon
22 all of the gossip about Temple that was -- he was
23 arriving with, nobody expressed regret to you?
24   A.  Not that I'm aware of.
25   Q.  Okay.  Would it be true that McPherson did

                                                                                                                    92
1  very well under your supervision?
2    A.  It would be.
3    Q.  And that he performed, in fact, well above
4  average compared to the other special agents?
5    A.  Well above average?  I wouldn't say well
6  above average.  I think that he did a good job.
7    Q.  He was award-winning, wasn't he?
8    A.  He did a good job when he was working down
9  there.  He was recognized for some achievements that
10 he -- or an achievement that he conducted and -- yep.
11   Q.  What was he recognized for?
12   A.  I hate to say I don't recall, but I don't
13 recall the specific one.  But I've -- yeah.
14   Q.  Would it be true that he didn't receive any
15 awards while you were the captain?  And it -- only
16 after you retired that he received the award?
17   A.  I know he received acknowledgment.
18 Necessarily an award, what -- I guess that's a
19 definition that you need to let me know what you
20 mean.
21   Q.  Well, you guys -- it's your workplace.
22 Don't you give out awards?
23   A.  There are a litany of -- of awards, yes.
24   Q.  The Regional Director Award is the big one?
25   A.  There -- the big one is the Director Award.

                                                                                                                    93
1    Q.  Did anybody under you get a Director Award?
2    A.  The squad during our riot investigations,
3  yeah, we got a Regional Director's Award if I'm --
4  yeah.
5    Q.  Okay.  That's regional.  But you just said
6  the director.  So I -- my question is did anybody get
7  a Director's Award --
8    A.  Not that I --
9    Q.  -- under you?
10   A.  -- recall, no.
11   Q.  Okay.  So the big one under you was the
12 Regional Director award, right?
13   A.  Yes.
14   Q.  Okay.  So did anyone get a Regional Director
15 award under you?
16   A.  No.
17   Q.  That would have been Lieutenant Hanson.  He
18 got it for the George Floyd protest work that 7C2 had
19 done.  Is that right?
20   A.  The -- I don't recall if he got a Regional
21 Director's award or not for his squad.
22   Q.  Okay.  You don't recall anybody getting a
23 Regional Director award under you while you were
24 there as a captain?
25   A.  So --

94

1  Q. Yes or no?
2  A. No.
3  Q. Okay. Are you aware that McPherson got a
4  Regional Director award for his work after you left?
5  A. No.
6  Q. Okay. Are you aware that McPherson had --
7  was more productive during the George Floyd protest
8  work than any other special agent in your three
9  squads?
10 A. No.
11 Q. He had more contacts. He had more contacts
12 that led to arrests. He had more identifications.
13 All of those objective measures?
14 A. Not that I recall.
15 Q. Okay. Who had more?
16 A. I don't recall who had the most contacts for
17 the situation that you described, the contacts, the
18 arrests, the -- I don't remember who had more.
19 Q. Okay. Would you have given that person an
20 award if they had had the most?
21 A. During the George Floyd riot we were -- we
22 were very well pleased with everyone as a whole on
23 their performance during that time.
24     MR. NOTZON: Object as nonresponsive.
25 Q. (BY MR. NOTZON) Would you have given that

95

1  person an award, whoever had the most, the most
2  objective criteria compared to the other special
3  agents during that work?
4  A. Would we have or did we is the question?
5  Q. I'll take both answers.
6  A. Not that I recall.
7  Q. Is that an answer to both questions?
8  A. Yes.
9  Q. Okay. And while that was going on, the
10 George Floyd protest work, McPherson was on 7C1,
11 correct?
12 A. Yes.
13 Q. Working counter-surveillance?
14 A. Yes.
15 Q. And a lot of 7C1 was working
16 counter-surveillance during that work, correct?
17 A. All of 7C1.
18 Q. While they were still doing their
19 investigative work, which was more than any other
20 squad, correct?
21 A. No.
22 Q. They weren't doing their -- continuing to do
23 their investigative work?
24 A. Yes, they were.
25 Q. But you're not willing to admit that they

