# EX. 15

```
            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

JARI MCPHERSON,               *
JERALD SAMS, and              *
DANIEL MARTINEZ,              *
     Plaintiffs               *
                              *  CIVIL ACTION
v.                            *     NO. 1:20-cv-01223-DAE
                              *
TEXAS DEPARTMENT OF           *
PUBLIC SAFETY,                *
     Defendant.               *
```

VIDEOCONFERENCED ORAL DEPOSITION

OF

CHRISTOPHER HANSON

Monday, November 28, 2022

(REMOTELY REPORTED)

VIDEOCONFERENCED ORAL DEPOSITION OF

CHRISTOPHER HANSON, produced as a witness at the

instance of the Plaintiffs, and duly sworn, was taken in

the above-styled and numbered cause on Monday,

November 28, 2022, from 9:11 a.m. to 4:43 p.m., before

Debbie D. Cunningham, CSR, in and for the State of

Texas, remotely reported via Machine Shorthand, pursuant

to the Federal Rules of Civil Procedure.

--ooOoo--

14

1  until -- well, until -- we moved into this
2  Wilbarger address; we owned that house.  My
3  wife lived there.
4       But I got a promotion to
5  lieutenant and moved to Waco.  We have a
6  30-mile -- there was a 30-mile policy for
7  residents from our office.  So I bought a
8  camper and moved up to Waco, across from the
9  office, at an RV park there; and we kept --
10 remained keeping our house, our home in
11 Pflugerville, where my wife lived.  And I went
12 home to her on the weekends.
13      And then --
14   Q.  Okay.  So if you don't mind, if I can
15 stop you there so that you don't lose me again,
16 I want you to take me step by step.
17      What was your Waco address?
18   A.  I don't recall the exact address.  It
19 was across the street from my office, off of 35
20 at Crest, Crest Drive.  I don't even recall
21 what the name of that place was -- it had a big
22 Statue of Liberty on a sign above it -- maybe
23 Crest RV Park or something.  I don't recall the
24 address.
25   Q.  So what was -- that was an RV there

15

1  that had your address, an RV?
2   A.  Yes, sir.
3   Q.  Now, describe for the record what an
4  RV is.
5   A.  A recreational vehicle.  It was a
6  travel trailer.
7   Q.  It was a travel trailer?
8   A.  Right.
9   Q.  And were you actually living out of
10 that travel trailer?
11  A.  Yes.
12  Q.  Okay.  How many days of the week were
13 you living out of that travel trailer?
14  A.  Usually four or five days a week and
15 then I would leave on Friday after work and go
16 home to -- go back to my wife in Pflugerville
17 and then return on Monday and live there
18 through the week.
19  Q.  Okay.  So you maintained your address
20 in Waco with the RV, recreational vehicle,
21 which was on wheels, correct?
22  A.  Yes, sir.
23  Q.  And it was in a trailer park?
24  A.  An RV park.
25  Q.  An RV park.  So it didn't really have

16

1  a physical address, then, correct?
2   A.  No, it had a physical address at the
3  park.  I just don't recall what it was.
4   Q.  Okay.  If you can figure that out
5  during the course of this deposition, we would
6  greatly appreciate it, Captain.  Okay?
7   A.  Okay.
8   Q.  Provide it to your counsel; and he
9  can provide it to us, please.
10  A.  Yes, sir.
11  Q.  Hopefully, you will be able to do
12 that on rather short order at the time we take
13 a break or something like that.
14  A.  Oh, no, it shouldn't be hard.  I'll
15 probably just have to Google it.
16  Q.  Okay.  And how did you acquire that
17 physical address for an RV?
18  A.  How did I acquire it?
19  Q.  Yes, sir.
20      I mean, you didn't just create
21 it yourself, right?
22  A.  No, no.  I drove through numerous RV
23 lots, establishments, trying to find a vacancy
24 and something within the mileage restriction
25 and requirement.  And I located the one across

17

1  the street originally and it was almost within
2  view of the office, but you couldn't -- at the
3  time the guy didn't have a vacancy.  And so I
4  continued to look elsewhere and then he called
5  me and he said he had an opening there.  And so
6  I bought a camper and moved up there and put my
7  camper on the lot and paid the guy rent for, I
8  don't know, nearly two years that I lived
9  there.
10  Q.  Okay.  And what was the name of this
11 RV park?
12  A.  I think -- I don't recall exactly.  I
13 think it was Crest -- maybe Crest or Crestview.
14 Like I said, I don't remember.  It's been
15 sometime back, but I can certainly acquire that
16 during the break from Google.
17  Q.  Okay.  That would be good, Captain.
18 And how did the landlord or owner of that RV
19 park determine what your address would be?
20 What was the process?
21  A.  He picked out a slot that he had that
22 was available and told me to park my camper in
23 that slot, and that was my address.  There's an
24 overall address for the whole RV park, and then
25 there were slot numbers.

