# EX. 17

```
             IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

JARI MCPHERSON,                    *
JERALD SAMS, and                   *
DANIEL MARTINEZ,                   *
     Plaintiffs                    *
                                   *  CIVIL ACTION
v.                                 *     NO. 1:20-cv-01223-DAE
                                   *
TEXAS DEPARTMENT OF                *
PUBLIC SAFETY,                     *
     Defendant.                    *
```

VIDEOCONFERENCED ORAL DEPOSITION

OF

RAMIRO SALDIVAR

Wednesday, February 1, 2023

(REMOTELY REPORTED)

VIDEOCONFERENCED ORAL DEPOSITION OF RAMIRO SALDIVAR, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on Wednesday, February 1, 2023, from 9:13 a.m. to 2:02 p.m., before Debbie D. Cunningham, CSR, in and for the State of Texas, remotely reported via Machine Shorthand, pursuant to the Federal Rules of Civil Procedure.

--ooOoo--

42

1  you?
2     A.  That there's no tolerance for that in
3  the workplace.
4     Q.  Which means what happens when it
5  occurs?  What are the consequences when it
6  occurs if there's a zero tolerance?
7     A.  There's an investigation.  Then after
8  the investigation, there are some type of
9  punitive outcomes; and then based on those
10 outcomes, there's a determination.  It varies.
11 I'm not sure -- I can't really say what that
12 outcome would be until the investigation is
13 concluded.
14    Q.  Yeah, but --
15    A.  It could --
16    Q.  Yeah, go ahead.
17    A.  It could be up to termination, but it
18 varies.
19    Q.  Okay.  And that policy and other
20 policies adopted by and enforced at that time
21 that you had this incident occurred with --
22 between yourself and Marisela Reynaga called
23 for you to report that, correct?
24    A.  Yes, sir.
25        MR. HARRIS:  Object to the form

43

1  of the question.
2     Q.  (BY MR. MUNGO)  Okay.  And it also
3  called for Lieutenant Hanson to report that
4  incident, correct?
5        MR. HARRIS:  Object to the form
6  of the question.
7     A.  Yes.
8     Q.  (BY MR. HARRIS)  Okay.  And your
9  testimony here today is that neither one of you
10 reported that up the chain of command, correct?
11       MR. HARRIS:  Object to the form
12 of the question.
13    A.  I didn't report it because she told
14 me that she was not going to make a big deal
15 out of it and that she was not going to file
16 anything against me.  She just wanted to bring
17 it to my attention.
18    Q.  (BY MR. MUNGO)  My only question is,
19 sir:  You did not report it, correct, up the
20 chain, correct?
21       MR. HARRIS:  Object to the form
22 of the question.
23    A.  Yes.
24    Q.  (BY MR. MUNGO)  Yes, you did not
25 report it, correct?

44

1     A.  Yes.
2     Q.  Okay.  And neither did Chris Hanson
3  report that incident of sexual harassment by
4  you of Marisela Reynaga up the chain of
5  command, correct?
6        MR. HARRIS:  Object to the form
7  of the question.
8     A.  Not to my knowledge, no.
9     Q.  So not to your knowledge.
10       If Chris Hanson had reported it
11 up the chain of command, the chain of command
12 was obligated to institute an investigation,
13 correct?
14       MR. HARRIS:  Object to the form
15 of the question.
16    Q.  (BY MR. MUNGO)  Correct?
17    A.  Yes, sir.
18    Q.  Okay.  According to Texas Department
19 of Public Safety's policies.
20       And you know that that never
21 occurred, correct?
22    A.  Yes, sir.
23    Q.  Okay.  And so that means that if
24 Lieutenant Hanson, as an agent of notice, as
25 were you, did report that up the chain of

