# Ex. 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
JARI MCPHERSON, JERALD        )
SAMS, AND DANIEL MARTINEZ,    )
                              )
            Plaintiffs,       )
                              ) CIVIL ACTION
VS.                           )
                              ) NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC    )
SAFETY,                       )
                              )
            Defendant.        )
```

-----------------------------------

REMOTE ORAL DEPOSITION OF

JEREMIAH RICHARDS

11/18/2022

-----------------------------------

REMOTE ORAL DEPOSITION OF JEREMIAH RICHARDS,

produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on November 18, 2022,

from 1:10 p.m. to 6:05 p.m., via Zoom, before Vanessa

J. Theisen, CSR in and for the State of Texas,

reported by machine shorthand, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached hereto.

22

```
 1      Q.  Okay.  Do you have any recollection of any
 2   of those events?
 3      A.  He did a few -- one for the agricultural
 4   commission.  I remember that event.  There were
 5   several others here and there.  I know he went to the
 6   Valley and the border and participated in an event
 7   down there as well.
 8      Q.  Uh-huh.
 9      A.  I'm not sure if we made it to Mardi Gras
10   that year or if -- I cannot recall if we went to help
11   out in Galveston or not.
12      Q.  Okay.
13      A.  I know we did with motors, but I cannot
14   recall about mounted.
15      Q.  Okay.  Is that the extent of your
16   recollection of Mr. Sams participating in events or
17   representing the mounted unit there from Region 7,
18   sir?
19      A.  Yes, sir.  As well as funerals and Memorial
20   Day -- he's often at memorial events as well.
21      Q.  Okay.  And you -- as far as your
22   recollection goes, he performed well when executing
23   those duties and assignments, correct?
24      A.  Yes, sir, to the best of my knowledge.
25      Q.  Okay.  So you just articulated some specific
```

23

```
 1   areas of caring for and nurturing of horses that
 2   Mr. McPherson was engaged in while a member of the
 3   mounted unit.
 4           How would you rank his level of skill in
 5   that regard with regard to caring for horses?
 6           MR. HARRIS:  Object to the form of the
 7   question.  Hold on.  Let me get my objection in.
 8           THE WITNESS:  Okay.
 9           MR. MUNGO:  I don't know.  I think you
10   guys overtalked each other.  Drew, you may have to do
11   that again.
12           MR. HARRIS:  All right.  Object to the
13   form of the question.  I think you referenced
14   McPherson in the question.
15           MR. MUNGO:  Oh, I did?  Okay.  Well,
16   see, I'm glad I asked you to clarify that one.  So --
17   and that can tend to happen when you have got more
18   than one client.
19      Q.  (BY MR. MUNGO)  So that question pertains to
20   Mr. Sams and not Mr. McPherson, sir.
21      A.  Can you repeat the question?
22           MR. MUNGO:  Court reporter, read it back
23   exactly, please.  Except don't use "McPherson."
24           THE REPORTER:  Whose name would you like
25   for me to use instead of McPherson?
```

24

```
 1           MR. MUNGO:  Sams.
 2           THE REPORTER:  Sams, okay.  "So you just
 3   articulated some specific areas of caring for and
 4   nurturing of horses that Mr. Sams was engaged in
 5   while a member of the mounted unit.  How would you
 6   rank his level of skill in that regard with regard to
 7   caring for horses?"
 8      A.  I would say that he ranked high.
 9      Q.  (BY MR. MUNGO)  Ranked high.  Is anyone else
10   that you recollect having skills -- a skill set for
11   caring for horses, sir, caring for and nurturing
12   horses, that would be ranked as high as
13   Mr. McPherson's skill level?
14           MR. HARRIS:  Object to the form of the
15   question.  You can answer.
16      Q.  (BY MR. MUNGO)  Not -- did I say Sams?  Did
17   I say McPherson again -- I think I did -- for Sams?
18      A.  Can you repeat the question?  And are you
19   specific to the mounted unit?
20      Q.  Yes, sir.
21      A.  Actually, you don't have to repeat the
22   question.
23           Specific to the mounted unit, I know
24   Cynthia Sparks is also in the unit.  I know she was
25   very well -- very capable and good at doing the job.
