# Ex. 25

```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

JARI MCPHERSON, JERALD      )
SAMS, AND DANIEL MARTINEZ,  )
                            )
          Plaintiffs,       )
                            ) CIVIL ACTION
VS.                         )
                            ) NO.: 1:20-cv-01223-DAE
TEXAS DEPARTMENT OF PUBLIC  )
SAFETY,                     )
                            )
          Defendant.        )
```

---

REMOTE ORAL DEPOSITION OF

CHRIS JONES

DECEMBER 8, 2022

---

REMOTE ORAL DEPOSITION OF CHRIS JONES, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on December 8, 2022, from 9:07 a.m. to 3:50 p.m., via Zoom, before Vanessa J. Theisen, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

162
1  wanted to make sure of that.
2        Now, based upon him -- Mr. Sams sharing
3  with you these racially offensive encounters with
4  these white troopers, the three that we talked about
5  and others that he talked about that you don't
6  specifically recall, did Mr. Sams express to you or
7  did you surmise as a result of Mr. Sams sharing this
8  information with you that he felt that the
9  environment was uncomfortable racially?
10       MS. COLLINS:  Objection, form,
11 foundation.  You can answer.
12    A.  Well, if he did, I feel like I did
13 everything I could to make sure that, you know, he
14 was in a position to accomplish his goals or whatever
15 that his aspirations was, which, at the time, you
16 know, a lot of the things we talked about was, you
17 know, his position in the mounted patrol going
18 forward.
19       I couldn't do anything about the past,
20 but I wanted to make sure I understood his concerns
21 and that we were doing everything from this chain of
22 command's point of view to make sure he got a fair
23 shot so he could compete for the position.
24    Q.  (BY MR. MUNGO)  Yes, sir.
25    A.  That was the context of all of our

163
1  conversations.  It was all about fairness, and that
2  was my only concern.
3     Q.  Yes.  And so, Major Jones, I'm not
4  suggesting at all that you didn't do what you were
5  supposed to do or that you didn't have a proper level
6  of sensitivity.  I'm -- that's not anywhere near
7  the implications of my question.
8        My question is that your perception,
9  when Mr. Sams was sharing these things with you, did
10 he not express, in your opinion, in his expressing
11 these concerns, communicate to you and you sense that
12 he felt that the environment was uncomfortable based
13 on his race?
14       MS. COLLINS:  Objection, form,
15 foundation.  You can answer.
16    A.  Yes.
17    Q.  (BY MR. MUNGO)  Okay.  All right.  And he
18 felt that with -- it wasn't just a passing thing.  It
19 was something that came across as something that
20 troubled him and not something that didn't trouble
21 him, correct?
22       MS. COLLINS:  Objection, form,
23 foundation.  You can answer.
24    A.  Yes.
25    Q.  (BY MR. MUNGO)  Okay.  If Sams had used the

164
1  word that based upon the racially -- the racial
2  insults and offensive effect on him, based on these
3  incidents that were racial, if he had used the word
4  he felt that the environment was hostile, would you
5  think that he would be accurate in using that term?
6        MS. COLLINS:  Objection, form,
7  foundation.  You can answer.
8     A.  If he felt it was hostile, I would be -- I'm
9  obligated to protect him as an employee by reporting
10 it, and I'm hoping that I did.
11    Q.  (BY MR. MUNGO)  And you did.  You already
12 said you did.  And the question is not to implicate
13 anything about you.  It's just about your perception
14 of his -- of his communication to you and that he
15 felt that the environment was racially hostile.
16 Would that be a fair term?
17       MS. COLLINS:  Objection, form,
18 foundation.  You can answer.
19    A.  Yes, I think -- I think it would be a fair
20 term.  Yes.
21    Q.  (BY MR. MUNGO)  Okay.  Do you believe that
22 Mr. Sams, in his communication to you about these
23 incidents that were racially charged, were part of
24 the promotional process on that promotion board where
25 he was not selected for sergeant over the mounted

