UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JARI MCPHERSON and JERALD SAMS and DANIEL MARTINEZ, | § § § | No. 1:20-CV-01223-DAE |
| Plaintiffs, | § § § | |
| vs. | § § | |
| TEXAS DEPARTMENT OF PUBLIC SAFETY, and Director Steven C. McCraw, in his official capacity, | § § § § § | |
| Defendants. | § § | |

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

Before the Court is a Motion for Summary Judgment filed by

Defendants Texas Department of Public Safety ("DPS") and Director Steven

McCraw ("McCraw") on May 12, 2023.[1]  (Dkt. # 57.)  Plaintiffs Jari McPherson

("McPherson"), Jerald Sams ("Sams"), and Daniel Martinez ("Martinez") filed a

Response in Opposition on June 5, 2023.  (Dkt. # 59.)  Defendants filed a Reply on

June 9, 2023.  (Dkt. # 60.)  Plaintiffs filed a Sur-reply on June 20, 2023.  (Dkt. #

62.)

---

[1] When referring to both DPS and McCraw, the Court will use the term "Defendants" for brevity.  Likewise, when referring to all three plaintiffs, the Court will use the term "Plaintiffs."

1

The Court finds this matter suitable for disposition without a hearing. After carefully considering the memorandum filed in support of and against the motions, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion for Summary Judgment (Dkt. # 57) for the following reasons.

## PROCEDURAL BACKGROUND

McPherson and Sams brought suit in this Court on December 15, 2020.  (Dkt. # 1.)  On July 18, 2022, McPherson and Sams amended their complaint to include Martinez as another plaintiff.  (Dkt. # 39.)  Defendants filed a Partial Motion to Dismiss on August 1, 2022.  (Dkt. # 40).  On October 31, 2022, this Court Denied in Part and Granted in Part with Leave to Amend that Motion. (Dkt. #45.)  Plaintiffs amended their complaint on November 21, 2022.  (Dkt. # 46.)  Now Defendants move for Summary Judgment on Plaintiffs' amended claims. (Dkt. # 57.)

## FACTUAL BACKGROUND

McPherson, Sams, and Martinez are employees with DPS's Austin office.  (Dkt. # 46).  Each raise Title VII claims arising out of their employment with DPS for race or national origin discrimination, unlawful retaliation and racial harassment and hostile work environment.  (Id.)  Martinez alone raises ADA claims arising out of lack of reasonable accommodation, failure to promote due to retaliation, and retaliation leading to hostile work environment. (Id.)

2

I.    McPherson's Background

McPherson is an African American man who has served as a commissioned officer with DPS for over twenty years.  (Dkt. # 46 at 3–4.)  In May 2018, McPherson was removed from the Regulatory Services Division of DPS in Austin, Texas and reassigned to the Criminal Investigation Division in Temple, Texas.  (Id. at 4.)  McPherson was the only African American in his unit and alleges many instances of "outrageous and abusive treatment" by DPS leadership on account of his race.  (Id.)

McPherson states that his Lieutenant ("Lt.") gave him a verbal warning in October 2018 for allegedly leaving his duty station without informing the Lt., despite previous authorization from his Lt. that he could do so.  (Id.) McPherson's supervisors, including his Captain, later elevated that verbal warning to a written warning and then to an issuance of a C-1 disciplinary treatment, which remains on McPherson's record today.  (Id.)  McPherson alleges he was the only person to receive these warnings even though similarly situated white employees engaged in the same behavior.  (Id.)

McPherson also claims a white co-worker informed him that McPherson's supervisor ordered a tracking device installed on McPherson's DPS vehicle.  (Id.)   The supervisor specifically said not to install a tracker on the vehicles of McPherson's similarly situated white co-workers.  (Id.)  McPherson

also contends he was denied permission to grow facial hair while similarly situated white employees' requests to do the same were granted.  (Id.)  According to McPherson, it is the custom of Criminal Investigation Division (CID) Special Agents to grow facial hair when working undercover.  (Id.)  McPherson asserts that denying him the ability to grow facial hair when undercover exposed him to greater danger as he worked on his CID assignments as a special agent.  (Id.)

Finally, McPherson alleges that his supervisors criticized his written reports to an extreme degree,[2] that several of his white co-workers noted his unfair treatment and said it was because he was Black, and that he was never encouraged or backed by his supervisors to apply to a promotion when his similarly situated white co-workers were routinely encouraged and backed by those supervisors to apply for promotions.  (Id. at 4-5.)

McPherson requested a transfer out of the Temple office back to Austin on or about September 2019.  (Id. at 6.)  His request was granted, and McPherson returned to Austin on or about October 2019.  Around the same time in October 2019, McPherson filed a complaint with the EEOC.  (Id.)  McPherson alleges his Austin supervisor, Captain Mark Koenig ("Koenig") was aware of his EEOC complaint and cautioned McPherson about placing himself in a negative

---

[2] McPherson states the criticisms were not factually, linguistically, or professionally supported.  (Dkt. # 46 at 5.)  For instance, McPherson alleges that when he and his white co-worker used the same report, only his report was criticized while the white co-worker's identical submission was not.  (Id.)

light because of his complaints of race discrimination in Temple, asserting that McPherson was merely being held accountable.  (Id.)  McPherson claims this was the beginning of Koenig being unjustifiably critical of McPherson and treating him in a disparaging manner compared to his white co-workers.  (Id. at 7.)

According to McPherson, from the period of December 2019 to March 2020, he was routinely discussed in a negative and denigrating manner by Austin CID command to his similarly situated white co-workers.  (Id.)  As part of the disparaging treatment, McPherson states he requested, upon his transfer to Austin CID, to be placed on 7C2 Counter Surveillance Unit, which would have been a career enhancing assignment.  (Id.)  According to McPherson's supervisors, McPherson first needed to spend time in the 7C1 unit to get experience investigating issues in Austin.  (Id.)  Moreover, Defendants claim there were no vacancies in the 7C2 unit at that time, even if it were appropriate to place McPherson there without 7C1 experience.  (Id.)  McPherson alleges there was a vacancy when he arrived.  (Id.)  McPherson asserts that a few months after his assignment to 7C1, the Austin CID Command assigned a white employee with no investigative or counter surveillance experience to 7C2, effectively allowing this white employee to skip the training McPherson had been told was necessary to join the 7C2 unit.  (Id.)  The white employee was "substantially less experienced and less qualified" than McPherson.  (Id.)  According to McPherson, there were no

African Americans assigned to the 7C2 unit then, while the 71C unit comprised only individuals of color and an immigrant.  (Id.)  McPherson alleges this reinforces that McPherson was not assigned to 7C2 because of his race, not his experience.  (Id.)