96

1  were doing more work than any of the other two
2  squads?
3  A. No, they weren't.
4  Q. Okay.
5  A. All the squads --
6  Q. And what objective measures do you have to
7  verify that they weren't doing more objective work
8  than the other two squads?
9  A. Purely the stats. If you are able to pull
10 up the stats for -- during that time frame. I don't
11 have access to them. However --
12 Q. What stats?
13 A. The stats inside our reporting system.
14 Q. Yeah, what stats?
15 A. Well, for everything that you just
16 described, you can pull up stats for that.
17 Q. Can you identify the stats that you would go
18 look at to see which squad was doing more work?
19 A. It's auditable. Our reporting system is
20 auditable.
21     THE REPORTER: I'm sorry. It's what?
22     THE WITNESS: Auditable.
23     THE REPORTER: Thank you.
24 Q. (BY MR. NOTZON) Could you name the stats
25 that you would look at that would be important to you

97

1  as signifying substantial work done by the squads?
2  A. So one would be investigations opened and
3  charges filed and disposition of charges.
4  Q. Okay. Anything else?
5  A. I mean, you can look at surveillance hours
6  on there also.
7  Q. Okay. Anything else?
8  A. I mean, everyone as a whole at the district
9  were conducting the same work. So --
10 Q. I'm -- that's not answering my question.
11 I'm just asking about the criteria, the data that you
12 would look at.
13 A. Our -- the reporting system is pretty
14 robust. So whatever you want to look at, you can
15 probably audit it and get that -- get the stats that
16 you're looking for.
17 Q. I'm asking you to please identify for us,
18 from your role as captain of the unit, what you
19 viewed as important criteria that you would look at
20 and it would be important to you to show that the
21 squad was doing substantial work in that area.
22     And if a squad was doing substantial
23 work in the raft of the data that you're identifying
24 as important to you in your assessment of the work,
25 that that would be info -- it would be substantial

106

1  A. Uh-huh, yeah.
2  Q. Were -- those employees that I just named,
3  were they already working under you prior to October
4  of 2019?
5  A. Amongst others, yes.
6  Q. Okay. What others were working under you
7  prior to October of 2019, that are here on this list?
8  A. Well, Carlton Scott, Mario Reyes, Rudy
9  Torrez, Travis Stenberg, Chris Barclay, Randall
10 Davis, Robert Cameron, Sandra Barrette, and David
11 Seard.
12 Q. Okay. So 7C3 was already populated with
13 Saldivar and the five people under him prior to
14 October of 2019?
15 A. I don't recall.
16 Q. Okay. But as of October 15th of 2019, there
17 are two vacancies, one in 7C1 and one in 7C2, right?
18 A. That's what it appears, yes.
19 Q. Okay. So what you said earlier about 7C2
20 having no vacancies when McPherson came in, that was
21 not true, correct?
22 A. I don't recall.
23 Q. Well, this is your document, Exhibit 1. It
24 shows that there was a vacancy when McPherson arrives
25 in October. So that would show that what you said

107

1  earlier wasn't true, correct, that there was a
2  vacancy in 7C2 when McPherson came in?
3  A. I don't specifically know when this chart
4  was made. I see the effective date on it, but I
5  don't know specifically when the chart was made.
6  Q. Regardless, there's a vacancy --
7  A. It could have been --
8  Q. -- on 7C2, right?
9  A. It could have been after he got there.
10 Q. Okay. Sitting here today, you can't say
11 that, right?
12 A. Correct.
13 Q. What you can say today is looking at this
14 organizational chart that was produced by DPS and
15 your particular unit shows a vacancy during the month
16 that McPherson arrived, correct?
17 A. Yes.
18 Q. And looking at that list, McPherson,
19 Livingston, and Oduwole are all black, right?
20 A. Yes.
21 Q. And Bibilonisambolin is an Italian native,
22 correct?
23 A. Yes.
24 Q. With a very heavy accent?
25 A. Okay.

108

1  Q. Right? He -- you could tell English was not
2  his first language?
3  A. He has an Italian accent.
4  Q. So much so that you could tell that was not
5  his first -- that English is not his first language,
6  correct?
7  A. Sir, my wife is a Mexican national. English
8  is a second language, and you couldn't tell. So I --
9  that -- no, I'm just telling you he had an Italian
10 accent. I don't know.
11 Q. You just stated the inverse of what I was
12 trying to say about him using your wife as an
13 example. If she doesn't sound like she's an English
14 as a second language speaker, that's great for her,
15 but that's not the question I'm asking.
16    I'm asking if Bibilonisambolin, with his
17 heavy accent, shows you that he was not English,
18 English was not his first language because he hadn't
19 been able to master it like your wife?
20 A. No, I'm not going to agree to that.
21 Q. Okay. But regardless, you knew him to be a
22 native Italian that came to the United States?
23 A. I learned that, yes.
24 Q. Okay. And you look at the other nine names
25 in 7C2 and 7C3 and there are no blacks there,