22

1  Q. Okay. And was that reflected on your
2  driver's license at the time?
3  A. No.
4  Q. Okay. Was it required to be
5  reflected on your driver's license as your
6  full-time residence?
7  A. Yes.
8  Q. Okay. But you didn't do that?
9  A. No, sir.
10 Q. And is that a violation of the law?
11     MR. HARRIS: Object to the form
12 of the question.
13 Q. (BY MR. MUNGO) You're in law
14 enforcement. You can answer that question.
15 A. Yes.
16 Q. Okay. Did you report that,
17 self-report that, to your supervisor?
18 A. No, sir.
19 Q. Isn't it required, along with meeting
20 the residency requirement and the mileage
21 criteria, to do so?
22 A. I don't know that answer.
23 Q. Did you care to explore to try to
24 determine the truth of the question that I just
25 asked you?

23

1  A. No, I did not.
2  Q. And why not?
3  A. I don't recall.
4  Q. So I understand when you say you
5  don't recall, is that because you don't
6  think -- you can't think of any thinking that
7  you engaged in at the time to consider that
8  question?
9  A. Yes, I can't think of any.
10 Q. Okay. Have you straightened that out
11 since about the address on your driver's
12 license, sir?
13 A. Yes.
14 Q. Are you going to report the fact that
15 you violated the law --
16     MR. HARRIS: Object --
17 Q. -- to your supervisor?
18     MR. HARRIS: Object to the form
19 of the question.
20 Q. (BY MR. MUNGO) You can answer, sir.
21 A. No.
22 Q. You're not. Why not?
23 A. I'm in compliance now with the
24 address requirement on the driver's license, so
25 I don't think it's relevant.

24

1  Q. Do you know the statute of
2  limitations on a -- is that a criminal or civil
3  violation, not putting your permanent address
4  on your driver's license?
5  A. It's a ticketable offense.
6  Q. It's a ticketable offense.
7     Okay. And is there points that
8  come along with that ticket?
9  A. I don't recall. I don't know.
10 Q. You don't know?
11 A. No, sir.
12 Q. All right. So you received all your
13 mail at the Pflugerville address?
14 A. I did.
15 Q. Okay. And what was the mileage to
16 your duty station from Pflugerville?
17 A. I don't know the answer to that.
18 It's approximately an hour-and-45-minute drive,
19 so.
20 Q. Okay. So what was the residency
21 mileage requirement that you were attempting to
22 meet by using this RV trailer and parking it at
23 this RV trailer park with the general address
24 and the specific parking slot?
25 A. We had a 30-mile requirement.

25

1  Q. It was a 30-mile requirement?
2  A. Yes, sir.
3  Q. And so which put you within 30 miles?
4  That meant that you had to be within 30 miles
5  of your duty station; is that correct?
6  A. Yes.
7  Q. Okay. And which put you in 30 miles
8  of your duty station, Waco or Pflugerville?
9  A. The Waco address, the Waco travel
10 trailer.
11 Q. Okay. And within how many miles did
12 the Waco address put you to your duty station?
13 A. Maybe a mile air miles.
14 Q. I'm so sorry, sir?
15 A. Maybe a mile as a crow flies.
16 Q. Oh, so you were just within a mile's
17 drive to your duty station?
18 A. Yeah.
19 Q. Okay. Very good.
20     Okay. And how many miles were
21 you out from your duty station from the
22 Pflugerville permanent address?
23 A. I don't recall the exact mileage, but
24 I know it's farther than 30 miles.
25 Q. Okay. Do you have any sense for

34

1     MR. HARRIS: Object to form.
2  A.  He came three months after I got
3  there, shortly after I got there; and then he
4  lived there after I left.
5  Q.  (BY MR. MUNGO) Any other Texas
6  Department of Public Safety personnel,
7  troopers, that resided at that RV address?
8  A.  No.
9  Q.  Are you sure?
10  A.  Not then.
11  Q.  Do you know some that's residing
12  there now?
13  A.  No, sir.
14  Q.  Well, who lives there now that you
15  know of?
16  A.  At the park?
17  Q.  Yeah. The Waco RV trailer park, yes.
18  A.  I don't know for sure of anyone that
19  lives there now unless the owner of it still
20  resides there.
21  Q.  No, no. I mean troopers, employees
22  of the Texas Department of Public Safety.
23  A.  I have no idea. I have no idea. I
24  don't know anybody there. I don't -- I don't
25  live there anymore. I've lived here for a good