45

1  command, the chain of command did not follow
2  agency policy, specifically 18.25 of the
3  general manual, citing and calling for zero
4  tolerance for sexual harassment, correct?
5     A.  Yes, sir.
6     Q.  Okay.  Did Captain Koenig have
7  knowledge of this incident, Marisela Reynaga's
8  complaint of your sexual harassment against
9  her?
10       MR. HARRIS:  Object to the form
11 of the question, calls for speculation.
12    A.  I do not know.
13    Q.  (BY MR. MUNGO)  Captain Koenig and
14 Chris Hanson were very close, were they not?
15       MR. HARRIS:  Object to the form
16 of the question, calls for speculation.
17    A.  I believe so.
18    Q.  (BY MR. MUNGO)  Okay.  In fact, to
19 your knowledge, they were really close friends,
20 correct?
21    A.  Yes, sir.
22    Q.  Do you recall the incident in which
23 Belinda Pedroza filed and/or voiced, one or the
24 other and maybe even both, a discrimination
25 complaint against Rebecca Butler, who was her

46

1  supervisor at that time?
2       MR. HARRIS:  Object to the form
3  of the question.
4     A.  Yes.
5     Q.  (BY MR. MUNGO)  And did you report
6  that up the chain?
7     A.  Yes, I did.
8     Q.  Who did you report that to?
9     A.  Mark Koenig.
10    Q.  You reported it to Mark Koenig.
11        And what became of that
12 complaint?
13    A.  I'm not sure, sir.  I just know that
14 I reported it up, and I'm not sure if it was
15 investigated or not.  I'm not aware of any.
16    Q.  Actually, you did not report that to
17 Koenig, did you?  You actually reported it to
18 Rebecca Butler; isn't that true?
19    A.  No, I reported it to Mark Koenig; and
20 then Mark Koenig asked me why I was reporting
21 it to him when it should be reported to, I
22 guess, her division, which is a different
23 division.
24    Q.  So Mark Koenig, as far as you know,
25 did not take any action reporting that up the

47

1  chain, correct?
2     A.  I don't know.  That's correct.
3     Q.  That's what I'm asking you.  As far
4  as you know, Mark Koenig didn't take any action
5  to report that up the chain, correct?
6     A.  I don't know.  That's the thing, I
7  don't know.  I don't know if he did or did not.
8     Q.  Yeah, that's my question to you is
9  that don't know, correct?
10        MR. HARRIS:  Objection, asked
11 and answered.
12    Q.  (BY MR. MUNGO)  Sir?
13    A.  Correct.
14    Q.  Okay.  All right.  And you don't know
15 what -- and you also reported it to Rebecca
16 Butler, correct?
17    A.  Correct.
18    Q.  And you call yourself, in doing so,
19 giving Rebecca Butler a heads-up, correct?
20    A.  Correct.
21    Q.  So why didn't you report that -- if
22 Koenig told you you didn't report it to the
23 right person, he left it up to you now to take
24 it up the chain now in, what, another division,
25 was it?  Did you say that, another division?

48

1     A.  Yes, sir.
2     Q.  Okay.  But you didn't do that, did
3  you?
4     A.  Because I notified my chain of
5  command.  That's why.  And I believe -- if I
6  remember, I believe that Mark Koenig did report
7  it to Nathanael Haddox because I was CC'd on
8  that e-mail.  Nathanael Haddox is our EEO
9  representative.
10    Q.  And you don't have a copy of that
11 e-mail with you today, do you, sir?
12    A.  No, sir.
13    Q.  Okay.  So you said a moment ago that
14 you didn't know whether or not Captain Koenig
15 reported that complaint of discrimination by
16 Belinda Pedroza against Rebecca Butler up the
17 chain; but now, you're saying he did.  Am I --
18    A.  I remembered.  Yes, sir, I
19 remembered that there was an e-mail that was
20 generated to Nathanael Haddox, not up the chain
21 but to Nathanael Haddox, by Mark Koenig about
22 the incident.
23    Q.  Okay.  And that was after you had
24 given Rebecca Butler a heads-up, correct?
25    A.  Correct.