```

25

```
 1   Dexter Freeman was fairly new to the unit, and George
 2   Dominguez as well, so I don't know -- obviously,
 3   usually Sams took the lead, along with Cynthia, and
 4   the only other unit -- or member on that unit while I
 5   was there during that time, he had left to go to
 6   SWAT, so I didn't have any time to evaluate him.
 7      Q.  Okay, okay.  So then you said Sams --
 8   Mr. Sams led that unit of those who were most highly
 9   skilled.  Is that correct?
10      A.  Correct.
11           MR. HARRIS:  Object to the form of the
12   question.
13      Q.  (BY MR. MUNGO)  Okay.  And did you -- well,
14   first of all, who was it that designated Mr. Sams to
15   lead that unit of the most skilled personnel in the
16   mounted unit?
17      A.  I do not know.  I was not there at the time
18   of the selection.
19      Q.  Okay, okay.  But when you arrived in Region
20   7, Mr. Sams was still the person who was leading that
21   group of highly skilled individuals.  Is that
22   correct?
23      A.  No, sir, he was not.
24      Q.  He was not.  Who was leading that group at
25   that time?
```

26

1    A. I believe Lieutenant Virgil Verduzco was
2  stepping into that role while an investigation was
3  concluding that initiated prior to my arrival, and
4  Sams was not allowed to supervise the unit until the
5  conclusion of that investigation.
6    Q. Okay.
7        THE REPORTER: Can you -- hang on. Can
8  you say the name again?
9        THE WITNESS: Virgil Verduzco,
10  Lieutenant.
11        THE REPORTER: Thank you.
12    Q. (BY MR. MUNGO) Okay. And we're going to
13  talk about that in just a moment, Captain. But I
14  want to go back and make sure the record is clear
15  with regard to your understanding and how you came to
16  the knowledge that Mr. Sams was one of the more
17  skillful persons with regard to the handling and
18  caring for the horses in that unit.
19        How did you come to that knowledge?
20    A. Watching him operate the horses themselves.
21  Also just from what I had heard, him being, you know,
22  well -- good at selecting the animals. He also was a
23  farrier and was able to trim the horse's hooves,
24  which not all riders can do.
25        Other than that, just speaking with him

27

1  and hearing about his ideas and knowledge of the unit
2  in the mounted.
3    Q. Okay, okay. Did Mr. Sams ever engage in
4  helping to develop the protocol for the operation of
5  that mounted unit?
6    A. Yes, sir. He provided great input into the
7  initial draft of the SOP for the unit.
8    Q. So was this -- and for the record -- I think
9  I know what you mean when you say "SOP," but for the
10  record, can you explain what an SOP is? And then I
11  want you to talk about the SOP as it specifically
12  applied to and related to that mounted unit.
13    A. SOP stands for standard operating
14  procedures. And the SOP lays out specifically what
15  the unit does; its intent, its mission.
16        It also depicts how to care for the
17  animals, what will occur when certain things happen,
18  selection of members of the unit, and selection of
19  the horses for the unit.
20    Q. Okay. And prior to Mr. Sams -- how was that
21  SOP, by the way? Have you ever had a chance to read
22  it?
23    A. I did.
24    Q. And what was your opinion of that SOP?
25    A. We read over it and, working with Jerald,

28

1  created a good portion of it, presented it to Victor
2  Taylor, who was the public informations officer
3  sergeant there at the facility at the capitol who
4  worked to tailor the draft to make corrections to it.
5  And we discussed and made several corrections over
6  the year I was there. And it doesn't look anything
7  like we started out with now, but...
8    Q. Okay. What kind of corrections was made to
9  Mr. Sams' original draft?
10    A. I can't recall.
11    Q. Okay. And so was Mr. Sams a part of that
12  ongoing process of editing that original draft?
13    A. As far as I know, him and Victor Taylor were
14  working together with my and Major Chris Jones's
15  input.
16    Q. Okay. So it would be accurate to state that
17  Mr. Sams was involved in developing that SOP from
18  beginning to end, correct?
19    A. No, sir.
20    Q. No? Tell me why. Explain to me why he was
21  not and at what point he ceased to become involved in
22  developing and perfecting that SOP.