165
1  unit?
2        MS. COLLINS:  Objection, form.  You can
3  answer.
4     A.  No.
5     Q.  (BY MR. MUNGO)  Okay.  Now, Mr. Sams didn't
6  tell you that it wasn't racial, did he?
7        MS. COLLINS:  Objection, form.  You can
8  answer.
9     A.  The promotional board?
10    Q.  (BY MR. MUNGO)  Yes.
11    A.  The promotional process?
12    Q.  Yeah.  He didn't tell you that race was not
13 a factor of him not being selected, did he?  He
14 didn't say that to you, did he?
15       MS. COLLINS:  Objection, form.  You can
16 answer.
17    A.  No, he didn't.  I don't -- I don't remember
18 him -- no.
19    Q.  (BY MR. MUNGO)  Okay.
20    A.  You mean after the decision was made he came
21 to me and said "They didn't give it to me because of
22 my race"?
23    Q.  Did he say that to you?
24    A.  No.  I'm just trying to get an understanding
25 of what you're asking me.

**Page 202**

1  transfer. Wong was already a sergeant.
2     Q. Okay. I understand. I understand. I
3  understand.
4          So do you believe -- well, how many
5  other candidates were there for the position when
6  Wong was selected, if you -- if you can recall?
7     A. When he trained with -- I think he was the
8  only one.
9     Q. He was the only one that applied?
10    A. I think so, yeah.
11    Q. For the transfer?
12    A. I mean, you can go back -- you can go back
13 and check my records. I mean, check the records.
14 And I don't want to be like, "God, he lied," but I
15 think he was the only one.
16    Q. No, I would never say -- I -- well, you
17 haven't given me -- well, let's leave that one alone.
18 Yeah, let's leave it at that. I don't want to lie
19 either. So, okay.
20    A. I think he was the only one that put in for
21 it.
22    Q. Okay, okay. All right. At any point in
23 time -- at any point in time, to allow Sams to have
24 applied for -- to fill the position, the sergeant's
25 supervisory position over the mounted unit that Wong

**Page 203**

1  was ultimately selected to fill, the agency could
2  have allowed Mr. Sams to put in his bid for that
3  position, correct?
4          MS. COLLINS: Objection, form,
5  foundation. You can answer.
6     A. I think the chief could have allowed, you
7  know, troopers to compete against sergeant. I guess
8  you would have to ask him that. But --
9     Q. (BY MR. MUNGO) Okay.
10    A. -- it was -- it was posted for any sergeant
11 interested at the time. And so since Sams wasn't a
12 sergeant, that eliminated him.
13    Q. Yeah. It eliminated him. And it was --
14 that particular approach to filling that position was
15 specifically calculated to eliminate Sams as a
16 candidate for filling that position. Would that be
17 fair to say?
18         MS. COLLINS: Objection, form,
19 foundation. You can answer.
20    A. I don't -- I don't think so. I think the
21 problem was with the -- you know, the complaints
22 sergeants were having about the canine program. You
23 know, the canine sergeants that transfer, they spend
24 a year or two in the canine program, then they can
25 transfer anywhere out in the state --

**Page 204**

1     Q. (BY MR. MUNGO) Okay.
2     A. -- as a sergeant. But if you were a
3  sergeant out in the state and you were to transfer
4  into the canine program, "Oh, you've got to be a
5  handler. You've got to be" -- and they didn't think
6  that was fair.
7          And when you really looked at it, you
8  know, it was like they allow the captains to do it,
9  why don't you allow the sergeants to do it. So I
10 think when they started looking at all that, they
11 started saying, you know, "If we just utilize the
12 same process that we used, the board assessment, you
13 know, then why not make it a little bit more
14 accessible to supervisors if they're willing to go
15 through the assessment and go through a school and
16 get certified and allow them to compete?"
17         And the timing of it all in allowing --
18 you know, and open it up, allowing sergeants that
19 were interested in a mounted patrol position to
20 transfer in, well, lo and behold, we had somebody
21 that put in for it, and that blocked Sams from
22 getting another chance in the future.
23    Q. Okay.
24    A. He competed for it and he was selected.
25    Q. Okay. So I asked you earlier if the