McPherson also alleges that the 71C unit was given more difficult and onerous tasks, was permitted fewer days off, and was treated less favorably than the white 72C unit.  (Id. at 8.)  McPherson further alleges that a co-worker informed him that a supervisor in one of the all-white units circulated photographs depicting a white Lt. wearing a "Hitler mustache" and black socks with an inscription of "Black Socks Matter," mocking the "Black Lives Matter" movement. (Id. at 8–9.)  McPherson claims he was not transferred to the 7C2 unit until shortly after he submitted his written complaint of race discrimination on June 10, 2020. (Id. at 9.)  And rather than switch employees between 7C2 and 7C1 at this point to ensure 7C1 was not shorthanded, Austin CID moved white employees from 7C2 to 7C3, maintaining 7C1 as a minority unit.  (Id.)

McPherson also claims that Koenig stripped him of his DPS vehicle, which he had been driving since 2012, with the stated reason that McPherson lives outside a 50-mile radius of Austin, so the use of the vehicle violated DPS policy. (Dkt. # 46 at 8.)  But McPherson asserts that other white employees live outside the 50-mile radius and were nonetheless permitted to maintain possession of their

DPS vehicles.  (Id.)  According to McPherson, this revocation of his vehicle caused him loss of pay through the loss of compensable travel time, increased fuel and wear and tear expenses on McPherson's private vehicle, and humiliation at being denied benefits his white co-workers and co-workers of color that had not complained of discrimination enjoyed. (Id. at 10.)

McPherson filed a charge of discrimination with the EEOC on July 11, 2020.  (Dkt. # 46-B.)   He received a Notice of Right to Sue from the EEOC on September 17, 2020.  (Id.)

II.     Sams' Background

Sams is African American man who has served as a commissioned officer with DPS for over twenty-six years.  (Dkt. # 46 at 11–12.)  Sams alleges that on or about October 2017, while working on DPS's Mounted Patrol Unit, he was falsely accused of making questionable leadership decisions by allegedly overworking the white officers within the unit.  (Id. at 12.)  Following this accusation, Sams was demoted.  (Id.)  Sams alleges he never received written or evidentiary justification for this decision, despite consistently seeking such justification from 2017 to 2020.  (Id.)

On or about September 2018, while Sams was developing the written manual for the Mounted Patrol Unit operational procedures, a white lieutenant accused him of attempting to turn the unit into a "Buffalo Soldiers Unit."  (Id.)

7

Sams alleges other prior acts of racial discrimination by DPS leadership, including a November 2017 comment,[3] a racist text message,[4] and twice selecting a less experienced and less qualified white employee for a Sergeant position over Sams.[5] (Id.)

Sams filed charges of discrimination with the EEOC on July 25, 2019, and January 4, 2020, and received a Notice of Right to Sue on September 17, 2020. (Dkt. # 46-A.)

III.    Martinez's Background

Martinez is a Hispanic man who has served as a commissioned officer with DPS for over fifteen years and as Lieutenant for the past six years.  (Dkt. # 46 at 15.)  Martinez started his career with DPS in its El Paso office, and later was

---

[3] Sams alleges Joe Ortiz, Commander of DPS region 7, told him, "can't you see what the perception is with all of these African Americans that are on the Mounted Unit."  (Dkt. # 46 at 13.)

[4] Sams alleges on or about July 2018, Jeremiah Richards, Captain of DPS region 7, took a photo of Sams while he was trimming a horse's hooves.  Richards texted the photo to his friend and read out his friend's response, stating while laughing, "I have never seen a black man doing that before." (Dkt. # 46 at 13.)

[5] Sams notes that he filed a complaint against Jeremiah Richards on or about October 2018.  (Dkt. # 46 at 13.)  On or about January 15, 2020, DPS sustained Sams' complaint of racial discrimination against Richards.  (Id.)  Sams alleges his later rejection from the Sergeant position was retaliation for that sustained complaint.  (Id.)  Sams filed another complaint against Richards after he was denied the position in October 2018.  (Id. at 13–14.)  DPS responded in March 2020, stating that its investigation failed to reveal misconduct by Richards.  (Id. at 14.)

transferred to Austin.  (Id.)  Martinez alleges he has physical and psychological disabilities, of which he alerted DPS in writing and orally.[6]  (Id. at 16.)

Before transferring to Austin, Martinez received a C1 disciplinary action allegedly for a circumstance that Martinez had complained of disparate treatment between him and a white Lieutenant by one of their supervisors.  (Id. at 15.)   Shortly after his transfer to the Austin office, Martinez asserts his direct supervisor, Capt. Koenig ("Koenig"), and others talked to him about McPherson's complaints in race discrimination and told Martinez to keep an eye on McPherson because he was merely being held accountable for his actions, not being discriminated against.  (Id.)  Martinez told Koenig he would not treat McPherson any differently from the other employees.  (Id.)

While working in DPS's Austin office, Martinez contends that he witnessed his white supervisor, Koenig, engaging in racially discriminatory

---

[6]  Martinez alleges his disabilities include an 80% disability impairment rating with physical limitations to his ankle, clavicle, hearing, and back, all of which affect his major life activities of ability to walk, sit, stand, sleep, driving for an extended period of time.  (Dkt. # 46 at 16.)  Martinez also has a 70% disability impairment rating for his psychological disability of PTSD, which affects his major life activities of reduced work reliability and productivity on occasion due to the following symptoms: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.  (Id.)

treatment of non-white employees.  (Id. at 17.)  Martinez claims Koenig denied him and other minority employees the same terms, privileges, conditions, and opportunities as similarly situated white employees.  (Id.)  Martinez asserts Koenig's discrimination in multiple forms, such as assigning minority employees heavier workloads and worse work conditions, shifts, and timing compared to what was assigned to white employees in other units.  (Id.)  Martinez submitted a complaint of discrimination to DPS on June 10, 2020, recounting these observations.  (Id. at 18.)