109

1  correct?
2  A. No, sir.
3  Q. That's correct?
4  A. That's correct.
5  Q. Okay. Earlier you said you didn't remember
6  who was in the other units, so I was just trying to
7  help you.
8     Now you can see that the blacks were
9  only in 7C1, correct?
10 A. The elite squad, yes. I see what you're
11 saying now.
12 Q. The elite squad?
13 A. Oh, yeah.
14 Q. The investigation unit you're referring to
15 as the elite squad?
16 A. Yes.
17 Q. When did you first refer to it as the elite
18 squad?
19 A. I'm just telling you it was.
20 Q. Without in jest -- without being in jest?
21 A. No, the investigators on 7C1 were top notch
22 investigators.
23 Q. Okay. That didn't answer my question. When
24 did you first refer to 7C1 as the elite unit? Was it
25 today, just now?

110

1  A. No. Oh, no. No, no, no.
2  Q. Okay.
3  A. That's been the sentiment all along.
4  Q. Whose sentiment?
5  A. Myself, Major Ortiz, how we explained it to
6  the lieutenants. We hopefully shared with them that
7  they were the cream of the crop.
8  Q. They're not the troublemakers?
9  A. Oh, no.
10  Q. They're not the trouble squad?
11  A. No.
12  Q. They're not the C-1 squad?
13  A. I didn't give them that designation.
14  Q. You knew that they were referred to it that
15  way, though?
16  A. At one point, yes, it became apparent or
17  brought to my attention.
18  Q. And you never took any action to stop that,
19  correct?
20  A. What do you mean by "action to stop" what?
21  Q. Did you ever issue a directive to stop
22  referring to 7C1 as the C-1 squad?
23  A. No.
24  Q. Did you ever tell the special agents that
25  C-1 was the elite squad? And when I say "special

111

1  agents," I'm referring to all special agents in your
2  three squads.
3  A. No. I wouldn't say -- I would say no.
4  Q. And two more special agents were added to
5  7C1 after those four, correct, in the next six months
6  or -- to a year, correct?
7  A. We had 18 then so -- yes.
8  Q. And they were both black, correct?
9  A. So I know Alonzo and Patrick was, and then
10  if you're saying a second one is added to it.
11  Q. You don't remember the other black employee
12  you had under you that you added to 7C1?
13  A. Remind me and maybe I will.
14  Q. Sure. I just was seeing if you could
15  remember on your own since he was the last black
16  employee that was added and yet you added him to 7C1
17  and not the other units.
18  A. Okay. Who was it?
19  Q. You still don't remember?
20  A. I'm asking you.
21  Q. Justin Murphy?
22  A. Oh, Justin. Yeah. Yeah. Justin, yeah,
23  he's a good guy. Very, very, very good investigator.
24  Q. Did he have a C-1?
25  A. No, not that I remember.

112

1  Q. Did Alonzo have a C-1?
2  A. No, not -- no, not when he was put on that
3  squad.
4  Q. Did Livingston have a C-1?
5  A. Not to my knowledge.
6  Q. Did Oduwole have a C-1?
7  A. Yes.
8  Q. Did any of the special agents in 7C2 and 7C3
9  have C1s?
10  A. I don't think so.
11     MR. HARRIS: Object to the form of the
12  question. What time period are you referring to?
13     MR. NOTZON: I'm referring to as their
14  names are on this sheet and at any time after that,
15  if the captain wants to testify to that.
16  A. So, I mean, McPherson was transferred to --
17  Q. (BY MR. NOTZON) No, I'm talking about 7C2
18  and 7C3. That's the question he's asking about.
19  A. Okay. You just said at any given time.
20  So --
21  Q. From 7C2 or 7C3 was the objection, about
22  those nine names?
23  A. All right. Would you please specify your
24  question again, please?
25  Q. Of those nine, did any of them have a C-1?