35

1  deal of time.
2  Q.  Are you sure?
3  A.  Yes.
4  Q.  Is Derek Evans still a lieutenant?
5  A.  Yes.
6  Q.  Do you know whether Derek Evans has
7  claimed that location as his permanent
8  residence?
9  A.  I believe --
10     MR. HARRIS: Object to the form
11  of the question.
12  Q.  (BY MR. MUNGO) You can answer the
13  question, sir.
14  A.  I believe he did while he resided
15  there.
16  Q.  Do you know whether or not he put
17  that address -- had that address placed on his
18  driver's license?
19     MR. HARRIS: Object to form.
20  Q.  (BY MR. MUNGO) The RV trailer
21  address.
22  A.  I don't know.
23  Q.  Who was his supervisor?
24  A.  Steven Schwartz.
25  Q.  Does Steven Schwartz know that

36

1  Lieutenant Derek Evans was living at the same
2  RV park in Waco as you were?
3  A.  Yes.
4  Q.  How long, if you know, was
5  Captain Schwartz knowledgeable of this?
6  A.  From the beginning of my promotion
7  and taking the lieutenant's position up in
8  Waco.
9  Q.  Okay. From the beginning of your
10  promotion. Promotion to lieutenant?
11  A.  Yes.
12  Q.  When were you promoted to lieutenant?
13  A.  I don't recall the exact date.
14  Q.  Do you recall the year?
15  A.  I want to say either 2017 -- I just
16  don't recall. It's been too long back.
17  Q.  I understand. I suffer from that
18  malady myself.
19     Have you ever known the
20  residency mileage requirements by the Texas
21  Department of Public Safety to be varied from?
22  A.  No. Each district has their own
23  specific policy. So, in my experience, where
24  I've held duty station, I believe Region 6 is
25  still 30 miles, which is Austin, Waco, Temple,

37

1  San Antonio. Those are all 30-mile
2  requirements. And then the Capitol District
3  was made 50 miles years ago, before I got
4  there, due to location; and at that time they
5  had numerous individuals that were working as
6  troopers that worked there that lived outside
7  of that mileage restriction before they ever
8  made it a requirement that they have a mileage
9  restriction.
10     I don't recall what exact year
11  that they added -- the Capitol Police Troopers
12  originally did not have take-home vehicles.
13  So they had no mileage restriction, and they
14  added -- I don't remember, like I said, which
15  year; but they gave the -- all the vehicles to
16  the Capitol Police Troopers, they issued them
17  vehicles. At that time they made a mileage
18  restriction of 50 miles; and I think that was
19  to encompass, you know, where everybody lived
20  at that time to make sure that nobody was out
21  of compliance because they were given a car
22  before they were required to live within a
23  certain mileage of the office, so.
24  Q.  Okay. So now, back to my question:
25  Have you ever known the Texas Department of

114

1  harassment --
2      A.  No.
3      Q.  -- attempting to hug and kiss her?
4      A.  No, I don't know of a complaint being
5  filed.
6      Q.  Okay.  Did she complain to you about
7  that?
8      A.  She didn't complain to me.  She told
9  me it happened.  And I asked her what she
10 wanted me to do about it.  And she said,
11 "Nothing," that she had dealt with it.
12     Q.  Okay.  I see.  What did you do about
13 it?
14     A.  That's what I did, nothing.
15     Q.  I see.  I see.  Was that the
16 appropriate response?
17         MR. HARRIS:  Objection to the
18 form of the question.
19     Q.  (BY MR. MUNGO)  Sir, was that the
20 appropriate response?
21     A.  I don't know.
22     Q.  So do you know what your duties and
23 responsibilities are when a -- when an employee
24 comes to you and tells you they're being
25 sexually harassed?