49

1     Q.  Okay.  Why didn't you go -- instead
2  of giving Rebecca Butler a heads-up, why did
3  you not go to someone above her or someone
4  outside of her chain of command?
5     A.  Well, I didn't give her a heads-up.
6  It was more like, "Watch what you say in front
7  of Belinda."  I guess that's what you can say a
8  heads-up; but I didn't report it above her
9  chain of command because I reported it to my
10 immediate chain of command, which is Mark
11 Koenig.
12    Q.  And he gave you direction to go to
13 her chain of command, didn't he?
14    A.  He didn't have a direction.  He
15 didn't tell me to do that.  He just said, "Next
16 time do that."  And he's the one that e-mailed
17 Nathanael Haddox.
18    Q.  Okay.  All right.  So why did you
19 tell Rebecca Butler to be careful what she says
20 around Belinda Pedroza?  How was that going to
21 help anything?
22    A.  I wasn't trying to help anything.  I
23 was just telling her, "Watch what you say as a
24 supervisor."
25    Q.  So then let me make sure I understand

150

1  report it to my captain; and then it goes up.
2  So the captain was part of that text group.  He
3  had been notified.
4      Q.  But the captain clearly -- even if
5  what you're saying was true -- the captain was
6  a part of all those texts, the trail of text
7  messages, correct?
8      A.  Yes, sir.
9      Q.  But you still didn't report Hanson.
10 Why treat Hanson more favorably than McPherson?
11 The question is still there.
12         MR. HARRIS:  Object to the form
13 of the question.
14     A.  Again, I reported McPherson to my
15 captain because it's something that I heard so
16 that they can take a look into it.  If I was to
17 report Hanson to my captain, they would have
18 taken a look into it.  If the captain was aware
19 of those pictures, why would I need to report
20 them to the captain if he's part of the
21 conversations?
22     Q.  (BY MR. MUNGO)  Did you ever talk
23 negatively about Mr. McPherson --
24     A.  No, sir.
25     Q.  -- to other department employees?

151

1      A.  No, sir.  I actually like Jari a lot.
2      Q.  But Mr. McPherson filed a complaint
3  on you based on that conduct, correct?
4      A.  Yes, sir.
5      Q.  But you're saying that conduct never
6  occurred, saying that Mr. McPherson was wrong
7  in his allegations against you, that it never
8  occurred?
9      A.  Well, the allegation was made.  There
10 was an investigation that was done, and the
11 investigation concluded that no further action
12 needs to be taken.  I was never part of that
13 investigation.  I was never involved.  By the
14 time they concluded that investigation, they
15 had already deemed that allegation as not
16 needing to be looked at.
17     Q.  Did you ever apologize to
18 Mr. McPherson for listening to everyone else
19 when Mr. McPherson first got to Region 7?
20         MR. HARRIS:  Object to the form
21 of the question.
22     A.  I never apologized for stuff that was
23 said.  I just apologized in the form that, hey,
24 whatever I knew about him was untrue; and,
25 therefore, we got off on the wrong foot.

152

1  That's what I was apologizing for, getting off
2  on the wrong foot.
3          MR. HARRIS:  Hold on.  Another
4  witness has --
5          MR. MUNGO:  Go ahead.  Go ahead.
6          MR. HARRIS:  It is 1:30, and so
7  we need to pause.
8          MR. MUNGO:  I'm not done.
9          MR. HARRIS:  I need to deal with
10 the next witness.
11         MR. MUNGO:  Well, we can talk
12 about that, since I'm not done, off the record.
13         THE REPORTER:  We're going off
14 the record at 1:28 p.m.
15         (Off the record from 1:28 to 1:29 p.m.)
16         THE REPORTER:  We're back on the
17 record at 1:29 p.m.
18     Q.  (BY MR. MUNGO)  So you apologized to
19 McPherson for treating him badly without you
20 ever getting to know him; isn't that correct?
21         MR. HARRIS:  Object to the form
22 of the question.
23     A.  No, that's not what I said.  I said
24 that I apologized for starting off on the wrong
25 foot with him.