23    A. Well, as I stated, the SOP to date, as I
24  have seen it, though I'm not over that unit, is much,
25  much larger and has been re-evaluated and revamped

29

1  many times. So to say he was part of it until it was
2  perfected is inaccurate in the fact that it is much
3  more in depth now and much, much better product now
4  than it started out in its inception.
5    Q. I see, I see. And still undergoing some
6  edits, I would imagine, and improvements?
7    A. I'm sure.
8    Q. Okay, all right. So do you know how
9  Mr. Sams became involved in first developing the
10  draft of that SOP?
11    A. As the corporal over the unit, of course we
12  requested his input on the initial draft. But there
13  were changes that we made that we tended to attempt
14  to mirror -- the canine SOP, which was already
15  established and approved -- in order to ensure that
16  we were covering all bases that needed to protect the
17  personnel on the unit, the animals themselves, and
18  the department as well.
19    Q. So if I understand your testimony correctly,
20  you were not there when Mr. Sams first began work on
21  the initial draft of the SOP for the mounted unit,
22  correct?
23    A. I do not know when -- if he first supplied
24  the initial draft while I was there or if I had just
25  come into, again, helping to edit it upon my arrival.

30

1 I cannot recall.
2    Q. I understand.  Do you know how long
3 Mr. Sams -- up to the point which you arrived, how
4 long Mr. Sams had been a member of that mounted unit?
5    A. I do not know off the top of my head, no.
6    Q. Okay.  Did it ever -- had anyone ever
7 discussed with you why Mr. Sams was running point on
8 developing that SOP?
9    A. Other than him being the corporal over the
10 unit and very experienced, no, sir.
11    Q. Okay, okay.  And at that point in time, he
12 had -- well, strike that.
13        There came a time in which the TSP
14 determined that there need be a sergeant placed in
15 charge of that mounted unit.  Is that correct?
16    A. Who determined?
17    Q. The Texas state police.
18    A. Okay.  I'm sorry.  We don't --
19        MR. HARRIS:  Object to the form of the
20 question.  Are you referring to DPS?
21        MR. MUNGO:  Department of public safety?
22 The Texas state police?
23        THE WITNESS:  We are not generally
24 referred to as Texas state police.  Texas Department
25 of Public Safety or Texas Highway Patrol.

31

1        MR. MUNGO:  Okay.  DPS.
2    Q. (BY MR. MUNGO)  So answer the question as it
3 relates to the DPS.
4    A. Can you read the question, please?
5        MR. MUNGO:  Ma'am Court Reporter, could
6 you read that back, please.
7        THE REPORTER:  Okay.  Would you like for
8 me to replace DPS for TSP?
9        MR. MUNGO:  Yes.
10        THE REPORTER:  Okay.  "There came a time
11 in which the DPS determined that there need be a
12 sergeant placed in charge of that mounted unit.  Is
13 that correct?"
14    A. Correct.
15    Q. (BY MR. MUNGO)  And were you there when the
16 postings for promoting into that sergeant position
17 was posted by the DPS?
18    A. I was.
19    Q. Okay.  Do you know who developed the
20 postings, the content of the posting, who was
21 responsible for that?
22    A. Our human resources promotions division.
23    Q. Okay.  And did they develop those postings
24 separate and apart from the input of the district
25 commander?

32

1    A. Not separate and apart.  We provide them
2 with the position that we want posted, and they post
3 it.
4    Q. Okay.  So how much input did you have in
5 developing the description for that particular
6 position, sergeant supervisor over the mounted unit?
7    A. Some.
8    Q. Okay.  Can you articulate into the record,
9 sir, what your role was and how much input you had in
10 that process?
11    A. Basically, we advised them we had a position
12 open for sergeant mounted, and we advised them that
13 it would be a two-year commitment upon selection.
14    Q. Okay.
15    A. As well as the specifics spelled out in the
16 standard operation procedures of an evaluation
17 process that would take place.  The rest of the
18 verbiage is typically inputted by human resources.
19    Q. Okay.  Correct me if I'm wrong, but at that
20 time you were also a district commander over the
21 canine unit for Region 7?
22    A. Yes, sir.
23    Q. During that same period of time, correct?
24    A. Yes, sir.  They're part of the same
25 district.

33

1    Q. Okay.  During that period of time, had you
2 posted any opportunities for a promotion to a
3 sergeant position for the canine unit?