**Page 205**

1  competitive promotional process was bypassed in favor
2  of the transferring -- the transfer process for
3  sergeants to transfer into that sergeant supervisory
4  position over the mounted unit was specifically done
5  in order to prevent Sams from filling that position,
6  and you said you don't think so. Remember that?
7     A. Yes.
8     Q. Okay. So would the -- so you don't think
9  so, but you're not sure whether or not that was a
10 motive in preventing Sams from an opportunity to
11 apply by opening it up to both promotions as well as
12 transfers?
13         MS. COLLINS: Objection, form.
14    Q. (BY MR. MUNGO) My question -- my question,
15 sir, is that you said you didn't think that that
16 transfer process was used in order to prevent Sams
17 from filling that position.
18         My question to you is that you don't
19 know whether or not that was a motive, correct?
20         MS. COLLINS: Objection, form,
21 foundation. You can answer.
22    A. No, sir, I don't.
23    Q. (BY MR. MUNGO) Okay. How likely is it that
24 you think it may have been a motive in light of Sams'
25 past complaints against folk?

**Page 206**

1    MS. COLLINS: Objection, form,
2 foundation, mischaracterizes evidence. You can
3 answer.
4    A. I don't think it was the case.
5    Q. (BY MR. MUNGO) Well, you don't think it was
6 the case. I'm asking you how likely do you think
7 that would have been the case?
8    MS. COLLINS: Objection, form.
9    A. How likely? It could happen. It could have
10 been -- it's possible.
11   Q. (BY MR. MUNGO) Okay. Okay. And you're not
12 saying that that wasn't done, that is the transfer
13 process used to fill the position that Wong got,
14 rather than opening it up to the competitive
15 promotional process -- your testimony here today is
16 that you're not saying that it wasn't -- that
17 transfer process was not used in order to prevent
18 Sams. You're saying that is not your testimony here
19 today, correct?
20   MS. COLLINS: Objection, form. You can
21 answer to the extent you're able.
22   A. I'm saying that I can't prove that that was
23 the motivation, but it could have happened, you know.
24   Q. (BY MR. MUNGO) Okay, okay. So when you say
25 you can't prove that that was the motivation, that

**Page 207**

1 Sams was retaliated against, that the transfer method
2 was used as a way of retaliating against Sams for his
3 complaints filed and in order for them to get back at
4 Sams, retaliate against Sams to close it off where he
5 had no opportunity to get that sergeant supervisory
6 position because they're going to open it up only to
7 sergeant transfers, what you're saying here today is
8 that you don't know whether or not he was retaliated
9 against --
10   A. Exactly.
11   Q. -- in doing so, correct?
12   A. Yeah.
13   MR. MUNGO: Objection, form, foundation,
14 mischaracterizes evidence.
15   Q. (BY MR. MUNGO) Okay. And then it goes back
16 to my other question that I don't think I got a clear
17 answer to. I may not have asked a clear question.
18   Is that -- is it -- how likely do you
19 think them preventing Sams from applying for the
20 position that Wong got as sergeant over the mounted
21 unit, how likely do you think it was that they did
22 that purposely to keep Sams from getting it because
23 of his complaints? How likely do you think that was?
24   MS. COLLINS: Objection, form,
25 foundation, mischaracterizes evidence. You can

**Page 208**

1 answer.
2    A. It's possible.
3    THE REPORTER: I'm sorry?
4    THE WITNESS: It's possible.
5    Q. (BY MS. COLLINS) So then it is --
6    THE REPORTER: Hang on. Hang on. I
7 still didn't get his answer. What did you say?
8    THE WITNESS: It's possible.
9    THE REPORTER: It's possible. Thank
10 you.
11   Q. (BY MR. MUNGO) So it is likely, then?
12   MS. COLLINS: Objection, form,
13 foundation.
14   Q. (BY MR. MUNGO) Is that correct?
15   A. I'll just go with it's possible. But I
16 don't think that that's what happened.
17   Q. Do you know what the -- do you know what the
18 definition of the word "likely" is?
19   MS. COLLINS: Objection, form.
20   A. I think it's the same thing basically. It's
21 likely or -- give me your definition of likely.
22   Q. (BY MR. MUNGO) No, you don't ask me
23 questions, sir, with all due respect. I know you're
24 the major, but you're not the major in my office.
25   Now we can play for a minute. We can