Martinez further alleges he was denied a disability accommodation request to transfer back to El Paso on December 18, 2020, and that he was denied promotions to the role of Captain on September 28, 2020, and November 15, 2021, due to his race, national origin, disabilities, and/or in retaliation for his protected activities.  (Id. at 22–25.)  Martinez filed a charge of discrimination with the EEOC on April 1, 2022, and received a Notice of Right to Sue on April 26, 2022.  (Dkt. # 46-C.)

IV.   Amended Claims

Martinez alleges eight counts in Plaintiffs' Second Amended Complaint, comprising five Title VII violations and three ADA violations.  (Dkt. # 46.)  Sams alleges the same five counts of Title VII violations as Martinez.  (Id.)  McPherson alleges only the first three counts of Title VII violations.

McPherson, Sams, and Martinez all assert claims of Title VII race or national origin discrimination, unlawful retaliation, and harassment leading to a hostile work environment.  (Dkt. # 46.)  Sams and Martinez bring additional Title VII claims for failure to promote.  (Id.)  Sams and Martinez also allege Title VII failure to promote due to retaliation.  (Id.)  Martinez alone brings claims under the ADA for disability discrimination for denial of accommodation, failure to promote due to retaliation, and retaliation resulting in a hostile work environment.  (Id.)

Defendants now move for summary judgment on all claims. (Dkt. # 57.)

## LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., LLC, 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for

trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Par. Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

<u>ANALYSIS</u>

Defendants move for summary judgment on all Plaintiffs' claims.

I.   Martinez's Claims Are Time-Barred, Even Considering the Continuing Violations Doctrine

The parties agree that Martinez filed his charge of discrimination on April 1, 2022, and is therefore limited to claims involving acts of discrimination after June 5, 2021.  (Dkts. ## 41 at 1-2; 39 at 43.)   As a result, Martinez may only

use his denied promotion on November 15, 2021, as the basis for his claims. For Martinez's hostile work environment claims, Martinez's allegations predating June 5, 2021 can be considered under the continuing violations doctrine.  (See Dkt. # 45.)

Under the continuing violations doctrine, "a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." Pegram v. Honeywell, Inc., 361 F.3d 272, 279 (5th Cir. 2004).  The Court cannot find that Martinez's allegations about his June 2020 complaint about Koenig's disparate treatment of assigning minority employees more onerous and time-intensive tasks are sufficiently related to his November 2021 denied promotion.  Martinez has not alleged that Koenig is the individual who denied his promotion or accommodation request.  He also has not shown that Koenig's disparaging treatment with respect to workloads and work conditions is the same type of harassment as he experienced with respect to his promotion or transfer requests.  The Court may consider only the November 2021 denied promotion as the basis of Martinez's claims. See Shaw v. Helix Energy Sol. Grp., Inc., 2019 WL 3557843, at *6 (finding there was no cohesion between untimely allegations of white co-workers' racist slurs and jokes and the timely allegations of failure to promote).

II.   <u>Title VII Violations</u>

Martinez alleges eight counts in Plaintiffs' Second Amended Complaint, five Title VII violations and three ADA violations.  (Dkt. # 46.)  Sams alleges the same five counts of Title VII violations as Martinez.  (<u>Id.</u>)  McPherson alleges only the first three counts of Title VII violations.  (<u>Id.</u>)  The Court addresses each count in turn.

A.   <u>Discrimination Based on Race and/or National Origin, Count 1:</u>
      <u>Martinez, Sams, and McPherson</u>

To establish a prima facie claim for race discrimination under Title VII, a plaintiff must show "that he (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." <u>Ernst v. Methodist Hosp. Sys.</u>, 1 F.4th 333, 339 (5th Cir. 2021) (quoting <u>Stroy v. Gibson ex rel. Dep't of Veteran Affs.</u>, 896 F.3d 693, 698 (5th Cir. 2018) (cleaned up).  If the plaintiff establishes a prima facie claim, the burden shifts to the employer to offer a nondiscriminatory reason for the adverse employment action.  <u>Id.</u> (citing <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 557 (5th Cir. 2007) (per curiam)).  If the employer provides a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the reason is pretext for a discriminatory purpose.  <u>Id.</u>

An adverse employment action is any action that "a reasonable employee would have found ... [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 657 (5th Cir. 2012) (quoting Aryain v. Wal–Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir.2008) (quotation marks and citation omitted)).

Plaintiffs allege they have suffered acts of racial and/or national origin discrimination by Defendant's management representatives, employees, or supervisors, which created a disparate, hostile, and abusive work environment. (Dkt. # 46 at ¶ 153 – 58). The only adverse employment action Plaintiffs plead here is the creation of a hostile work environment. (Id. at ¶ 156; 158) ("[The] discrimination created a… hostile, … work environment for Plaintiffs.") ("As a direct and proximate result of … [the] acts of the Defendant, … Plaintiffs have sustained violations of their rights to work in an environment free of unlawful racial and/or national origin discrimination.")

As a result, this claim is essentially identical to Plaintiffs' harassment and hostile work environment claim, Count 3. Indeed, Plaintiffs' plead discrimination as part of Count 3. (Dkt. # 46 at ¶ 171; 172) ("The racial harassment has included but is not limited to racially and/or national origin demeaning, derogatory, and *discriminatory comments* …") ("The unlawful racially

and/or national origin *discriminatory actions* of Defendant…") (emphasis added). The Court therefore finds it appropriate to assess the factual basis for this claim in Count 3, rather than address two substantively identical claims.

The Court grants summary judgment on Count 1 and assesses Plaintiffs' claims as incorporated into Count 3.

B. Retaliation, Count 2: Martinez, Sams, and McPherson

To state a claim for retaliation, a plaintiff must show that (1) he engaged in a statutorily protected conduct, (2) he suffered a materially adverse action, and (3) a causal connection exists between the protected activity and the adverse action. Jenkins v. City of San Antonio Fire Dep't, 784 F.3d 263, 269 (5th Cir. 2015) (citing Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir. 2008)). Once a plaintiff has made a prima facie case, the employer must provide some "legitimate nondiscriminatory reason" for the adverse action taken. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). If the employer provides a nondiscriminatory reason, the burden shifts back to the plaintiff to show a genuine issue of material fact that the employer's proffered nondiscriminatory reason is pretext for retaliation. See Alvarado v. Tex. Rangers, 492 F.3d 605, 611 (5th Cir. 2007).