113

1  A. In 7C2 and 7C3 right now, not that I recall.
2  Q. That's the same answer you gave before.
3  A. Okay.
4  Q. Okay. Did anybody else try to get on 7C2
5  besides McPherson that you denied?
6  A. Not that I recall.
7  Q. Okay. And just to clarify, you are aware
8  that McPherson wanted to be on 7C2 when he arrived to
9  Austin?
10  A. Correct.
11  Q. Okay. And he continued to express interest
12  in getting on 7C2 even afterwards?
13  A. And he was ultimately placed on 7C2.
14  Q. So the answer to my question is yes?
15  A. Yes, he did express he wanted to be on 7C2.
16  Q. All right. And continued to express that?
17  A. Yes.
18  Q. And you didn't allow it until mid 2020,
19  correct?
20  A. Correct.
21  Q. Do you remember when exactly you put him on
22  7C2?
23  A. No.
24  Q. Wouldn't it be accurate that it was shortly
25  after Lieutenant Martinez filed his EEO complaint of

                                                                178
1    A. It's a summation of what she told me, yes.
2    Q. Okay. And you never had a conversation with
3  him about that?
4    A. I don't recall if I told him specifically
5  what she said or not.
6    Q. Okay. And did you -- did you tell her "Be
7  that as it may, he's still got a great reason to go
8  back and he's got some serious family needs"? Did
9  you try to convince her?
10   A. Yes.
11   Q. And she wasn't being convinced?
12   A. I didn't -- I didn't get that from her, no.
13   Q. Okay.
14       MR. NOTZON: All right. Stay close.
15 When I pop back up, we'll get going again, okay?
16       THE WITNESS: What does that mean?
17       MR. NOTZON: In other words, we're
18 taking a short break and you're watching your screen
19 in case I pop up to ask you a few more questions.
20       THE WITNESS: Okay.
21       THE REPORTER: Off the record at 3:07.
22       (Brief recess.)
23       THE REPORTER: Back on the record at
24 3:11.
25   Q. (BY MR. NOTZON) Okay. Mr. Koenig, I wanted

                                                                179
1  to ask you about one particular incident with
2  Lieutenant Martinez and Special Agent Murphy.
3       Do you recall that they saved that
4  person's life that was wanting to jump and they
5  talked him out or talked him down or away or
6  whatever, however you want to put it?
7    A. Was it Murphy or Agent Head?
8    Q. I believe Head observed and then nominated
9  them for an award because he observed Murphy and
10 Martinez talking him down, but Head didn't actually
11 -- wasn't actually engaged.
12   A. Okay. I remember the situation.
13   Q. Okay. Does that sound familiar?
14   A. Yes.
15   Q. Okay. And you're aware that they were
16 nominated for an award, correct?
17   A. No.
18   Q. All right. How does a nominate -- well, I
19 think it's a life saving award. Is there such a
20 thing?
21   A. Yes.
22   Q. Okay. Is that the name of it?
23   A. I believe it is, correct.
24   Q. Okay. And how does that work?
25   A. Much with any other award, there is a

                                                                180
1  write-up that's submitted to support the actions.
2    Q. Okay. The nomination?
3    A. Yes.
4    Q. And a -- the nomination apparently complies
5  with the purpose of the award. And then is it an
6  annual award, or is it only when it occurs?
7    A. I'm not sure. No, I mean only it -- I mean,
8  life saving award is when it occurs.
9    Q. Okay. So anytime somebody saves a life,
10 they get an award?
11   A. I mean, if the potential is there.
12   Q. Okay. And that could happen, there could be
13 a weekly award if it qualifies and it gets -- it's
14 not an annual thing?
15   A. Yes.
16   Q. Okay. So there's no competition between
17 individuals saving lives to who had the better save
18 that year?
19   A. No, no.
20   Q. It's just if you do a good job and the
21 powers that be say that this qualifies for an award,
22 it gets an award?
23   A. Correct.
24   Q. And that's presumably through the chain of
25 command?

                                                                181
1    A. Correct.
2    Q. And so somebody who nominates could be
3  anyone from, I guess, even a citizen --
4    A. Yes.
5    Q. -- all the way through to the director could
6  nominate somebody?
7    A. Yes.
8    Q. Okay. And in this case, we understand that
9  Special Agent Head had nominated Martinez and Murphy?
10   A. It was discussed.
11   Q. Between who?
12   A. But I don't recall if -- the nomination ever
13 actually coming through my desk.
14   Q. Okay. Who discussed it?
15   A. During the lieutenants meeting, the activity
16 was discussed of what took place.
17   Q. Okay. And so the lieutenants meeting would
18 have been four people?
19   A. Three lieutenants and myself, yes.
20   Q. Okay. And who --
21       THE REPORTER: I'm sorry. Did you say
22 -- did you say, "three lieutenants and myself"?
23       THE WITNESS: Yes, ma'am.
24       THE REPORTER: Okay. Thank you.
25   Q. (BY MR. NOTZON) And who brought it up?