115

1      A.  I don't know specifically.  I don't
2  know all the verbiage.
3      Q.  Do you know what your duties and
4  responsibilities are when an employee complains
5  of being harassed on the basis of race?
6      A.  No, not particularly.
7      Q.  Were you not considered an agent of
8  notice for the Texas Department of Public
9  Safety?
10         MR. HARRIS:  Object to the form
11 of the question.
12     A.  I don't know the answer to that.
13     Q.  (BY MR. MUNGO)  Oh, you never recall
14 being designated as an agent of notice?
15     A.  No, sir.
16     Q.  And that you had to report Marisela's
17 complaint of sexual harassment by
18 Lieutenant Saldivar?
19     A.  No.
20     Q.  Okay.  It isn't your testimony here
21 today that you were not responsible for taking
22 action against Lieutenant Saldivar on the basis
23 of Ms. Marisela -- I know I'm mispronouncing
24 her name -- your administrative assistant's
25 complaint against him for sexual harassment,

116

1  correct?
2      A.  It isn't my testimony.  I don't have
3  an answer to that.
4      Q.  So you're simply ignorant of your --
5  for whether or not you had any responsibilities
6  to act upon receiving that report from
7  Marisela, right?
8      A.  I don't know the answer to that.
9      Q.  So do you know the answer to whether
10 or not you know what your obligations were?
11     A.  I just answered that.  I don't know.
12     Q.  Do you remember receiving a complaint
13 or becoming knowledgeable of a complaint from
14 or by Dorinisha Livingston?
15     A.  No.
16     Q.  You were never knowledgeable of a
17 complaint being made by Dorinisha Livingston.
18 Is that your testimony here?
19     A.  About what?
20     Q.  Anything.
21     A.  Not that I recall.
22     Q.  What about racial discrimination?
23     A.  Not that I recall.
24     Q.  Okay.  What about Patrick Alonzo?
25 Are you aware of Patrick Alonzo, an

117

1  African American, just like Dorinisha
2  Livingston, an African American, who complained
3  about racial discrimination?
4      A.  Yes.
5      Q.  So you are aware that Patrick Alonzo
6  complained of racial discrimination?
7      A.  Yes.
8      Q.  How did you become aware of it?
9      A.  I'm the subject of the complaint.
10     Q.  Okay.  And what did Mr. Patrick
11 Alonzo complain that you did?
12     A.  That I disseminated racially
13 insensitive photos via text.
14     Q.  Okay.  Was that true?
15     A.  Yes.
16     Q.  Was the investigation against you
17 ever sustained?
18     A.  No, it's still in progress.
19     Q.  It's still in progress.  Okay.
20     A.  It was filed in August of this year.
21     Q.  Okay.  Patrick Alonzo also complained
22 that you, in cooperation with Captain Koenig,
23 were racially biased against
24 Lieutenant Martinez, correct?
25     A.  I don't -- that wasn't in my

258

1  valuable intelligence and bring it back to us
2  so we could prepare and be actively ready for
3  when these folks showed up.
4       Q.  And that sounds like exceptional
5  work.
6       A.  It was.
7       Q.  Wow.  Yeah, certainly above average.
8           Did you receive an award for
9  your accomplishments in 2020?
10      A.  I don't know if it was for
11 accomplishments.  I got a Regional Director's
12 Award for a situation that took place with an
13 assault on one of our Black troopers by members
14 of the crowd on the riot day.
15      Q.  And that was during the Black Lives
16 Matter assemblies, right?
17      A.  Black Lives Matter, George Floyd, a
18 number of different groups were part of that.
19      Q.  Okay.  So was the title of that award
20 that you received Excellence in
21 Countersurveillance during George Floyd
22 rallies?
23      A.  I don't recall what it exactly said
24 on it.  I know it was for taking action when
25 one of our troopers was being specifically

259

1  assaulted and gathering -- getting those folks
2  off of him, protecting his face, and later
3  gathering information via photos and such to
4  get some of them identified.
5       Q.  Okay.  Did Special Agent McPherson
6  contribute in any way to the initiative that
7  you were involved in and that resulted in your
8  award?
9       A.  Yes, sir.  After the fact of that
10 award, they put together a task force that
11 Danny was, like, the lieutenant over the task
12 force to try to identify some of the people
13 from the footages that we captured during the
14 specific rioting.  And after that, Jari was
15 able to get into one of the subversive groups
16 that was doing a lot of damage and detriment
17 and was able to correspond directly with them
18 and meet with them and helped us identify some
19 people and get information beforehand when, you
20 know, they were going to be gathering and such.
21      Q.  And all of that was part of your
22 initiatives which resulted in your award,
23 right?
24      A.  No, the award came before that.
25      Q.  I meant contributions that