153

1      Q.  (BY MR. MUNGO)  What do you mean,
2  starting off on the wrong foot?  Explain that
3  for the record.
4      A.  Well, when he got here, you know, he
5  came here with issues that, I guess, happened
6  to him in Temple or Killeen, the Region 6 area.
7  And so, when he got here, I was told he should
8  have been reporting to me on the 1st; and he
9  didn't.  I guess that there was some
10 miscommunication or whatever, and that created
11 some friction right off the bat.  And so that's
12 why, you know, we started off on the wrong
13 foot; and that's how it went.
14         I don't have any animosity
15 towards Jari, even after the complaint happened
16 and I was made aware of what was on that
17 complaint and whatnot.  And I just told him,
18 "Hey, man, I'm sorry you felt that way."  And
19 we went from there.  I didn't take anything
20 personal.
21     Q.  Who told you what happened with
22 McPherson in Killeen?
23     A.  He did.
24     Q.  He told you about that.  You didn't
25 hear anything about that before he told you,

**166**

1  speculative; but, yes, it's a fair assumption
2  to say that.
3    Q.  (BY MR. MUNGO)  And, really, Mark
4  Koenig treated you like crap, in a way of
5  expression.  Would you agree with that?  Is
6  that a fair statement?
7    A.  I agree, yes, sir.
8    Q.  And you don't believe that your race
9  had anything to do with that?
10   A.  I would hope not, no, sir.
11   Q.  But you don't know?
12   A.  I do not know, yes, sir.
13   Q.  It would be a fair statement to say
14  that it may possibly be one of the reasons,
15  correct?
16      MR. HARRIS:  Object to the form
17  of the question.
18   Q.  (BY MR. MUNGO)  It would be a fair
19  statement?
20      MR. HARRIS:  Object to the form
21  of the question.
22   A.  Again, I don't know.
23   Q.  (BY MR. MUNGO)  No, you don't know;
24  but is it a fair statement to say possibly it
25  could be one of the reasons?

**167**

1    A.  I don't know.  I would hope not, but
2  I don't know.
3    Q.  Didn't you go to Mr. Martinez and
4  literally cried and vented with him about how
5  you were being treated by Koenig?
6    A.  I don't think I cried, but I did have
7  a lot of conversations with Danny Martinez
8  about how I was treated by Mark Koenig.  I
9  don't think I've ever cried.  I have cried when
10  speaking to Mark Koenig, but not to Danny
11  Martinez.
12   Q.  And you don't feel that Koenig
13  harbors any racial animus towards people of
14  color?
15   A.  Again, I don't know.  I'm hoping not,
16  but I don't know.
17   Q.  Okay.  So it is among the possible
18  reasons why you were mistreated and why he
19  mistreated Danny Martinez.  Would that be a
20  fair statement?
21      MR. HARRIS:  Object to the form
22  of the question.
23   Q.  (BY MR. MUNGO)  Would that be a fair
24  statement?
25   A.  Again, I don't know; but I hope not.

**168**

1    Q.  Okay.  So I'm not saying -- asking
2  you do you know.  I'm asking:  Would it be a
3  fair statement to say that your race and Danny
4  Martinez's race would be among the possible
5  reasons why you and Danny Martinez were treated
6  so badly by Mark Koenig?  That's all I'm
7  asking.  Is it a fair statement?
8      MR. HARRIS:  Objection.  He's
9  already answered the question he doesn't know.
10   Q.  (BY MR. MUNGO)  Do you understand I'm
11  not asking you if you know that?  I'm asking
12  you:  Would that be a fair statement that race
13  could be one of the reasons why you and Danny
14  Martinez was treated so badly, unfairly, by
15  Mark Koenig?
16      MR. HARRIS:  Object to the form
17  of the question.
18   Q.  (BY MR. MUNGO)  Would that be a fair
19  statement?
20   A.  I believe that -- yes, we are both
21  Hispanics; but I don't believe it was based on
22  our race.
23   Q.  But the point is that you don't know
24  that it was based on your race, correct?
25   A.  That is correct.