4    A. No, sir.
5    Q. Okay.  Were you there in the capacity of
6 district commander over Region 7 when any postings
7 for promotion into the position of sergeant for the
8 canine unit?
9    A. No, sir.
10    Q. Okay.  Were you aware of what the criteria
11 was for promotion into the sergeant position for the
12 canine unit?
13    A. While I have seen such postings throughout
14 my career, I do not recall.
15    Q. Okay, no problem.  But you are aware and
16 familiar with the posting for the sergeant position
17 for the canine unit, correct?
18    A. I'm not understanding your question.
19    Q. During the time you served as district
20 commander in Region 7, you were there when a position
21 was posted for a promotion into the -- a position of
22 sergeant to supervise a canine unit.  Is that -- not
23 the canine unit.  I'm sorry -- the mounted unit,
24 correct?
25    A. Yes, sir.

78

1  situations that were provided as examples that placed
2  him in the capacity of a supervisor, i.e., acting
3  sergeant at times.
4      Q.  Uh-huh.
5      A.  As well as the current rank of corporal at
6  the time of board process.  All those things are --
7  can be taken into consideration by a specific board
8  member and was taken into consideration by me
9  specifically.
10     Q.  Anything else other than those three items?
11 And let me just do my checklist here.  So far you
12 have got years of experience; Mr. Davenport more
13 favorable.  Educational experience; Mr. Davenport
14 more favorable; and the fact that he was a corporal?
15     A.  Yes, sir.  And is a -- yes, sir, yes, sir.
16     Q.  Were there any other factors that caused you
17 to say, "I am pulling for and I favor Mr. Davenport
18 to fill this sergeant position over the mounted
19 unit," other than the three items that you just
20 mentioned?
21     A.  Also the fact that he was there at the
22 inception of the mounted unit and helped start the
23 mounted unit itself.  He was never a member but
24 actually was there in selection of locations, horses,
25 and just did not stick with the mounted unit because

79

1  they would request that he lose his corporal stripes
2  as you don't -- when you transfer between areas, you
3  don't automatically keep your corporal position.  You
4  have to relinquish that when you go to a new area and
5  go through a different selection process for corporal
6  in that specific area.  And he did not want to
7  relinquish his corporal stripes, therefore, he
8  maintained the position of corporal in the area he
9  was at the capitol, so.
10        But he had participated in the creation,
11 selection and building up of the mounted unit at the
12 in the beginning.
13     Q.  Along with Mr. Sams?
14     A.  Again, I don't -- I'm not sure if Jerald was
15 part of that initial process, but I know that
16 Davenport had been and that he participated in that
17 process in the beginning.
18     Q.  I thought you didn't know or have any facts
19 pertaining to the beginning process of that mounted
20 unit.
21     A.  Other than that.
22     Q.  Have I misunderstood your testimony?
23     A.  Other than Davenport's experience that he
24 expressed during the board process.
25     Q.  Oh, I see.  I see.

80

1      A.  Of the entire unit itself, I do not know who
2  was all selected --
3      Q.  I see.
4      A.  -- and the purposes, I was not present for
5  those conversations.
6      Q.  I see.  So you learned this about
7  Mr. Davenport at the -- during the selection process?
8      A.  Yes, sir, during the board --
9      Q.  Okay.  That he was at the beginning.  Did
10 you learn the same thing about Mr. Sams during the
11 selection process, that he was there at the beginning
12 and championed the creation, the first draft of the
13 standard operating procedure for the mounted unit?
14     A.  The creation of the SOP, or assisting in the
15 creation of the SOP, was captured in his HR-113 as
16 one of his examples, yes.
17     Q.  Okay.  So he had the same -- on that note,
18 at least, he had the same if not more experience than
19 Mr. Davenport.  Would that be fair to say, the same
20 or more?
21     A.  Experience in what, sir?
22     Q.  In what you said you gave Mr. Davenport more
23 credit for.
24     A.  In leadership?  No, sir.
25     Q.  No, no, no, no, no, no.  About being there

81

1  at the beginning of the mounted unit and contributing
2  to its growth and development.
3      A.  Yes, sir, having experience with the mounted
4  unit in the beginning, yes, sir.