**Page 209**

1 role play for a minute if that's what you want to do.
2    A. My definition of likely is probable.
3    Q. So you're saying -- so you're saying yes, it
4 was probable?
5    A. Yeah.
6    MS. COLLINS: Objection, form,
7 foundation.
8    MR. MUNGO: Madam Court Reporter, did
9 you get the answer?
10   THE REPORTER: Yes.
11   MR. MUNGO: Okay. Thank you.
12   Q. (BY MR. MUNGO) Okay. Now I asked you
13 already about the promotional boards in which
14 Jeremiah Richards was the chair, and we talked about
15 that at length. I only have a couple follow-up
16 questions to that, sir.
17   How likely is it that Sams' opportunity
18 to be selected to fill that supervisory sergeant
19 position over the mounted unit was based upon his
20 previous complaints and/or -- and/or his race?
21   MS. COLLINS: Objection, form,
22 foundation, mischaracterizes evidence. You can
23 answer.
24   A. Likely is it?
25   Q. (BY MR. MUNGO) Do you say it was likely?

**242**

1  those of whites?
2       MS. COLLINS: Objection, form.
3    Q. (BY MR. MUNGO) Disproportionate and the
4  numbers do not -- do not fairly reflect the numbers
5  of -- the numbers of African Americans that should be
6  there?
7       MS. COLLINS: Objection, form,
8  foundation.
9    Q. (BY MR. MUNGO) As sergeants? As sergeants?
10      MS. COLLINS: Objection, form,
11  foundation. You can answer.
12   A. Yeah. So -- and I forgot about Timothy
13  Palma. He's African American.
14   Q. (BY MR. MUNGO) Another sergeant?
15   A. Yes.
16      THE REPORTER: I'm sorry?
17   Q. (BY MR. MUNGO) So we got two African
18  American sergeants. Okay.
19      THE REPORTER: Timothy, who?
20      THE WITNESS: P-A-L-M-A.
21   Q. (BY MR. MUNGO) Do you feel that's a fair
22  representation of African Americans amongst the rank
23  of sergeants in your division, sir?
24      MS. COLLINS: Objection, form. You can
25  answer.

**243**

1    A. No.
2    Q. (BY MR. MUNGO) And why not?
3    A. Well, two out of -- I don't -- two out of
4  20. I mean, we would like to see -- like to see
5  more.
6    Q. Sir, I have information that indicate that
7  there are no African American sergeants in that
8  division. Are you sure the numbers you're giving me
9  are accurate?
10      MS. COLLINS: I'm going to object to
11  form. Asked and answered.
12   A. Yeah, I've got one, Santiago, and Timothy
13  Palma. From my understanding, I think they're
14  African American. They -- I know they have Hispanic
15  names, but I've never just walked up and said, "Hey,
16  what race are you?" But if you look at their skin
17  and the texture -- Palma might be Hispanic. I really
18  don't know, to be honest with you. His skin is just
19  as dark as mine.
20   Q. (BY MR. MUNGO) So you actually do not know.
21  The answer to my question is that you actually do not
22  know how many African American sergeants you have in
23  your division. Would that be fair to say, sir?
24   A. In my -- in my region.
25   Q. Yeah, yeah, yeah. In your region, right.

**244**

1    A. I have two African Americans in my region.
2    Q. In your region. What about in your
3  division? You're in the highway patrol division,
4  correct?
5    A. Yes, sir. I have no clue how many is in the
6  division.
7    Q. Okay. In fact, you don't know if -- like
8  you just said, you don't know how many. The better
9  answer for that -- to that question is that you don't
10  know if you have any. Would that be fair to say?
11      MS. COLLINS: Objection, form,
12  foundation. But you can answer.
13   A. In the division, yeah. We've got -- we've
14  got African American sergeants in the division.
15   Q. (BY MR. MUNGO) Okay. How many do you have?
16   A. I don't know. We're talking about 2,000
17  people, so I don't know how many of them are African
18  American as far as the sergeants.
19   Q. Okay.
20   A. I know I've got two in this region.
21   Q. Okay. How many African Americans are
22  currently serving on the mounted unit?
23   A. Currently? I don't think there's any.
24   Q. I beg your pardon? I didn't hear that
25  answer.