1. Martinez Fails to Establish a Prima Facie Case for Retaliation

As discussed above, Martinez is time-barred from basing his retaliation claim on any act other than his denied promotion in November 2021. Thus, Martinez's assertion that he has been retaliated against for his "active and expressed opposition, both verbally and in writing, to Defendant's unlawful discriminatory employment practices" cannot be considered by this Court as the basis for his claim.  (Dkt. # 46 at 28 ¶ 163.)

Martinez cannot sustain a retaliation claim based on his denied promotion in November 2021.  Under the facts here, applying for a promotion would not be considered a protected activity under Title VII.  Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003) (quoting Green v. Administrators of the Tulane Educ. Fund, 284 F.3d 642, 657 (5th Cir. 2002)) ("Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII.")

Because Martinez has not demonstrated that he engaged in protected activity by applying for the Captain position, he has failed to establish a prima facie case for retaliation under Title VII.

The Court grants summary judgment as to Count 2 for Martinez.

### 2.  Sams Shows the Given Non-Discriminatory Reason for "Retaliation" is Pretext

In claiming retaliation, Sams shows that (1) he engaged in statutorily

protected conduct by filing a complaint against Captain Richards with the DPS

OIG for racial discrimination, (2) he suffered a materially adverse action when he

was denied a Sergeant position given to a less qualified applicant, first in 2018 and

again in 2019, and (3) he established a causal connection exists between his

complaint against Captain Richards and him being rejected for Sergeant both times

because Captain Richards was in charge of filling the position in both 2018 and

2019 and chose not to give it to Sams because Sams had filed a complaint against

him.  (Dkt. # 46 at 13.)  Sams therefore establishes a prima facie case of retaliation.

      Defendants provide a "legitimate nondiscriminatory reason" for

Captain Richards passing up Sams for promotion both in 2018 and 2019.  As for

the 2018 promotion, Defendants state that Sams was not chosen because the

candidate chosen had more leadership experience than Sams.  (Dkt. #  57 at 11.)

"Choosing some other candidate [for a promotion] because he is the best-qualified

individual for the job is generally a legitimate, nondiscriminatory reason for an

adverse employment action."  Patrick v. Ridge, 394 F.3d 311, 319 (5th Cir. 2004.)

Defendants then state that the vacancy was filled in 2019 through transfer by an

existing Sergeant, so there was never a promotion opportunity available that year.

(Id.)

      Sams does not establish that the failed 2019 promotion was pretext for

retaliation.  The DPS restricted applications for promotion in 2019 to transfers only.  While Sams complains that there was no legitimate work-related reason for that restriction,[7] his bald assertion that the person selected was less experienced and less qualified than Sams as they had no experience with horses or the Mounted Unit is not enough to show that Sams was clearly better qualified.  The 2019 promotion fails as a sufficient basis for Sams' Count 2 claim.

Sams does show that the reason given for his lack of promotion in 2018 is pretext for retaliation.  See Alvarado, 492 F.3d at 611.  Sams points to the evidence to show that there is a genuine issue of material fact as to why he was denied a promotion.  With respect especially to promotion decisions, the bar for proving pretext is high because "[u]nless the qualifications are so widely disparate that no reasonable employer would have made the same decision … differences in qualification are generally not probative evidence of discrimination."  Murchison v. Cleco Corp., 544 F.App'x. 556, 560 (5th Cir. 2013) (per curiam).  While this burden is high, Sams alleges, with respect to the 2018 promotion, that a "lesser experienced White male with less seniority and less qualifications was selected for that Sergeant position," and backs this claim up with evidence in the record.  (Dkt. # 59 at 9–10.)

---

[7] Additionally, courts "do not view the discrimination laws as vehicles for judicial-second guessing of business decisions."  Walton v. Bisco Industries, Inc., 119 F.3d 368, 372 (5th Cir. 1997.)  It is likely that limiting a promotion to transfers is a business decision that would be permitted.

According to Sams, Richards in his deposition could not cite any documentation on which he relied in support of his selection of Davenport over Sams other than what Davenport presented in an HR form.  (Id. at 9.)  Richards also admitted that Davenport was never a member of the Mounted Unit, and Sams argues Davenport did not have Sams' level skills in training and instruction of the horses or Mounted Troops as a result.  (Id. at 10.)  Sams also produces evidence that a Major stated in her interview with the OIG that Richards demonstrated inappropriate and wrongful behavior, which caused Sams not to be selected for the promotion.  (Id.)  Viewing the evidence in the light most favorable to Sams as the non-moving party, a jury could reasonably conclude that a reasonable person, in the exercise of impartial judgment, could not have chosen Davenport over Sams, given his lack of experience with the Mounted Unit.

The Court denies summary judgment as to Count 2 for Sams.

### 3.  McPherson Shows Retaliation

In claiming retaliation, McPherson shows that (1) he engaged in statutorily protected conduct by filing a complaint against Temple CID Command with the DPS OIG for racial discrimination and (2) he suffered a materially adverse action when he was denied a position on the 7C2 Unit, which was later given to a less qualified, white individual and when his state-issued vehicle revoked. McPherson also establishes (3) a causal connection exists between his complaint of

racial discrimination and him being placed on 7C1 and having his vehicle revoked

because Captain Koenig of Austin CID expressed disapproval of McPherson's

complaint and then placed McPherson on the racially segregated 71C unit and

revoked his vehicle.  (Dkt. # 46 at 6–10.)  While McPherson did not file a

complaint against Koenig, Koenig stated that he felt McPherson was "merely being

held accountable," for his actions, not being discriminated against.  (Id. at 6.)

McPherson illustrates that Koenig was aware of McPherson's complaint and

treated him with suspicion because of the complaint.  (Id.)  And McPherson alleges

that Koenig routinely treated McPherson in a "disparaging and less favorable

manner." (Id. at 7.)  The facts show that placing McPherson on the 7C1 unit was

part of Koenig punishing McPherson for both being black and reporting racial

discrimination.  McPherson further characterizes the revocation of his state-issued

vehicle as part of his punishment.  McPherson therefore establishes a prima facie

case of retaliation.