182

1  A. I don't recall.
2  Q. Okay. Head would have been under Hanson at
3  that time, correct?
4  A. Yes.
5  Q. Okay. And Murphy was under Martinez?
6  A. Yes.
7  Q. Okay. And what was the discussion?
8  A. The discussion was the description of the
9  events that took place.
10 Q. Okay. And then what?
11 A. And then it's, "Hey, well, write that up and
12 we'll send it up and see if it qualifies for the
13 award."
14 Q. Okay. So all four of you agreed that it
15 should be written up and submitted?
16 A. We thought so, yes.
17 Q. And that direction was made to who to get it
18 written up?
19 A. I want to say it was to Lieutenant Hanson to
20 direct or to tell Agent Head to write that -- to
21 write the events up.
22 Q. To invite him to do so if he felt like it
23 warranted it?
24 A. Yes.
25 Q. Okay. And what's the next thing you heard

183

1  about the nomination for that award for Martinez and
2  Murphy?
3  A. Nothing.
4  Q. You never heard it again?
5  A. I don't believe -- I don't believe so.
6  Q. And did you ask any questions to follow up?
7  A. No.
8  Q. So you had an agreement with the four of you
9  to proceed with the nomination, but you never heard
10 anything about it and you never followed it up to
11 find out what happened with that agreement and an
12 instruction for Hanson to get Head to write it up?
13 A. So what happened was --
14 Q. Yes or no.
15 A. Yes, I did.
16 Q. You did do something?
17 A. I did question about it.
18 Q. Okay. Tell me what you did.
19 A. I questioned Lieutenant Hanson about it, and
20 he said that they're going to get to it. And I guess
21 it never -- they never got to it and time had passed
22 and nothing happened.
23 Q. Okay. So you asked one time Hanson to find
24 out what happened, and he said they're working on it.
25 And you never found out anything again, and you never

184

1  asked anything again?
2  A. Correct.
3  Q. Okay. Is there a limit on time for when the
4  life saving event must be written up and submitted
5  for award?
6  A. Not that I'm aware of.
7  Q. Okay. Is there a reason why you didn't
8  follow up again?
9  A. Just -- no, no reason.
10 Q. Okay. Do you remember when that was that
11 the event happened, the life saving event happened?
12 A. No.
13 Q. Do you remember if it was just before you
14 retired or a substantial period of time before you
15 retired?
16 A. No. I don't know the specific time frame.
17 Q. Before you retired, did you ask for your
18 chain of command to write assessments of you?
19 A. Before I retired did I ask them? No.
20 Q. Yeah. At any time before you retired, did
21 your chain of command under you write assessments of
22 you and your performance as a supervisor?
23 A. No.
24 Q. This doesn't ring a bell to you, that people
25 had written assessments about you separate from your

185

1  supervisor doing your annual evaluation?
2  A. No.
3  Q. Did you -- you did get an annual evaluation?
4  A. Yes.
5  Q. Okay. But other than that annual
6  evaluation, you don't -- you're not aware of anybody
7  writing an evaluation or assessment or, you know,
8  critique of you as a captain?
9  A. My supervisor did.
10 Q. Yeah, as part of your evaluation?
11 A. Right.
12 Q. Yeah. Other than that, any other
13 assessments that you're aware of that people wrote or
14 were asked to write about you?
15 A. No, not aware.
16 Q. Are you aware of any investigation being
17 conducted of the complaints that were made by
18 Martinez, McPherson, Alonzo, or Livingston?
19 A. That took place or that are current? What
20 do you mean?
21 Q. Yeah, that took place following their
22 complaints of discrimination.
23 A. I mean, actual investigations by OIG --
24 Q. Or EEO.
25 A. I do know that EEO was looking into it. I