260

1  Mr. McPherson may have made to any of the
2  initiatives that you engaged in that resulted
3  in your award.  Did Mr. McPherson play any role
4  in those dynamics?
5       A.  I guess.  I don't know if it resulted
6  in my award.  You know, the action that I got
7  the award for occurred before Jari was doing
8  his investigative work; but he was able to
9  identify some people as related to some of
10 those organizations.
11      Q.  Well, you just indicated, though, he
12 did exceptional work.  Did Mr. McPherson
13 receive an award for his work?
14      A.  Not that I'm aware of.  I think they
15 gave an award to some of the people on the task
16 force that participated in the task force.  I
17 don't know if he got one of those awards or
18 not.
19      Q.  Okay.  Do you think that
20 Mr. McPherson deemed an award based upon his
21 exceptional work as you described it earlier?
22      A.  It just depends on the circumstances.
23 I mean, he did a great job.  You know, they
24 don't hand out awards every day for
25 different -- you know, for everything; but he

261

1  did a good job.  I certainly recognized him.  I
2  commended him all the time and talked to him
3  about it, and I noted it in his performance
4  evaluations specifically.
5       Q.  Okay.  Now, did you use what Special
6  Agent McPherson did in 2020 on your HR 113
7  which assisted you in making Captain?
8       A.  I don't recall that.  I'm not -- I
9  don't recall.  That 113 has changed so many
10 times, I don't recall.
11      Q.  Okay.
12          MR. MUNGO:  Excuse me.  Just one
13 second.  I'm at the very end of my list here.
14 I just need to go off for just a minute.
15          THE REPORTER:  Shall I take us
16 off the record?
17          MR. HARRIS:  I think he's saying
18 he's just going to be right back, so...
19          THE REPORTER:  Okay.
20          MR. MUNGO:  Yeah, go ahead and
21 go off the record.
22          THE REPORTER:  We're going off
23 the record at 4:30 p.m.
24          (Off the record from 4:30
25      to 4:37 p.m.)

262

1    THE REPORTER: We're back on the
2  record at 4:37 p.m.
3    Q. (BY MR. MUNGO) Mr. Hanson, are you
4  aware of a lifesaving award that Justin Murphy
5  and Lieutenant Martinez were nominated to
6  receive?
7    A. I don't know if they were nominated
8  for an award, no. I know they had an event
9  where they were on the roof with a guy that was
10 going to jump, but I don't know if they were
11 nominated for one.
12   Q. You're not aware that Nate Head
13 nominated both Justin Murphy, Special
14 Agent Justin Murphy, and Lieutenant Danny
15 Martinez to receive a lifesaving award? You're
16 not aware that he nominated them?
17       MR. HARRIS: Objection, asked
18 and answered.
19   Q (BY MR. MUNGO) Go ahead, sir.
20   A. No. I know he mentioned it to chain
21 of command. I wasn't there that day, but I
22 think he witnessed it out the window or
23 something.
24   Q. Okay. So you never received a memo
25 from Mr. Head nominating Justin Murphy and

263

1  Martinez, Lieutenant Martinez, for the
2  lifesaving award? You never received a memo
3  from him? I just want to make sure your
4  testimony is clear.
5    A. Not that I recall.
6    Q. Okay. Once you receive such a
7  nomination, what are your responsibilities with
8  regard to that nomination?
9        MR. HARRIS: Object to the form
10 of the question.
11   A. If I were to get that, I would have
12 to let the chain of command know about the
13 event.
14   Q. (BY MR. MUNGO) And you would have to
15 do that within 30 days, correct?
16   A. I don't know.
17   Q. You don't know?
18   A. No, sir.
19   Q. So you don't know what your
20 responsibilities would be after receiving a
21 nomination for an award to go to special agents
22 and troopers and lieutenants within your
23 organization; is that correct?
24   A. No, not specifically.
25   Q. Okay. And you have no knowledge of

264

1  such a nomination of Justin Murphy -- I just
2  want to be clear. You have no knowledge of the
3  nomination by Nate Head of Justin Murphy and
4  Lieutenant Danny Martinez to receive a
5  lifesaving award? No knowledge at all of such
6  a nomination; is that correct?
7        MR. HARRIS: Objection, asked
8  and answered.
9    A. I don't recall that.
10   Q. (BY MR. MUNGO) You don't recall
11 that?
12   A. No, I was told about it; but I don't
13 recall ever getting anything in writing.
14   Q. Who told you about it?
15   A. Nate.
16   Q. So why didn't you act on it?
17   A. I don't know the answer to that. I
18 didn't get -- not that I recall ever getting
19 anything in writing to submit. I know I told
20 Captain Koenig about it. I wasn't sure of all
21 the details as I wasn't there.
22   Q. And Nate told you within the 30 days
23 of the event, correct?
24   A. Yes.
25   Q. And you sat on it? He told you this,