**169**

1      MR. HARRIS:  Asked and answered.
2    Q.  (BY MR. MUNGO)  And the fact you
3  don't know means it's possible that race was
4  one of the reasons, right; is that fair to say?
5      MR. HARRIS:  Asked and answered.
6  You're trying to get a sound bite out of him.
7  He's already given you his answer that he
8  doesn't know.
9    Q.  (BY MR. MUNGO)  All right, sir.  You
10  understand my question.  You've said that you
11  don't know a number of times.  All I'm asking
12  is:  That means it's possible that race could
13  be one of the reasons.  That's fair, right?
14   A.  My answer is:  I don't believe it has
15  anything to do with race.
16   Q.  Well, but you don't know is the
17  point, correct?
18      MR. HARRIS:  At this point
19  you're just arguing with him.
20   Q.  (BY MR. MUNGO)  Is that correct?
21      MR. HARRIS:  He's already
22  answered the question.
23   Q.  (BY MR. MUNGO)  Sir, is it fair to
24  say you don't know?
25   A.  I don't know.

170

1  Q.  Okay.  Do you believe that
2  Captain Koenig showed favoritism to a
3  lieutenant who is now a captain, Chris Hanson?
4  A.  Yes, sir.
5  Q.  Did Captain Koenig give you favorable
6  evaluations?
7  A.  No, sir.
8  Q.  If not, why do you feel that you were
9  given less-than-favorable evaluations?
10  A.  For actions that I've taken.
11  Q.  Do you believe that the department,
12  Texas Department of Public Safety, has a
13  good-old-boy system as pertains to the hiring
14  process and promotions?
15      MR. HARRIS:  Object to the form
16  of that question.
17  A.  No, sir, I don't believe that.
18  Q.  (BY MR. MUNGO)  Do you believe the
19  good-old-boy system supports African Americans?
20  A.  I believe the promotional system is a
21  system that has flaws, but it's a promotional
22  system that the department has that we have to
23  abide by and play with.
24  Q.  Did Hanson ever complain of
25  mistreatment from Koenig?

171

1      MR. HARRIS:  Object to the form
2  of the question.
3  A.  Not to me, no, sir.
4  Q.  (BY MR. MUNGO)  And they are both
5  White males, correct?
6  A.  Yes, sir.
7  Q.  Would you say that Mark Koenig and
8  Chris Hanson benefitted tremendously throughout
9  their career paths from being part of that
10  group of good old boys?
11      MR. HARRIS:  Object to the form
12  of the question.
13  A.  Without knowing their career paths
14  and their backgrounds, I can't answer that.
15  Q.  (BY MR. MUNGO)  Do you think that
16  they benefitted tremendously throughout their
17  careers because they were White in terms of
18  promotions and other kinds of favorable
19  treatment?
20  A.  I don't believe so.
21  Q.  Why haven't you competed for
22  promotional opportunities to captain?
23  A.  I don't believe in competing for a
24  position I'm not ready for.
25  Q.  Would you say that Chief Floyd

172

1  Goodwin is a part of a group that have
2  benefitted in terms of his career because he is
3  White?
4  A.  Again, I don't know any career path
5  or background on Goodwin to make a
6  determination either way.
7  Q.  Do you feel that the Texas Department
8  of Public Safety handles all investigations,
9  including C-1s against White employees, the
10  same as they do minority employees?
11      MR. HARRIS:  Object to the form
12  of the question.
13  A.  I believe that all investigations of
14  allegations are taken seriously and the
15  investigators do a good job diligently to
16  investigate all allegations whether --
17  regardless of race or gender.
18  Q.  (BY MR. MUNGO)  Do you feel that
19  minorities are afforded equal opportunity to
20  promote as their White counterparts?
21  A.  Yes, sir, I believe so.
22  Q.  Do you believe that minorities in DPS
23  receive C-1s for fraudulent or minor violations
24  and that White counterparts don't?
25  A.  Can you repeat that?