5      Q.  And so your testimony here today is that
6  Mr. Davenport beat Mr. Sams out in terms of amount of
7  experience and the time in that unit.  Is that
8  correct?
9          MR. HARRIS:  Objection to the form of
10 the question.
11     A.  To answer your question, no, sir.  There's
12 two separate things there.
13     Q.  (BY MR. MUNGO)  Okay.  Well, can you address
14 the two separate things?
15     A.  Jerald Sams was a tenured member of the
16 mounted unit, yes.  He presented and partook in the
17 initial creation and starting of the mounted SOP,
18 yes, but that does not mean that either one had any
19 favorable, one or the other, for that.  Each one is
20 different.  It's a totality of the circumstances when
21 dealing and comparing each one.
22        The fact that Davenport had experience
23 with the horses, was able to work with the horses,
24 and was there at the creation of the mounted unit
25 itself, accompanied with his leadership experience,

162

1 events that he participated in?  We mentioned some
2 earlier:  Going to schools, et cetera.
3     A. Yes, sir.
4     Q. As the commander of the mounted patrol, how
5 many of those events did you attend?
6     A. I don't recall the number.
7     Q. Okay.  As the commander of the mounted
8 patrol -- okay.  So I can strike that one.
9          Would you agree that the -- well, was
10 there ever a sergeant that was a motorcycle unit
11 supervisor appointed to oversee the mounted unit?
12     A. Yes, sir.
13     Q. Okay.  And did they train horses?
14          MR. HARRIS:  Object to the form of the
15 question.
16     Q. (BY MR. MUNGO)  Did that person train
17 horses?
18     A. No.
19     Q. Did they train the personnel?
20     A. No, sir.
21     Q. Did they evaluate new horses?
22     A. No, sir.
23     Q. Did they provide medical care for the
24 horses?
25     A. No sir.

163

1     Q. Did they acquire new horses?
2     A. No, sir.
3     Q. Did they fill out donor information?
4     A. No, sir.
5     Q. Did that person write proposals for new
6 mounted equipment?
7     A. No, sir.
8     Q. Did that person evaluate personnel?
9     A. No, sir.
10     Q. Did that person draft the mounted SOP?
11     A. Actually, the previous question, yes, sir,
12 he did the evaluation process, performance
13 evaluation, on those individuals, as they were the
14 sergeant over that unit.
15          To your second question, no, they did
16 not do the SOP.
17     Q. Can you name an occasion in a mounted patrol
18 situation that Trooper Sams was not in charge while
19 you were captain?
20          MR. HARRIS:  Object to the form of the
21 question.
22     A. As stated before, on -- what?
23          MR. HARRIS:  Object to the form of the
24 question.
25     Q. (BY MR. MUNGO)  Did you say --

164

1     A. As stated previously, upon my arrival, he
2 was -- the investigation -- the outcome of the
3 investigation was concluded, but the determination of
4 what that was going to entail had not been concluded
5 until Ron Joy's termination, indicated by his letter.
6 So during that time, that month, month and a half,
7 however long it was, upon my arrival he was not
8 allowed to interact with the mounted unit.
9     Q. Okay, all right.  And you had to escort
10 him -- he was ultimately sent back to the mounted
11 unit because he was the only one that could perform
12 certain tasks that required the skills that he had,
13 so he was sent back to the mounted unit.  Isn't that
14 correct?
15     A. During that time he was allowed to return to
16 the facility to trim the hooves for the horses as we
17 did not have a farrier contracted, and he had the
18 expertise to do so.
19     Q. And there was no one else in the mounted
20 unit that could do that, correct?
21     A. Correct.
22     Q. Okay.  And you had to escort him when he
23 went back to the unit to perform that -- those
24 functions, correct?
25     A. Any one of -- either myself or the

165

1 lieutenant or the major could have.  I was available,
2 so I went.
3     Q. Who else participated in escorting him?  Was
4 that Lieutenant Virgil -- I'll pronounce his name
5 right -- Verdu --
6     A. Verduzco.
7     Q. Yes.  He and yourself would escort Mr. Sams
8 when he went back to perform those functions at the
9 mounted unit, correct?
10     A. Correct.
11          THE REPORTER:  Okay.  Somebody say the
12 name again for me.  Virgil?