**245**

1    A. Zero.
2    Q. Zero. How many -- how many troopers are in
3  that unit?
4    A. Eight. Eight.
5    Q. Eight. And who is the current supervisor of
6  the eight Caucasian troops?
7    A. They're not Caucasians. There's Hispanics
8  and females.
9       THE REPORTER: I'm sorry. Repeat your
10  answer, please.
11      THE WITNESS: They're not Caucasian.
12  They're not all Caucasian. There are Hispanics and
13  females. And Darryl Tidwell is the sergeant.
14   Q. (BY MR. MUNGO) Okay. And Tidwell, is he
15  white or Hispanic?
16   A. He's white.
17   Q. So you have got the white man over all of
18  the Hispanics. Would that be --
19      MS. COLLINS: Objection, form.
20   Q. (BY MR. MUNGO) Would that be an accurate
21  statement?
22   A. No, sir. It's -- there's three white
23  troopers on there as well. I mean, three -- three
24  white officers on the unit as well. And one of them
25  is -- two of them are female.

234

1   him for shortcomings of the unit as a whole in terms
2   of its -- its function. There were blames and there
3   were complaints about that. Am I correct?
4           MS. COLLINS: Objection, form,
5   foundation. You can answer.
6       A. There were no formal complaints, but they --
7   they had -- they were working through issues as a
8   team.
9       Q. (BY MR. MUNGO) Uh-huh, uh-huh.
10      A. As far as him being blamed for it, no, I
11  didn't blame him for anything.
12      Q. No, no, not you. Not you. But there -- but
13  he was being blamed as the reason for the various
14  shortcomings of the unit. Isn't that correct?
15          MS. COLLINS: Objection, form,
16  foundation. You can answer.
17      A. Well, if he was being blamed, I feel like --
18  I feel like there was something I probably should
19  have done or -- if it was ever brought to my
20  attention.
21      Q. (BY MR. MUNGO) Uh-huh. Okay. But you
22  don't -- you don't recall anybody else being blamed,
23  I guess, is the base question. You don't recall
24  anyone else being blamed for any shortcomings of the
25  unit, the mounted unit, other than Sams. Would that

235

1   be fair to say?
2           MS. COLLINS: Objection, form,
3   foundation.
4       Q. (BY MR. MUNGO) Would that be fair to say?
5       A. Yes.
6       Q. Okay. Was anyone else ever reprimanded in
7   regards to the leadership of the mounted patrol
8   besides Trooper Sams that you're aware of?
9       A. No, sir.
10      Q. Have you ever heard anyone state that they
11  didn't want Trooper Sams to be the sergeant over the
12  mounted patrol?
13      A. They haven't said it, no. I haven't heard
14  that.
15      Q. Have you ever, in your DPS career as a
16  supervisor, escorted anyone who was under investi --
17  under an OIG investigation to do their daily duties
18  in a manner that Trooper Sams was?
19          MS. COLLINS: Objection, form,
20  foundation. You can answer.
21      A. You broke out on the first part of that. I
22  didn't get the first part.
23      Q. (BY MR. MUNGO) So have -- have you ever
24  heard of anyone who was under investigation being
25  escorted to conduct their -- when they -- when they

236

1   went to conduct their daily duties?
2       A. Escorted as in somebody is with them?
3       Q. Yes, sir.
4       A. Following them?
5       Q. Yes, sir.
6       A. No, sir.
7       Q. You do know that Sams was escorted when he
8   was sent to the barn to tend to the hooves of a
9   horse? You're aware of that, right? He was
10  escorted?
11      A. Who escorted him?
12          MS. COLLINS: Objection, form.
13      Q. (BY MR. MUNGO) Jeremiah Richards.
14      A. The cap -- yeah, that was the captain. If
15  he did, I didn't know it was like an official escort.
16  Maybe he just went out there to watch them do their
17  job. I don't know.
18      Q. But what if it wasn't just to watch him do
19  the job? What if he -- what if Captain Jeremiah
20  Richards went out there with Sams specifically to
21  escort him? What about that? Would that be
22  appropriate?
23      A. By him --
24          MS. COLLINS: Objection, form,
25  foundation. You can answer.