Defendants provide a "legitimate nondiscriminatory reason" both for

Captain Koenig placing McPherson on the 7C1 Unit and for the revocation of

McPherson's state-issued vehicle.  Defendants state the Units were never racially

segregated, as 7C1 had a white employee and 7C2 had a Hispanic employee at the

time McPherson alleged the units were segregated.  (Dkt. # 57 at 8–9.)  Koenig

allegedly placed McPherson on 7C1 because there was a vacancy in that unit at the

time and Koenig "wanted to make sure McPherson had proper CID investigation training." (Id. at 9.)  Defendants claim that Koenig prefers to start new employees on Unit 7C1, and a white employee was only started on 7C2 in the unique case where two new agents started at the same time.  (Id.)  Koenig thought it best to spread the training burden across the two units rather than have the members of 7C1 train two new agents at once.  (Id.)  Wanting to ensure a new employee has proper training is a legitimate, business reason for McPherson's placement on 7C1.

Defendants also explain that Koenig did not revoke McPherson's state-issued vehicle.  Rather, Koenig allowed McPherson to retain his state-issued vehicle and park it within a 50-mile radius of the station, as required by DPS policy.  (Id.)  It was then Regional Director Dwight Mathis who overruled this arrangement and forced McPherson to use his own vehicle.  (Id.)  Having McPherson comply with a department policy to use a state-issued vehicle is not inherently racially discriminatory.

McPherson establishes a genuine dispute of material fact as to whether the training reason for his placement on Unit 7C1 was a pretext for retaliation.  McPherson states that Koenig did not place him on 7C2 even when there was a vacancy.  (Dkt. # 46 at 7.)  McPherson says this stemmed from Koenig retaliating against him for filing a report of racial discrimination with the OIG.  (Id.)  McPherson supports this allegation by pointing out that Koenig started a

white employee directly in 7C2 several months after McPherson's assignment to

7C1, even when the white employee was "substantially less experience[d] and less

qualified" than McPherson for the position.  (Id.)  Rather than balancing any

training burden, McPherson alleges Koenig placed the white employee on 7C2

because there were intentionally no African American on the 7C2 unit at that time.

(Id.)  McPherson also alleges that Koenig's preference for placing black employees

on 7C1 continued, with Koenig placing two more black employees on 7C1 in later

months.  Of the five black agents in 7C1, at least two of them had also made

complaints of race discrimination.  (Id. at 8.)  McPherson also alleges Koenig did

not show a concern for leaving 7C1 shorthanded in June 2020, choosing to

maintain 7C1 as a minority-only unit rather than evening the workload between all

units.  (Id. at 9.)  Viewing the facts in the light most favorable to McPherson, the

Court finds there is a genuine question about whether Koenig acted based on his

training preferences or in retaliation.  See Alvarado, 492 F.3d at 611.

McPherson similarly overcomes the pretextual reason offered for the

revocation of his state-issued vehicle.  Contrary to Defendants' claim that

McPherson does not allege Mathis racially discriminated against him, McPherson

alleges that it was "Austin CID Command" that discriminated against him in

interpreting the vehicle policy.  (Dkt. # 46 at 9.)  Regional Director Mathis is

presumably included.  McPherson refutes that he was merely made to comply with

a department policy about his vehicle.  McPherson states that White co-workers who did not engaged in protected activities were allowed to operate their state-assigned vehicles "outside the minimum travel distance under the same or similar circumstances or were provided exceptions to the policy."  (Id. at 10–11.)  If true, and the Court views the facts in the light most favorable to the non-moving party, Austin CID Command's "enforcement" of the vehicle policy in a disparate manner for McPherson undermines the pretextual reason Defendants provide.

The Court denies Summary Judgment as to Count 2 for McPherson.

C. Harassment Based on National Origin and/or Race Resulting in a Hostile Work Environment, Count 3: Martinez, Sams, and McPherson

To establish a national origin-based claim for hostile work environment under Title VII, a plaintiff must show that: (1) he belongs to a protected group; (2) he experienced unwelcome harassment; (3) the harassment complained of was based on national origin or race; (4) the harassment complained of affected a term, condition or privilege of employment; and (5) the employer knew or should have known of this harassment and failed to take prompt remedial actions.  Hernandez v. Yellow Transp., 670 F.3d 644, 651 (5th Cir. 2012).  To affect a term, condition, or privilege of employment, the national origin or race-based harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

Williams v. E.I. du Pont de Nemours & Co., 154 F.Supp.3d 407, 421 (M.D. La. 2015) (quoting Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2022)).

1. Martinez Fails to Establish a Case for Racially Hostile Work Environment

As explained in this Court's Order on the Defendants' Partial Motion to Dismiss, the failure to promote Martinez in November 2021, taken alone, is insufficient to state a plausible claim for relief under the Title VII framework for a racially hostile work environment.  (Dkt. # 45 at 17.)  "[E]ven viewing the evidence in the light most favorable to Martinez, considering his June 2020 complaint, Koenig's behavior, and his transfer request as 'relevant background evidence,' the incident occurring within the actionable statutory period cannot plausibly be found to involve racial discrimination." Id. (quoting Ramsey, 286 F.3d at 270).  In the Plaintiffs' Amended Complaint, Martinez has pled no factual link between the decision by another DPS leader not to promote him and the alleged racially discriminatory treatment he and others experienced by Koenig.  Since Martinez is time-barred from alleging his June 2020 complaint as the basis for his claim, he fails to show, on the facts alleged, that an employer knew or should have known about the harassment by Koenig and failed to take remedial action.

For these reasons, the Court grants summary judgment as to Martinez's hostile work environment claim, Count 3.

2.  <u>Sams Establishes a Claim for Hostile Work Environment Based on Race</u>

In pleading a national origin-based claim for hostile work environment, Sams shows that: (1) he is a member of a protected group as an African American individual; (2) that he was subjected to unwelcome harassment at his job when his supervisors made racially offensive comments; (3) that the harassment complained of was based on race; and, (4) the harassment complained of affected a term, condition, or privilege of employment by creating an abusive work environment.  Sams also illustrates (5) the employer knew or should have known about this harassment and failed to take prompt remedial action.  The DPS OIG sustained Sams' racial discrimination complaint on January 15, 2020, and Major Katie Conley stated in her OIG interview that Captain Richards intentionally interfered with and obstructed Sams from being selected for a promotion in 2018. (Dkt. # 59 at 9–10.)  The Department then failed to take prompt remedial action. (<u>Id.</u>)

Defendants argue that Sams has shown no more than general criticism and joking text messages, and that "sporadic use of abusive language" or other unprofessional conduct fails to show a hostile working environment.  (Dkt. # 57 at 6; 16.)  Defendants also assert Sams can put forward no evidence that the allegedly harassing conduct was due to his race.  Sams demonstrates this is not the case.