Page 186

```
 1  don't know -- I mean, that was an investigation.
 2  They looked into it.
 3     Q.  But you're not aware of any interviews that
 4  were conducted either of you or any of your
 5  subordinates?
 6     A.  With Brenda Helton there was several
 7  interviews that took place with that one.
 8     Q.  Okay.  By who?
 9     A.  I think it was Mike -- I've gone blank for
10  his name.  Mike, Michael.  I can't remember his last
11  name.
12     Q.  Okay.  Any others?
13     A.  I mean, other investigations being
14  conducted?
15     Q.  Yeah.
16     A.  Dealing with --
17     Q.  Complaints of discrimination from people
18  that are under your supervision.
19     A.  Complaints of discrimination, no.
20     Q.  All right.
21         MR. NOTZON:  I'll pass the witness.
22         MR. HARRIS:  All right.  We'll reserve
23  our questions for trial and request that the witness
24  be given an opportunity to review and sign the
25  transcript.
```

Page 187

```
 1         MR. NOTZON:  Thank you.  Good luck.  Off
 2  the record?
 3         THE REPORTER:  Yes.  Off the record --
 4  oh, hang on a second.  Mr. Harris, did you also want
 5  to buy a copy of the transcript?
 6         MR. HARRIS:  Yes.
 7         THE REPORTER:  Okay.
 8         MR. HARRIS:  Let's get a digital, like a
 9  miniscript pdf.
10         (Deposition concluded at 3:22 p.m.)
```

Page 188

```
 1             CHANGES AND SIGNATURE
 2  WITNESS NAME:  MARK KOENIG
 3  DATE OF DEPOSITION:  NOVEMBER 17, 2022
 4  PAGE     LINE      CHANGE          REASON
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 189

```
 1      I, MARK KOENIG, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5              _____
                     MARK KOENIG
 6
 7  THE STATE OF _____ )
 8  COUNTY OF _____ )
 9      Before me, _____, on this day
10  personally appeared MARK KOENIG, known to me (or
11  proved to me under oath or through _____)
12  (description of identity card or other document) to
13  be the person whose name is subscribed to the
14  foregoing instrument and acknowledged to me that he
15  executed the same for the purposes and consideration
16  therein expressed.
17
18      Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21            _____
              NOTARY PUBLIC IN AND FOR
22
23            THE STATE OF _____
24  My commission expires: _____
25  ____ No Changes Made ____ Amendment Sheet(s) Attached
```

```
                                                        190
 1       IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                  AUSTIN DIVISION
 3   JARI MCPHERSON, JERALD    )
     SAMS, AND DANIEL MARTINEZ, )
 4                              )
             Plaintiffs,  )
 5                        ) CIVIL ACTION
     VS.                  )
 6                        ) NO.: 1:20-cv-01223-DAE
     TEXAS DEPARTMENT OF PUBLIC  )
 7   SAFETY,             )
                         )
 8          Defendant.   )
 9      REPORTER'S CERTIFICATION OF THE REMOTE ORAL
             DEPOSITION OF MARK KOENIG
10             NOVEMBER 17, 2022
11       I, Vanessa J. Theisen, a Certified
12   Shorthand Reporter in and for the State of Texas,
13   hereby certify to the following:
14        That the witness, MARK KOENIG, was duly
15   sworn by the officer and that the transcript of the
16   oral deposition is a true record of the testimony
17   given by the witness;
18        That the original deposition was delivered
19   to Mr. Drew Harris to obtain witness's signature.
20        That a copy of this certificate was served
21   on all parties and/or the witness shown herein on
22   December 8th, 2022.
23
24        I further certify that pursuant to FRCP
25   Rule 30(3) that the signature of the deponent:
```

```
                                                        191
 1        _XX_ was requested by the deponent or a
 2   party before the completion of the deposition and
 3   that the signature is to be before any notary public
 4   and returned within 30 days from date of receipt of
 5   the transcript.
 6         If returned, the attached Changes and
 7   Signature Page contains any changes and the reasons
 8   therefore:
 9        ____ was not requested by the deponent or
10   a party before the completion of the deposition.
11        I further certify that I am neither
12   counsel for, related to, nor employed by any of the
13   parties or attorneys in the action in which this
14   proceeding was taken, and further that I am not
15   financially or otherwise interested in the outcome of
16   the action.
17        Certified to by me on this, the 8th day
18   of December, 2022.
19
20       _____
         VANESSA J. THEISEN, Texas CSR, RPR
21       Texas Cert No. 3238
         Expiration Date:  10/31/23
22       Integrity Legal Support Solutions
         Firm Registration No. 528
23       9901 Brodie Ln., Ste. 160-400
         Austin, Texas 78748
24       (512) 320-8690
         www.integritylegal.support
25
```