265

1  and you sat on it; is that correct? Am I
2  understanding your testimony correctly?
3    A. No, sir, I don't believe I sat on it.
4  I believe I told Mark Koenig, the captain,
5  immediately; or Nate might have brought it up
6  in front of all the lieutenants and the
7  captain.
8    Q. What evidence do you have that you
9  told Koenig about the nomination of Justin
10 Murphy and Lieutenant Danny Martinez to receive
11 the lifesaving award, sir?
12   A. I don't have any evidence.
13   Q. Is it true that you did not forward
14 this nomination for a lifesaving award in
15 writing to Captain Koenig because you harbor
16 racial animus towards persons of color?
17   A. No.
18   Q. How do you disassociate the admitted
19 racially offensive pictures that you texted out
20 over the group text from this treatment of
21 failure to forward a nomination of Justin
22 Murphy and Lieutenant Danny Martinez for a
23 lifesaving award to Captain Koenig?
24       MR. HARRIS: Objection to the
25 question.

266

```
 1    A.  I don't know the answer to that.  I
 2  don't draw a correlation at all.
 3    Q.  (BY MR. MUNGO)  All right.  And how
 4  long have you been a captain?
 5    A.  Oh, since February of this year.
 6    Q.  February of this year.
 7        And how many people, department,
 8  Texas Department of Public Safety are you
 9  supervising -- do you have supervising
10  responsibility over?
11    A.  Let's see.  Roughly twelve direct and
12  then some in between us, but I have twelve
13  under me.
14    Q.  All right.  That's it.  I'm done.
15        MR. MUNGO:  I pass the witness.
16        MR. HARRIS:  We will reserve our
17  questions for trial, and we ask that the
18  witness be given an opportunity to read and
19  sign the transcript.
20        THE REPORTER:  This concludes
21  the deposition at 4:43 p.m.
22        (Deposition concluded at 4:43 p.m.)
23            --ooOoo--
24
25
```

267

```
 1          CHANGES AND SIGNATURE
 2  WITNESS NAME:          DATE OF DEPOSITION:
 3  CHRISTOPHER HANSON          November 28, 2022
 4  PAGE/LINE    CHANGE            REASON
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

268

```
 1        I, CHRISTOPHER HANSON, have read the
 2  foregoing deposition and hereby affix my signature that
 3  same is true and correct, except as noted herein.
 4
 5            _____
 6            CHRISTOPHER HANSON
 7
 8  THE STATE OF _____  )
 9        Before me, _____, on
10  this day personally appeared CHRISTOPHER HANSON, known
11  to me (or proved to me under oath or through
12  _____) (description of identity card or other
13  document) to be the person whose name is subscribed to
14  the foregoing instrument and acknowledged to me that
15  they executed same for the purposes and consideration
16  therein expressed.
17        Given under my hand and seal of office on
18  this _____ day of _____, _____.
19
20
21         _____
22         NOTARY PUBLIC IN AND FOR
23         THE STATE OF _____
24         My Commission Expires:_____
25
```

269

```
 1  STATE OF TEXAS   )
 2         REPORTER'S CERTIFICATION
 3     I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that
 4  the witness was duly sworn and that this transcript is a
 5  true record of the testimony given by the witness.
 6     I further certify that I am neither counsel for,
 7  related to, nor employed by any of the parties or
 8  attorneys in the action in which this proceeding was
 9  taken.  Further, I am not a relative or employee of any
10  attorney of record in this cause, nor am I financially
11  or otherwise interested in the outcome of the action.
12     I further certify that pursuant to FRCP
13  Rule 30(f)(1) that the signature of the deponent was
14  requested by the deponent or a party before the
15  completion of the deposition and that the signature is
16  to be before any notary public and returned within 30
17  days from date receipt of the transcript.  If returned,
18  the attached Changes and Signature Page contains any
19  changes and the reasons therefore.
20     Subscribed and sworn to by me this day,
21  December 20, 2022.
22         _____
           Debbie D. Cunningham, CSR
23         Expiration:  6/30/23
           INTEGRITY LEGAL SUPPORT SOLUTIONS
24         9901 Brodie Ln, Ste. 160-400
           Austin, Texas 78748
25         www.integritylegal.support
           512-320-8690; FIRM # 528
```