173

1  Q.  Yes.  Do you believe that minorities
2  in the Texas Department of Public Safety
3  receive C-1s for fraudulent or minor violations
4  that their White counterparts do not?
5  A.  I do not know.
6  Q.  Do you believe that C-1s block
7  minorities from future promotions?
8  A.  I believe the current promotional
9  system where you have to disclose a C-1 does
10  block you from promotional opportunities, yes,
11  sir.
12  Q.  I talked to you about complaints
13  being filed against you by Belinda Pedroza and
14  Marisela Reynaga.  Were any other such
15  complaints filed against you?
16  A.  No, sir.
17  Q.  Okay.  Do you recall
18  Lieutenant Martinez being mocked and over-
19  looked -- or mocked and being called a new
20  idea fairy?
21  A.  I don't recall that, no, sir.
22  Q.  You've never said that about
23  Lieutenant Martinez?
24  A.  No.
25      MR. MUNGO:  Okay.  Give me just

174

1  one moment, please.
2       (Brief pause.)
3       MR. MUNGO:  Okay.  Drew, pass
4  the witness.  Thank you very much,
5  Mr. Saldivar.
6       THE WITNESS:  Thank you.
7       THE REPORTER:  Mr. Harris, do
8  you have any questions of the witness?
9       MR. HARRIS:  No, we'll reserve;
10 but the witness would like the opportunity to
11 review and sign the deposition.
12      THE REPORTER:  And do you need a
13 copy of the transcript?
14      MR. HARRIS:  Yes.
15      MR. MUNGO:  Yes.
16      THE REPORTER:  This concludes
17 the deposition at 2:02 p.m.
18      (Deposition adjourned at
19 2:02 p.m.)
20          --ooOoo--

175

1            CHANGES AND SIGNATURE
2  WITNESS NAME:         DATE OF DEPOSITION:
3  RAMIRO SALDIVAR          February 1, 2023
4  PAGE/LINE   CHANGE           REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

176

1       I, RAMIRO SALDIVAR, have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted herein.
4
5       _____
6       RAMIRO SALDIVAR
7
8  THE STATE OF _____ )
9       Before me, _____, on
10 this day personally appeared RAMIRO SALDIVAR, known to
11 me (or proved to me under oath or through
12 _____) (description of identity card or other
13 document) to be the person whose name is subscribed to
14 the foregoing instrument and acknowledged to me that
15 they executed same for the purposes and consideration
16 therein expressed.
17      Given under my hand and seal of office on
18 this _____ day of _____, _____.
19
20
21      _____
22      NOTARY PUBLIC IN AND FOR
23      THE STATE OF _____
24      My Commission Expires:_____
25

177

1  STATE OF TEXAS   )
2         REPORTER'S CERTIFICATION
3    I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that
4  the witness was duly sworn and that this transcript is a
5  true record of the testimony given by the witness.
6    I further certify that I am neither counsel for,
7  related to, nor employed by any of the parties or
8  attorneys in the action in which this proceeding was
9  taken.  Further, I am not a relative or employee of any
10 attorney of record in this cause, nor am I financially
11 or otherwise interested in the outcome of the action.
12    I further certify that pursuant to FRCP
13 Rule 30(f)(1) that the signature of the deponent was
14 requested by the deponent or a party before the
15 completion of the deposition and that the signature is
16 to be before any notary public and returned within 30
17 days from date receipt of the transcript.  If returned,
18 the attached Changes and Signature Page contains any
19 changes and the reasons therefore.
20    Subscribed and sworn to by me this day,
21 February 16, 2023.
                          _____
22           Debbie D. Cunningham, CSR
             Expiration:  6/30/23
23           INTEGRITY LEGAL SUPPORT SOLUTIONS
             9901 Brodie Ln, Ste. 160-400
24           Austin, Texas 78748
             www.integritylegal.support
25           512-320-8690; FIRM # 528