13          THE WITNESS:  Verduzco.
14          THE REPORTER:  Thank you.
15     Q. (BY MR. MUNGO)  Was Trooper Sams called upon
16 to provide expert testimony on mounted operations in
17 different situations?
18     A. I do not recall that he was ever requested
19 to do expert testimony.
20     Q. What about talking to legal and horse
21 donors?
22     A. Horse donors, yes.  Legal, I do not recall.
23 He more than likely was part of that conversation on
24 the selection, and we did evaluate one horse that I
25 remember attending the evaluation of.

166

1    Q. Okay, okay. Who else would perform that
2  function in such a way that the DPS would have as
3  much confidence in them as they did in Sams?
4    A. At that time it would have been Jerald Sams.
5    Q. It would have been just Jerald Sams, right?
6  Okay.
7    A. I believe Cynthia Sparks went along, but I
8  believe he took the lead on most of that.
9    Q. What is your definition of leadership,
10  supervisor, and instructor?
11        MR. HARRIS: Object to the form of the
12  question.
13    A. I believe those are three different --
14  requires three different definitions.
15    Q. (BY MR. MUNGO) Okay.
16    A. A leader is somebody that influences others
17  to accomplish by setting the example, providing
18  accurate information and guidance.
19        A supervisor is someone that just
20  manages the process and gets things done, schedules,
21  so forth and so on.
22        And a trainer is just somebody who just
23  simply trains -- or an instructor, I believe, is
24  what -- instructor/trainer is somebody that does just
25  that.

167

1    Q. Do you believe that Mr. Sams had those
2  traits?
3    A. I believe he was challenged in his
4  leadership capabilities indicated by the
5  investigation and the subsequent demotion, and those
6  are things he needed to overcome through training and
7  initiative.
8    Q. But the investigation was never sustained,
9  correct? I mean, the investigation never sustained
10  the complaint against Sams, correct?
11    A. Correct, it did not sustain the complaint of
12  racial discrimination. However, it did have the
13  additional findings that leadership and communication
14  was a problem for him and that he needed to seek
15  additional training to overcome that.
16    Q. Okay. But there was never any complaint
17  against him for those things, correct?
18        MR. HARRIS: Object to the form of the
19  question.
20    A. Not specifically to my knowledge.
21    Q. (BY MR. MUNGO) Okay. You said not to your
22  knowledge?
23    A. Correct.
24    Q. Okay. Did you talk to Major Chris Jones in
25  regards to mounted -- no, I already asked you that.

168

1  I'm sorry.
2        MR. HARRIS: All right. It's just about
3  6:00. I don't know if the court reporter still has
4  a --
5        THE REPORTER: Yes, I do.
6        MR. HARRIS: -- a conflict.
7        MR. MUNGO: Okay. So we're -- yeah,
8  we're just about there. Hold on just a second here.
9  Let me see if we can move this. I'm eliminating a
10  lot of questions we've already asked here, just
11  taking a moment. Hold on.
12    Q. (BY MR. MUNGO) Would you agree that the
13  mounted patrol is a specialized unit?
14    A. Yes, sir.
15    Q. And you agree that you would have to obtain
16  a specialized skill set to function in that unit,
17  correct?
18    A. Yes, sir.
19    Q. Did you tell Trooper Sparks that she didn't
20  have to note in detail Davenport's deficiencies?
21    A. I do not recall.
22    Q. Okay. All right. So do you have copies of
23  the -- do you recall the accolades in the form of
24  emails, letters, in regards to Trooper Sams where you
25  commended him on his job performance?

169

1    A. I do.
2    Q. Okay. And I think we may have them, but, if
3  not, could you provide them to your attorney?
4    A. Any of those emails would have been part of
5  his personal -- his personnel file.
6    Q. Personnel file, okay. And then the last
7  question is, do you feel Trooper Sams is a large part
8  of the success of the mounted unit?
9    A. At that time, yes.
10    Q. Okay. All right. Well, it was at that time
11  because he has no longer been part of the unit,
12  correct?
13    A. Currently he is not.
14    Q. Okay. And when you say "at that time," you
15  mean the time that he was part of the unit, correct?