237

1       A. Okay. Yeah. By him being in his chain of
2   command, that could be his reasoning or his excuse,
3   went out to watch my troop do his job.
4       Q. (BY MR. MUNGO) No, sir. No, sir. No, sir.
5   I got that, and I -- I've embraced that, okay? I
6   understand what you're saying. That's not my
7   question, though.
8           My question was, if Jeremiah Richards
9   escorted Sams to the barn because Sams was under
10  investigation, would that be appropriate?
11          MS. COLLINS: Objection, form,
12  foundation. You can answer.
13      A. No.
14      Q. (BY MR. MUNGO) Okay. And why wouldn't that
15  be appropriate?
16          MS. COLLINS: Same objections. You can
17  answer.
18      A. Because if he's escorting him out there
19  because he's got allegations against him, then he's
20  treating him like he's -- it's already -- he will be
21  treating him like it's already -- the allegations are
22  true. Allegations are just allegations, you know,
23  just like the same as innocent until proven guilty.
24      Q. (BY MR. MUNGO) Okay. Have you ever known
25  any white troops to be escorted when they conduct

**Page 238**

1  their daily duties when they're under investigation
2  by the OIG?
3  A. No.
4  Q. Would that be considered a violation of
5  agency policy?
6      MS. COLLINS: Objection, form,
7  foundation. You can answer.
8  A. Yes.
9  Q. (BY MR. MUNGO) Have you ever heard anyone
10 state that they didn't want Trooper Sams to be
11 sergeant over the mounted patrol?
12     MS. COLLINS: Objection, asked and
13 answered. You can answer again.
14 A. No.
15 Q. (BY MR. MUNGO) Do you know whether or not
16 Ron Joy directed Richards to escort Trooper Sams to
17 the barn?
18 A. No, sir.
19 Q. You didn't direct him to escort -- Richards
20 to escort Trooper Sams to the barn, did you?
21 A. No, sir.
22 Q. Okay. Are you familiar with what
23 institutional racism is?
24     MS. COLLINS: Objection, form. You can
25 answer.

**Page 239**

1  A. Somewhat.
2  Q. (BY MR. MUNGO) Okay. What's your
3  explanation of it, sir?
4  A. It's -- I don't know. It's like built-in
5  racism that exists from past racisms that -- not so
6  much that you're trying to blatantly practice it
7  going forward, but it exists just because of
8  incidents that happened in the past that were -- that
9  were never addressed, like social inequality, you
10 know.
11     Once the particular race is
12 disenfranchised based on their past and going
13 forward, it creates an inability to be able to
14 compete based on what happened to you in the past.
15 Q. Uh-huh. Do you feel institutional racism
16 exists in the Texas Department of Public Safety?
17 A. Yes.
18 Q. Did you ever write any accolades in the form
19 of emails, letters, or otherwise in regards to
20 Trooper Sams' job performance, commending him for his
21 job well done?
22 A. I'm real big on writing people to commend
23 them. I don't really necessarily email folks to put
24 them down. So if I send anything, it was a thank you
25 or commending him for something.

**Page 240**

1  Q. Okay. Do you feel Trooper Sams is a large
2  part of the success of the mounted patrol?
3  A. Yes.
4      MS. COLLINS: Objection, form,
5  foundation. You can answer.
6  A. Yes.
7  Q. (BY MR. MUNGO) What is the demographic
8  makeup of sergeants under your command? In other
9  words, by race?
10     MS. COLLINS: And is that currently?
11     MR. MUNGO: Since he's been -- well,
12 currently, yes, and then I -- we'll talk about just
13 before current, okay?
14 A. Let's see if I can find an org chart right
15 quick.
16     MS. COLLINS: I'm going to -- Major
17 Jones, please answer based off of your recollection
18 without referencing any documents.
19 A. Okay. The demographic would be one female
20 sergeant, several -- some Hispanic sergeants, and the
21 rest of them are white males.
22 Q. (BY MR. MUNGO) Do you have any idea as to
23 what the numbers of these different categories are?
24 A. Not right off the top of my head.
25 Q. The white males drastically outnumber the