Again, to affect a term, condition, or privilege of employment, the

national origin or race-based harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Williams</u>, 154 F.Supp.3d at 421 (quoting <u>Ramsey</u>, 286 F.3d at 268.)  Actively denying an individual a promotion alters the conditions of her employment.  Moreover, Major Chris Jones, during his deposition, testified that he felt that Sams' communication to him that the DPS environment was racially hostile was a fair description of the DPS environment.  (Dkt. # 59 at 9.)  Sams experienced not only failure to promote but allegedly false accusations that he abused horses and two investigations into his conduct based on un-substantiated accusations by white co-workers.  (Dkt. # 59 at 8.)  While Sams does not specifically link his criticism for allegedly abusing horses to his race, he does provide facts allowing the Court to see the picture that he was treated and criticized in a way that was different from his white peers.  Sams was being criticized and sent inappropriate, racial text messages exactly because of his race.  His work environment was so hostile that his co-workers did not need to say Sams was being targeted based on his race, it was simply understood.  Viewing the facts in the light most favorable to Sams as the non-movant, it appears that Sams' work environment was not merely uncivil but hostile and that this was based on his race differing from that of his white co-workers and supervisors.

Finally, it is not clear that Defendants took prompt remedial action for every instance of harassment.  Defendants state that Richards was disciplined for his racist text exchange and that Nieronow submitted an affidavit explaining the gorilla text message was unrelated to race.  (Dkt. # 57 at 11.)  That said, Defendants provide no evidence that any action was taken to investigate or otherwise address the rumors that Sams was abusing horses, and Defendants also did not act to address why Sams' white workers continued to submit complaints of discrimination against him after both complaints were unsubstantiated.  Finally, Defendants offer no evidence that Richards was disciplined after inappropriately discussing Sams' disciplinary history and using unacceptable scoring methods "which has no place in law enforcement scoring" when evaluating Sams' 2018 application for promotion.  (Dkt. # 59 at 10.)

The Court also notes that Sams leaving the Mounted Patrol Unit for the Capitol security detail and not claiming that he is being discriminated against or retaliated against in that new position is irrelevant to the evaluation of hostile work environment experienced by Sams in the Mounted Patrol.  (Dkt. # 57 at 12.) Sams being promoted to Senior Corporal in March 2021 in this new division also supports Sams' assertion that he was not promoted in the Mounted Patrol for discriminatory reasons, not his personal qualifications, contrary to Defendants' assumption that this shows a lack of previous discrimination.  (Id.)

28

The Court denies summary judgment as to Count 3 for Sams.

### 3. McPherson Establishes a Claim for Hostile Work Environment Based on Race

In pleading a national origin-based claim for hostile work environment, McPherson shows that: (1) he is a member of a protected group as an African American individual; (2) that he was subjected to unwelcome harassment at his job when his co-workers made racially offensive comments and when his employers treated him worse than similarly-situated white employees; (3) that the harassment complained of was based on race; and, (4) the harassment complained of affected a term, condition, or privilege of employment by creating an abusive work environment. McPherson also establishes (5) that his employer knew or should have known about the harassment and failed to take prompt remedial action. Captain Koenig knew about McPhersons' complaint to the OIG before he even started in Austin. (Dkt. # 46 at 6.) Koenig then cautioned other supervisors to "beware" of McPherson because of his complaints of race discrimination. (Id.) During the many years of alleged discrimination that followed, McPherson alleges no remedial actions were taken.

As with Sams, Defendants argue that McPherson has shown no more than a text message, which was not sent to him, to prove a hostile work environment, and that "sporadic use of abusive language" or other unprofessional conduct fails to show a hostile working environment. (Dkt. # 57 at 16.)

29

Defendants further assert that the sender of the offensive text message was promptly disciplined, showing prompt remedial action of any harassment.  (Id.)  A single text message and sporadic use of abusive language are not all McPherson alleges.

First, McPherson alleges that he was denied use of a state-wide vehicle due to a policy that was not enforced on similarly situated White employees.  (Dkt. # 46 at 8–10.)  This disparate treatment resulted in "loss of pay thought the loss of compensable travel time, increased fuel expenses and wear and tear on [McPherson's] private vehicle instead of the state assigned vehicle, and humiliation at being denied benefits that the White employees and employees that had not complained of discrimination had not experienced."  (Id. at 10.)  Defendants address this by saying the revocation of McPherson's vehicle was at the direction of Mathis, who is black and against whom McPherson does not explicitly bring a claim of racial discrimination.  (Dkt. # 57 at 9.)  This does not respond to McPherson's claims that he was disparately treated compared to White employees.  And it certainly does not demonstrate any remedial action.

McPherson also establishes a hostile working environment related to his placement on the 7C1 Unit.  As discussed above, McPherson alleges Koenig relegated minorities to Unit 7C1, placing white employees on 7C2 and 7C3.  Koenig then gave Unit 7C1 "more difficult and onerous tasks, work, and

assignments" and gave these employees less time off than afforded to agents on units 7C2 and 7C3.  (Dkt. # 46 at 8.)  McPherson also alleges he was not the only individual who complained about the disparate treatment of the "minority" 7C1 unit.  (Id.)  At least three other members of the unit complained about racial discrimination.  (Id.)  McPherson further alleges DPS did not even investigate these complaints until two years later.  (Id.)  Defendants also simply claim no racial discrimination took place with respect to the units.  (Dkt. # 57 at 16.) Rather, Defendants say the work schedule was made with the input of three supervisors and "approved by Captain Koenig," who "denies that the assigned workload was unequal."  (Id. at 18.)  Koenig is the same supervisor McPherson has consistently alleged acted discriminatorily against him and other minorities, even being the person McPherson alleges kept the 7C1 unit racially segregated.  (Dkt. # 46 at 8–11.)  That Koenig says the workload was not unequal between units only adds to the genuine dispute of material fact as to whether discrimination occurred. Taking the facts in the light most favorable to the non-moving party, McPherson experienced a hostile work environment due to his race, and Defendants knew about the discrimination and failed to take remedial action.

The Court denies summary judgment as to Count 3 for McPherson.