16    A. Correct.
17    Q. All right.
18        MR. MUNGO: Madam Court Reporter, if you
19  can give me just a couple of seconds. Give me about
20  two minutes, please, okay? Give me about two
21  minutes. All I need is two minutes.
22        THE REPORTER: Off the record at 6:03.
23        (Brief pause.)
24        THE REPORTER: Back on the record. Did
25  you want to say something, Mr. Mungo?

**170**

```
1          MR. MUNGO:  No, Mr. Harris did.
2          MR. HARRIS:  Do you pass the witness?
3  Are you done?
4          MR. MUNGO:  Yes.  I'm sorry.  Yes, pass
5  the witness.
6          MR. HARRIS:  Then we will request that
7  the witness be given the opportunity to review and
8  sign the transcript and reserve the rest of our
9  questions for trial.
10         MR. MUNGO:  Okay.  Thank you, sir.
11         (Deposition concluded at 6:05 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**171**

```
1          CHANGES AND SIGNATURE
2  WITNESS NAME:  JEREMIAH RICHARDS
3  DATE OF DEPOSITION:  NOVEMBER 18, 2022
4  PAGE      LINE      CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

**172**

```
1          I, JEREMIAH RICHARDS, have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted above.
4
5          _____
           JEREMIAH RICHARDS
6
7  THE STATE OF _____ )
8  COUNTY OF _____ )
9          Before me, _____, on this day
10 personally appeared JEREMIAH RICHARDS, known to me
11 (or proved to me under oath or through
12 _____) (description of identity card or
13 other document) to be the person whose name is
14 subscribed to the foregoing instrument and
15 acknowledged to me that he executed the same for the
16 purposes and consideration therein expressed.
17
18        Given under my hand and seal of office, this
19 _____ day of _____, _____.
20
21        _____
          NOTARY PUBLIC IN AND FOR
22
23        THE STATE OF _____
24 My commission expires: _____
25 _____ No Changes Made _____ Amendment Sheet(s) Attached
```

**173**

```
1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                    AUSTIN DIVISION
3
   JARI MCPHERSON, JERALD        )
4  SAMS, AND DANIEL MARTINEZ,    )
                                 )
5          Plaintiffs,           )
                                 )  CIVIL ACTION
6  VS.                           )
                                 )  NO.: 1:20-cv-01223-DAE
7  TEXAS DEPARTMENT OF PUBLIC    )
   SAFETY,                       )
8          Defendant.            )
9
10
           REPORTER'S CERTIFICATION OF THE ORAL
11         DEPOSITION OF JEREMIAH RICHARDS
                NOVEMBER 18, 2022
12
13         I, Vanessa J. Theisen, a Certified
14 Shorthand Reporter in and for the State of Texas,
15 hereby certify to the following:
16
17         That the witness, JEREMIAH RICHARDS, was
18 duly sworn by the officer and that the transcript of
19 the oral deposition is a true record of the testimony
20 given by the witness;
21
22         That the original deposition was delivered
23 to Mr. Drew Harris to obtain witness's signature.
24
25         That a copy of this certificate was served
```

174

1   on all parties and/or the witness shown herein on
2   December 8, 2022.
3
4        I further certify that pursuant to FRCP
5   Rule 30(3) that the signature of the deponent:
6
7        _XX_ was requested by the deponent or a
8   party before the completion of the deposition and
9   that the signature is to be before any notary public
10  and returned within 30 days from date of receipt of
11  the transcript.
12
13       If returned, the attached Changes and
14  Signature Page contains any changes and the reasons
15  therefore:
16
17       ____ was not requested by the deponent or
18  a party before the completion of the deposition.
19
20       I further certify that I am neither
21  counsel for, related to, nor employed by any of the
22  parties or attorneys in the action in which this
23  proceeding was taken, and further that I am not
24  financially or otherwise interested in the outcome of
25  the action.

175

1        Certified to by me on this, the 8th day
2   of December, 2022.
3
4
5        _____
         VANESSA J. THEISEN, Texas CSR, RPR
6        Texas Cert No. 3238
         Expiration Date:  10/31/23
7        Integrity Legal Support Solutions
         Firm Registration No. 528
8        9901 Brodie Ln., Ste. 160-400
         Austin, Texas 78748
9        (512) 320-8690
         www.integritylegal.support
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25