**Page 241**

1  Hispanics and females, correct?
2      MS. COLLINS: Objection, form. You can
3  answer.
4  A. I think so. We've got several Hispanic
5  sergeants as well. But, yeah, for the most part,
6  right off the top of my head, yeah.
7  Q. (BY MR. MUNGO) All right.
8      MR. MUNGO: So, Counsel, the information
9  that he was going to look at on the chart, I don't
10 see the harm in him doing it, particularly since
11 we've already requested this through discovery. We
12 may have it, but we may not, but we should have it.
13 Q. (BY MR. MUNGO) So how long would it take
14 you to look at the chart, Major?
15 A. Now, you just want the number of white males
16 versus --
17 Q. Yes, yes.
18 A. Out of approximately 20 sergeants, probably
19 14 of them are white, one female, and six of them are
20 Hispanic.
21 Q. Any black sergeants?
22 A. No, sir. Yes, I do. I got one. One.
23 Santiago. He's African American.
24 Q. Is that -- the numbers of African Americans
25 as sergeants in your division disproportionate to

266

```
1       I, CHRIS JONES, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5              _____
                     CHRIS JONES
6
7   THE STATE OF _____ )
8   COUNTY OF _____ )
9       Before me, _____, on this day
10  personally appeared CHRIS JONES, known to me (or
11  proved to me under oath or through _____)
12  (description of identity card or other document) to
13  be the person whose name is subscribed to the
14  foregoing instrument and acknowledged to me that he
15  executed the same for the purposes and consideration
16  therein expressed.
17
18      Given under my hand and seal of office, this
19  _____ day of _____, _____.
20
21              _____
                 NOTARY PUBLIC IN AND FOR
22
23              THE STATE OF _____
24  My commission expires: _____
25  ____ No Changes Made ____ Amendment Sheet(s) Attached
```

268

```
1   _XX_ was requested by the deponent or a
2   party before the completion of the deposition and
3   that the signature is to be before any notary public
4   and returned within 30 days from date of receipt of
5   the transcript.
6       If returned, the attached Changes and
7   Signature Page contains any changes and the reasons
8   therefore:
9   ____ was not requested by the deponent or
10  a party before the completion of the deposition.
11      I further certify that I am neither
12  counsel for, related to, nor employed by any of the
13  parties or attorneys in the action in which this
14  proceeding was taken, and further that I am not
15  financially or otherwise interested in the outcome of
16  the action.
17      Certified to by me on this, the 20th day
18  of December, 2022.
19
20              _____
                VANESSA J. THEISEN, Texas CSR, RPR
21              Texas Cert No. 3238
                Expiration Date: 10/31/23
22              Integrity Legal Support Solutions
                Firm Registration No. 528
23              9901 Brodie Ln., Ste. 160-400
                Austin, Texas 78748
24              (512) 320-8690
                www.integritylegal.support
25
```

267

```
1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION
3   JARI MCPHERSON, JERALD   )
    SAMS, AND DANIEL MARTINEZ, )
4                            )
        Plaintiffs,  )
5                ) CIVIL ACTION
    VS.              )
6                ) NO.: 1:20-cv-01223-DAE
    TEXAS DEPARTMENT OF PUBLIC )
7   SAFETY,          )
                     )
8       Defendant.  )
9   REPORTER'S CERTIFICATION OF THE REMOTE ORAL
        DEPOSITION OF CHRIS JONES
10         DECEMBER 8, 2022
11      I, Vanessa J. Theisen, a Certified
12  Shorthand Reporter in and for the State of Texas,
13  hereby certify to the following:
14      That the witness, MAJOR CHRISTOPHER JONES,
15  was duly sworn by the officer and that the transcript
16  of the oral deposition is a true record of the
17  testimony given by the witness;
18      That the original deposition was delivered
19  to Ms. Allison Collins to obtain witness's signature.
20      That a copy of this certificate was served
21  on all parties and/or the witness shown herein on
22  December 20, 2022.
23
24      I further certify that pursuant to FRCP
25  Rule 30(3) that the signature of the deponent:
```