D. <u>Failure to Promote due to Discrimination Based on Race and/or National Origin, Count 4: Martinez and Sams</u>

Title VII prohibits an employer from failing to promote an employee

on the basis of his race.  See 42 U.S.C. § 2000e-2(a)(1).  To challenge a failure to promote, a plaintiff must establish a prima facie case of discrimination, demonstrating that (1) he was not promoted, (2) he was qualified for the position he sought, (3) he fell within a protected class at the time of the failure to promote, and (4) the defendant either gave the promotion to someone outside the protected class or otherwise failed to promote the plaintiff because of his race.  Id. (citing Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002)).

If the plaintiff can make out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action taken against the plaintiff.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993).  The defendant's burden is one of production, not proof, and involves no credibility assessments.  See, e.g., West v. Nabors Drilling USA, Inc., 330 F.3d 379, 385 (5th Cir. 2003).  This "burden requires the production of admissible evidence in support of its nondiscriminatory reasons."  Hervey v. Miss. Dep't of Educ., 404 F. App'x 865, 868 (5th Cir. 2010) (per curiam).

Last, the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination.  Reed v. Neopost USA, Inc., 701 F.3d 434, 439 (5th Cir. 2012).  The plaintiff must "prove either that [the defendant's] articulated reason is merely pretext for race discrimination (the pretext alternative), or that [the defendant's] reason, while true, is only one of the reasons for its

decision, and another 'motivating factor' is [the plaintiff's] protected characteristic (the mixed-motives alternative)." <u>Autry</u>, 704 F.3d at 347.

       1.    <u>Martinez Fails to Show He Was Not Promoted Due to His Race</u>

Martinez makes a prima facie case for failure to promote due to racial discrimination.  That said, Defendants offer a legitimate reason for failing to promote Martinez in November 2021, stating that Nava, the individual promoted instead of Martinez, was ranked higher than Martinez and displayed more leadership growth in his interview.  (Dkt. # 57 at 14.)  "Choosing some other candidate [for a promotion] because he is the best-qualified individual for the job is generally a legitimate, nondiscriminatory reason for an adverse employment action." <u>Patrick</u>, 394 F.3d at 319.

Martinez then fails to overcome Defendants' proffered, legitimate reason for not promoting him.  Martinez has pled no factual link between the decision by another DPS leader not to promote him and the alleged racially discriminatory treatment he and others experienced by Koenig.  (<u>See</u> Dkt. # 46.)

For these reasons, the Court grants Summary Judgment as to Count 4 for Martinez.

       2.    <u>Sams Shows He Was Not Promoted Due to His Race</u>

As discussed above with respect to Count 2, Sams has sufficiently

established that he was not promoted in 2018 by the promotion board headed by Captain Richards.  Sams was (1) not promoted, (2) he points to evidence of his time in the Mounted Patrol and his qualifications for the position he sought, (3) he fell within a protected class at the time of the failure to promote, and (4) Richards gave the promotion to someone outside the protected class, the white applicant Davenport.

Defendants articulate a legitimate, nondiscriminatory reason for the employment action taken against Sams, stating that Sams had less leadership experience than Davenport and that Sams had been demoted due to previous leadership and communication issues.  (Dkt. # 60 at 4.)

Sams meets his burden of showing intentional discrimination.  As discussed in Count 2, Sams establishes that Richards acted to inappropriately block his promotion in 2018.  First, Sams produces evidence that raises a genuine question of whether Davenport was more qualified.  Davenport had not been a part of the Mounted Patrol.  Sams, meanwhile, had extensive experience in the division, including in leadership positions and with horses.  (Dkt. # 59 at 9–10.)  Ultimately, a white man with less experience was promoted instead of Sams, a black man.  Second, Captain Richards inappropriately discussed Sams' disciplinary history with the board when deciding on the promotion.  (Id. at 10.)  And even if Sams' disciplinary history were a valid reason for the decision to not promote Sams,

another motivating factor for Richards trying his best to prevent Sams being promoted was Sams' race, especially given Richards' other racially harassing conduct to Sams, including the racist text message exchange in 2017, for which Richards was disciplined.  (Dkt. # 57 at 11.)   Viewing the evidence in the light most favorable to Sams as the non-moving party, a jury could reasonably conclude that Sams' failed promotion was due to intentional discrimination, and the business reasons given were simply pretextual.

The Court denies summary judgment as to Count 4 for Sams.

A. <u>Failure to Promote due to Retaliation, Count 5: Martinez and Sams</u>

Again, Martinez is time-barred from basing his retaliation claim on any act other than his denied promotion in November 2021.  Thus, for the reasons explained above in the Court's analysis of Martinez's Count 2, Martinez cannot sustain a retaliation claim based on his denied promotion in November 2021.  The Court grants summary judgment as to Count 5 for Martinez.

As the alleged adverse employment action in Sams' Count 2 Retaliation claim is an alleged failure to promote, the Court does not repeat the analysis of this claim here.  For the reasons explained above, Sams has sufficiently shown that his failure to be promoted is reasonably linked to his protected actions of filing discrimination complaints against his supervisor, Captain Richards, who

subsequently intentionally blocked Sams' promotion.  The Court denies summary judgment as to Sams' Count 5 claim.

III.   ADA Violations

Martinez pleads three violations of the ADA in Plaintiffs' Second Amended Complaint.  (Dkt. # 46.)   These are counts 6, 7, and 8 in the Complaint.  (Id.)  The Court addresses each in turn.

B.  Denial of Reasonable Accommodation, Count 6

To prevail on a disability discrimination claim for denial of accommodation under the ADA, a plaintiff must show that (1) he is a "qualified individual with a disability;" (2) the disability and its consequential limitations were "known" by the employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations.  Amedee v. Shell Chem., LP, 953 F.3d 831 (5th Cir. 2020) (quoting Feist v. La., Dep't of Justice, Office of Attorney Gen., 730 F.3d 450, 452 (5th Cir. 2013)).  "[U]nder the ADA, a 'qualified individual' is a person with a 'physical or mental impairment that substantially limits one or more major life activities,' a record of such an impairment, or being regarded as having such an impairment."  Valenzuela v. Univ. of Tex. at Austin, 2022 WL 958386, at *5 (W.D. Tex. 2022) (citing 42 U.S.C. § 12102(1)).

Martinez has sufficiently established that his disability qualified for accommodation under the ADA in the Amended Complaint.  (Dkt. # 46 at 16.)

Martinez gives the facts below to support that his disability qualified for an

accommodation under the ADA:

> Martinez has physical and psychological disabilities] includ[ing] an
> 80% disability impairment rating with physical limitations to [his]
> ankle, clavicle, hearing and back; all of which affect [his] major life
> activities of ability to walk, sit, stand, sleep, [and] driving for an
> extended period of time.  [Martinez] also has a 70% disability
> impairment rating for his psychological disability of PTSD which
> affects []his] major life activities of reduced work reliability and
> productivity on occasion due to the following symptoms: flattened
> affect; circumstantial, circumlocutory, or stereotyped speech; panic
> attacks more than once a week; difficulty in understanding complex
> commands; impairment of short – and long-term memory (e.g.
> retention of only highly learned material, forgetting to complete
> tasks); impaired judgment; impaired abstract thinking; disturbances of
> motivation and mood; difficulty in establishing and maintaining
> effective work and social relationships.

(Dkt. # 46 at 16 n.3.)  Identifying a major life activity that is substantially limited

by an impairment is sufficient to plausibly allege a plaintiff is a qualified individual

under the ADA.  See Lowe v. American Eurocopter, LLC, 2010 WL 5232523, at *8

(N.D. Miss. 2010) (analyzing whether a plaintiff had plausibly alleged she

qualified as "disabled" within the meaning of the ADA to overcome a motion to

dismiss).

Martinez has also alleged his employer knew about his disabilities and

limitations.  Martinez stated he informed members of his chain of command in

writing about his psychical and psychological disabilities and verbally informed

his Captain and Major about his limitations no later than November 2019.  (Dkt. # 46 at 16.)

Martinez also shows a genuine dispute over whether his employer failed to make "reasonable accommodations" for his known limitations.  Martinez argues that he requested a hardship transfer that was denied.  (Id. at 23.)  Martinez argues this transfer was an accommodation for his PTSD.  (Id.)  Martinez's superiors denied this hardship request without explaining why Martinez did not qualify even when his request to transfer was supported by documentation of Martinez's disabilities.  (Id. at 22–23.)

It is not out of the realm of possibilities that a transfer to a different location could be a reasonable accommodation for Martinez's PTSD.  See Gazvoda v. Sec'y of Homeland Sec., 258 F. Supp. 3d 799, 816 (E.D. Mich. 2017) ("Given this medical record, there is a genuine issue of fact regarding whether Gazvoda's requested accommodation was necessary. Several physicians, before and after Gazvoda requested the accommodation, opined that a transfer to the northern border was necessary (or at least likely to assist in recovery).")  Defendants do not address PTSD as the basis for Martinez's transfer request.  (Dkt. # 57 at 14 (explaining Martinez said the relocation was mainly to be closer to relatives and he also mentioned back issues.))  Defendants fail to consider that being closer to relatives and away from a stressful workplace, even if the discrimination against

38

Martinez were only perceived, could help alleviate symptoms of PTSD.  See Gazvoda, 258 F. Supp. 3d at 815 (detailing that a doctor "recommended that Gazvoda 'be stationed where there are less environmental triggers and more familiarity, near his treating VA office and family support system'" to accommodate Gazvoda's PTSD).  Viewing the facts in the light most favorable to Martinez, it is possible that the hardship request was a reasonable accommodation for his PTSD disability, and his employer failed to even engage in discussion of this accommodation.

Accordingly, the Court denies Defendants' motion for summary judgment on Count 6, Martinez's claim for disability discrimination for failure to accommodate under the ADA.

C.  Failure to Promote due to Retaliation, Count 7

To pursue an ADA retaliation claim, a plaintiff only needs to show a "reasonable, good faith belief" that the ADA has been violated, not that "she suffers from an actual disability." Tabatchnik v. Cont'l Airlines, 262 F. App'x 674 (5th Cir. 2008) (quoting Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001)).  "By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA." Krouse v. Am. Sterilizer, 126 F.3d 494, 502 (3rd Cir. 1997) (quoting 42 U.S.C. § 12203(a)).

To demonstrate unlawful retaliation, a plaintiff must make a prima facie case of (1) engagement in an activity protected by the ADA; (2) an adverse employment action; and (3) a causal connection between the protected act and the adverse action.  Tabatchnik, 262 F. App'x at 676.  As discussed above, Martinez is time-barred from basing his retaliation claim on any act other than his denied promotion in November 2021.  Thus, Martinez's assertion that he engaged in protected activities by opposing the unlawful discriminatory conduct of Defendant and requesting reasonable accommodations for his disabilities cannot be considered by this Court as the basis for his claim.  (Dkt. # 46 at 22 – 24.)

Martinez cannot sustain an ADA retaliation claim based on his denied promotion in November 2021.  Under these facts, applying for a promotion would not be considered a protected activity under the ADA.  St. John v. Sirius Sol., LLLP, 299 F. App'x 308 (5th Cir. 2008) ("To engage in protected activity [means] 'oppos[ing] any act or practice made unlawful by [the ADA].'"); see also Gray v. WinCo Foods, LLC, 2022 WL 2899277, at *12 (reciting the same).

Because Martinez has not demonstrated that he engaged in protected activity by applying for the Captain position, the Court grants Defendants' Motion for Summary Judgment as to Count 7, Martinez's ADA failure to promote claim.

### D. Retaliation Resulting in a Hostile Work Environment, Count 8

Again, to establish unlawful retaliation, a plaintiff must make a prima

facie case of (1) engagement in an activity protected by the ADA.  Tabatchnik, 262

F. App'x at 676.  Martinez is time-barred from basing his retaliation claim on any

act other than his denied promotion in November 2021.  As this denied promotion

is not a protected activity under the ADA here, Martinez has failed to establish a

prima facie case of unlawful retaliation.  The Court therefore grants Defendants'

Motion for Summary Judgment as to Count 8, Martinez's ADA retaliation resulting

in a hostile work environment claim.

CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and

**DENIES IN PART** Defendants' Motion for Summary Judgment.  (Dkt. # 57.)

Plaintiff Martinez's Count 6 survives.  Plaintiff Sams' Counts 2, 3, 4, and 5

survive.  Plaintiff McPherson's Counts 2 and 3 survive.  The Court **GRANTS**

Summary Judgment as to all other counts.

**IT IS SO ORDERED.**

**Signed:** February 29, 2024.

_____

David Alan Ezra
Senior United States District Judge